G9L8HIR1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 Cr. 643 (PKC)

5    GARY HIRST,

6              Defendant.

7    ------------------------------x
                                        September 21, 2016
8                                       10:00 a.m.

9    Before:
                    HON. P. KEVIN CASTEL

10
                                        District Judge
11                                        and a Jury

12
                         APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   BY:  BRIAN R. BLAIS
          AIMEE HECTOR
16        REBECCA G. MERMELSTEIN
          Assistant United States Attorneys
17
     SHER TREMONTE LLP
18        Attorneys for Defendant
     BY:  MICHAEL TREMONTE
19        JUSTINE A. HARRIS
          NOAM KORATI BIALE
20

21   ALSO PRESENT:
          SPECIAL AGENT SHANNON BIENIEK, FBI
22        ELLIE SHEINWALD, Paralegal
          GARY SMITH, Paralegal
23        RYAN POLLOCK, Paralegal

24

25

G9L8HIR1

                    (Trial resumed; jury not present)

1                   THE COURT:  Prior to the trial of this case, I set a

2       schedule for the government to submit requests to charge and a

3       schedule for the defendant to respond.

4                   Last Thursday I delivered to counsel what has been

5       marked as Court Exhibit 2, and I directed that any objections

6       or further requests be transmitted to chambers by Monday

7       morning.

8                   I received letters from both sides, but when I look at

9       the letters submitted by the defendant, it indicates that the

10      defendant wants to submit a theory of the case charge, but

11      hasn't submitted it.

12                  The Court will always take last-minute amendments to

13      the proposed instructions based on new developments in a case,

14      that's an appropriate thing for a trial judge to do, but it is

15      also reasonable for the Court to set a date for which

16      instructions are to be submitted.

17                  The mischief in this is that the defendant can come in

18      with a theory-of-the-case instruction, which then requires

19      extensive briefing and delay on whether or not it is a valid

20      defense and whether it's supported by the evidence.  So I am

21      setting a final deadline that if the theory of the case

22      instruction is not in my hands by 2 p.m. today, it will not be

23      given.

24                  Now, likewise, if the defense has problems with the

G9L8HIR1

language on the conscious avoidance charge -- I understand the

defense position is they don't want a conscious avoidance

charge, I gather.  But you have alternate language to propose,

there is something wrong with the language that the Court has

put out in the draft jury instructions, the time for you to

have submitted the counter language has passed.  If you don't

do it by 2:00, it's gone.

Now, when I say do it by 2:00 or it's gone, waived,

forfeited, that does not account for some development that

should happen in this trial subsequently.  As I said, I will

always keep an open mind up to the moment that I deliver the

instructions to take account of new developments.

I have the same problem with the government.  The

government says, Well, we don't think there should be a statute

of limitations charge, but if there is one, we have one that we

like better.

If the government wants me to consider a statute of

limitations charge, 2:00 today or it's waived.

MR. BLAIS:  I don't believe we submitted anything

regarding a statute of limitations.

THE COURT:  That's what I am saying.  The defendant

did.  The government said, as I understand it -- and please

correct me, because I have a lot of paper and I may have

misapprehended your position.  I thought your position was, no

statute of limitations instruction is appropriate, but if one

G9L8HIR1

1      is appropriate, we would like to submit it to you.

2                  MR. BLAIS:  No.  Just to be clear, we submitted our

3      response to the jury charge I think first, not that that

4      mattered.  Defense submitted theirs that included a statute of

5      limitations instruction.  We have not responded in one way or

6      another regarding that.

7                  THE COURT:  What is your response on the statute of

8      limitations charge?

9                  2:00 today I expect a response.

10                 MR. BLAIS:  Understood.

11                 THE COURT:  Now, the Court received a file that

12     originated with the law firm that Mr. Shant Chalian is

13     associated with, and it is in a format which we were not able

14     to open.

15                 That's where we are.  So it turned out to be useless.

16                 I am going to ask my law clerk:  What is the format?

17                 LAW CLERK:  It's just a problem opening on the

18     browser.

19                 THE COURT:  What kind of a file is it?

20                 LAW CLERK:  It's just a downloadable file.  There is a

21     link that we can't open on the courthouse Web browser.

22                 THE COURT:  OK.  You will be in touch with the IT

23     people?

24                 LAW CLERK:  I spoke with IT this morning.  No luck.

25                 THE COURT:  OK.

G9L8HIR1

1          Yes.

2          MS. HECTOR:  On that point, when we received that

3     information from your law clerk last night, we reached out to

4     Hodgson Russ and asked that they download the material to a CD

5     that we can pick up in their New York office.  They have done

6     that and they said it was going to be ready at 9:45.  We have a

7     paralegal waiting at their office to try to get that and bring

8     it here.

9          THE COURT:  Thank you.

10          Now, what I don't understand is why does the

11     government need Shant Chalian with regard to the document

12     search?  Are you proposing to have Shant Chalian testify as to

13     the document search?

14          MS. HECTOR:  No, your Honor.

15          THE COURT:  Who is supposed to be doing that?  Anyone?

16          MS. HECTOR:  We don't propose any testimony with

17     respect to the document search.  So Mr. Chalian will testify, I

18     didn't make this calculation, and I have never seen it before

19     preparing to testify.  The search that was done was to respond

20     to the defense argument that there may have been materials

21     withheld, on basis of privilege, that would prevent their

22     ability to cross-examine Mr. Chalian.

23          So we had the search done to apprise the Court that no

24     such materials about that calculation exists in the electronic

25     files of Hodgson Russ.  So there are no materials from which to

G9L8HIR1

1    cross-examine Mr. Chalian on that basis. So that was the point

2    of the search that was done.

3              THE COURT: All right. When that CD-ROM arrives, I am

4    going to ask you to hand it up to my deputy clerk so I can do

5    what I need to do.

6              MS. HECTOR:  We will. Thank you.

7              THE COURT: Are our jurors here?

8              THE DEPUTY CLERK: Not yet.

9              THE COURT: Let's talk a moment about Tracey Hirst.

10             Have the parties arrived at any agreement on the scope

11   of her testimony?

12             MS. MERMELSTEIN: No, your Honor.

13             THE COURT: So what is the medical condition that you

14   want her to testify to?

15             MR. TREMONTE: We don't plan to elicit evidence as to

16   the details of her medical condition. We plan to elicit from

17   Ms. Hirst that she was on vacation with her family at a

18   particular point in time, this is in late May, early June of

19   2010. The circumstances of the vacation were that she was

20   scheduled to have major surgery, that's why the family went on

21   the vacation. Nothing beyond that. Then we plan to elicit

22   from her that there came a time in early 2011 when her father

23   stopped working. Why was that? Because he was taking care of

24   me after surgery. That's it. Nothing on her medical

25   condition.

G9L8HIR1

1            THE COURT:  Well, with all due respect, I think that's

2      quite a lot about her medical condition.  In other words, you

3      want to get before the jury that it's major surgery, period.

4      Why isn't that problematic?  And that she required care after

5      the surgery.  And her loving father was the person who provided

6      the care.  Why isn't that an appeal for sympathy before the

7      jury, an improper appeal for sympathy before the jury, that her

8      father is such a swell guy that he gave up his time to look

9      after her medical needs?

10           MR. TREMONTE:  Your Honor, we don't have to say it's

11     major surgery, but we would like to elicit that he stopped

12     working to take care of her in light of her medical needs.  We

13     don't think it is an improper bid for sympathy because it goes

14     to Mr. Hirst's state of mind.  The timing of his leaving

15     Gerova --

16           THE COURT:  How does it go to his state of mind?

17           MR. TREMONTE:  Because he is preoccupied with his

18     daughter's care.

19           THE COURT:  Let me hear from the government.

20           MS. MERMELSTEIN:  Your Honor, as we have said in our

21     letter, I think it is an improper plea for sympathy.  I think

22     your Honor has the right of it.  The idea that the purpose of

23     the family vacation is necessary to her testimony I think is

24     just not plausible.  There is no reason she can't testify that

25     they went on vacation and Mr. Hirst was not at work on those

G9L8HIR1

days, to the extent that's relevant.  Or to the extent that she
is going to testify that Mr. Galanis sort of showed up with
documents on the vacation, we have no objection to that
testimony.  But the reason for the vacation seems wholly
irrelevant to me and an attempt at a plea for sympathy.

        I similarly think that if she has personal knowledge
that her father stopped working at Gerova in 2011, which to be
clear is really largely after all of the relevant conduct in
this case, but she can testify that he stopped working there.
I don't think the "why" adds enough to it to overcome the
prejudice of the sort of plea for sympathy that, as your Honor
has said, the loving father stopped working to take care of the
daughter that needs full-time care.

        THE COURT:  I conclude that any probative value in the
reason why the family took the vacation, or in the reason why
Mr. Hirst stopped work at Gerova, is substantially outweighed
by the danger of unfair prejudice, jury confusion, and jury
sympathy, and it is foreclosed.

        I will, if the defense wishes me to, say as follows,
along these lines:  Ladies and gentlemen, I have precluded
testimony as to the reason for the vacation, or the reason that
Mr. Hirst stopped work, because they are not relevant to this
case.  Ladies and gentlemen, you are not to speculate on those
subjects.

        If you would like me to give that instruction, I will

G9L8HIR1

1    give it.  If you don't want me to give that instruction, I

2    won't.

3            MR. TREMONTE:  Your Honor, I don't think we need the

4    instruction.  I think we can just elicit testimony with care to

5    avoid this prohibitive area.

6            THE COURT:  All right.  I know, Mr. Tremonte, that you

7    and your colleagues will pay close personal attention to

8    instructing the witness so there is not a mishap on that.

9            MR. TREMONTE:  Yes, your Honor.

10           THE COURT:  With regard to the motion to strike the

11   testimony of Hamels on the basis, as I understand it, that the

12   defendant believes that he testified to participation in a

13   separate and different conspiracy -- is that your position, Ms.

14   Harris?

15           MS. HARRIS:  It is, your Honor.

16           THE COURT:  Let me hear from the government on that.

17           MR. BLAIS:  Your Honor, I think, as alleged in the

18   indictment, I think they are all part of the same conspiracy,

19   and I certainly think that it was reasonably foreseeable at the

20   time that the Shahini shares were issued, at a time when they

21   were more than half of the public float of Gerova, that the

22   only realistic way to dispose of those shares was through some

23   form of market manipulation.

24           Mr. Hamels has testified that is in fact what

25   happened, that there was a matched trading scheme through which

G9L8HIR1

1   a significant portion of the Shahini shares were disposed of.

2   And I think it's entirely reasonably foreseeable to a member of

3   the conspiracy, particularly a member who we allege issued the

4   shares in question, I think it's entirely reasonably

5   foreseeable that those shares would be disposed of in an

6   improper fashion, and we don't believe the testimony should be

7   stricken.

8              THE COURT:  Thank you.

9              Ms. Harris.

10             MS. HARRIS:  I understand -- and this repeats some of

11  our in limine issues -- that is what the government alleges.

12  But at this point in trial, I think the standard, and what we

13  expect, is a little bit more, which is real evidence, hard

14  evidence of the connection, and I think the standard in the law

15  is mutual assistance and relationship between -- and it's all

16  alleged as one conspiracy between what the government would

17  characterize as different stages of the same conspiracy.

18             Here, there is a number of -- the government's own

19  witness has testified that Reg S shares can be held by a

20  foreign national in U.S. brokerage accounts.  We have

21  contradictory or seemingly confusing testimony from the Roth

22  Capital and the CK Cooper witness about -- it seems like the CK

23  Cooper witness is testifying that they could be sold, and they

24  were sold, to deal with margin issues that they were having in

25  the CK Cooper account, without any market manipulation.  So

G9L8HIR1

1       it's not reasonably foreseeable.

2              You heard Mr. Hamels testify that his willingness to

3       engage in the market manipulation scheme with Jason Galanis and

4       others arose from a very particular and acute set of

5       circumstances unique to him, that I don't think were reasonably

6       foreseeable that those opportunities, and the willingness of a

7       broker to be bribed, to then engage in timed matched trading,

8       at the direction of other members of the Galanis family, that

9       there has been any predicate set to connect or to make those

10      acts reasonably foreseeable to the signing of a warrant

11      agreement and a letter to Continental to actually just issue

12      the shares.

13             There are a lot of shareholders at this time, as you

14      heard from the government witnesses.  There are a lot of

15      transactions going on.  People were getting share issuances in

16      large numbers, some small numbers.  Mr. Hirst had shares.

17      Everyone was hoping these shares could be registered and

18      eventually there would a market for these shares.

19             So the notion that this is all just a fortiori, was

20      obviously plain at the moment of the alleged conduct that Mr.

21      Hirst engaged in, that they are connected, I think is not

22      supported by the evidence to date.  And, obviously, whenever

23      the Court considers statements in furtherance of the

24      conspiracy, we are looking for predicates and the factual

25      foundation in the evidence presented, and obviously there is a

G9L8HIR1

1    little bit more to the government's case, but as of this

2    moment, we don't think that they sustained the one conspiracy,

3    the one conspiracy that's been alleged, that the evidence is

4    simply not there.

5            THE COURT:  Thank you.

6            I am denying the motion to strike Hamels' testimony.

7    The government has come forward with credible evidence of a

8    single overarching conspiracy as alleged in the grand jury's

9    indictment.  So the testimony will stand.

10           With regard to Ms. Akdeniz, as I instructed -- I

11   didn't instruct the jury, but as I instructed or questioned the

12   witness, she is not a lawyer.  She testified as to her

13   professional experience as a person who received opinions of

14   counsel seeking to remove a restricted legend, and she spoke

15   about the practices of Roth and her own personal experiences.

16   And that testimony stands, and I don't really see the basis for

17   the argument there.

18           Similarly, with regard to the FBI practices, it's up

19   to the jury to decide what weight, if any, to give to the

20   testimony.  It's not after a witness testifies.  If the Court

21   gives a mini summation for the government or a mini summation

22   for the defense on what to do with the testimony, my

23   instructions at the conclusion of the case will make it clear

24   that they should examine the testimony of all witnesses and

25   give it such weight as it deserves.  The witness was clear that

G9L8HIR1

1   he was testifying about the practices of his employer.  That's

2   what he testified to.  And he explained the basis for those

3   practices.  And the jury can draw reasonable inferences from

4   the testimony.

5        So we were talking yesterday afternoon about Cayman

6   Islands law and what the Court would instruct in terms of a

7   fulsome statement.  Maybe what I should do is have this person

8   come in.  Are they available this afternoon at 5:00?

9        MS. HARRIS:  Your Honor, may we confer for a moment?

10       THE COURT:  Yes.

11       (Pause)

12       MR. TREMONTE:  We have a proposal.  I think what is

13   likely to happen today, based on our conversations with the

14   government, is that the government will rest at some point,

15   either before or shortly after lunch is fair, and then we will

16   begin putting on witnesses.

17       What we propose to do, as a practical matter, is to

18   put on our proposed Cayman Islands witness, as the government

19   did Professor Laby, as a summary witness, as a fact witness.

20   That is how we plan to proceed.  However, we will confer over

21   the lunch break.  If over the lunch break we determine that it

22   really is something that we need to have the expert testimony

23   on the legal point, we will make the witness available for the

24   Court to question after the break.  And that way we make sure

25   that the flow of the presentation of the evidence is

G9L8HIR1

1        appropriate.

2                    THE COURT:  Thank you.

3                    The word is that one of the jurors -- there are two

4        jurors not present I gather.  One is about a block away.  The

5        other is incommunicado, doesn't carry his cell phone, I

6        believe, but there were reports of transit delays this morning.

7        So I think it's worth our while to wait on it.

8                    MS. HARRIS:  Your Honor, may we just recess to the

9        back of the courtroom?

10                   THE COURT:  Yes.

11                   (Pause)

12                   THE COURT:  We are still waiting on the juror, but it

13       would be helpful to hear from the government what it's proposed

14       examination of Mr. Chalian would be.  I would like to hear with

15       some precision because there is a question about the scope of

16       the cross and fair impeachment.

17                   MR. BLAIS:  That's perfectly fine, your Honor, and I

18       am happy to walk through the very specific questions that I

19       will ask.

20                   I have, call it five or six background questions to

21       establish that during 2010 he worked at Hodgson Russ, he was a

22       partner at the time, one of his clients was Gerova, and he was

23       not the lead lawyer on the Gerova relationship.  In fact, it

24       was Steve Weiss.  So just establishing who he was.

25                   From there, I think I have four questions:

G9L8HIR1

1           I am showing you Government Exhibit 601, which is

2    already in evidence, which is the calculation document.

3           Mr. Chalian, did you prepare this document?

4           Did you do the calculations reflected in this

5    document?

6           During the time period May 21, which was the date of

7    the exercise notice with respect to the warrants, through May

8    27, which was the date that the shares were in fact issued, did

9    you ever see this document?

10          And during the time period May 21 through May 27,

11   2010, did you work on any calculations regarding shares to be

12   received by Ymer Shahini?

13          That was the extent of the questioning.

14          THE COURT:  All right.  What is it that you would want

15   to cross him on?

16          MS. HARRIS:  Your Honor, look, it's hard to know

17   because we don't have the fulsome set of documents that I would

18   normally like to have in this situation.  I think ideally we

19   would have a means to suggest that this is a long time ago,

20   that he worked on a lot of different aspects of the Gerova

21   related business, that he was involved in issuing opinion

22   letters in connection with share issuances on a routine basis.

23          There are any number of those that we right now have

24   our hands on.  There may be others that we can identify.  There

25   are thousands, maybe even -- and we brought today, though our

G9L8HIR1

printer jammed printing, a 500-page compendium of e-mails.  And

how many e-mails, how much correspondence he engaged in on this

matter, to come to Court and to suggest that he knows

specifically now six years later whether he did that

calculation or not -- and he might have done that calculation

over the phone and it was written down by somebody else.  There

are all sorts of other things that could have happened that

would give a fuller account of the facts and the truth.

Your Honor, the other sort of missing part of this,

and your Honor began to address it earlier this morning, since

there are so many moving parts of this issue, I am not sure if

it's premature or not.  But the issue of the search, and I

think your Honor raised a good point, is Mr. Chalian didn't

personally perform the search.  He is no longer with Hodgson

Russ.  The nonexistence of the document, which has been

proffered to us in an affidavit, is untested and there is

hearsay because it's Kevin Kearny relying on his IT department.

And they conducted certain word searches.  We don't know what

the word searches were.  We don't know what kind of digital

forensic analysis was conducted.  We don't know whether people

did work at home on their computer ever and what the scope of

the search was, what the policies are.  All of that background

for the government -- that's not even really part of the

testimony necessarily, but it is part of the foundation for

which the government is saying, despite the privilege issues,

G9L8HIR1

1   we can put Mr. Chalian on because we represented to you through

2   this affidavit that there is no document that would impeach

3   him.  That's basically the situation we are in.

4         There are documents that do and correspondence that

5   even indicates --

6         MR. TREMONTE:  Your Honor, if I may.  It's in evidence

7   that the e-mail address bigschmulik@aol.com is Steve Weiss.

8   And there is a document in evidence that is from bigschmulik to

9   Joe Bianco.  It's one of the key documents in this case.  It's

10  an early draft.  So there is evidence in the record that these

11  lawyers did work -- at least Steve Weiss did work at home.

12        MS. HARRIS:  To be clear, the stipulation hasn't been

13  read yet so it's not quite in evidence yet, but that will be

14  tied up.

15        THE COURT:  So, in other words -- I think I get the

16  drift here -- that it's nice that Mr. Chalian says, I didn't

17  communicate with Mr. Hirst on these calculations, but you don't

18  know whether Mr. Weiss did, and Mr. Chalian doesn't know for

19  that matter.

20        MR. TREMONTE:  Beyond that, we also are not in a

21  position as we ordinarily would be to test the proposition even

22  that Mr. Chalian did.  Because the foundation that's been laid

23  for the Court's crediting and allowing Mr. Chalian to testify

24  as to this very narrow set of facts is untested as to the

25  condition of Hodgson Russ's documents.  We can't know on this

G9L8HIR1

1    record if Mr. Chalian's e-mails were deleted.

2            THE COURT:  Let's back this up.  Let's back this up.

3            As I understand it, no one is offering evidence as to

4    the document search.  The document search is not something

5    that's coming in to evidence, at least from the government.

6            Now, I am not up to whether there is some use that the

7    defendant can make of it, but the government isn't offering it.

8    It's not going to come out of the mouth of the witness.

9            The Court, however, has concerns, particularly with

10   regard to the privilege issue, whether there are privileged

11   documents during the relevant time period discussing the

12   warrant that the defense is not seeing that may in fact be a

13   discussion of the calculation.  And you're not getting to see

14   it, not because the documents are not here, but I expect that

15   they are going to be in my hands very soon.

16           In fact, I am told that the CD -- I don't need it this

17   instant -- is here.  And my review of that will enable me to

18   say, we have a privilege issue here, and either foreclose the

19   witness altogether, or the privilege issue is not germane

20   because of what I learned on the in camera review, and of

21   course the CD-ROM would be sealed and made available to any

22   reviewing court to see.

23           Go ahead.

24           MS. HARRIS:  Just to make our record as well,

25   obviously it's true that if there were a document between May

G9L8HIR1

21 and May 27, that would seem directly pertinent.  But, for
example, had there been a phone call or had there been some
other mode of communication in 2010 about the warrant
calculation, relating to the share issuance in any way, shape
or form, there could be documents both before that day, but
more likely maybe even after that day, that refer back to that
issue that would be possible impeachment as well.

          I think the nub of the issue is, from the defense
perspective, is that our view of what constitutes the universe
of potential impeachment material, or potential
cross-examination material, is, in fairness, a broader
universe.

          We submitted to your Honor the order directing
production of documents.  We have got an excellent paralegal
staff.  We would do this extraordinarily efficiently, in terms
of one day of searching whatever documents that Hodgson Russ
could produce us.  Because there are two different issues.
There is a privilege issue.  If they say, we have these
responsive documents, but 10 percent of them are privileged or
40 percent of them are privileged --

          THE COURT:  With a law firm, figure at least 40
percent, if not higher.  It might be 80 percent.

          MS. HARRIS:  Right.  We don't even have access, given
the history that I described to you, to the nonprivileged
documents.  That's a separate issue from the privilege issue.

G9L8HIR1

1    The government put in an exhibit that contained reference to

2    this very issue.  So the notion that this came up in the middle

3    of the trial, in fairness, we need a short adjournment, and we

4    will do our very best to make it efficient and speedy, that's

5    just to get the documents that we don't have.

6         THE COURT:  Ms. Harris, let's put this in context.  I

7    take your point -- and your point is a very good point -- that

8    the exhibit was put into evidence by the government, which

9    reflects this statement by Mr. Hirst.

10        Is that not correct?

11        MR. BLAIS:  That is correct.

12        THE COURT:  So that's the starting point.  And I think

13   it's a very good point you raise, and that's why I haven't

14   entirely made my mind up yet.

15        That said, the government's obligation with regard to

16   this witness, as any other testifying witness, is defined in

17   law, and the scope of their obligation is the Jencks Act,

18   Section 3500, Brady and Giglio, and Rule 16.  That's the

19   government's obligation.

20        The government has satisfied its obligation -- one

21   second, please.

22        On the phone right now with my deputy is Juror No. 2.

23        Madam Deputy, can you recount what you just learned?

24        THE DEPUTY CLERK:  He said that he is in the hospital

25   and he has -- he is dizzy and he has something wrong with his

G9L8HIR1

1        eye and they are checking that out now.

2                    THE COURT:  Any objection to my excusing the juror?

3                    MR. BLAIS:  No, your Honor.

4                    MR. TREMONTE:  Your Honor, we are no medical experts.

5        It's unclear as to how serious this is or how long it will take

6        to resolve.  Is there some way to get a little more information

7        or to wait just a short period of time to see if this is

8        something that is likely to clear up promptly?

9                    THE DEPUTY CLERK:  He is in the hospital.  They are

10       working on it now.  They are looking into it now.

11                   He is in Westchester Hospital.

12                   MS. HARRIS:  We are a little stymied.  None of us

13       controls the situation.  It's our second juror from the pool

14       that we have lost.  So there is a little reluctance to not give

15       it a little bit more time, but we understand the Court's

16       schedule and those of everyone else here, so we are not doing

17       it to deliberately cause an inconvenience.  At this point, we

18       will leave it to Court's discretion, but that would be our

19       request, that we wait for a little bit more information, but we

20       leave it to the Court's discretion.

21                   THE COURT:  The experience of those who have gone to

22       hospital, urgent care, or emergency rooms, are that there is

23       first a triage operation before you get to see a doctor, and

24       dizziness is more than an ophthalmological problem, and I am

25       concerned with a room full of jurors waiting until this

G9L8HIR1

1    individual is seen and the doctor determines what tests are

2    appropriate to confirm that the dizziness is not something more

3    serious would unduly prolong matters.  So Juror No. 2 is

4    excused.

5              Madam Deputy, you may advise the juror on the phone.

6              THE DEPUTY CLERK:  Mr. Brown, the judge is excusing

7    you from the case.

8              THE COURT:  And we hope that he feels better.

9              MR. BIALE:  May I speak to your deputy just about a

10   housekeeping issue with respect to the room we are using with

11   facilities?

12             THE COURT:  Yes.  It's got to be quick because I am

13   bringing our jurors in right now.

14             MS. MERMELSTEIN:  May we step out to use the rest room

15   while that's happening?

16             THE COURT:  Yes, that's fine.

17             MS. HARRIS:  May we go on the record briefly before

18   the jury comes in --

19             THE COURT:  Yes.

20             MS. HARRIS:  -- to close a loop on one issue.

21             THE COURT:  Is it all right with you, Mr. Blais?

22             MR. BLAIS:  Yes.

23             MS. HARRIS:  Thank you.

24             Just with respect to Mr. Chalian point, I just want to

25   make clear that our position is we are not alleging there has

G9L8HIR1

1    been a failure to comply by the government under Rule 16 or

2    3500.  The issue really is because of the circumstances I

3    described.  It's about our obligations, that when the

4    government represented to us the weekend before trial that they

5    were not calling Mr. Chalian, we no longer pursued obtaining

6    all of the documents I just described to you.  So because of

7    the change in position -- which is, again, as a result of

8    evidence that they elicited in their chase in chief, testimony

9    and in exhibits -- their change in position didn't allow us to

10   effectuate our obligations, and we just need a brief recess to

11   address those.

12          THE COURT:  As I have come to understand, it was a

13   date in June of 2016 that the defendants served their subpoena

14   on Hodgson Russ, and the reality is that issues of subpoena

15   compliance could have been addressed at an earlier point in

16   time.

17          Now, I am mindful that the Friday before trial

18   somehow, some way the SEC furnished the defense with a

19   privilege log, which they did not previously have.

20          Now, why they did that is really not before me, not

21   before me.  I don't understand why.  I don't hear any argument

22   that the government is in any way responsible for that.  But

23   that's part of the background to this as well.

24          MS. HARRIS:  To be clear, it was not a privilege log,

25   your Honor.  It was actually a record of the total e-mails,

G9L8HIR1

1    privileged and nonprivileged, that had been made available to

2    the SEC a year ago.

3         THE COURT:  I think I asked this question before, but

4    I am going to ask it again, and maybe I didn't get it the first

5    time.  Did Hodgson Russ give the SEC privileged e-mails?  Is

6    this a limited waiver type situation?

7         MS. HARRIS:  There is that issue as well, your Honor.

8    There are two issues.  They produced documents to the SEC, a

9    certain batch of documents from their hard files, I believe,

10   and maybe also their electronic files.  Part of the problem was

11   that production -- and I am not clear when the government had

12   that production -- that production we did not appear to have in

13   our Rule 16 materials.  So that was an initial problem.

14        Then the few Hodgson Russ e-mails -- Government

15   Exhibit 509 -- that were in our production, we mysteriously had

16   Bates numbers that corresponded to Continental -- not even

17   Continental, I apologize.  It had an SEC Bates number on it,

18   and the SEC represented it came in a batch of documents from

19   other sources.

20        It is only because we have been trying to unearth the

21   source of Exhibit 509, and trace our way backwards, did we

22   stumble upon the various Bates numbering issues, production

23   issues that came up very late in the day, in the ten days

24   before trial.  Then we learned that those e-mails that they

25   erroneously Bates stamped, that those few e-mails had been

G9L8HIR1

1    produced by Kevin Kearny by e-mail to the SEC.  It's three or

2    four e-mails, just by themselves.  Which, frankly, on some

3    level you might consider it to be some sort of privilege waiver

4    because those are e-mails between Mr. Chalian and Mr. Weiss,

5    but I don't know the line that was drawn or not drawn, but they

6    are certainly internal firm communications.  So just those

7    three e-mails had been sent over by e-mail to an SEC staff

8    attorney.

9              THE COURT:  Is there an indication that they were ever

10   claimed to be privilege, those three e-mails?

11             MS. HARRIS:  I am not privy to the communications

12   between the SEC, but there has been no privilege log submitted

13   to the SEC.  But the firm has always maintained to us that the

14   client Gerova has always -- there has been no privilege waiver.

15             THE COURT:  My point, and at least the question I was

16   asking, is maybe a very small piece of the puzzle, but it's not

17   a circumstance where Hodgson Russ, to the best of anyone's

18   information here, has taken the position that it is giving the

19   SEC privileged communications which it is otherwise

20   withholding.

21             (Continued on next page)

22

23

24

25

G9LOHIR2

1          MR. TREMONTE:  To be very clear, we don't know.  But

2     those documents are privileged on their face.

3          THE COURT:  Right.

4          MR. TREMONTE:  Just one more piece that I really would

5     like to make sure that the Court has.  This exhibit that came

6     across the transom at the 11th hour, it changed the character

7     of the proof in a big way.  Right?  Because the way that it was

8     produced to the government by the SEC, and therefore, the way

9     that it came to us months ago, suggested a substantially

10    different factual picture.  The attachment to the email

11    included, for example, a copy of the warrant agreement

12    suggesting that it was in the possession of Continental from

13    May 27th.  It wasn't until -- and I just can't impress the

14    Court on this enough -- it was not until the original document

15    came as cross the transom.  Forget the metadata.  Right?  That

16    it was clear days before trial that that was not the case and

17    that these attachments were discrete and not sort of one big

18    lump, and it wasn't clear who had which documents until the

19    very 11th hour.

20         THE COURT:  With regard to the email communication by

21    Mr. Hirst, when was that produced?

22         MR. TREMONTE:  The email --

23         THE COURT:  In which he maintains that he got the

24    calculations from Hodgson Russ.

25         MR. TREMONTE:  The Skype chats, your Honor?

G9LOHIR2

| | |
|---|---|
| 1 | THE COURT:  Yes.  That, I guess, was a Skype chat. |
| 2 | Skype chat. |
| 3 | MR. TREMONTE:  I don't remember the precise dates, but |
| 4 | those chats were produced in timely fashion in connection with |
| 5 | the rules. |
| 6 | THE COURT:  All right. |
| 7 | MR. BLAIS:  Your Honor, I have facts to buttress some |
| 8 | of what was being said.  I don't want to delay the jurors if |
| 9 | your Honor -- |
| 10 | THE COURT:  Go ahead, Mr. Blais. |
| 11 | MR. BLAIS:  Just a couple of points.  One is, my |
| 12 | understanding of this -- we've been calling it a privileged |
| 13 | log -- document, whatever it is, that lists the various Hodgson |
| 14 | Russ documents, I understand that the circumstances under which |
| 15 | it was made available to the SEC was, here's a set of materials |
| 16 | that we have available, Hodgson Russ.  If there is anything you |
| 17 | want to look at, let us know and we'll take a look and see if |
| 18 | it's privileged.  That's my understanding of the circumstances |
| 19 | under which it was made available, and it's my understanding |
| 20 | that the SEC made no further inquiry, didn't ask Hodgson Russ |
| 21 | to look at any of those documents to make a privilege |
| 22 | determination. |
| 23 | Mr. Tremonte is correct, there were documents produced |
| 24 | by Hodgson Russ to the SEC that, for whatever reason, did not |
| 25 | make their way to us, so they were not part of our Rule 16 |

G9LOHIR2

1    production.  When issues were being raised in the weeks leading

2    up to trail about are there documents from Hodgson Russ that

3    are missing?  It seemed like there was something produced to

4    the SEC.  We, of course, made inquiries.  We got them, and as

5    soon as we got them, we turned them over to the defense.

6              THE COURT:  So they've been turned over.

7              MR. BLAIS:  Yes.  The Hodgson Russ materials that were

8    produced to the SEC were turned over.  It wasn't the weeks

9    leading up to the trial, but that was also the same time period

10   that we had those documents.  It wasn't like we, the

11   government, were sitting on materials for months that we didn't

12   then turn over.

13             THE COURT:  So you're representing that, to the best

14   of your knowledge, such documents as were produced by Hodgson

15   Russ to the SEC have been turned over to the government and by

16   the government to the defense prior to trial.

17             MR. BLAIS:  Correct.  There's nothing we're aware of

18   that we are in our possession of that we haven't turned over.

19   And yes, there's some materials that we received late, but as

20   soon as we got them, we turned them over.

21             MS. HARRIS:  The only postscript to that, and I'm not

22   alleging any kind of malfeasance, but I just want to raise.

23   The reason we started a hunt for more Hodgson Russ documents,

24   among others, and we served the subpoena back in July, was that

25   when we got the government's thousands of pages of proposed

exhibits, there were Bates numbers of "HR".  And when we went

back -- and I'm newer to the case -- saying, gosh, where's the

Hodgson Russ production?  That's when we sort of all reminded

or figured out for the first time that there hadn't been, in

our Rule 16, a Hodgson Russ production.

It may be that the government also got them late in

the game, these Bates numbers HR, and there was confusion among

all the parties about the Bates numbering, because as we've

explained to you, to compound matters, Hodgson Russ was

producing documents on its own behalf but also represents

Continental Stock Transfer Company.  So there's multiple levels

of sort of unearthing and possible confusion.

Once we alerted the government that there were

documents Bates stamped Hodgson Russ that we didn't have Rule

16 for, they were promptly -- we promptly worked together to

figure out what happened and to make sure, and that's when we

started getting about 2,000 pages of Continental documents that

hadn't been produced previously, and that additional -- the

original Hodgson Russ production, the cover letter to the SEC

with the production, and that cover letter to the SEC indicated

that they had not actually produced emails.  Right?  Because

that's part of the assumption here -- and I know we can't rely

on it -- but part of the assumption here is that, when we have

this multiagency government prosecution, right, where there's

obviously an investigation done with the SEC, and they give

G9LOHIR2

1    documents and share documents with the U.S. Attorney's Office,

2    when we go to these third parties, I mean, the first thing they

3    tell us is, we produced everything to the SEC.  You have what

4    we produced to the SEC.  So there's a -- we have to like engage

5    in this process, well, what did you produce to the SEC?  And

6    it's only -- so there's an assumption -- and I think now we've

7    learned a lot not to rely on that assumption -- but there's an

8    assumption in the first place that they made a complete and

9    fulsome production.  When we saw the cover letter to the SEC,

10   it said, "Here's documents from our hard file.  Here are

11   documents from our electronic file.  And gosh, we have too many

12   emails to kind of figure it all, so here's a list of our

13   emails, and you let us know what emails you want."  So it's

14   only at that moment that we had full understanding that their

15   production to the SEC, which we had received eventually, though

16   close in time to trial, had really left out what, in this

17   modern day and age, is a very important part of production,

18   which is all and any email communications.

19          Now, there's a privilege issue embedded within that,

20   but in the first instance, there are obviously emails there

21   that are not privileged.

22          So I realize it's more information than your Honor

23   perhaps wants or needs, but the rich details here really

24   present the -- I want to paint the picture of the complications

25   that we as advocates and representing a client charged with

1122

G9LOHIR2

1    very serious crimes, our obligations and the challenges we face

2    in doing that, and why we're begging for -- when this kind of

3    development happens midway through a trial, that I think by

4    some measure should not have been as much of a surprise as it

5    is, though we all -- again, not accusing anyone of acting in

6    bad faith -- but there was some notice that this was coming,

7    that we, in fairness, want some time to be able to effectively

8    prepare and represent our client.

9              THE COURT:  I would like to see a copy of the Hodgson

10   Russ subpoena and any correspondence regarding compliance with

11   that subpoena.

12             Bring our jurors in, please.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

G9LOHIR2

```
 1                  (Jury present)
 2                  THE COURT:  Ladies and gentlemen, let me give you a
 3     little explanation.  Juror number 2, you'll notice, is not here
 4     this morning.  Flo received a telephone call from him, and he
 5     reported on a medical situation that needed to be attended to.
 6     Wisely, he's attending to it, and he called us to let us know
 7     that.  He described it.  I gather he was comfortable speaking
 8     on the phone.  I think he's going to be okay, but it's one of
 9     these situations for you, for me, for everyone afflicted with
10     the human condition, which is all of us, when you have certain
11     symptoms that indicate you should get prompt medical attention,
12     we shouldn't disregard those symptoms, we should take care of
13     it.  So I think he's going to be fine.  We will try and get an
14     update, because I know you're concerned about the well-being of
15     your fellow jurors, and if we get additional information, we'll
16     let you know.  But as I understand it, he went to get this
17     attended to of his own doing, he was not taken by ambulance or
18     any such thing, and we all will keep him in our thoughts and
19     prayers and hope for the very best, and if we get any updated
20     news, I'll give it to you.  But juror number 2 has been excused
21     from the jury.
22                  We'll continue with the examination.  You may proceed,
23     Mr. Blais.
24                  The Court reminds you, sir, that you're still under
25     oath.
```

 1              THE WITNESS:  Yes, sir.

 2      ALEX MONTANO,

 3           recalled as a witness by the Government,

 4           having been previously sworn, testified as follows:

 5              MR. BLAIS:  Thank you, your Honor, your Honor.

 6      DIRECT EXAMINATION

 7      BY MR. BLAIS:

 8      Q.  Good morning, Mr. Montano.

 9      A.  Good morning.

10      Q.  When we broke for the day yesterday we were walking through

11      the brokerage statements for the Ymer Shahini account at CK

12      Cooper.  Do you recall that?

13      A.  Yes, sir.

14              MR. BLAIS:  Ms. Sheinwald, if you could please publish

15      to the jury page 166 of Government's Exhibit 334, which is in

16      evidence.  Ms. Sheinwald, if we could, just to situate us, if

17      you could just focus on the very top of the page, and even

18      above that, Ms. Sheinwald.

19      Q.  Can you just remind us whose account statements we're

20      looking at?

21      A.  Yes.  We're looking at the account statement for Ymer

22      Shahini.

23      Q.  This is an account at CK Cooper?

24      A.  Yes, sir.

25      Q.  What is the time period reflected on this particular

1   account statement that we were looking at yesterday?

2   A.  This statement is for the month ended June 30th, 2010.

3   Q.  Mr. Montano, I want to direct your attention in the section

4   "withdrawals from your account" to an outgoing wire on

5   June 22nd, 2010 in the amount of $2,620,000.  Do you see that?

6   A.  Yes, sir.

7            MR. BLAIS:  You can put this down for a minute,

8   Ms. Sheinwald.  I want to bring up Government's Exhibits 330

9   and 331, which are already in evidence.  Ms. Sheinwald, could

10  you put up Government's Exhibit 330 first?

11  Q.  Mr. Montano, what is this document?

12  A.  This looks like an email with attachments.

13  Q.  Who is it to?

14  A.  It's to Adam Montano.

15  Q.  And who is it from?

16  A.  From Jared Galanis.

17  Q.  What's date of this email?

18  A.  The date is June 22nd, 2010.

19  Q.  Are there attachments to this particular email?

20  A.  Yes, sir.

21           MR. BLAIS:  Ms. Sheinwald, could you turn to

22  Government's Exhibit 331, which is the attachment to this

23  email?

24  Q.  Mr. Montano, what is this document?

25  A.  It looks like it's a transfer instruction letter.

G9LOHIR2                         Montano - Direct

1    Q.  What is the date of this letter?

2    A.  June 22nd, 2010.

3    Q.  Who is it addressed to?

4    A.  To Adam Montano.

5    Q.  Who is this letter signed by?

6    A.  Ymer Shahini.

7    Q.  What is the amount that is instructed about in this

8    particular letter?

9    A.  It's to wire the $2,620,000.

10   Q.  And where is the wire going to?

11   A.  It's going to Venture FCU for the benefit of Taurus Global

12   Opportunities Fund Ltd.

13   Q.  Now, what support, if any, did CK Cooper request for this

14   June 22nd, 2010 wire of $2.62 million from the Shahini account?

15   A.  We requested evidence for what the funds were being used

16   for.

17   Q.  Did CK Cooper, in fact, receive support?

18   A.  Yes, we did.

19          MR. BLAIS:  Ms. Sheinwald, could you please pull up

20   Government's Exhibit 332, which is in evidence.  Focusing on

21   the first page.

22   Q.  Mr. Montano, what is this document?

23   A.  This is an email, along with an attachment, with an

24   attached file.

25   Q.  Who is it to?

1    A.  To Adam Montano.

2    Q.  Who is it from?

3    A.  From Jared Galanis.

4    Q.  What's the date on this email?

5    A.  Thursday, June 24th, 2010.

6          MR. BLAIS:  Ms. Sheinwald, if we could turn to page 2

7    of this document.  Actually, page 3.  I'm sorry.  If you

8    continue to page 4.

9    Q.  Mr. Montano, what is this document?

10   A.  This is an application form for shares for Taurus Global

11   Opportunities Fund Ltd.

12         MR. BLAIS:  Ms. Sheinwald, if you could turn to the

13   end of the document to the final page.

14   Q.  Who is this document signed by?

15   A.  Ymer Shahini.

16   Q.  Is this document the support that CK Cooper received

17   regarding the $2.62 million wire from the Shahini account on

18   June 22nd, 2010?

19   A.  Yes, sir.

20   Q.  What is your understanding of what this document shows?

21   A.  That he was investing the funds into this investment fund.

22   Q.  Again, what was the name of it?

23   A.  Taurus Global Opportunity Fund.

24   Q.  What, if anything, do you know about the Taurus Global

25   Opportunity Fund?

1        MR. BIALE:  Objection.

2        THE COURT:  I'll take it subject to a motion to

3   strike.  Let's hear the answer.

4   Q.  What, if anything, do you know about the Taurus Global

5   Opportunity Fund?

6   A.  I don't know anything about it.

7   Q.  And what, if anything, do you know about who ran the Taurus

8   Global Opportunity Fund?

9        MR. BIALE:  Objection.

10        THE WITNESS:  I don't know.

11        THE COURT:  Overruled.  Go ahead.

12        THE WITNESS:  I'm sorry.  I don't know.

13   Q.  And what, if anything, do you know about the kind of

14   investments made by the Taurus Global Opportunity Fund?

15   A.  I don't know.

16        MR. BLAIS:  Ms. Sheinwald, could you please put back

17   up Government's Exhibit 334, which are the Shahini broker

18   statements, and turn to page 152 of the document.  Again,

19   focusing on the very top of the page, Ms. Sheinwald.

20   Q.  Mr. Montano, what is the time period that's reflected in

21   this particular account statement?

22   A.  This is for the month ended July 31st, 2010.

23   Q.  Mr. Montano, I'm going ask you to look through the "assets

24   sold" section of the document, which actually occurs over three

25   pages.  So we'll go through page by page, and I'm going to ask

1    you, were there any sales from this account of anything other

2    than sales of Gerova?

3    A.  Are we going to go through the rest of the pages?

4    Q.  Yes.  That's the first page.

5        MR. BLAIS:  Ms. Sheinwald, could you turn to page 153.

6    And Ms. Sheinwald, page 154.

7    A.  Okay.

8    Q.  So Mr. Montano, were there sales of any shares from this

9    account other than shares of Gerova?

10   A.  No.

11   Q.  Focusing on the total number, "total assets sold/redeemed",

12   what was the dollar value of Gerova shares sold from this

13   account in July, 2010?

14   A.  $2,078,247.96.

15   Q.  Then focusing on the very bottom of that page, the

16   "withdrawals" section, what was the value of funds withdrawn

17   from this account in July of 2010?

18   A.  $85,000.

19   Q.  Finally, at least finally for this statement, do you see

20   where it says "transfer A/C negative 1 million"?

21   A.  Yes.

22   Q.  What is that referring to?

23   A.  That would refer to a transfer out of the account of

24   1 million shares of Gerova Financial Group.

25       MR. BLAIS:  Ms. Sheinwald, we're going to turn to a

1   different section of this exhibit, pages 141 to 143.  So pages

2   141 to 143, and I believe the Bates number, for the record, the

3   page I'm looking at is SEC-CORCLEAR-E-683.

4            I'm going to ask you first if you could focus on the

5   top, Ms. Sheinwald.

6   Q.  For what time period, Mr. Montano, is this particular

7   statement that we're looking at?

8   A.  This statement is for the period ending -- or the month

9   ended August 31st, 2010.

10  Q.  We're going to focus -- and again, it's across three

11  pages -- on the "assets sold/redeemed" section.  I'm going to

12  ask you the same question.

13           In August of 2010, were there any sales from this

14  account of anything other than shares of Gerova?

15           MR. BLAIS:  Ms. Sheinwald, could you flip to page 142?

16  Ms. Sheinwald, could you turn to page 143?

17  Q.  Mr. Montano, were there any sales from this account of

18  anything other than shares of Gerova?

19  A.  No.

20  Q.  Focusing on the "total assets sold/redeemed", what was the

21  dollar value of Gerova shares sold from this Shahini account in

22  August of 2010?

23  A.  $886,083.23.

24  Q.  Then finally, on the August statement, if you could focus

25  on the section "withdrawals from your account".  What was the

1    value of funds withdrawn from the Shahini account in August of

2    2010?

3    A.  $2,525,000.

4    Q.  One last broker statement.

5            MR. BLAIS:  Ms. Sheinwald, if you could turn to pages

6    126 and 127, Government's Exhibit 334, which is Bates label

7    SEC-CORECLEAR-E668, it appears.  Yes, thank you.

8    Q.  Again focusing on the top, for what month is this portion

9    of the Shahini account statement?

10   A.  This is for the month ended September 30th, 2010.

11   Q.  Again, looking at the "assets sold/redeemed" section, which

12   is across two pages this time, were there any sales from this

13   account in September of 2010 of anything other than shares of

14   Gerova?

15   A.  No.

16   Q.  What was the dollar value of Gerova shares sold from this

17   account in September of 2010?

18   A.  $755,084.07.

19   Q.  Then looking at the "withdrawal" section, which I think

20   starts on this page and goes over to the next page, what was

21   the value of funds withdrawn from the Shahini account in

22   September of 2010?

23   A.  $595,000.

24   Q.  Focusing on the last entry in the "withdrawal" section.

25           MR. BLAIS:  If you could blow that back up again,

1   Ms. Sheinwald.  I think you need to go a little higher.

2   Q.  Do you see the notation on September 28th, "transfer A/C

3   negative 2 million"?

4   A.  Yes.

5   Q.  And that one column over it says "Gerova Financial Group,

6   Ltd."?

7   A.  Yes.

8   Q.  What does this entry mean?

9   A.  This would have been a transfer of 2 million shares of

10  Gerova Financial out of the account.

11  Q.  What ultimately happened to Ymer Shahini's account at CK

12  Cooper?

13  A.  It was closed.

14  Q.  Why?

15  A.  We were uncomfortable with the activity that was taking

16  place in the account and so we asked --

17          MR. BIALE:  Objection.

18          THE COURT:  Basis?

19          MR. BIALE:  Speculation.

20          THE COURT:  Overruled.

21  Q.  You can continue.

22  A.  Based on the activity taking place in the account we

23  were --

24  Q.  What do you mean by that?

25  A.  Well, there was a lot of buying and selling of the same

G9LOHIR2                          Montano - Cross

1     security in and out, and there was a lot of money going out of

2     the account, and we just felt it wasn't the type of business

3     the firm wanted.

4                MR. BLAIS:  Your Honor, may I have a moment?

5                THE COURT:  You may.

6                MR. BLAIS:  No further questions, your Honor.

7                THE COURT:  Cross examination.

8     CROSS EXAMINATION

9     BY MR. BIALE:

10    Q.  Good morning, Mr. Montano.

11    A.  Good morning.

12    Q.  Yesterday, on direct examination, you described the concept

13    of margin funds, right?

14    A.  Yes, sir.

15    Q.  Margin funds, as you testified, are funds that -- they're

16    essentially a loan from the brokerage firm based on shares that

17    are in an account, right?

18    A.  Correct.

19    Q.  You testified that you request from the clearing firm

20    whether the account can be margined, right?

21    A.  Yes.

22    Q.  And then you decide how much margin loans to offer, right?

23    A.  Not necessarily.

24    Q.  When you say "not necessarily", are there some

25    circumstances in which you would decide we're going to loan

G9LOHIR2                          Montano - Cross

1    this amount of money?

2    A.  We would have input into that with our clearing firm.

3    Q.  Again, just to be clear, a margin loan allows a party to

4    borrow from the brokerage firm, and that loan is collateralized

5    by the shares that are in the account, right?

6    A.  Yes, sir.

7    Q.  Now, let's say that you have a bunch of Pepsi stock.  Pepsi

8    stock you know can be easily traded on the open market, right?

9    A.  Yes, sir.

10   Q.  Because it's a well-known company, right?

11   A.  Yes.

12   Q.  And there's lots of evidence about what the share price is,

13   right?

14   A.  Yes.

15   Q.  And about what the market for those shares would be, right?

16   A.  Yes.

17   Q.  So if someone were to open an account at CK Cooper with a

18   lot of Pepsi stock and say "I want to borrow margin funds based

19   on this Pepsi stock", that would be a pretty safe bet, right?

20   A.  If it was concentrated in one position, just Pepsi, it

21   wouldn't be as safe of a bet, it would be considered a

22   concentrated account.

23   Q.  Well, let's say it was Pepsi, Coke, Microsoft, IBM, a bunch

24   of well-known companies.

25   A.  Yes, that would be considered a relatively safe margin

G9LOHIR2                           Montano - Cross

1    loan.

2    Q.  As you just testified, if it's all concentrated in one

3    share, that would not be a safe margin loan, right?

4    A.  Not as safe.

5    Q.  Okay.  And if the shares were all concentrated in a company

6    that didn't have a lot of history of trading, that would also

7    be risky, right?

8    A.  Yes, sir.

9    Q.  If, for example, it was a company that had only recently

10   come into being, that would be a more risky proposition, right?

11   A.  Yes, sir.

12   Q.  Just to be clear, the government went over this with you,

13   but all of the shares in Mr. Shahini's account were Gerova

14   shares, right?

15   A.  Yes, sir.

16   Q.  And Gerova is not a company like Pepsi, right?

17   A.  Not to my knowledge, no.

18   Q.  It's not like Microsoft.

19   A.  Not to my knowledge, no.

20   Q.  Didn't have a lot of history being traded on the stock

21   market, right?

22   A.  No.

23   Q.  Further, the government showed you some account statements

24   that had a designation on them of "Reg S", right?

25   A.  Yes, sir.

G9LOHIR2                        Montano - Cross

 1   Q.  And you testified that Reg S denotes Regulation S, right?

 2   A.  That's my understanding.

 3   Q.  Okay.  And your understanding is that Regulation S means

 4   that the stock can be held in the possession of a foreign

 5   person but cannot be sold on the U.S. market, right?

 6   A.  That's not my -- I'm not clear on that.

 7   Q.  Okay.  You understand that Reg S is a form of restriction

 8   on how stock can be sold, right?

 9   A.  That's not my understanding.

10   Q.  Okay.  You don't have an understanding of what Reg S means,

11   is that what you're testifying?

12   A.  I believe it's an exemption, not a restriction.

13   Q.  Okay.

14   A.  So I think it's an exemption to a registration.

15   Q.  It's an exemption to registration that puts certain other

16   restrictions on shares, namely that they cannot be sold in the

17   U.S. market, right?

18   A.  I'm not 100 percent clear on that.

19   Q.  Okay.  If there were restriction on sale in the U.S.

20   market, that would also make the stock a risky proposition,

21   right?

22   A.  Yes.

23   Q.  In the sense that if there were such a restriction, you

24   couldn't be sure who you could sell it to, right?

25   A.  Correct.

1   Q.  It would limit the types of customers that you could sell

2   the stock to.

3   A.  Yes.

4   Q.  And it would be harder, in fact perhaps impossible under

5   the regulations, to trade that stock on the U.S. market, right?

6   A.  If that's the case, correct.

7   Q.  Now, you testified that CK Cooper margined $13 million in

8   loans based on these Gerova shares, right?

9   A.  That was the maximum balance, correct.

10  Q.  When you say "that was the maximum balance", that was the

11  maximum allowed to be margined?

12  A.  No, that was the maximum that the margin balance got to.

13  Q.  Okay.  But it's fair to say that that's a pretty

14  significant sum of money, right?

15  A.  It was too significant.

16  Q.  Correct.  It's a lot of money to loan to somebody, right?

17  A.  Yes.

18  Q.  Especially when that loan is collateralized based on a

19  risky proposition, right?

20  A.  Yes.

21  Q.  Based on shares that don't have a lot of history of

22  trading, right?

23  A.  Yes.

24  Q.  And might be subject to this regulation that would prohibit

25  you from selling them on the U.S. market, right?

1    A.  If that's the case, correct.

2    Q.  Now, you testified yesterday that you decided at a certain

3    point to call the loan, right?

4    A.  Correct.

5    Q.  And what that means is that you want to bring back the

6    money that's been loaned out, right?

7    A.  We want to pay off -- pay down the loan.

8    Q.  Pay down the loan, right.  And you testified that there's a

9    couple of ways you can pay off the loan, right?

10   A.  Yes.

11   Q.  So one way is to shift the collateral to something else,

12   right?

13   A.  Yes.

14   Q.  And another way is to sell the stock to pay off the loan,

15   right?

16   A.  Yes.

17   Q.  Let's talk briefly about selling the stock.  You testified

18   yesterday on direct examination that the stock can

19   automatically be sold by CK Cooper, right?

20   A.  Correct.

21   Q.  At a certain time of day.

22   A.  Yes, sir.

23   Q.  If the customer doesn't sell them himself, right?

24   A.  Correct.

25   Q.  So one way to pay down the loan is for CK Cooper to sell

1   the assets in the account, right?

2   A.  Yes.

3   Q.  You testified yesterday that you don't remember in this

4   case whether CK Cooper sold the assets or whether the customer

5   sold the assets, right?

6   A.  That's correct.

7   Q.  If CK Cooper had sold the assets and had done so on the

8   U.S. market, that would be illegal, right?

9   A.  I don't know.  I don't know if that's the case.

10  Q.  If they were restricted and could not be sold on the U.S.

11  market, you could not do so, right?

12  A.  If they were restricted and could not be sold on the U.S.

13  market, we would not have sold them.

14  Q.  But again, you testified you don't remember if you sold

15  them or not, right?

16  A.  Correct.

17  Q.  If you hadn't received instruction from the customer to

18  sell them, you would have sold them automatically; is that

19  right?

20  A.  Correct.

21          MR. BIALE:  If I may have one moment, your Honor.

22          THE COURT:  You may.

23          MR. BIALE:  Mr. Pollock, if you could bring up, for

24  the witness only, Exhibit 1255.  If I may approach, I'm going

25  to hand the witness a hard copy?

G9LOHIR2                          Montano - Cross

1             THE COURT:  All right.  You may.  Is it in evidence?

2             MR. BIALE:  It's not.  I'm planning on offering it.

3             THE COURT:  All right.

4             MR. BIALE:  Okay.  Your Honor, just for the record,

5    there appears to be a mix-up in the numbering, but the copy we

6    have electronically is Defendant's Trial Exhibit 1256.  I

7    handed the government a copy that's marked 1255, but I think

8    properly it should be 1256.

9             THE COURT:  All right.  Let me see what's in front of

10   the witness.  Do you have the hard copy there?  This bears the

11   number 1255.  Are you asking that it be remarked as 1256?

12            MR. BIALE:  Yes, your Honor.

13            THE COURT:  Okay.  Here you go, sir.

14            THE WITNESS:  Thank you.

15            MR. BIALE:  Thank you, your Honor.

16   Q.  Mr. Montano, what is that document?

17   A.  This is an email.

18   Q.  Who sent the email?

19   A.  From me.

20   Q.  To whom?

21   A.  To Jared Galanis.

22            MR. BIALE:  Your Honor, I offer Defendant's

23   Exhibit 1256 in evidence.

24            MR. BLAIS:  No objection.

25            THE COURT:  Received.

G9LOHIR2                          Montano - Cross

1           (Defendant's Exhibit 1256 received in evidence)

2    BY MR. BIALE:

3    Q.  This was an email sent July 2nd, 2010, right?

4    A.  Yes.

5    Q.  Can you read the subject line, please?

6    A.  "This is what I'm going to send to Jarvis.  Please let me

7    know if I'm omitting any pertinent facts, et cetera."

8    Q.  Who is Jarvis?

9    A.  He was legal counsel for our clearing firm.

10   Q.  For the clearing firm.  Okay.  So this is an email with

11   proposed language that you were going to send to the clearing

12   firm, right?

13   A.  Correct.

14   Q.  Again, just so everyone remembers, the clearing firm that

15   you worked with is Legent, right?

16   A.  Yes, sir.

17   Q.  Is it correct that they're the ones who actually hold the

18   shares?

19   A.  And provided the loan.

20   Q.  And provided the loan.  I understand.  So it's addressed to

21   David.  Who is David?

22   A.  That's David Jarvis.

23   Q.  Understood.  Okay.  Could you read the first paragraph,

24   please?

25   A.  "Yesterday the question was asked how Ymer Shahini obtained

1   the shares of Gerova Financial Group.  GFC is the result of a

2   series of transactions between Asia Special Situation

3   Acquisition Corp., a special purpose acquisition corporation,

4   (SPAC).  Mr. Shahini had advised the SPAC on several potential

5   transactions during its SPAC phase and developed relationships

6   with many of the institutional holders of SPAC units."

7   Q.  Okay.  So just to break that down a little bit.  There was

8   a question posed and this email is providing response, right?

9   A.  That's correct.

10  Q.  You discuss a little bit of the history of Gerova Financial

11  Group, and also Mr. Shahini's role in the SPAC, right?

12  A.  Correct.

13  Q.  Now, if you could read the second paragraph, please.

14  A.  "When it was determined for the SPAC to acquire Gerova and,

15  in effect, become Gerova Financial Group, it was during a time

16  of tremendous stress in the financial markets and when most

17  SPACs were simply not de-SPACing.  Mr. Shahini assisted in this

18  process and was entitled to a fee of over $2 million based upon

19  his efforts in the successful outcome of this transaction."

20  Q.  If you could read the next paragraph, please.

21  A.  "Gerova at the time did not desire to pay this fee and as a

22  result offered cashless exercise warrants to Mr. Shahini to

23  satisfy this fee.  While he reluctantly accepted the warrants

24  at the time rather than money, he was able to benefit from the

25  successes of GFC in the marketplace and including the

G9LOHIR2                    Montano - Redirect

1   maintenance of its listing on the NYSE Amex, the conversion of

2   its Series A preferred into common, and it being added to the

3   Russell 3000 index."

4   Q.  Lastly, if you could read the last paragraph.

5   A.  "Mr. Shahini determined to exercise his warrants, which

6   resulted in free trading shares, which were subsequently

7   deposited into an account with CK Cooper & Company.  I believe

8   this should provide the background requested."

9   Q.  And the email is signed by you, right?

10  A.  Yes.

11  Q.  It's sent to Jared Galanis?

12  A.  Correct.

13  Q.  Isn't it correct this email reflects your understanding and

14  you were running that understanding by Jared Galanis.

15  A.  That's correct.

16          MR. BIALE:  No further questions.

17          THE COURT:  Any redirect?

18          MR. BLAIS:  Yes, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. BLAIS:

21  Q.  Mr. Montano, you were just asked several questions about

22  Defendant's Exhibit 1256.  Where did you get the information

23  that you included in Defendant's Exhibit 1256?

24  A.  I think from Jared Galanis.

25          MR. BLAIS:  No further questions, your Honor.

G9LOHIR2

1        THE COURT:  You may step down.  Thank you.

2        MR. TREMONTE:  Your Honor, may we approach?

3        THE COURT:  Yes.  You're excused.  Leave the documents

4   there, counsel will retrieve them.

5            (Continued on next page)

1              (At sidebar)

2              MR. TREMONTE:  Just in the context of our motion to

3    strike, I just wanted to make a record here.  We're likely to

4    renew it.  This is the second brokerage witness that the

5    government has put on and allowed to testify erroneously as to

6    the law which the government knows to be different.

7              We believe under the law the government has an

8    obligation to correct that and, absent such a correction, that

9    testimony can be stricken, simply making a record and alerting

10   the Court.

11             MR. BLAIS:  Mr. Montano testified about his

12   understanding as to whether the shares, the Reg S shares, could

13   trade freely or not.  That's reflected in part in Defendant's

14   Exhibit 1256 where the very final paragraph reflects that the

15   shares were free trading.  So I think it's fair for him to

16   testify about his understanding of what could and could not

17   happen with these Regulation S shares.

18             MR. TREMONTE:  That's fundamentally misleading.  The

19   government's own expert testified, and the law is clear, and I

20   know that the government doesn't disagree with me on that,

21   there's a difference between a restriction, right, that applies

22   when there's a legend that's attached to the shares.  For

23   example, under Rule 144 on the one hand, and Reg S, which is

24   completely different, which prohibits the trading of shares

25   that are subject to Regulation S on the U.S. exchange.

G9LOHIR2

1       Both of the government's brokerage witnesses were

2   fundamentally confused as to that fact.  They got the law dead

3   wrong.  It contradicts what the expert testified to and what

4   the government knows the law to be, and that is fundamentally

5   confusing to the jury.

6       THE COURT:  And you believe the law is what?

7       MR. TREMONTE:  The law with respect to?

8       THE COURT:  Reg S.

9       MR. TREMONTE:  Correct.  The law under Reg S is that

10  shares subject to Regulation S cannot be traded on a U.S.

11  exchange.  Period.

12      MR. BLAIS:  One, that's for a limited period of time.

13  But two, the fact is, these shares did trade.  That's part of

14  the scheme.  He just testified, we went through lengthy

15  brokerage records that showed that these shares, in fact,

16  traded.  So these shares did, in fact, trade, and that's

17  obviously relevant to what happened in this particular

18  conspiracy, or alleged conspiracy, as to how the shares were

19  disposed of.

20      MR. TREMONTE:  But this goes to the heart of the case.

21  Right?

22      MR. BLAIS:  Exactly.

23      MR. TREMONTE:  To suggest that it's a scheme implies

24  that there's some reasonable basis for expecting that this

25  defendant, based on the proof that is presented at trial, knew

G9LOHIR2

1   or could have reasonably anticipated that this was going to

2   happen.

3           What the jury must understand is that, under the

4   applicable law, which people in the industry are expected to

5   know and abide by, these shares could not be traded.

6           MR. BLAIS:  I'm not sure that's so clear from --

7           MR. TREMONTE:  I believe moreover, that to the extent

8   that you've elicited testimony on the law which you know to be

9   incorrect, you have an obligation to fix that.

10          THE COURT:  Now, how did the last witness' testimony

11   vary from your statement of the law?

12          MR. TREMONTE:  The last witness testified -- I think

13   he said two things which were not necessarily perfectly

14   squared.

15          First, he said, no, it's not my understanding that Reg

16   S shares cannot be traded on a U.S. exchange, or conversely, it

17   was his understanding that they could be traded.  And I think

18   he also testified that he wasn't 100 percent sure.

19          That's similar to Ms. Akdeniz who testified that her

20   understanding of the law was that Reg S shares could be traded

21   on the U.S. exchange.  That's wrong.  It's not the law.

22          Professor Laby testified accurately as to what the law

23   is, and that is that Reg S shares can't be traded on the U.S.

24   exchange for a period of time, nor can they be subject to

25   directed selling efforts.

G9LOHIR2

1          That is precisely the statement of law that is

2     articulated in the letter from Barry Feiner, the letter that

3     Mr. Hirst sent.  It is very, very misleading to the jury to

4     have testimony that contradicts the expert on this key point.

5          MR. BLAIS:  And I think that's wrong.  I think if you

6     look at the opinion letter from Barry Feiner -- first of all,

7     Professor Laby testified that Regulation S shares are

8     restricted for a period of approximately 40 days.  Mr. Feiner's

9     opinion is that, because the warrants were held for 40 days,

10    that the applicable restriction period had expired.

11         So first of all, I think it's completely relevant that

12    the shares, in fact, traded.

13         MR. TREMONTE:  That --

14         THE COURT:  Well, you're not objecting to that.

15         MR. TREMONTE:  I am.  That letter does not say that

16    the restriction --

17         MR. BLAIS:  Yes, it does.

18         THE COURT:  You're not objecting to the fact that the

19    witness testified that the shares traded.

20         MR. TREMONTE:  No, they did, in fact, trade, yes.

21         THE COURT:  Okay.

22         MR. BLAIS:  So what exactly is he seeking to strike?

23    The witness' understanding of Regulation S?

24         THE COURT:  Yes.  I think that's right.

25         MR. TREMONTE:  Thank you, your Honor.

G9LOHIR2

1        MR. BLAIS:  Yes.  I think it's our position that the

2   defendant exploited this uncertainty that the brokers had about

3   whether these shares could be traded or not.  That was part of

4   the scheme.

5        THE COURT:  Well, this is what I'm going to ask you to

6   do, is come up with proposed language for an instruction to the

7   jury, and also the support for that, and the government will

8   have an opportunity to look at that and see whether you agree.

9   You may both wind up agreeing on it.  I mean, you're not

10  suggesting that the law is other than as your own witness

11  testified to.

12        MR. BLAIS:  Of course not.  Correct.

13        THE COURT:  And you're relying on that statement of

14  law also, correct?

15        MR. TREMONTE:  That is correct, your Honor.

16        THE COURT:  All right.  So this should be something

17  that perhaps an instruction to the jury may be appropriate.

18        MR. TREMONTE:  Your Honor, that may work.  I want to

19  explore this further, but I believe the law actually puts an

20  affirmative obligation on the government to correct this

21  imperfection, and we will look into that.

22        MR. BLAIS:  I think Mr. Montano testified that he

23  wasn't sure.  He didn't have an explicit understanding of what

24  Reg S allowed, so I think that's not -- he said he didn't

25  understand.

G9LOHIR2

1      THE COURT:  Yes.  Listening to the witness, what I

2  heard, and I think what the jury heard, was a person who really

3  was not on top of his game as to Reg S.  This is not a Reg S

4  guy.

5      MR. TREMONTE:  And we will certainly argue that in

6  closing in some form or fashion.  But he did also testify that

7  those shares would not have been sold if it was not offered for

8  them to be sold, and that's just not right.

9      THE COURT:  Let me see what the proposed instruction

10  is.  Thank you.

11      (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9LOHIR2                          Hallac - Direct

1              (In open court)

2              THE COURT:  Call your next witness.

3              MR. BLAIS:  The government calls Albert Hallac.

4       ALBERT HALLAC,

5           called as a witness by the Government,

6           having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  Please state your full name and

8       spell your last name for the record.

9              THE WITNESS:  Albert Hallac.  HALLAC.

10             THE COURT:  You may inquire.

11      DIRECT EXAMINATION

12      BY MR. BLAIS:

13      Q.  Good morning, Mr. Hallac.

14      A.  Good morning.

15      Q.  Mr. Hallac, how old are you?

16      A.  79.

17      Q.  Are you married?

18      A.  Yes, sir.

19      Q.  Do you have any children?

20      A.  Yes.

21      Q.  How many?

22      A.  Four.

23      Q.  I want to direct your attention to 2009.  What did you do

24      for a living in 2009?

25      A.  I was a chairman and CEO of a firm called Weston Capital

1    Management.

2    Q.  What is Weston Capital Management?

3    A.  It's an asset management firm.  We put together fund of

4    funds.  We structured them as a product so that investors can

5    invest in these things.

6    Q.  Who founded Weston?

7    A.  I did.

8    Q.  When did you found it?

9    A.  In 1993.

10   Q.  What positions did you hold at Weston?

11   A.  Generally the same, as chairman and CEO.

12   Q.  Now, you mentioned that Weston managed fund of funds.  Let

13   me break that down a bit.  Generally, what kind of assets did

14   Weston manage?

15   A.  They were hedge fund assets and they were -- so all of our

16   investments were in hedge funds, and we put them together

17   separately.

18   Q.  Now, for the benefit of the jury, what is a hedge fund?

19   A.  It's an entity that in fact invests so that it can be long

20   and short at the same time, thereby creating, supposedly, less

21   risk to the investors.

22   Q.  You just mentioned the concepts of "long" and "short".

23   Let's break that down.  What does it mean to be long in a

24   particular investment?

25   A.  Well, it's basically to buy something with the hope that it

G9LOHIR2                    Hallac - Direct

1   goes up.

2   Q.  And what does it mean to be short on a particular

3   investment?

4   A.  It's to sell something you actually don't own with the hope

5   that it goes down.

6   Q.  So in simple terms, being long is hoping that the price of

7   something goes up, and being short is hoping that the price of

8   something goes down; is that fair?

9   A.  Yes, sir.

10  Q.  Now, you also mentioned the concept of a fund of funds.

11  What is that?

12  A.  Well, it's, for instance, investing in ten different funds,

13  each doing different things, and putting together in one

14  structure trying to achieve a certain result or a certain type

15  of risk profile, which then creates a product that people will

16  feel comfortable with.

17  Q.  Now, what are the benefits to investors of investing in a

18  fund of funds?

19  A.  Well, it's technically less risky.  The returns are not as

20  high, but less risky.

21  Q.  When Weston made a particular investment in a hedge fund

22  that's part of a fund of funds, how much of its investment

23  could it possibly lose?

24  A.  Technically, the whole thing.

25  Q.  Did Weston manage a single fund of funds or multiple funds

G9LOHIR2                         Hallac - Direct

1    of funds?

2    A.  No, we had multiples.  We had eight, nine, ten funds at a

3    time at one point.

4    Q.  At its peak, what was the value of assets managed by

5    Weston?

6    A.  About 2.8 billion.

7    Q.  When, approximately, did that peak occur?

8    A.  In June, 2008.

9    Q.  At its peak, how many employees did Weston have?

10   A.  Between 45 and 50.

11   Q.  Where was Weston headquartered?

12   A.  In Connecticut.  I believe they have a New York office, and

13   we did have an office in London.

14   Q.  Can you give some examples of the kinds of investors in

15   Weston?

16   A.  Well, at the beginning, they were mostly high net worth

17   individuals, and as we grew larger and time went on,

18   institutional investors became our clients.

19   Q.  How did Weston make money from managing these kinds of

20   assets that we talked about?

21   A.  We charged the management fee on our assets, and we also

22   charged a performance fee.

23   Q.  Now, was Weston a registered investment advisor?

24   A.  Yes, sir, we were.

25   Q.  Did it file a Form 80-V every year?

1  A.  Yes, we did.

2  Q.  Back in 2009, which is where we're focused, how was Weston

3  structured?

4  A.  Well, we had one major holding company called Weston

5  Capital Management, and then a variety of underlying entities.

6  In terms of share holdings, I owned about 73 percent of the

7  company with my family, and a particular private equity firm

8  owned 25 percent, and a gentleman, who is now deceased, owned

9  2 percent of Weston Capital.

10  Q.  Just to be clear, in 2009, you owned approximately

11  73 percent of the parent company, the holding company of Weston

12  called Weston Capital Management?

13  A.  Yes, sir.

14  Q.  And you said that a private equity company owned

15  25 percent; is that correct?

16  A.  Yes, sir.

17  Q.  What was that private equity company?

18  A.  It was called Palm Beach Capital.

19  Q.  How did Palm Beach Capital come to own a portion of Weston?

20  A.  Palm Beach Capital was a private equity fund which was

21  managed by a friend of mine, and when I needed some funds and

22  capital to buy out my partner back in 2006, Palm Beach Capital

23  could step in as a minority investor, invested the money, and I

24  was able to buy my partner out.

25  Q.  What was happening in the financial markets in 2008 and

1    2009?

2    A.  It was pretty disastrous.  Markets, you know, went down

3    substantially.  There was a lot of fear in the streets.  People

4    were losing their homes and whatever.  There was a lot of

5    panic, and markets came down about 40 percent, on average.

6    Q.  How did that impact Weston?

7    A.  Well, we lost a lot of our assets under management.  In

8    other words, clients came and redeemed or sold their

9    investments with us, so we lost over 2 billion in assets in

10   less than a year.

11   Q.  Now, did there come a point in time when you were

12   introduced to Jason Galanis?

13   A.  Yes.

14   Q.  When was that?

15   A.  Actually, the first time was early 2008.

16   Q.  Who introduced you to Jason Galanis?

17           THE WITNESS:  Excuse me.  Is there a possibility of

18   having some water?

19           THE COURT:  Absolutely.  You just sit back, we're

20   going to take care of that.

21           THE WITNESS:  Just a little glass.

22           THE COURT:  If you want to go ahead.

23           THE WITNESS:  Go ahead.

24           MR. BLAIS:  Okay.

25   Q.  I think the question was, who introduced you to Jason

1     Galanis?

2     A.   A gentleman called Joe Bianco.

3     Q.   How did you know Joe Bianco?

4     A.   He had been introduced to me about four or five years

5     previous to that by one of his partners, Joe Bianco's partners,

6     you know, someone that I knew in Connecticut, and we just had

7     sort of kind of a very sort of passive relationship.  Nothing

8     serious, no business.

9     Q.   What was Jason Galanis doing at the time you were

10    introduced to him by Joe Bianco?

11    A.   Well, I didn't know much about him.  He came in with a

12    gentleman who was actually said to me was a president of the

13    company called Fund.com.

14    Q.   What was your understanding of Jason Galanis' role at

15    Fund.com?

16    A.   Well, basically, that he seemed to be running it or

17    controlling it.

18    Q.   What, if anything, did you know about sanctions imposed on

19    Jason Galanis by the SEC?

20    A.   I found out later that he had been sanctioned for five

21    years not dealing with a public company and had to pay a small

22    fine.

23    Q.   When did you learn about that?

24    A.   Well, after the meeting.  I, you know, looked him up, and

25    some of my people told me about him, and then I called Joe

G9LOHIR2                    Hallac - Direct

1   Bianco and I said, "What are we doing?"  And he said, "Well,

2   don't worry.  He's a great guy.  Very smart."  You know.  And

3   he encouraged me to continue dealing.

4   Q.  Did there come a point in time when Weston did a deal with

5   Fund.com?

6   A.  Yes, there was.

7   Q.  When did that deal take place?

8   A.  It was concluded and signed on March 31st, 2010.

9   Q.  What, generally, were the terms of the deal?

10  A.  Well, we sold the whole company, but there were some

11  positive terms and conditions, primarily that I was able to

12  value the company again three to five years later on, and if

13  the value of the company was substantially higher than it was

14  when we made the deal, then my family and I and other

15  shareholders would receive a higher amount of capital.

16  Q.  Just to be clear, Fund.com bought the parent company of

17  Weston?

18  A.  Yes, sir.

19  Q.  Weston Capital Management, which we just talked about

20  earlier?

21  A.  Yes, sir.

22  Q.  I know you mentioned the revaluation idea.  What were the

23  other terms of the deal?  What did you or what did Weston get

24  for entering into that deal with Fund.com?

25  A.  Well, there was some cash up front of which most -- most of

G9LOHIR2                    Hallac - Direct

1    the cash went to Palm Beach Capital.  Then there was some

2    working capital payments to Weston Capital of 500,000, there

3    was a $2 million payment to Palm Beach Capital, and there was a

4    half million dollars payment to me.  Plus, they -- part of the

5    conditions were they were supposed to give us some additional

6    working capital.

7    Q.  Now, why did Weston enter into that deal?

8    A.  Well, you know, we were looking for a partner in any case.

9    I'll just excuse myself for a moment.

10   Q.  Sure.

11   A.  Really sorry.

12   Q.  No problem.  I think you were explaining why Weston entered

13   into the deal with Fund.com.

14   A.  Well, as I said, we were looking for a merger partner,

15   primarily because Palm Beach Capital, a minority investor,

16   wanted to get out of the position, and the only thing -- the

17   only way they could get out of the position where if they were

18   to receive some cash.  So technically, a merger was not good

19   enough for them, they wanted an actual sale, so that's why we

20   did it.

21   Q.  How, if at all, did Jason Galanis' SEC bar affect your

22   willingness to do a deal with Jason Galanis?

23   A.  It was definitely an issue, but we went ahead and did the

24   deal anyway.

25   Q.  How, if at all, did the operations of Weston change after

1    the Fund.com deal?

2    A.  Well, I mean, I was technically in control of running the

3    company, but it did change because, first, Joe Bianco became

4    chairman of Weston Capital, and then we were eventually and

5    routinely asked to make certain types of investments and, you

6    know, which -- all to raise money for certain types of things.

7    But generally, I was still in control and we were able to carry

8    on.

9    Q.  Did Fund.com live up to the terms of the deal that you just

10   described a moment ago?

11   A.  No, they did not, not all of them.

12   Q.  And how did Fund.com fail to live up to the terms of the

13   deal?

14   A.  Well, first of all, they were delayed in making certain

15   payments, which they were supposed to make on May 30th, 2010.

16   They did not provide any working capital.  In fact, they

17   probably needed the working capital themselves, and overall, it

18   was not a good situation.

19   Q.  Now, with respect to the Fund.com purchase of Weston

20   Capital Management, what, if anything, did you disclose to

21   Weston's investors about Jason Galanis' involvement in

22   Fund.com?

23   A.  I did not disclose that information.

24   Q.  What, if anything, did you disclose about Jason Galanis'

25   SEC bar?

G9LOHIR2                          Hallac - Direct

1   A.  I did not disclose that, as well.

2   Q.  Now, sitting here today, do you believe that Jason Galanis'

3   involvement in Fund.com and his SEC bar are facts that Weston's

4   investors would have wanted to know?

5   A.  Definitely.

6   Q.  Now, did there come a point in time when Weston did another

7   deal with an entity associated with Jason Galanis?

8   A.  Yes.

9   Q.  When did that deal take place?

10  A.  It actually closed on January the 20th, 2010.

11  Q.  How did that particular transaction come about?

12  A.  We were approached in late 2009 by Jason and Joe about

13  exchanging some of our assets in a particular fund called the

14  Wimbledon Financing Fund against stock of Gerova which would

15  then be a public entity versus our assets that were not liquid.

16  Q.  As a general matter, what were the terms of -- well, let me

17  ask this.  Did you ultimately agree to a deal involving Gerova?

18  A.  Yes, we did.

19  Q.  What were the terms of that deal?

20  A.  Again, with the deal, we exchanged $85 million worth of

21  valuation of assets versus getting $85 million worth of Gerova

22  stock.

23  Q.  To be clear, which Weston funds were part of the Gerova

24  deal?

25  A.  There were two funds.  One was called the Wimbledon

G9LOHIR2                    Hallac - Direct

1    Financing Fund, and the other one was called the Wimbledon Real

2    Estate Financing Fund.

3    Q.  Just for the benefit of the jury, what were those two

4    funds?  What was the Wimbledon Financing Fund?

5    A.  There were basically -- underneath this particular fund of

6    ours, they were eight to ten managers whose sole investment

7    strategy was to invest and to lend money against assets.  So it

8    was an asset-backed kind of lending operation which went

9    totally illiquid when 2008, 2009 took place.

10           THE COURT:  All right.  If you'll pause there we're

11   going to take a brief five-minute recess.  Thank you.

12           (Recess)

1    (Jury present)

2         THE COURT:  You may continue.

3    BY MR. BLAIS:

4    Q.  Mr. Hallac, before the break you were testifying about the

5    two Weston funds that were contributed as part of the Gerova

6    deal.  Do you recall that?

7    A.  Yes, sir.

8    Q.  I believe you testified that the two funds were the

9    Wimbledon Financing Fund and the Real Estate Financing Fund.

10   Do you recall that?

11   A.  That's correct.

12   Q.  I believe you described what the Wimbledon Financing Fund

13   was right before we broke.  So let me ask you now to describe

14   what the Real Estate Financing Fund was?

15   A.  Exactly the same concept as the first, except that the only

16   loans made were against real estate assets.

17   Q.  What were the value of the two Weston funds that became

18   part of Gerova?

19   A.  85 million.

20   Q.  At their peak, what were the assets of those two funds

21   worth?

22   A.  Approximately 114, 115 million.

23   Q.  Were the investors in the two Weston funds required to

24   consent to the Gerova deal?

25   A.  Not really, no.

1   Q.   Why not?

2   A.   Our offering memoranda was such that we had the fiduciary

3   responsibility to do whatever was right for the fund, but we

4   did, in fact, keep all of our investors appraised of the

5   situation.   We explained the transaction, and we got neither a

6   do not do it or do it.   It was basically do what you can do as

7   an investment adviser.

8   Q.   What was your understanding of what Gerova planned to do

9   with the assets of the two Weston funds that were contributed

10  as part of the deal?

11  A.   It was a complicated situation.   We were told that the

12  assets that we had were such that they were sort of degrading

13  liquid assets, which would be able to be used as statutory

14  capital in Bermuda for an insurance company, meaning those

15  assets would be capital for Gerova so that they can write

16  insurance business.

17  Q.   What did the investors in the two Weston funds get as part

18  of the Gerova deal?

19  A.   They got a pro rata share of Gerova stock.

20  Q.   Were the Gerova shares received by the Weston investors

21  restricted or unrestricted?

22  A.   They were restricted.

23  Q.   For how long?

24  A.   Six months.

25  Q.   What happened when the six months expired?

1   A.  We were approached by Gerova requiring another extension

2   since they had not finalized their financials.

3   Q.  What happened at the end of that six-month period?

4   A.  By then Gerova had imploded and delisted.

5   Q.  So did the Weston investors ever get any shares of Gerova?

6   A.  No, sir.

7   Q.  Did anyone associated with Weston become a member of the

8   board of directors of Gerova following the transaction you just

9   described?

10  A.  No, sir.

11  Q.  Did anyone associated with Weston become an officer of

12  Gerova?

13  A.  No.

14  Q.  Did anyone associated with Weston become an employee of

15  Gerova?

16  A.  No.

17  Q.  Now, what was your understanding of what Jason Galanis's

18  role at Gerova was?

19  A.  Well, we were told that he was an adviser on acquisitions

20  that Gerova would make in the future, and he was heading an

21  entity called Gerova Advisors.

22  Q.  What, if anything, did you disclose to the Wimbledon

23  Financing Fund and the Real Estate Financing Fund investors

24  about Jason Galanis's involvement in Gerova?

25  A.  Unfortunately, we disclosed nothing.

1   Q.  What, if anything, did you disclose to those investors

2   about Jason Galanis's SEC bar?

3   A.  We did not disclose that either.

4   Q.  Sitting here today, do you believe that Jason Galanis's

5   involvement in Gerova and his SEC bar are facts that the

6   investors in those two Weston funds would have wanted to know?

7   A.  I think so, yes.

8   Q.  To be clear, who introduced Weston to Gerova?

9          THE COURT:  Repeat the question, please.

10  Q.  To be clear, who introduced Weston to Gerova?

11  A.  There was no introduction needed.  We knew Jason and Joe

12  Bianco, and they approached me directly.

13  Q.  Do you know whether anyone was compensated for making the

14  introduction of Weston to Gerova?

15  A.  Not that I know of.

16  Q.  What role, if any, did Gary Hirst have at Gerova?

17  A.  Mr. Hirst was president and chief investment officer.

18  Q.  Do you see Mr. Hirst in the courtroom today?

19  A.  Yes, I do.

20  Q.  Can you point to him and identify an article of clothing

21  that he is wearing?

22  A.  Behind the computer with nice gray hair.

23         THE COURT:  Identification noted.

24  Q.  Now, Mr. Hallac, have you ever met an individual named Ymer

25  Shahini?

1  A.  No, I have never heard the name.

2  Q.  What, if anything, do you know about Ymer Shahini?

3  A.  Nothing at all.

4  Q.  What role, if any, did Ymer Shahini have in introducing

5  Weston to Gerova?

6  A.  None whatever.

7  Q.  Did Shahini ever work for Weston?

8  A.  No, not at all.

9  Q.  Did Shahini ever provide consulting services to Weston?

10  A.  No.

11  Q.  To your knowledge, did Ymer Shahini play any role

12  whatsoever introducing Weston to Gerova?

13  A.  None whatsoever.

14  Q.  Mr. Hallac, I want to turn to a different topic.

15        Did any Weston funds maintain a bank account in

16  Switzerland?

17  A.  Yes, we did.

18  Q.  Which fund was that?

19  A.  It was called Wimbledon C Fund.

20  Q.  Why did the Wimbledon C Fund use a Swiss bank account?

21  A.  Because it was an offshore fund only, which means that it

22  was only available to foreign investors, and, therefore, all

23  activities and the bank accounts had to be offshore from the

24  United States.

25  Q.  At what bank was the Wimbledon C Swiss bank account

G9L8HIR3                        Hallac - Direct

1    maintained?

2    A.  It was called Societe Generale Private Bank, Suisse.

3    Q.  That's a subsidiary of a French bank, correct?

4    A.  Yes.  The bank is Societe Generale in France, Paris, one of

5    the largest banks in the world.

6    Q.  Is that bank sometimes referred to in brief as Soc-Gen?

7    A.  Yes, very frequently.

8    Q.  Did there come a point in time when Weston made an

9    investment in a fund associated with Gary Hirst?

10   A.  Yes.

11   Q.  Which Weston fund made that investment?

12   A.  That same Wimbledon C Fund.

13   Q.  How much was Weston's investment?

14   A.  $5 million.

15   Q.  How did that investment come about?

16   A.  I got a call from Jason Galanis asking me if I had some

17   available cash in one of our offshore funds, and if I would be

18   able to invest in Mr. Hirst's fund called the Global Asset

19   Fund.

20           MR. TREMONTE:  Objection.

21           THE COURT:  This is for the fact that it was said.

22           MR. BLAIS:  It is also a statement in furtherance.

23           MR. TREMONTE:  May we come up, your Honor?

24           THE COURT:  You may.

25           (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            (At the sidebar)

2            THE COURT:  How is it in furtherance?

3            MR. BLAIS:  So Mr. Hallac's funds made a $5 million

4    investment in a fund that was managed by Mr. Hirst.  After a

5    short period of time, those funds were redeemed and a portion

6    of the redemption, approximately $2.6 million, was paid for

7    from proceeds of the Shahini sales.  So this investment, we

8    believe, is part of the charged conspiracy.

9            MR. TREMONTE:  Even accepting all of that as true, the

10   government is not taking the position that Mr. Hallac made any

11   statements in furtherance of the conspiracy.  In fact, as I

12   understand it, the government's position is that, from Mr.

13   Hallac's point of view, this is not something that he

14   participated in knowing it was part of any crime.

15           I expect that the government will elicit from Mr.

16   Hallac that he allocuted to committing a string of offenses,

17   together with Jason Galanis and another individual named David

18   Bergstein, but this isn't one of them.  And all of the 5

19   million that went, at Jason Galanis's request, from Mr.

20   Hallac's fund to the Global Asset Fund goes back to Mr. Hallac.

21           Moreover, there is no foundation for Mr. Hallac's

22   statement that the fund is Mr. Hirst's fund, which it wasn't.

23           MR. BLAIS:  First of all, we are not going to elicit

24   any statement from Mr. Hallac about what he said.  He said what

25   Mr. Galanis reported to him over the phone.

G9L8HIR3                        Hallac - Direct

1          I can lay a foundation for why he believed it was Gary

2     Hirst's fund, which is going to be that Jason Galanis told him

3     that the investment was going into Gary Hirst's fund.  So I am

4     happy to elicit that statement.

5          THE COURT:  Give it to me again why the investment and

6     therefore statements about the investment are in furtherance of

7     the charged conspiracy.

8          MR. BLAIS:  Your Honor, these are funds that Jason

9     Galanis is directing be invested in a fund that we allege is

10    associated with Gary Hirst, and again, after a short period of

11    time, those funds were redeemed and the redemption was paid

12    using proceeds from the Shahini sales.

13         THE COURT:  Why is that significant?

14         MR. BLAIS:  Why is that significant?

15         THE COURT:  Yes.

16         MR. BLAIS:  We would argue this is an obligation that

17    was owed by Mr. Hirst -- these funds were invested and

18    legitimately redeemed -- and we would allege that the

19    obligation was satisfied using criminal proceeds, criminal

20    proceeds of this conspiracy.

21         THE COURT:  And that were transferred by whom to whom?

22         MR. BLAIS:  The $2.6 million was transferred from

23    Shahini's account to two different bank accounts that are

24    maintained at a credit union in Arizona, the signatory on which

25    is Gary Hirst and the account opening documents for both of

1    which lists Gary Hirst as the joint owner.  And then there are

2    instructions provided by Mr. Hirst to that credit union to wire

3    the funds to the Swiss bank account that we have been just

4    discussing.

5         MR. TREMONTE:  Again, I still don't see how any

6    statement that this witness made was in furtherance of the

7    conspiracy.  If he heard a statement from Jason Galanis, that's

8    different.  I also don't think you can let the testimony stand

9    that it's Gary Hirst's fund without the clarifying foundational

10   question as to how he knows that.

11        THE COURT:  You can lay the foundation.  And a

12   statement by Galanis, during and in furtherance of the

13   conspiracy, it will be admitted for the truth of its content,

14   but I take your point about statements by Hallac are not in

15   furtherance of the conspiracy.

16        MR. BLAIS:  Understood, your Honor.  I don't believe

17   at this point I have elicited any testimony from Mr. Hallac

18   about what he said in connection with this particular

19   investment.

20        THE COURT:  Thank you.

21        (Continued on next page)

22

23

24

25

1          (In open court)

2          MR. BLAIS:  I am not sure whether Mr. Hallac finished

3     his answer before the objection was lodged.

4          THE COURT:  You can reput the question.

5     BY MR. BLAIS:

6     Q.  Let me back up for a minute.

7          I asked you a question earlier about making an

8     investment in a fund associated with Gary Hirst.  Do you recall

9     me asking that question?

10    A.  Yes, I do.

11    Q.  What was your basis for understanding that that fund was

12    associated with Gary Hirst?

13    A.  Well, I knew the name of the fund from previous, before

14    even my getting involved with Gerova, because it existed.  But

15    I also knew that, when Jason called me, he specified the name

16    and mentioned that Gary was the chief investment officer of

17    that fund.

18    Q.  I will pose the question again because I am not sure we

19    fully answered it before we went to sidebar.

20         How did this particular $5 million investment in this

21    fund come about?

22    A.  Well, as I said, I got a call.  I was concerned about one

23    particular thing prior to making the investment.  So I asked

24    for certain conditions.  But at the end of the day, Wimbledon C

25    through Societe Generale made an investment of $5 million in

G9L8HIR3                          Hallac - Direct

1    that fund.

2    Q.  What was the name of the fund in which the investment was

3    made?

4    A.  Global Asset Fund.

5    Q.  When did the phone call that you were just describing with

6    Jason Galanis take place?

7    A.  I think it was late January of 2010.

8    Q.  Now, what, if anything, did you request in return for

9    making the investment?

10   A.  In view of the fact that the request was to make an

11   investment quickly, we had no chance to make any due diligence

12   on the fund or to know whether what he was going to do or no

13   the do.  So I asked two particular things from Jason, which

14   was, number one, no matter what happened, we would have to get

15   our $5 million back; and, number two, they would have to waive

16   the period of redeeming shares in that fund so that we could do

17   it within five business days at any time.

18   Q.  Did Mr. Hirst agree to those terms?

19              THE COURT:  Just so I understand it, there was a

20   longer waiting period and you wanted that waiting period

21   shortened?

22              THE WITNESS:  That's correct.  It was 60-day notice

23   period, and I wanted to do it five days at any time at the end

24   of the month.

25   Q.  Did Mr. Hirst agree to those conditions?

1    A.  He did.

2            MR. TREMONTE:  Objection, your Honor.

3            THE COURT:  Lay a foundation.

4            MR. BLAIS:  Your Honor, I can show a document in

5    evidence regarding this.

6            Ms. Sheinwald, if you could please publish to the jury

7    Government Exhibit 540, which is in evidence.

8            If you could turn to page 2 of this document, please.

9    Q.  Mr. Hallac, I am going to focus your attention to the

10   e-mail at the bottom of the page.  Do you see that?

11   A.  Yes.

12   Q.  Who is that e-mail from?

13   A.  It's from Keith Wellner to Gary Hirst.

14   Q.  What is the date of that e-mail?

15   A.  February 3, 2010.

16   Q.  Who is Keith Wellner?

17   A.  Keith Wellner was our chief operating officer, our in-house

18   counsel, and as well he was our compliance officer.

19   Q.  Can you just read the content of that e-mail, please?

20   A.  It says, "Gary, just another e-mail to our administrator to

21   get them completed as soon as possible reminding them of the

22   time-sensitive nature.  I forgot that the documents are

23   completed by the administrator's group in Geneva so you should

24   expect to receive them early tomorrow."

25           MR. BLAIS:  Ms. Sheinwald, could you please turn to

1    the first page of this particular document.

2               Actually, could you put page 1 and 2 side-by-side

3    because I am going to ask Mr. Hallac to read the paragraph at

4    the bottom that leads over to page 2.

5    Q.  Mr. Hallac, I am focusing your attention on the e-mail

6    that's at the bottom of page 1.

7               Who is that e-mail from?

8    A.  From Keith Wellner to Gary Hirst again.

9    Q.  Could you read the contents of that e-mail, please?

10   A.  "As the money will be wired tomorrow, please execute the

11   side letter tonight and e-mail back to me.  Thanks, Keith

12   Wellner."

13   Q.  What was the side letter that's being referred to in this

14   e-mail?

15   A.  The side letter is what we -- are the obligations that we

16   requested from the fund to give us, which was, number one, that

17   we would have the capital back intact, not less than 5 million,

18   and, number two, that we could in fact sell or redeem our

19   shares within five business days' notice.

20   Q.  Did that side letter in fact get signed?

21   A.  Yes, it did.

22               MR. BLAIS:  Ms. Sheinwald, could you please turn to

23   page 4 of this exhibit.

24   Q.  Mr. Hallac, what is this document?

25   A.  This is a document, yes.

G9L8HIR3                           Hallac - Direct

1   Q.   What is this document?

2   A.   This is the side letter that we were referring to.

3   Q.   On the letterhead of what entity is this particular letter?

4   A.   It says "Global Asset Fund Ltd., Cayman Islands."

5   Q.   Who is this letter sent to?

6   A.   It's sent to me, Albert Hallac, Weston Capital Management.

7   Q.   What is the date on this letter?

8   A.   February 1, 2010.

9   Q.   Who is it signed by?

10  A.   It's signed by Gary Hirst.

11  Q.   Now, I am going to ask you to read two parts of this

12  particular letter.  Could you read the sentence starting with

13  the word "anything in the PPM," and read up to Roman (ii).

14  A.   "Anything in the PPM, to the contrary notwithstanding, and

15  in consideration of your investment in the class A shares of

16  the company, the company hereby agrees (i) to allow Weston

17  Capital Management LLC, through one or more of the funds that

18  it or its affiliates advises (Weston) the ability to redeem all

19  of the class A shares it holds in the company at any time on

20  the last business day of any month (on at least five calendar

21  days prior written notice), not subject to any lock-up periods,

22  redemption fees, designated investments (side pockets),

23  redemption suspensions, payments in kind or hold-backs of any

24  nature."

25  Q.   Let me stop you there.

1             That provision that you just read, what does that mean

2      in layman's terms?

3      A.  Well, even though you're allowed to redeem within five

4      business days, people can say, fine, we don't have the cash,

5      but we will pay you in kind, which means that they will

6      actually give you some of their assets and break them up in

7      small pieces and give them to you.  So this makes sure that we

8      do no in fact receive anything but cash.

9      Q.  Can you just pick up the last clause of the paragraph

10     starting with Roman (ii)?

11     A.  "That upon redemption by Weston of its class A shares,

12     Weston shall receive aggregate proceeds at least equal to its

13     initial investment in the company."

14     Q.  Mr. Hallac, what does that mean in layman's terms?

15     A.  It means that no matter what happens, we will get our $5

16     million back.

17     Q.  Can you just read the last paragraph of the letter right

18     before the signature block?

19     A.  "The content of this letter agreement shall be valid

20     through all of the duration of Weston's investment and shall at

21     all times be kept confidential by each party."

22     Q.  Now, Mr. Hallac, how common was it for Weston to receive a

23     full guarantee that it would not lose any money in an

24     investment?

25     A.  Not very common.

1    Q.  How common was it for Weston to have the ability to redeem

2    its investment in a fund with only five days' notice?

3    A.  Not very common either.

4    Q.  Now, when did Weston's investment in the Global Asset Fund

5    actually take place?

6    A.  It took place on February the 1st or the 3rd, in that area,

7    of 2010.

8    Q.  Where did the funds Weston used to make the investment

9    actually came from?

10   A.  They came from our bank, Societe Generale in Geneva.

11   Q.  So from the Wimbledon C Swiss bank account that you

12   referenced earlier?

13   A.  Correct.

14   Q.  To be clear, was Weston's investment in the Global Asset

15   Fund a loan or did Weston actually purchase an interest in

16   Global Asset?

17   A.  We purchased a certain amount of shares so we had an

18   interest in the fund.

19           MR. BLAIS:  Ms. Sheinwald, could you please publish to

20   the jury Government Exhibit 542, which is in evidence.

21           Go to page 2 of this document.

22           If you could highlight the e-mail at the bottom.

23   Q.  Now, Mr. Hallac, who is this e-mail from?

24   A.  This e-mail is from a gentleman named Terence Thorpe, who

25   worked for Societe Generale.

1    Q.  That's the bank that had the Swiss account for Wimbledon C?

2    A.  Correct.

3    Q.  Who is this e-mail to?

4    A.  It's to Gary Hirst.

5    Q.  What is the date of this e-mail?

6    A.  February 5, 2010.

7    Q.  Could you read the contents of this e-mail?  Just the first

8    paragraph.

9    A.  "Please find the subscription documents executed in favor

10   of SG Private Banking (Suisse) SA with reference:  Wimbledon.

11          "Thank you for confirming us the good reception."

12   Q.  Mr. Hallac, what is SG Private Banking Suisse SA?

13   A.  It's really a bank that is owned by Societe Generale.  It

14   was headquartered in Switzerland, and therefore the name Suisse

15   in it, and it was our bank where Wimbledon C kept its assets.

16   Q.  So that's the Swiss bank where Wimbledon had its account?

17   A.  Absolutely.

18          MR. BLAIS:  Ms. Sheinwald, could you please publish

19   Government Exhibit 545, which is in evidence.

20   Q.  Now, I think this is the same e-mail we were just looking

21   at, but who is this e-mail sent from?

22   A.  It's sent from Mr. Thorpe to Gary Hirst.

23   Q.  What is the date of this e-mail?

24   A.  February 5, 2010.

25   Q.  Again, does this e-mail attach the subscription documents

1    for Wimbledon?

2    A.  Correct.

3    Q.  Let's turn to page 2 of this document.

4            What is this document?

5    A.  This is the confirmation that the Swiss bank sent to Global

6    Asset Fund whereby they just confirmed that they subscribed for

7    $5 million of the fund with a trade date of February 1, 2010.

8            MR. BLAIS:  Ms. Sheinwald, could you turn to page 3 of

9    this document.

10   Q.  What is this, Mr. Hallac?

11   A.  This is the actual subscription form.  This is where you

12   actually apply for shares in the company.

13   Q.  Again, this is an investment in the Global Asset Fund,

14   correct?

15   A.  Correct.

16           MR. BLAIS:  Ms. Sheinwald, could you please publish

17   Government Exhibit 428, page 53, to the jury.

18           Again, this document is in evidence.

19   Q.  Mr. Hallac, what is this document?

20   A.  This is a description of the Fed payments showing the $5

21   million transfer.

22   Q.  This is a document summarizing a wire that was sent,

23   correct?

24   A.  That's correct.

25   Q.  What was the amount of this wire?

1   A.  $5 million.

2   Q.  What was the date of the wire?

3   A.  February the 5th.

4   Q.  Where was it sent from, who is the sender of this wire?

5   A.  It was sent by Societe Generale.

6   Q.  Again, that was the Swiss bank account that Wimbledon C

7   had?

8   A.  Yes, sir.

9   Q.  Where was this wire sent to?

10  A.  It was sent to a name called Grand Adirondack.

11  Q.  Who is listed as the beneficiary?

12  A.  Global Asset Fund Ltd.

13  Q.  Mr. Hallac, is this a confirmation that the $5 million that

14  you have been describing was in fact wired from the Wimbledon C

15  bank account to the Global Asset Fund?

16  A.  That's correct.

17          MR. BLAIS:  Ms. Sheinwald, I want to turn back to

18  Government Exhibit 542, page 40.

19  Q.  Mr. Hallac, what is this document?

20  A.  This is an actual confirmation of the transaction, which

21  Global Asset Fund has sent to SG Private Bank.  And it shows

22  here that they purchased $5 million worth.  They got a certain

23  amount of shares, 2,660 shares, plus a few others.

24          And then they also talked about -- I'm sorry, the

25  first number is the actual share price of the shares, and the

1   second amount is the actual share amount of 1,879 shares.

2   Q.  Mr. Hallac, I want to focus you on the upper right-hand

3   part of the page.  What is the trade date that is listed for

4   this particular transaction?

5   A.  March 31, 2010.

6   Q.  Why if Weston wired money on February 5, 2010 to the Global

7   Asset Fund was the investment not made until March 31, 2010?

8   A.  I have no idea.

9   Q.  Now, what was your understanding of who ran the Global

10  Asset Fund?

11  A.  Well, we were told that this was always Gary Hirst as the

12  chief investment officer.

13  Q.  What was your understanding of the investment strategy of

14  the Global Asset Fund?

15  A.  It bought and sold securities for a profit.

16  Q.  What was your understanding of the kinds of securities

17  purchased by the fund?

18  A.  Equities mostly.

19  Q.  Do you know of any specific investment made by the Global

20  Asset Fund?

21  A.  I have no idea.

22          MR. TREMONTE:  Objection.  Foundation, your Honor.

23          THE COURT:  Overruled.

24          Go ahead.

25  Q.  Do you know of any specific investment made by the Global

1   Asset Fund?

2   A.  No, I'm afraid not.

3   Q.  How long was Weston invested in the Global Asset Fund?

4   A.  A short period of time.

5   Q.  Approximately how long?

6   A.  Well, we redeemed the first half on April 30th of 2010.

7   And the second half was paid on June 22, 2010.

8   Q.  Why did Weston choose to redeem its investment in the

9   Global Asset Fund after such a short period of time?

10  A.  Well, we were never planning to remain for a long time, and

11  we did this basically while we had cash, and we needed it back

12  to make other investments.  So in the normal course of the

13  running of our Wimbledon C Fund.

14         MR. BLAIS:  Ms. Sheinwald, could you please publish to

15  the jury Government Exhibit 541, which is in evidence.

16         Turn to page 2 of this document, please.

17  Q.  Again, I want to focus your attention, Mr. Hallac, to the

18  e-mail messages on the bottom of the page.

19         Who is this message from?

20  A.  From the same Mr. Thorpe of Soc-Gen.

21  Q.  Who is it to?

22  A.  Gary Hirst.

23  Q.  What was the date of this particular e-mail?

24  A.  April 30, 2010.

25  Q.  Could you please read the contents of this e-mail?

G9L8HIR3                        Hallac - Direct

1  A.  "Dear Gary, please find here a request for redemption in

2  Global Asset Fund."

3  Q.  Mr. Hallac, what is this e-mail?

4  A.  Basically, this e-mail is requesting the sale of our $5

5  million investment in the Global Asset Fund.

6       MR. BLAIS:  Ms. Sheinwald, if you could pull up the

7  e-mail on the top of the page.

8  Q.  Again, who is this message from?

9  A.  This message is from Gary.

10  Q.  Who is it to?

11  A.  Mr. Thorpe.

12  Q.  What is the date of this e-mail?  It appears to be in

13  European format with the day --

14  A.  It's April 30, 2010.

15  Q.  Can you read the content, the first two paragraphs of the

16  e-mail?

17  A.  "The Global Asset Fund acknowledges receipt of your

18  redemption request.

19       "The redemption will be effective today, April 30.

20  Global Asset Fund is sending a wire for the 95 percent of the

21  estimated proceeds, $2,375,000 at close of business today."

22  Q.  Did Weston, in fact, receive a wire of $2,375,000 on April

23  30, 2010?

24  A.  Yes, we did.

25       MR. BLAIS:  Ms. Sheinwald, if you could pull up

G9L8HIR3                          Hallac – Direct

1   Government Exhibit 428, which is in evidence, page 1.

2   Q.  Mr. Hallac, what is this document?

3   A.  Again, this is a confirmation of the Fed payments of the

4   $2,375,000.

5   Q.  Again, what was the date of this particular wire?

6   A.  April 30, 2010.

7   Q.  Who was the wire sent from?

8   A.  An entity called Vensure FCU AZ.

9   Q.  Who is listed as the originator further down?

10  A.  Global Asset Fund Ltd.

11  Q.  Who is the beneficiary of this particular wire?

12  A.  The beneficiary is Societe Generale.

13  Q.  That's, again, the Swiss bank account for the Wimbledon C

14  Fund?

15  A.  Yes, sir.

16  Q.  Now, to be clear, where did the redemption payments from

17  the Global Asset Fund go?

18  A.  They went to the Wimbledon C Fund at Societe Generale.

19  Q.  We just looked at the documents showing a $2.375 million

20  redemption.  When, if at all, did Weston redeem the remainder

21  of its funds in the Global Asset Fund?

22  A.  It would have been sometime in May because we got paid in

23  June.

24          MR. BLAIS:  Ms. Sheinwald, if you could pull up

25  Government Exhibit 546, which is in evidence.

G9L8HIR3                      Hallac - Direct

1              Focus on the e-mail at the bottom of the page.

2    Q.  Mr. Hallac, who is this e-mail from?

3    A.  Again, Mr. Thorpe of Societe Generale.

4    Q.  Who is it to?

5    A.  Gary Hirst.

6    Q.  What is the date?

7    A.  June 3rd.

8    Q.  Can you read the contents of this particular e-mail?

9    A.  "Dear Gary, please find enclosed our request of redemption

10   which represents our total holdings in the above-mentioned

11   fund."

12              MR. BLAIS:  Ms. Sheinwald, if you could flip to page 2

13   of this document.

14   Q.  Mr. Hallac, what this is document?

15   A.  This document is a confirmation of the redemption from

16   Societe Generale to the fund, and it shows a redemption of 939

17   shares -- 6653 shares, excuse me, of the Global Asset Fund.

18   Q.  Just to be clear so there is no confusion, the 939,6653 has

19   a comma in the middle.  Is that a European convention where a

20   comma is sometimes used in place of a period?

21   A.  That's exactly it.

22   Q.  So it's 939.6653 shares, not 939 million or 939,000,

23   correct?

24   A.  That's exactly correct, yes.

25              MR. BLAIS:  Ms. Sheinwald, if you could flip to page 3

1    of this document.

2    Q.   What is this?

3    A.   This is a request for redemption which came from Societe

4    Generale to Global Asset Fund.

5              MR. BLAIS:  Ms. Sheinwald, could you please turn to

6    page 1 of this document.

7              Just focus in on the e-mail on the top.

8    Q.   After the redemption request is sent from Societe Generale

9    to Gary Hirst, to whom does Mr. Hirst forward this e-mail?

10   A.   Actually, there is an e-mail from Gary Hirst to

11   jason@holmbycompanies.

12   Q.   Do you recognize that e-mail address?

13   A.   That's one of Jason Galanis's e-mail addresses.

14             MR. BLAIS:  Now, Ms. Sheinwald, could you please pull

15   up Government Exhibit 543.

16             If you can focus on the e-mail at the bottom of the

17   first page.

18             Sorry.  I meant the e-mail in the middle of the page.

19   I apologize.

20   Q.   Who is this e-mail from?

21   A.   It's from Gary Hirst to Keith Wellner.

22   Q.   Are you copied on this e-mail?

23   A.   Yes, I am.

24   Q.   What is the date of the e-mail?

25   A.   June 22, 2010.

1    Q.  Could you read the contents of this e-mail?

2    A.  Yes.  It says, "Keith, Global Asset Fund has wired the

3    funds to Soc-Gen this afternoon.  A copy of the wire

4    confirmation is attached."

5            MR. BLAIS:  Ms. Sheinwald, could you please turn to

6    page 3 of this document.

7    Q.  Mr. Hallac, what is this document?

8    A.  That, again, is the Fed confirmation of the wire.

9    Q.  What date was this wire sent?

10   A.  The date was June 22, 2010.

11   Q.  What was the amount of the wire?

12   A.  $2,620,000.

13   Q.  Who is shown as the originator of this particular wire?

14   A.  Again, an entity called Vensure FCU AZ.

15   Q.  Under the originator section, in the middle of the page,

16   what is the name of the originator?

17   A.  The name of the originator is Global Asset Fund Ltd.

18   Q.  And, finally, who is the beneficiary of this particular

19   wire?

20   A.  Societe Generale Private Banking.

21   Q.  Again, that's the Swiss bank account with the Wimbledon C

22   Fund?

23   A.  Yes, sir.

24           MR. BLAIS:  Ms. Sheinwald, could you turn to

25   Government Exhibit 548, which is in evidence.

1              Focus on the e-mail that's at the bottom of the page.

2     Q.   Who is this e-mail from and to?

3     A.   Again, from Terence Thorpe.

4     Q.   Who is it to?

5     A.   It's to Gary Hirst.

6     Q.   What is the date of this e-mail?

7     A.   June 14, 2010.

8     Q.   Could you read the contents of this e-mail?

9     A.   "Dear Gary, could you please inform us of the next

10    settlement date regarding the redemption of Global Asset Fund

11    (second part of the total position, validate May 30, 2010)?"

12              MR. BLAIS:  Ms. Sheinwald, could you zoom out and then

13    focus on the e-mail at the top of the page.

14    Q.   Who is this e-mail from?

15    A.   This e-mail is from Gary Hirst to Mr. Thorpe.

16    Q.   What is the date?

17    A.   June 22.

18    Q.   Could you read the contents of this e-mail?

19    A.   Yes.  It says, "Dear Terence, Global Asset Fund has this

20    afternoon wired $2,620,000 to your account.  A redemption would

21    have been for September 30 so the fund has instead refunded

22    your subscription.  This represents full and final payment."

23    Q.   What do you understand this e-mail to mean?

24    A.   Well, number one, that they paid the balance, even though

25    there's $5,000 missing.  But the second point is that we were

G9L8HIR3                          Hallac - Direct

1   no longer subscriber of the fund.  It means that they just

2   canceled our subscription originally.  So, therefore, if there

3   were any profits or losses, we would not have gotten any.

4   Q.  To be clear, did Weston's Swiss bank account in fact

5   receive the $2.6 million wire as part of its redemption of its

6   investment in Global Asset Fund?

7   A.  Yes, it did.

8   Q.  Do you know where the $2.62 million that paid back Weston's

9   redemption request came from?

10  A.  It went to our Swiss bank.

11  Q.  Let me ask the question again.

12          Do you know where the $2.62 million that paid back

13  Weston's redemption request, where that money came from?

14  A.  No, except we assume it's from Global Asset Fund.

15  Q.  Now, Mr. Hallac, did you commit crimes when you were

16  running Weston?

17  A.  Yes, sir, I did.

18  Q.  As a general matter, what was the nature of your criminal

19  activity?

20  A.  Well, I made certain transfers between our own funds, I

21  made certain loans by our funds, without disclosing it at all

22  to our investors.

23          I also sent a balance sheet, later on a balance sheet

24  that was not an authentic balance sheet by e-mail to a board of

25  directors of a public company.

G9L8HIR3                          Hallac - Direct

1  Q.  Did some of the money that you transferred from one Weston

2  fund to another without disclosure end up in your own pocket?

3  A.  No, sir.

4  Q.  Now, did there come a point in time when you offered to

5  speak to the government about your involvement in criminal

6  activity?

7  A.  Yes, sir.

8  Q.  Why was that?

9  A.  Well, again, my attorneys and I decided that it was time to

10 have a discussion with the prosecutors.

11 Q.  Approximately when did that happen?

12 A.  In 2013 at some point.

13 Q.  Approximately how many times did you meet with the

14 government?

15 A.  Half a dozen, ten times, around there.

16 Q.  What was the general topic of discussion in those meetings?

17 A.  I just explained my wrongdoing, and I went over all of the

18 facts.

19 Q.  Who, as a general matter, participated in these

20 discussions?

21 A.  There were some prosecutors, sometimes there were people

22 from the SEC, sometimes the FBI, and my own attorneys.

23 Q.  Did there come a point in time after your meetings with the

24 government when you pled guilty to federal criminal charges?

25 A.  Yes, there was.

1    Q.  What charges did you plead guilty to?

2    A.  I pled to five felonies.  I pled to a conspiracy to commit

3    investor adviser fraud and securities fraud, as well as

4    committing securities fraud.  I also pled to conspiring on wire

5    fraud, and then in fact committing wire fraud.

6    Q.  Do the charges to which you pled guilty relate to the

7    criminal conduct that you just described?

8    A.  Yes, sir.

9    Q.  Have you been sentenced yet on those charges?

10   A.  No, I have not.

11   Q.  What is your understanding of the maximum sentence you

12   could receive for the crimes to which you pled guilty?

13   A.  I could receive up to 70 years.

14   Q.  What is the minimum sentence you could receive?

15   A.  I guess probation.

16   Q.  Now, in connection with your guilty plea, did you enter

17   into a cooperation agreement with the government?

18   A.  Yes, I did.

19   Q.  Does this agreement require you to forfeit any money that

20   you made through your criminal conduct?

21   A.  Yes, it does.

22   Q.  What do you understand the government will do if you comply

23   with the terms of your cooperation agreement?

24   A.  I presume they will write a letter on my behalf.

25   Q.  What do you understand would be in that letter?

1    A.  Basically, the fact that I would continue -- first of all,

2    never to commit crimes, that I will certainly tell the truth at

3    all times, and that I would be available to the prosecutors if

4    they needed me as a witness.

5    Q.  You mentioned a letter in connection with sentencing.  What

6    is your understanding of what would be in that letter?

7    A.  I presume it's just a letter explaining the transaction and

8    then it would be presentencing.

9    Q.  What is your understanding of what would be included in

10   that letter?

11   A.  It will be things like what I did.  It will include things

12   about my behavior and all of that.

13   Q.  What is your understanding of whether the government will

14   make any recommendation about the specific sentence you should

15   receive?

16   A.  I was told there would be no recommendation whatsoever.

17   Q.  Who determines what your sentence will be?

18   A.  I was told only the judge.

19   Q.  Even if the government sends such a letter, what is the

20   maximum sentence you could face?

21   A.  I still could face 70 years.

22   Q.  What do you hope to receive by testifying here today?

23   A.  Well, hopefully, a much reduced sentence.

24   Q.  Does your sentence depend in any way on the outcome of this

25   trial?

G9L8HIR3                        Hallac - Direct

```
 1    A.  Not at all.

 2    Q.  Has anyone from the government or anyone else made you any

 3    promise about what your sentence will be?

 4    A.  No, not at all.

 5    Q.  I just want to return just very briefly to one substantive

 6    topic.

 7            You testified earlier, I believe, that in connection

 8    with the criminal activity that you have described, that there

 9    was no money that ended up in your own pockets.

10            Do you recall that testimony?

11    A.  Yes, sir.

12    Q.  Are you familiar with a company called Purple Box?

13    A.  Yes, sir.

14    Q.  In connection with a transaction involving Purple Box,

15    isn't it the case that there was money that actually ended up

16    in your own pocket, sir?

17    A.  Yes.  Actually, it went into Purple Box, that's correct.

18    Q.  Can you just briefly describe that situation for the jury?

19    A.  Sorry.  I forgot all about that.

20            In January 2012, there was a payment made by an entity

21    to an entity called Purple Box, of which I had a 50 percent

22    interest, and I received $240,000 from that entity.

23            MR. BLAIS:  Your Honor, may I have a moment?

24            THE COURT:  Yes.

25            MR. BLAIS:  No further questions.
```

G9LOHIR4                          Hallac - Cross

1            THE COURT:  Ladies and gentlemen, we will take our

2    lunch break.  Please do not discuss the case among yourselves

3    or with anyone.  Keep an open mind.  We will back in action at

4    2:00.

5            Thank you very much.

6            (Jury exits courtroom)

7            THE COURT:  I am going to ask the clerk to mark as

8    Court Exhibit 5 a revised version of the proposed jury

9    instructions for the review of the parties.

10            Have a pleasant lunch.

11            (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9LOHIR4                        Hallac - Cross

1              (Jury not present)

2              THE COURT:  First of all, let me thank defense counsel

3     for complying with my directive.  The letter was received in

4     good order and I appreciate that.

5              Did the government submit anything on the statute of

6     limitations?

7              MR. BLAIS:  We have, your Honor.

8              THE COURT:  It didn't make its way to me.  I believe

9     you.  Where is it?  On ECF?

10              MR. BLAIS:  It was filed on ECF.

11              THE COURT:  We'll find it on ECF.  That's fine.

12              Our jurors are ready, so let's bring them in.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  The defendant may cross examine.

3                MR. TREMONTE:  Thank you, your Honor.

4       CROSS EXAMINATION

5       BY MR. TREMONTE:

6       Q.  Good afternoon, Mr. Hallac.

7       A.  Good afternoon.

8       Q.  When you testified earlier, you testified about your fund,

9       right?

10      A.  Yes.

11      Q.  The Weston Fund.  And you testified about transfers of

12      money to and from you, correct?

13      A.  Yes.

14      Q.  But I want to be clear about this.  That's just sort of

15      shorthand, right?  The funds in the Weston Fund, those belong

16      to investors, right?

17      A.  Correct.

18      Q.  That's not your money, right?

19      A.  Definitely not.

20      Q.  And that's typical of this business, the hedge fund

21      business, the money in the funds is invested on behalf of

22      investors, correct?

23      A.  Yes, sir.

24      Q.  Not on behalf of people who run the fund, right?

25      A.  That's right.

G9LOHIR4                     Hallac - Cross

1   Q.  So if you're the owner of Weston, you own the business that
2   manages other people's money, right?
3   A.  That's correct, even though I did have plenty of my own
4   money in all of our funds.
5   Q.  Understood.  And so to the extent that you had money in the
6   fund yourself, you are one of the investors in the fund, right?
7   A.  Correct.
8   Q.  And whoever is working for the fund, whoever manages the
9   money, they have obligations to the investors, correct?
10  A.  Absolutely.
11  Q.  And if you're an investor, then you would be one of them,
12  right?
13  A.  Yes.
14  Q.  Now, in connection with your guilty plea in a different
15  case, you allocuted.  Do you remember that?
16  A.  Yes, I do.
17  Q.  And that means that you stood up in court and you explained
18  to the Court the facts and circumstances relating to the crimes
19  that you committed, right?
20  A.  Yes, sir.
21  Q.  You committed some of these crimes that you allocuted to
22  with Jason Galanis, right?
23  A.  Yes, sir.
24  Q.  So for example, in 2009, you agreed with Jason Galanis that
25  Fund.com would acquire Weston, right?

1    A.  Yes.

2    Q.  And you didn't tell your investors that Jason was involved

3    in Fund.com, right?

4    A.  That's right.

5    Q.  That was one fraudulent lie that you allocated to, right?

6    A.  Yes.

7    Q.  And then you told the Court that in early 2010, you agreed

8    that the Wimbledon assets would be exchanged for Gerova stock,

9    correct?

10   A.  Yes.

11   Q.  And again, just to focus in on the type of fraud it was,

12   that was a fraud on your investors, right?

13   A.  Well, not the exchange of shares versus assets.  The fraud

14   was that I did not tell my investors that Gerova was, in fact,

15   run by Jason Galanis.

16   Q.  Right.  So the idea was that you were causing the Wimbledon

17   assets to be exchanged for Gerova stock, right?

18   A.  Yes.

19   Q.  And those Wimbledon assets were owned by the investors of

20   that fund, right?

21   A.  That's correct.

22   Q.  And you defrauded the investors of that fund by not telling

23   them about Galanis, right?

24   A.  Well, yes.  The fact is, I did not tell them about Galanis,

25   but the transfer of asset and the transaction itself was

1    originally for the benefit of the investors.

2    Q.  Okay.  But you did defraud the investors in connection with

3    that transaction, correct?

4    A.  Yes.  I did not tell them about the fact that Jason Galanis

5    was involved in Gerova.

6    Q.  Okay.  And that was $85 million worth of assets that you

7    put under Jason Galanis' control without telling the investors,

8    right?

9    A.  Well, actually, it was $85 million of face value assets,

10   yes.

11   Q.  Then in early 2011, there were certain negative articles

12   that came out about Galanis' involvement with Gerova, right?

13   A.  Yes.

14   Q.  And the share price of Gerova stock dropped dramatically,

15   right?

16   A.  It sure did.

17   Q.  At that point, you had a problem because these Wimbledon

18   fund assets were -- you had exchanged them for Gerova stock

19   that wasn't worth anything, right?

20   A.  That's right.

21   Q.  So your investors had worthless Gerova stock, whereas

22   before they had had valuable assets, right?

23   A.  They had assets.

24   Q.  That was one problem.  The other problem that you had at

25   the time was you didn't want to inform your investors that you

1    had defrauded them by getting involved with Galanis, right?

2    A.  Yes.  But I do have to tell you that our investors knew

3    every move that we made with Gerova.  They were given

4    explanatory memorandums, they were given presentations, they

5    were actually put together with the management of Gerova.  It

6    was not a situation where we simply did the transaction and

7    gave out -- we were just simply that nothing changed in the

8    world.  They knew what we had done, they just did not know that

9    Mr. Galanis was in control of Gerova.

10   Q.  And that would have been important for them to know, right?

11   A.  It would have been important.

12   Q.  And that's why you didn't tell them, because if they had

13   known, they probably wouldn't have said yes, right?

14   A.  Well, as I said, we had the right to make the investments,

15   but you're right, we did not tell them and we should have told

16   them.

17   Q.  And you defrauded them, right?

18   A.  We did, yes.

19   Q.  And you pleaded guilty to, among other things, that fraud,

20   right?

21   A.  Yes, sir.

22   Q.  And the investors, if they had been concerned about that,

23   that would have been justified because they ended up holding

24   worthless Gerova stock, right?

25   A.  Yes.

1    Q.  So you tried do something about that by getting involved

2    with somebody named David Bergstein; isn't that right?

3    A.  Well, I was introduced to David Bergstein by Jason Galanis.

4    Q.  I understand you were introduced to him, but then you

5    entered into a series of fraudulent agreements with him, didn't

6    you?

7    A.  Yes, I did.

8    Q.  And that was, in part, to try to clean up the mess that you

9    had made with the Wimbledon assets, right?

10   A.  You could say that.

11   Q.  I'm asking you, is that --

12   A.  It was to help -- to help the assets have some value again,

13   correct.

14   Q.  And it's another fraud because you didn't tell your

15   investors about what you were doing with Bergstein, right?

16   A.  Yes, sir.

17   Q.  One of the things you were doing with Bergstein is you

18   agreed that he would try to recover these assets from Gerova,

19   right?

20   A.  That was the understanding.

21   Q.  So basically, the deal was, he would try to recover them,

22   and if he did, then you would have to give the recovered assets

23   to something called Arius Libra, right?

24   A.  Yes.

25   Q.  And that's another company that Bergstein controlled,

1    right?

2    A.  Well, actually, the Wimbledon Financing Fund controlled

3    65 percent of the stock of Arius Libra.  Bergstein controlled

4    it in the sense that he was the initial director and had some

5    powers of moving things around.

6    Q.  Okay.  But again, this was part of your guilty plea

7    allocution, right?

8    A.  Well, not that specific thing.  The fact, my guilty plea

9    was about investor advisory fraud and securities fraud.

10   Q.  Okay.  You agreed that if Bergstein could recover these

11   assets, you would be okay with them being pledged to Arius

12   Libra to finance investments in medical billing companies,

13   right?

14   A.  Yes, I was very okay with that.

15   Q.  And that was part of your larger fraud to which you

16   allocuted, right?

17   A.  Yes.  And in fact, prior to that transfer being made, all

18   the investors of the Wimbledon Financing Fund were gathered at

19   a meeting on December 14th, 2011 to explain to them what was

20   being done with Bergstein and Parmar and with the Wimbledon

21   Financing Fund, and they knew all about it.

22   Q.  Okay.  And then Bergstein convinced you to take cash from

23   another Weston fund called Partners 2, correct?

24   A.  Yes.

25   Q.  And the point there was to loan that money to Arius Libra?

G9LOHIR4                    Hallac - Cross

1  A.  That's correct.

2  Q.  And that was something on the order of $9 million, correct?

3  A.  At the height, yes.

4  Q.  Well, at the end -- at the height.  It was $9 million,

5  right?

6  A.  Yes.

7  Q.  You didn't tell the investors of the P2 fund about that,

8  right?

9  A.  No, I did not.

10 Q.  And you allocated to that, as well?

11 A.  Yes.

12 Q.  So no matter what the convened shareholders of Wimbledon

13 knew, none of your investors knew that you were defrauding them

14 again by stealing money from P2 to loan out to Arius Libra,

15 right?

16 A.  You are confusing two funds, sir.  The first fund in which

17 they knew it was happening was the Wimbledon Financing Fund.

18 Q.  They didn't know it was happening.  They didn't know that

19 you had exchanged all of their assets for worthless Gerova

20 stock with Jason Galanis.  They didn't know that, right?

21 A.  Well, at that point, Gerova was not worthless, it was just

22 starting in business.

23 Q.  Okay.  Go ahead.  I'm sorry.

24 A.  So I'm trying to tell you, there are three funds.  Let's

25 not confuse them.  When I made the loan of $9 million, this was

1    for different investors in a different fund on which we

2    received $12 million worth of assets from Arius Libra.

3    Q.  I understand.  So you had already defrauded Weston

4    investors in connection with Fund.com, you had already

5    defrauded Wimbledon investors in connection with Gerova, and

6    now you were defrauding a separate group of investors, the

7    Partners 2 investors.

8    A.  If this is how you want to phrase it, sure.

9    Q.  Am I wrong?

10   A.  Well, the fact remains that this is what I allocated to and

11   you are absolutely correct.

12   Q.  It didn't stop there, right?

13   A.  No, there was a third transaction.

14   Q.  And that involved the Wimbledon TT transaction, correct?

15   A.  That's correct.

16   Q.  With that Sports ID?

17   A.  Yes, sir.

18   Q.  That was a $17 million fraud, correct?

19   A.  17.7, yes.

20   Q.  It didn't stop there, did it?  I think you forgot this on

21   direct, too.  There was the Purple Box, too, right?

22   A.  Yes.

23   Q.  As an end of the day net in the Purple Box fraud, you had

24   hundreds of thousands of dollars in your pocket, right?

25   A.  Yes.

G9LOHIR4                    Hallac - Cross

1    Q.  And the point of all of these frauds was to line your

2    pockets, correct?

3    A.  Well, as I said, other than the 240,000, it did not line

4    any of my pockets.

5    Q.  But the point was to keep your businesses afloat, right?

6    A.  The unfortunate part is lost money for my investors, and

7    for which I am sorry, and for which I pleaded guilty.

8    Q.  That's not answering my question.

9    A.  What is your question?

10   Q.  My question is, each and every one of these frauds was

11   designed to line your pockets, correct?

12   A.  No.  And the answer is no.  I did not line my pockets other

13   than the $240,000.  I was a $1 million investor in the

14   Wimbledon Financing Fund.  Lost all my money there.  I was a

15   $500,000 investor in the P2 Fund, and I lost some of my money

16   there.  So I want to make sure that I agree to everything you

17   have said, except that I did not line my pockets.

18   Q.  And actually, I left one out.  There was the Bids.com

19   fraud, correct?

20   A.  Yes, but that was not against our investors.

21   Q.  But it was a fraud, right?

22   A.  Absolutely.

23   Q.  You created a false financial statement and presented it as

24   if it was real, correct?

25   A.  Yes, sir.

1   Q.  You made up a fake fund called the P3 Fund, right?

2   A.  The fund existed, but it had no assets.

3   Q.  And you pretended it did have assets.

4   A.  Yes, I did.

5   Q.  So that was another separate fraud, correct?

6   A.  Absolutely.

7   Q.  So you allocuted to committing these crimes with Jason

8   Galanis and David Bergstein, and that was in '09, '10 and '11,

9   right?

10  A.  Yes, sir.

11  Q.  Not everything you did during that time period was

12  fraudulent, correct?

13  A.  I hope not.

14  Q.  Although you were involved in these multiple frauds, you,

15  in fact, engaged in transactions that you understood to be

16  legitimate, right?

17  A.  I hope so.

18  Q.  And one of those was the GAF, Global Asset Fund,

19  subscription you testified about on direct?

20  A.  As far as I was concerned, I did not know what was

21  happening.  I, technically speaking, did not tell my investors

22  about that investment.  I also, frankly speaking, was very

23  concerned with that investment.  And first of all, the way it

24  was asked of me and the way it was presented, I was very

25  concerned with that investment.

G9LOHIR4                          Hallac - Cross

1    Q.  But you did it nevertheless, correct?

2    A.  I did it, but do not call it necessarily a legitimate

3    transaction.

4    Q.  But it's another transaction that you allocuted to when you

5    pled guilty, correct?

6    A.  No, it was not, but it was under the umbrella of my bad

7    acts.

8    Q.  It's not a transaction that you reported to the government

9    as fraudulent, correct?

10   A.  No.

11   Q.  In advance of your allocution, right?

12   A.  That's correct.

13   Q.  Now, there came a time when you agreed with Jason Galanis

14   to make this investment, correct?

15   A.  Yes.

16   Q.  And that was in Global Asset Fund, right?

17   A.  Yes.  That's what he asked me.

18   Q.  He asked you to make a $5 million investment in the fund

19   and you agreed, right?

20   A.  Yes.

21   Q.  And shortly after making the investment, you tried to

22   redeem, correct?

23   A.  Well, first of all, I did not just make the investment.

24   You forgot, or forgot to mention two very important

25   qualification and conditions that be met prior to making the

1   investment, which were, number one, that no matter what, we

2   would receive our $5 million back.  Not less than, but

3   hopefully a profit, and the second thing, more importantly, was

4   that we would have the right to redeem very quickly with five

5   days' notice.

6   Q.  And you made the investment with those conditions, right?

7   A.  Yes.

8   Q.  And then there came a time when you attempted to redeem,

9   right?

10  A.  Yes.

11  Q.  And you were told that there would be a quarterly

12  redemption in late May on a regular schedule.  You can't get it

13  all now, correct?

14  A.  Yes.

15  Q.  And you objected to that or, through Mr. -- you directed

16  Mr. Wellner to object to that, correct?

17  A.  Yes.

18  Q.  You basically, either directly or through Mr. Wellner,

19  picked up the phone to Jason Galanis, right?

20  A.  Yes.

21  Q.  And said, "Jason Galanis, I want my money back," right?

22  A.  Well, not only that, but I think Mr. Wellner actually sent

23  an email to Mr. Hirst saying to him, "Hey, there's a side

24  letter.  You better read it before you tell us that we don't

25  have the right to redeem."

1  Q.  Right.  Mr. Wellner brought to Mr. Hirst's attention the

2  side letter, correct?

3  A.  Yes.

4  Q.  Because Mr. Hirst's initial response was you can't get the

5  redemption until May, right?

6  A.  Correct.

7  Q.  Okay.  And that's what caused you to call Jason Galanis,

8  right?

9  A.  Correct.

10  Q.  Okay.  At the end of the day, the $5 million came back,

11  correct?

12  A.  At the end of the day, yes.

13  Q.  Right.  So the redemption request was honored, right?

14  A.  Actually, it was three weeks late, the last payment.

15  Q.  Ultimately, the redemption request was honored, right?

16  A.  Yes.

17  Q.  The $5 million went back to the Wimbledon Fee Fund, right?

18  A.  Yes.

19  Q.  Back into the pool of assets that belonged to the

20  investors, right?

21  A.  Yes.

22  Q.  And that was available for legitimate investments going

23  forward, right?

24  A.  Yes.

25  Q.  That money did not end up in the hands of Gary Hirst at the

G9LOHIR4                    Hallac - Redirect

1    end of the day, correct?

2    A.  No.

3              MR. TREMONTE:  No further questions.

4              THE COURT:  You may redirect.

5    REDIRECT EXAMINATION

6    BY MR. BLAIS:

7    Q.  Mr. Hallac, you testified earlier that you pled guilty

8    pursuant to a cooperation agreement.  Do you recall that?

9    A.  Yes, sir.

10   Q.  There's a set of materials in the Redweld in front of you,

11   and I would direct your attention to the exhibit that is marked

12   for identification as 3505-11.

13   A.  Did you say 3505?

14   Q.  3505-11.

15   A.  Let me look some more.

16   Q.  I can pass a copy up to you, Mr. Hallac.

17   A.  Thank you.

18   Q.  Do you recognize that document, Mr. Hallac?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  It's my plea agreement with the government.

22   Q.  If you could flip to the last page of the document.

23   A.  Yes, sir.

24   Q.  Is that your signature on the document?

25   A.  Yes.  I signed this document.

1        MR. BLAIS:  Your Honor, the government offers the

2   document identified as 3505-11.

3        THE COURT:  Any objection?

4        MR. TREMONTE:  No objection.

5        THE COURT:  Received.

6        (Government's Exhibit 3505-11 received in evidence)

7        MR. BLAIS:  Ms. Sheinwald, could you please pull up

8   the ELMO for the jurors?

9   BY MR. BLAIS:

10  Q.  Mr. Hallac, do you see this document on the screen in front

11  of you?

12  A.  Yes.

13  Q.  What's the date of this document?

14  A.  July 27th, 2015.

15  Q.  You see that it's addressed to Martin Kaplan, Esquire?

16  A.  Yes, sir.

17  Q.  Who is that, sir?

18  A.  He is my attorney, Martin Kaplan of Gusrae Kaplan.

19  Q.  I'm going to flip to the last page of the document.  Is

20  that your signature, Mr. Hallac?

21  A.  Yes.

22  Q.  I want to turn back to the first page of the document.  Do

23  you see here, Mr. Hallac, there are a series of counts that are

24  listed; Count One, Count Two, Count Three?

25  A.  Yes, sir.

1   Q.  Are those the counts that you pled guilty to pursuant to

2   this cooperation agreement?

3   A.  Yes, sir.

4   Q.  I'm turning to page 2 of this document.  You see it

5   continues and there's Count Four, Count Five?

6   A.  Yes.

7   Q.  Those are also counts that you pled guilty to, sir?

8   A.  Yes, sir.

9   Q.  You see the sentence that begins "The total maximum

10  sentence"?

11  A.  Yes, I do.

12  Q.  Could you read that sentence aloud, sir?

13  A.  "The total maximum sentence of incarceration on all counts

14  is 70 years of imprisonment."

15  Q.  And then focusing you down on the paragraph that begins

16  "The defendant furthermore admits", could you read that

17  paragraph for the jury?

18  A.  "The defendant furthermore admits the forfeiture

19  allegations with respect to Count One through Five of the

20  information and agrees to forfeit to the United States pursuant

21  to 18 U.S.C. 981(a)(1)(C) and 28 U.S.C. 2461 any and all

22  property, real or personal, that constitutes or is derived from

23  the commission of the offenses alleged in Counts One through

24  Five."

25  Q.  You can stop there, Mr. Hallac.

1   A.  Thank you.

2   Q.  I want to direct your attention to the paragraph that

3   begins "it is understood".  Do you see that?

4   A.  Yes, sir.

5   Q.  That paragraph outlines your various obligations under the

6   cooperation agreement, correct?

7   A.  Yes.

8   Q.  And one of those obligations is that you disclose

9   truthfully all information about your past activities,

10  including criminal activities, correct?

11  A.  Yes.

12  Q.  In looking at letter B, "you're obligated to cooperate

13  fully with this office," that's the U.S. Attorney's Office,

14  correct?

15  A.  Yes.

16  Q.  And the Federal Bureau of Investigation?

17  A.  Yes, sir.

18  Q.  And any law enforcement agency that's directed by the U.S.

19  Attorney's Office?

20  A.  Yes.

21  Q.  And then you're also obligated to attend meetings and

22  provide any materials that the U.S. Attorney's Office requests,

23  correct?

24  A.  Yes.

25  Q.  Could you please read paragraphs E, F, and G?  I'm sorry,

1   the subclauses of the paragraph.

2   A.  Yes.  "Shall truthfully testify before the grand jury and

3   any other trial and other court proceedings with respect to any

4   matter about which this office may request his testimony; (f),

5   shall bring to this office's attention all crimes which he has

6   committed and all the administrative, civil, or criminal

7   proceedings, investigations, or prosecutions in which he has

8   been or is a subject, target, party, or witness; and (g), shall

9   commit no further crimes whatsoever."

10  Q.  I want to direct your attention, sir, to page 3 of your

11  cooperation agreement and focus you on the paragraph at the

12  bottom of the page that begins "it is understood".  Can you

13  read at least the start of that paragraph to the jury?

14  A.  Let me find it here.

15  Q.  It's the long paragraph at the bottom.

16  A.  Oh, I'm sorry.  I was looking in the middle of it.  Sorry.

17  "It is understood that the sentence to be imposed upon the

18  defendant is within the sole discretion of the Court.  This

19  office cannot and does not make any promise or representation

20  as to what sentence the defendant will receive, and will not

21  recommend any specific sentence to the Court.  However, this

22  office will inform the probation office and the Court of, (a),

23  this agreement; (b), the merit and extent of the defendant's

24  activities with respect to this case and all other activities

25  of the defendant which this office deems relevant to

1   sentencing; and (c), the nature and extent of the defendant's

2   cooperation with this office."

3   Q.  You can stop there.  I'm going ask you to skip the next

4   paragraph and then read -- sorry next sentence -- and read the

5   sentence that begins "in addition, if this office determines".

6   A.  "In addition, if this office determines that the defendant

7   has provided substantial assistance in an investigation or

8   prosecution, and if he has fully complied with the

9   understanding specified in this agreement, this office will

10  file a motion pursuant to Section 5K1.1 of the sentencing

11  guidelines."

12          THE COURT:  All right.  That's enough.  The document

13  is in evidence.  It will be in the jury room if the jury wishes

14  to read it in full during deliberations.

15          MR. BLAIS:  Okay, thank you.  I have no further

16  questions, your Honor.

17          THE COURT:  All right.  You may step down, sir.

18          MS. HECTOR:  Your Honor, may the government read a

19  stipulation?

20          THE COURT:  Yes.

21          MS. HECTOR:  "United States of America versus Gary

22  Hirst.  It is hereby stipulated and agreed by and among the

23  United States of America by Preet Bharara, United States

24  Attorney for the Southern District of New York, Brian Blais,

25  Aimee Hector, and Rebecca Mermelstein, Assistant United States

1   Attorneys of counsel, and Gary Hirst, the defendant, by and

2   with the consent of his attorneys, Michael Tremonte and Justine

3   Harris that, one, Government's Exhibits 450 and 451 include

4   true and correct telephone records, including subscriber

5   information and records of incoming and outgoing calls with the

6   cellular telephone assigned telephone number (203)977-7676.

7   The information contained in Government's Exhibits 450 and 451

8   was recorded by AT&T at or near the time that the telephone

9   activity took place, was kept in the regular course of AT&T's

10  business activity, and was relied on as the regular practice of

11  AT&T.

12        Two, Government's Exhibits 452 and 453 include true

13  and correct telephone records, including subscriber information

14  and historical cell site information for the cellular telephone

15  assigned number (415)271-3751.  The information contained in

16  Government's Exhibits 452 and 453 was recorded by AT&T at or

17  near the time that the telephone activity took place, was kept

18  in the regular course of AT&T's business activity, and was

19  relied on as a regular practice of AT&T.

20        Government's Exhibit 454 includes true and correct

21  telephone records, including historical cell site information

22  for the cellular telephone's assigned call numbers

23  (415)271-3751 and (415)632-7047.  The information contained in

24  Government's Exhibit 454 was recorded by AT&T at or near the

25  time that the telephone activity took place, was kept in the

1    regular course of AT&T's business activity, and was relied on

2    in the regular practice of AT&T.

3            Four.  Government's Exhibit 455 includes true and

4    correct telephone records, including subscriber information and

5    records of incoming and outgoing calls, for the cellular

6    telephone assigned telephone number (310)351-7680.  The

7    information contained in Government's Exhibit 455 was recorded

8    by Verizon Wireless at or near the time that the telephone

9    activity took place, was kept in the regular course of Verizon

10   Wireless' business activity, and was relied on as a regular

11   practice of Verizon Wireless.

12           Five.  Government's Exhibit 456 includes true and

13   correct telephone records, including subscriber information and

14   records of incoming and outgoing calls for the cellular

15   telephone assigned telephone number (407)417-0338.  The

16   information contained in Government's Exhibit 456 was recorded

17   by AT&T at or near the time that the telephone activity took

18   place, was kept in the regular course of AT&T's business

19   activity, and was relied on as a regular practice of AT&T.

20           Six.  Government's Exhibit 457 includes true and

21   correct telephone records, including records of incoming and

22   outgoing calls for the cellular telephone assigned telephone

23   number (407)805-0422.  The information contained in

24   Government's Exhibit 457 was recorded by AT&T at or near the

25   time that the telephone activity took place, was kept in the

1    regular course of AT&T's business activity, and was relied on

2    as a regular practice of AT&T.

3              It is further stipulated and agreed by and among the

4    parties that this stipulation and the government's exhibits

5    recited herein are admissible as government exhibits.

6              That is dated September 16th, 2016 and signed by the

7    parties.

8              Your Honor, the government now admits the government's

9    exhibits included --

10             THE COURT:  You offer?  I'm sorry.  The government

11   now --

12             MS. HECTOR:  -- seeks to admit the government exhibits

13   recited in the stipulation and this stipulation, Government's

14   Exhibit 1510.

15             THE COURT:  Any objection?

16             MR. TREMONTE:  Your Honor, may we confer briefly?

17             THE COURT:  Yes.

18             (Pause)

19             MS. HECTOR:  Judge Castel?

20             THE COURT:  Yes.

21             MS. HECTOR:  May I, for a moment?

22             THE COURT:  All right.

23             MS. HECTOR:  Could I just clarify something?

24             THE COURT:  Yes.

25             MS. HECTOR:  First of all, in item number six, the

1   stipulation recited that it was Government's Exhibit 457 was a

2   cellular telephone number.  It actually is a landline number.

3   But nonetheless, the government is now not actually seeking

4   admission of Government's Exhibit 457, so let me clarify that.

5          Let me also clarify that I inadvertently said

6   "stipulated and agreed that the exhibits are admissible", it's

7   that the stipulation is admissible, not that the exhibits

8   themselves are admissible.

9          The government nonetheless moves for the admission of

10  all of the exhibits recited and the stipulation, except for

11  Government's Exhibit 456 and 457.

12          THE COURT:  Any objection?

13          MR. TREMONTE:  No objection, your Honor.

14          THE COURT:  They're received.

15          (Government's Exhibits 450, 451, 452, 453, 454, 455,

16  1510 received in evidence)

17          MS. HECTOR:  May we have a sidebar regarding this next

18  witness?

19          THE COURT:  Yes.

20          (Continued on next page)

21

22

23

24

25

G9LOHIR4                        Hallac - Redirect

1              (At sidebar)

2              MS. HECTOR:  Your Honor, the next witness that we

3     intended to call was Shant Chalian.

4              THE COURT:  I'm going to send the jury to the -- we'll

5     take a recess, and then we'll take up the issue.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Ladies and gentlemen, I'm going to send

3    you in early for a mid-afternoon break.  Do not discuss the

4    case among yourselves or with anyone else.  See you in a few.

5    (Continued on next page)

1              (Jury not present)

2              THE COURT:  Ms. Hector, any live witnesses after this?

3              MS. HECTOR:  Yes.

4              MR. BLAIS:  One more.  Mr. Hinton, who is our summary

5    exhibit witness.

6              THE COURT:  So call him next.  All right?  We'll take

7    a break and call Hinton next.

8              MS. MERMELSTEIN:  That's fine, your Honor.  I think

9    that there's a fair chance that we finish with Mr. Hinton today

10   with time left, and we're then at the crossroads.

11             THE COURT:  I have certain materials which I received

12   from the law firm, and my law clerk is working under my

13   direction in reviewing.  I do have a question regarding the

14   20-F and, is it the Form 6 that a foreign company files?  Do I

15   have that right?

16             MR. BLAIS:  I think there's a 6-K form --

17             THE COURT:  6-K.

18             MR. BLAIS:  -- which is the equivalent of a U.S. 8-K,

19   actually.

20             THE COURT:  8-K.

21             MR. BLAIS:  And then I think there also is an 8-A

22   form.

23             MR. TREMONTE:  A/A and there's an F-1.

24             THE COURT:  All right.  In or about May, June, was

25   there a public filing disclosing the exercise price?

1          MR. BLAIS:  Yes.  I think it's Defendant's

2     Exhibit 114.  That was the 8-A form.

3          MR. TREMONTE:  That's the form 8-A/A.

4          THE COURT:  What does it say about the exercise price?

5          MR. TREMONTE:  It says that on May 21st, 2010, the

6     company -- I can't remember if it's the shareholders or the

7     board -- but the company authorized two things; the issuance of

8     $17,400,000 additional publicly traded warrants, so that

9     doubled the number of publicly traded warrants, and adjusted

10     the strike price from $7.50, which is what it had been

11     previously, to $7 as of May 21, 2010.

12          MS. HECTOR:  But your Honor, just to be clear, the

13     testimony I believe is that that was relevant to publicly

14     traded warrants at the time, which is distinct from the private

15     warrant agreement with Mr. Shahini.

16          MR. TREMONTE:  That is some of the testimony.

17          THE COURT:  Right.  And what's your position with

18     regard to that?

19          MS. HECTOR:  We don't think that has any relevance to

20     the warrant calculation document that is in evidence as

21     Government's Exhibit 601.  That dealt with publicly traded

22     warrants, and it says in that filing that this relates to the

23     publicly traded warrants under -- and I can't remember off the

24     top of my head the date -- but something that, you know, the

25     January something warrant agreement, which are the publicly

G9LOHIR4                        Hallac - Redirect

1    traded warrants, not the March 29th, 2010 private warrant

2    agreement with Mr. Shahini.

3            MR. TREMONTE:  Couple things, your Honor.  The

4    language of the warrant agreement itself states that that $7.50

5    strike price is adjustable under certain circumstances.  It's a

6    couple of paragraphs -- subparts to a long paragraph.  I don't

7    remember them off the top of my head.  And it's clear that

8    Mr. Feiner, or Mr. Chalian, or whoever prepared the warrant

9    exercise calculation used the $7 price that was the price of

10   the company's publicly traded warrants in May.

11           THE COURT:  All right.  We're in recess.  Thank you.

12           (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Bring our jurors in, please.

2           (Jury present)

3           THE COURT:  You may call your next witness.

4           MS. MERMELSTEIN:  The government calls Mr. Paul

5    Hinton.

6     PAUL HINTON,

7          called as a witness by the government,

8          having been duly sworn, testified as follows:

9           THE DEPUTY CLERK:  State your name and spell it for

10   the record, please.

11          THE WITNESS:  Paul Hinton, P-A-U-L, H-I-N-T-O-N.

12   DIRECT EXAMINATION

13   BY MS. MERMELSTEIN:

14   Q.  Good afternoon, Mr. Hinton.

15   A.  Good afternoon.

16   Q.  Let me ask you to pull the microphone a little closer to

17   you.

18          Why don't you begin by walking us through your

19   educational background?

20   A.  Yes.  I studied an undergraduate degree at Oxford

21   University in England in engineering science.  And then I

22   studied a graduate degree at Harvard University, at the Kennedy

23   School, where I studied economic, statistics, finance and

24   public policy.

25   Q.  Where do you currently work?

1    A.  I work at the Brattle Group.

2    Q.  What is the Brattle Group?

3    A.  The Brattle Group is a specialty consulting firm that

4    specializes in economic analysis, mainly, in connection with

5    litigation.

6    Q.  What do you do there?

7    A.  I provide expert testimony and work on economic analysis

8    that's needed in connection with litigation.

9    Q.  What is your title?

10   A.  My title is principal.

11   Q.  How long have you been with the Brattle Group?

12   A.  I have been with the Brattle Group about three years.

13   Q.  What did you do before that?

14   A.  I worked at a similar consulting firm for 18 years doing a

15   similar line of work.

16   Q.  Approximately how many litigations have you been involved

17   in?

18   A.  I have been involved in almost 100, I would say.

19   Q.  In connection with your work at the Brattle Group, and at

20   your prior employer, have you testified as a witness before?

21   A.  I have.

22   Q.  In depositions?

23   A.  Yes.

24   Q.  And in arbitrations?

25   A.  Yes.

G9L8HIR5                         Hinton – Direct

1    Q.  What kinds of cases were those depositions and arbitrations
2    in?
3    A.  Yes.  They were a combination of commercial damages claims
4    and securities litigation, for example, class actions involving
5    shares of stock.
6    Q.  Which side did you testify for?
7    A.  A lot of those cases, I would say the majority of those
8    were for the defense.
9    Q.  Have you ever testified in a criminal trial before?
10   A.  I have not.
11   Q.  Was the Brattle Group retained by the government in this
12   case?
13   A.  It was.
14   Q.  What was the initial scope of the work for which the
15   Brattle Group was retained?
16   A.  Well, it was pretty broad, in that they were looking at the
17   financial circumstances, really focused on two areas.  One,
18   looking at trading activity connected with the allegations in
19   the case, and the other was to look at the proceeds of trading
20   activity and what happened to that money.
21   Q.  So just so we are clear, the information you're going to
22   testify about here today, is that the entirety of the work that
23   you have done for the government?
24   A.  No.
25   Q.  Approximately how much have you billed the government for

1    all of your work in this matter?

2    A.  Well, the Brattle Group has billed over $200,000.

3    Q.  In connection both with the investigation and then in

4    addition to your testimony here at trial?

5    A.  Yes, all together.

6    Q.  Just to be clear, does your compensation depend in any

7    fashion on the outcome of this trial?

8    A.  It does not.

9    Q.  What kinds of things have you reviewed in connection with

10   your work on this matter?

11   A.  We have reviewed a lot of trading records, data with regard

12   to the trading of equities, account statements, wire transfers,

13   documents which record the transactions.

14   Q.  Where did you get those documents from?

15   A.  Well, some of the data is available publicly on trading of

16   shares, but most of the documents were obtained through the

17   government.

18   Q.  The documents that you used to do the analysis you're going

19   to talk about, are those all documents that are in evidence in

20   this case?

21   A.  Yes.

22   Q.  Broadly speaking, what kinds of analysis are you going to

23   testify about today?

24   A.  Well, I am going to summarize both parts of that work that

25   we did, the analysis of trading activity and the analysis of

G9L8HIR5                        Hinton - Direct

1   the proceeds and where the money went and who it ended up with.

2   Q.  Let me direct your attention to what is in front of you in

3   a folder that's labeled Government Exhibits 901 through 910.

4   Let me ask you to pull those out.

5          Do you recognize those?

6   A.  Yes, I do.

7   Q.  Are those charts in whose preparation you participated?

8   A.  Yes.

9   Q.  That contain the summary analysis you were just discussing?

10  A.  They do.

11  Q.  Are each of these charts based on documentary evidence

12  admitted at this trial?

13  A.  They are.

14  Q.  Are each of these charts accurate depictions based on the

15  evidence you have reviewed?

16  A.  Yes.

17          MS. MERMELSTEIN:  The government offers Government

18  Exhibit 901 through 910.

19          MS. HARRIS:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibits 901 through 910 received in

22  evidence)

23          MS. MERMELSTEIN:  In light of the number of documents

24  here and the technological issues we have had, we have hard

25  copies of the charts that we will also blow up on the screen,

G9L8HIR5                         Hinton - Direct

 1    but that way we are prepared.

 2              Is that all right with your Honor?

 3              THE COURT:  Yes.

 4              MS. MERMELSTEIN:  Ms. Sheinwald, if I could ask you to

 5    pass them out.

 6              So let's pull up Government Exhibit 901 on the screen,

 7    if we can, and everyone should have a copy as well.

 8    BY MS. MERMELSTEIN:

 9    Q.  What is this chart showing?

10    A.  This is a chart of the stock price of Gerova, and it

11    identifies the news events along the way.

12    Q.  What time frame is this chart showing?

13    A.  It starts in January 2010 and goes through March 2011.

14    Q.  Turning first to the numbers that go down the left-hand

15    side of the page, what do those indicate?

16    A.  These numbers down the side are just the stock price at any

17    point along the line.  So if you read the blue line, it goes up

18    and down showing how the stock price went up and down.

19    Q.  Just so we are clear on the blue line, you just used the

20    fancy touch screen in front of you to point the jury to what

21    you're talking about.  The blue line you were referring to is

22    not the line you drew, it's the line that was already on the

23    chart, is that right?

24    A.  Yes.  I guess I should change the color to red.

25              There are a lot of blue lines on these charts.  So we

1   will use green for my highlighting.

2   Q.   The left-hand side is the stock price.  And then what is on

3   the bottom of that chart?

4   A.   The bottom has the dates on which the stock price is

5   measured on each day.

6   Q.   So, generally speaking, what does it show about the stock

7   price of Gerova over this time period?

8   A.   Well, it shows that it started around $10.00, there was a

9   big jump up in the May through June time period, and then it

10  comes down again to around the $6.00 area.  At the end of the

11  chart, it drops down to about a dollar.

12  Q.   Let's walk through some of the events that are on this

13  chart.

14          Let me direct your attention to the first event on the

15  chart, and if you could walk us through what that indicates.

16  A.   This first event is on January 19, that's what Gerova was

17  formed.  And on that date, the stock price -- you can read it

18  off on the axis here -- is about $9.02.

19  Q.   Then let's go on to the next indication on the chart.

20          What does that show?

21  A.   The second news event was on March 1st, and on that date,

22  the American Stock Exchange, which is where Gerova was being

23  traded, issued a notice saying that it intended to delist

24  Gerova.

25  Q.   Just so we are clear, was the notice of the delisting

1    issued by Gerova itself or by the New York Stock Exchange, or

2    do you not know?

3    A.  I believe it was issued -- I believe it was issued by

4    Gerova.

5    Q.  We can pull the document if necessary.

6           Let's go to the next indication.  What happens next on

7    the chart?

8    A.  So the next date we are looking at is May 27, and that's

9    when Ymer Shahini received 5.3 million shares of Gerova, and on

10   that date the shares were trading at $13.56.

11   Q.  Now, underneath the various events it says -- in

12   particular, underneath this event -- GX 302 and 500.  What does

13   that indicate?

14   A.  Those numbers there are the exhibits that are admitted in

15   this case as supporting the event there.  So it would be in

16   that case the document that shows that the shares were received

17   by Shahini and authorized by Gary Hirst.

18   Q.  So throughout the charts you prepared, are these references

19   to government exhibit numbers just the underlying documentation

20   that supports what you have demonstrated?

21   A.  That's right.

22   Q.  Let's pull up an example just so that's clear, and let's

23   look at Government Exhibit 302 in evidence.

24           MS. MERMELSTEIN:  If you could go to page 2, please,

25   Ms. Sheinwald, and zoom in on the middle section.

G9L8HIR5                          Hinton - Direct

1   Q.  What does this indicate about the issuance of shares to Mr.

2   Shahini?

3   A.  This is showing that, at the end of the account statement

4   period showing the balance in the account, it's showing it's

5   5.3 million shares in the account at that time.

6   Q.  Then let's go to Government Exhibit 500, the other

7   citation.

8   A.  Can I just go back?

9   Q.  Absolutely.

10  A.  I just wanted to point out that the date of the transfer is

11  in the account activity section.  So you see the date 5/27,

12  that was the date that we put on the chart.  So that's really

13  the event we are supporting.

14          MS. MERMELSTEIN:  If we can look at 500 for a moment,

15  and go to the second page, please.

16  Q.  Is this the back-up documentation for the notation on your

17  chart that Gary Hirst authorized the issuance of those shares?

18  A.  That's correct.

19  Q.  Let's go back to Government Exhibit 901, please.

20          What is the next indication on this chart?

21  A.  The next date we are looking at is in June, June 14.  And

22  that's the date on which Ymer Shahini first begins to sell

23  shares in Gerova.

24  Q.  What is the stock price on that date?

25  A.  You can read it off of the chart here.  It's $17.25.

G9L8HIR5                        Hinton - Direct

1    Q.  Is that the highest stock price that Gerova had during the

2    time frame depicted on this chart?

3    A.  It is.

4    Q.  What happens in the sort of week slash two following that

5    initial sale of shares from the Shahini account?

6    A.  As you could see, the share price drops dramatically over

7    the next two weeks.

8    Q.  So -- sorry.  Go ahead.

9    A.  I was just going to point out, by the time you get to the

10   beginning of July, July 2, the price is down at $4.89.

11   Q.  So it drops from 17.25 to 4.89 over the course of two

12   weeks?

13   A.  That's right.

14   Q.  What is the next indication on this chart?

15   A.  The next indication is all the way down in November, on

16   November 23rd.  That's the date when there was this five-to-one

17   share consolidation, and that's when shareholders were given

18   one new share in exchange for five of their previous shares.

19   And, obviously, the new share they got would be worth five

20   times as much.  So rather than showing the share price jumping

21   up on that day, we have adjusted the share price to the rest of

22   the chart just to reflect the fact that the individual

23   investors still held shares that were worth the same amount of

24   money.

25   Q.  Otherwise you would have seen a huge jump on the stock

1    price and then it would continue along the same way, it would

2    continue just higher on the chart?

3    A.   That's right.

4    Q.   Now, between July 2, when the price was 4.89, and the

5    one-to-five share consolidation in November 2010, where is the

6    share price in that time frame?

7    A.   In this time period, you can see the share price is in and

8    around the five to seven dollar range.

9    Q.   What is the next indication on your chart?

10   A.   The next indication is January 10, 2011, when two new

11   stories are noted, one by Forbes and one by Dalrymple Finance.

12   Q.   And what happens to the stock price of Gerova in the month

13   or two following those news reports?

14   A.   You can see that in the following weeks the share price

15   drops from $5.40 down to $1.06 by February 23rd.

16   Q.   What happens on February 23?

17   A.   So that's the date on which the New York Stock Exchange

18   halted trading of Gerova.

19   Q.   So then after that the stock sort of stopped trading?

20   A.   Right.  There is no more trading so you don't see any

21   changes after that.

22   Q.   Let's move to Government Exhibit 902.

23             MS. MERMELSTEIN:  Let me ask everyone to keep their

24   hard copy of 901 up.

25   Q.   Can you explain how this chart 902 relates to 901, the

1    chart we were just looking at?

2    A.  What we did here is we just zoomed in on that section of

3    the chart that goes between the beginning of May and the end of

4    July.  So that was part of the first chart that had the big

5    jump up in the stock price.  So we zoomed in on that and

6    consequently it sort of stretched it out sideways.  That's why

7    it looks slightly different, but it's really the same share

8    price.

9    Q.  Most of this chart is the peak that we looked at on the

10   last chart?

11   A.  That's right.

12   Q.  So let's turn our attention to Government Exhibit 902, and

13   what does this chart show?

14   A.  Now we have the blue lines showing the share price again,

15   just as we had before, with the corresponding events that we

16   talked about from the previous exhibit.  But now we have added

17   in some other information.  On the bottom axis you will see

18   these blue bars, all these blue bars here.  These represent how

19   much trading activity there was in the market on each day.  And

20   you can look to see -- read them off of the right-hand axis to

21   see how much trading activity there was in shares.

22   Q.  So volume in million, that's just a trading activity,

23   number of shares?

24   A.  Yes, that's the number of shares in millions.

25   Q.  What time frame does this chart address?

1   A.   It goes from May 1, 2010 to July 31.

2   Q.   In very broad terms, what does this chart show about the

3   correlation between the volume of Gerova stock being bought and

4   sold in the market and the price of the stock?

5   A.   It enables you to see how much trading is going on, by

6   reading the information on the bottom here, at the same time

7   that the share price is going up and down.

8   Q.   So just so it's clear, what is the correlation between

9   volume and share price on this chart?

10  A.   For most of the time period, in the first six weeks, you

11  will see there is really not very much trading activity.  But

12  the really important feature of this chart, or noteworthy

13  feature, is the point in time when the share price drops

14  dramatically, there is also a huge jump in the volume.

15  Q.   Let's walk through it step by step.

16         Where on this chart does it indicate that the shares

17  in the Shahini account of Gerova are first beginning to be

18  sold?

19  A.   Right.  So that's starting with this date on the top, June

20  14, that's the date when the shares begin to be sold.

21  Q.   Approximately how many shares are sold on June 14, 2010 in

22  the market?

23  A.   If you look at this little bar right here, and then if you

24  read off this axis on the right, it's essentially 134,000

25  shares on that day traded in the market.

1    Q.  What is the source of information that you use for the

2    volume and price of the stock in the market?

3    A.  It's Government Exhibit 900.

4    Q.  Let's just look at Government Exhibit 900 for a moment.

5    And if we can flip to the page for June 2010.

6         So June 14, what was the volume on that day?

7    A.  That's the 134,000 that I mentioned.

8    Q.  Just for sake of comparison, what was, for example, the

9    volume on the prior two days of trading?

10   A.  On the previous two days, you had 6,900 and then 4,000.

11   Q.  Let's go back to Government Exhibit 902, please.

12        Again, what happens to the stock price of Gerova in

13   the, let's say, two weeks following, or the week and a half

14   following the beginning of the selling of shares?

15   A.  So from June 14, you can see in the next week the share

16   price drops somewhat and comes back a little bit, but by June

17   24th the share price is now $13.66.

18   Q.  Then what happens between June 24 and June 29?

19   A.  That's the time period over which you see there is a big

20   drop down to $5.63.  It's actually a drop by a factor of 2.4.

21   Q.  What happened on June 24?

22   A.  Well, what is going on on June 24, we mentioned this

23   before, this is actually the date when Shahini is selling a

24   large amount of shares and the volume jumps to 1.4 million

25   shares.

1  Q.  So that's June 25 the volume jumps all the way to 1.4

2  million shares?

3  A.  Right, which is about ten times what it had been on June

4  14.

5  Q.  So following that huge jump in volume, what happens to the

6  stock price?

7  A.  That's the same time that the share price is dropping.

8  Q.  Are there continued sales of Gerova following that 1.4

9  million share day?

10  A.  Right.  Obviously, compared to the level of trading before,

11  it jumps right up to 1.4 million, but it remains pretty high

12  for the next few days.

13  Q.  Now, in addition to looking at the volume and the stock

14  price of Gerova, have you analyzed the sales of Gerova in the

15  period following this decline in stock price?

16  A.  Yes.

17  Q.  In particular, have you looked at who certain purchasers of

18  Gerova were in that time period?

19  A.  That's right.

20  Q.  Have you identified any patterns?

21  A.  We have.

22  Q.  Broadly speaking, we will talk about the specifics in a

23  moment, what are those patterns?

24  A.  What we found was that on days when Ymer Shahini is selling

25  shares, there were particular brokers in the market who were

G9L8HIR5                           Hinton - Direct

1    buying shares.

2    Q.  Let's take a look at that, and let's move to Government

3    Exhibit 903, please.

4         Before we get into the specifics, can you generally

5    explain sort of what this chart depicts?

6    A.  Right.  So we are now looking at the time period in those

7    weeks just after, in July, when there's some increase in

8    trading volume.  The light blue bars on the chart are sales by

9    Ymer Shahini.  I should say they are trades by Ymer Shahini.

10        MS. HARRIS:  Objection.

11        May we approach?

12        THE COURT:  Sure.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2            MS. HARRIS:  The witness is testifying repeatedly that

3    the trading was done by Ymer Shahini.  The evidence in the case

4    is clear that Ymer Shahini wasn't personally making the trades.

5    I think it would be fair for the government to clarify whether

6    his personal knowledge is just that those shares were being

7    traded and clarify that for the record.

8            MS. MERMELSTEIN:  I am happy to do that.  He is using

9    shorthand; he is not suggesting he has any knowledge one way or

10   the other.  I will clarify that what he means is he reviewed

11   the account statements in that name.  It's no problem.

12           MR. TREMONTE:  Again, the point is he is summarizing

13   information.  You had another witness testify that a great big

14   chunk of that trading was with Legent, the clearing broker,

15   covering a margin, which if he is going to accurately report on

16   what he is seeing, he should say that.

17           MS. MERMELSTEIN:  I am very happy to clarify that he

18   is not saying that Shahini is the one doing the trading.  I

19   think the charts speak for themselves.  In fact, we are going

20   to get to another chart that talks about the margin situation.

21   But I also think these are summary charts that represent

22   certain parts of the story.  If defense counsel has questions

23   on cross-examination or wants to put up other charts, that

24   certainly is fine.

25           THE COURT:  I agree with both of you.  So I think the

G9L8HIR5                    Hinton - Direct

1    clarification is appropriate and you also have your

2    opportunities on cross.

3            (Continued on next page)

G9L8HIR5                           Hinton - Direct

 1            (In open court)

 2   BY MS. MERMELSTEIN:

 3   Q.  You were about to start describing this chart.

 4            Let me just ask you, what documents, in particular,

 5   did you review in preparing this chart?

 6   A.  Well, we had account statements for Ymer Shahini, and we

 7   also had blue sheet data and also account statements for Martin

 8   Kelly brokerage firm.

 9   Q.  So you don't have any personal knowledge of the events in

10   this case, right?

11   A.  No, I don't.

12   Q.  When you say that Martin Kelly and Ymer Shahini acted,

13   that's shorthand for that the brokerage account in the name of

14   Shahini reflects these purchases or sales, right?

15   A.  That's right.  I am just looking at the activity in those

16   accounts from the account statements.

17   Q.  Got it.

18            So I interrupted you.  You were describing what the

19   light blue and dark blue bars are.

20   A.  All the bars indicate trading activity in numbers of

21   shares.  So the number of shares is indicated on the side here.

22   There are trades out of the Shahini account and then there is

23   also dark blue bars for trading by a broker called Martin

24   Kelly.

25            The bars that are below the line, the negative bars,

G9L8HIR5                        Hinton - Direct

1    those are sales.  And the bars that are above the lines, those

2    are purchases.

3    Q.  So mostly the indication for the last sells and buys is

4    above the line?

5    A.  Right.

6    Q.  Now, there are a few light blue bars above the line.  What

7    does that mean?

8    A.  It's true.  It just means there are some days on which Ymer

9    Shahini purchased some Gerova shares.

10   Q.  So let's walk through then what this shows.

11            In the first couple of entries in the beginning of

12   July, what is happening on the days that Martin Kelly buys

13   Gerova, if anything?

14   A.  Well, you could see that there is purchasing activity by

15   Martin Kelly, but there is no activity in the Shahini account

16   on those days.

17   Q.  Those shares are being purchased not from the Shahini

18   account, in other words?

19   A.  No, those are just open market purchases by Martin Kelly.

20   Q.  Then let's jump to July 22.  What does that show?

21   A.  So July 22 is the date on which there is large amount of

22   activity.  And on that day, the volume of shares that are

23   traded by -- or sold, I should say, out of the Shahini account

24   are about 300,000 shares, and a similar number of shares are

25   purchased by Martin Kelly.

1    MS. MERMELSTEIN:  Now, can we blow up 902 and 903

2    side-by-side for a moment, Ms. Sheinwald.

3    Can we zoom in on that spike you were just talking

4    about on 903.

5    Let's zoom in on the same time period at the bottom of

6    the chart on the top.

7    THE WITNESS:  It's over here.

8    MS. MERMELSTEIN:  Where the green marks are.  There we

9    go.

10   Q.  Can you show us where are we on the first chart in the time

11   frame we are looking at on the second chart, if that question

12   makes sense?

13   A.  In other words, this bar, where there is an increase in

14   trading activity, that's July 22, which is the same date that

15   we see the big spike in activity in the Shahini account.

16   Q.  Let's go back to 903 then, please.

17   MS. MERMELSTEIN:  Now, Ms. Sheinwald, pull up 903 up

18   side-by-side with Government Exhibit 1068.

19   Let me ask you to zoom in on the top part of that

20   e-mail.

21   Q.  What is the date of that e-mail?

22   A.  It's dated July 22.

23   Q.  Can you read for the jury the second line of that e-mail?

24   A.  It says, "We need to act on this immediately" -- you

25   mean --

G9L8HIR5                         Hinton - Direct

1    Q.  I mean the second sentence.  My fault.

2    A.  I will read it from the beginning of the e-mail text.

3          It says, "Ymer, sounds great, my friend.  Jason has

4    identified a buyer for 300,000 shares.  We need to act on this

5    immediately as this cash flow will see us through the rest of

6    the summer (in addition to getting you paid and the partnership

7    money for over there).  The sale will be to long-term investors

8    who look to hold positions, meaning it will be people who will

9    not run the stock down.  But we need to be ready today to give

10   Raymond James instructions.  These friendly trades are rare and

11   we need to take advantage."

12         MS. MERMELSTEIN:  Let's pull that down and go back to

13   903, please.

14   Q.  Approximately how many shares were sold from the Ymer

15   Shahini account on July 22?

16   A.  It's just over 300,000.

17   Q.  How many were purchased by Martin Kelly that day?

18   A.  Over 250,000.

19   Q.  Then what does the chart show happens on the next couple of

20   indications?

21   A.  What you see in the subsequent days is on the days on which

22   there are sales out of the Shahini account, there are also

23   purchases; they tend to be purchases out of the Martin Kelly

24   account in a similar amount.

25   Q.  How many days on this chart are depicted where Martin Kelly

G9L8HIR5                          Hinton - Direct

1   bought shares of Gerova?

2   A.  I think there are about 24.

3   Q.  How many days are there in which Martin Kelly bought Gerova

4   in which there were sales by Ymer Shahini's account?

5   A.  There are 16.

6   Q.  On the days that there were sales in the Ymer Shahini

7   account and purchases in the Martin Kelly account -- withdrawn.

8          Have you reviewed phone records for an individual

9   named Gavin Hamels?

10  A.  Yes.

11  Q.  Have you also reviewed phone records for a telephone -- the

12  phone records of which are in evidence -- subscribed in the

13  name of Jared Galanis?

14  A.  Yes.

15  Q.  On the 16 days in which there's sales out of the Shahini

16  account and purchases in the Martin Kelly account, on how many

17  of those days is there telephone communication between Gavin

18  Hamels and the telephone subscribed to Jared Galanis?

19  A.  There are 15 days out of the 16 where we found telephone

20  communication between them.

21  Q.  Let's move on to Government Exhibit 904, but if we can pull

22  it up side-by-side with 903.

23          So, generally speaking, what is 904 a chart of?

24  A.  904 is a similar chart, but it's for a subsequent time

25  period.  So you will see the first chart ends on September 10

1   and the next chart begins on September 11.  But in the case of

2   Exhibit 904, we are looking at the trading in the Shahini

3   account against trading by a brokerage firm called TAG.

4   Q.  Before we pull down 903, you said this chart 903 ends at

5   September 10 and 904 starts on September 11.

6          Was September 10 the last date on which Martin Kelly

7   purchased Gerova?

8   A.  I believe it was.

9   Q.  Following that time period, and until the first purchase of

10  Gerova on the next chart by the investment adviser I think you

11  called TAG, does the Ymer Shahini account sell any shares of

12  Gerova in that time period?

13  A.  No.  You can see there are tiny little blue bars there, but

14  I believe they are all small purchases.

15  Q.  So there are no sales?

16  A.  There are no sales by Shahini in that time period prior to,

17  on the second chart, prior to 9/28.

18  Q.  Let's go to 904 and maybe it will be easier to see.

19          So you were pointing to 9/28 in particular.  What

20  happens on that day?

21  A.  On 9/28, that's the first date on this chart when there is

22  sales activity in the Shahini account.

23  Q.  Then, generally speaking, what does this chart show about

24  sales by Shahini, or purchases by Shahini, and the investment

25  adviser listed as TAG in the time frame all the way up to

G9L8HIR5                     Hinton - Direct

1   January of 2011?

2   A.  It shows that, in general, on the days when Shahini is

3   selling a large number of shares, there are also purchases by

4   TAG.

5   Q.  OK.  Is it a sort of precise match-up, in other words, are

6   the amounts always that Shahini is selling the exact amounts

7   purchased by TAG?

8   A.  No.

9   Q.  Are there some days on which Shahini buys and TAG

10  doesn't -- Shahini sells and TAG does not buy?

11  A.  Yes.  It occasionally does happen, but there is a general

12  pattern.

13  Q.  Let's go to 905, please.

14          What does this chart show?

15  A.  This is really -- it's a very similar chart to the last

16  one, but instead of showing all of the TAG transactions, we are

17  just showing the activity for one of the account holders at TAG

18  whose name was Rita Cole.

19  Q.  So if you sort of superimpose this chart over 904, these

20  Rita Cole purchases in orange are a portion of the TAG

21  purchases, is that accurate?

22  A.  That's accurate, yes.

23  Q.  Again, what does this generally show about the pattern of

24  purchases by Rita Cole of Gerova and the sales of Gerova shares

25  from the Shahini account?

G9L8HIR5                         Hinton - Direct

1   A.  Once again, on the days where Shahini is selling a

2   significant number of shares, it's often the case that Rita

3   Cole's account sees a purchase of Gerova shares.

4   Q.  So let's transition to a slightly different topic.

5        You have talked now about various sales of Gerova

6   shares from accounts in the name of Ymer Shahini.

7        Have you done any analysis of the brokerage accounts

8   in which Shahini's Gerova shares were held?

9   A.  Yes, we have.

10  Q.  So let's turn to Government Exhibit 906, please.

11       What is this showing us?

12  A.  It's showing that Shahini actually had four brokerage

13  accounts, and it's showing the sales of Gerova shares and the

14  proceeds that were generated by the sales.

15  Q.  Let me ask you to walk us through it from the beginning.

16  A.  Certainly.

17       So the first thing that happens is you see the Gerova

18  shares being received on 5/27 by Shahini, and on that date the

19  shares are received into a Roth Capital account.

20  Q.  What, if anything, happens to the shares after they are

21  deposited in the Roth Capital account?

22  A.  Nothing.  They sit in the account for about two weeks, and

23  then they are transferred out on June 14 to a different

24  account, which is also a Shahini account, but it's a different

25  broker.  This broker's name is CK Cooper.

G9L8HIR5                        Hinton - Direct

1   Q.  What are these color arrows showing about what happens at

2   CK Cooper?

3   A.  Right.  So at CK Cooper, you have got two sets of arrows.

4   The arrows at the top, that's showing proceeds that are coming

5   into the account from selling shares of Gerova.  And the arrows

6   at the bottom are showing wire transfers out of the CK Cooper

7   account, or out of the brokerage account, in this case CK

8   Cooper.

9   Q.  What does the "80K other box" in the middle of the account

10  indicate?

11  A.  That is just explaining where the rest of the proceeds went

12  to.  So you will see the proceeds are 9.9, and the wire is out,

13  they are 9.8.  The remaining amount is explained by other

14  market activity, interest and fees.

15  Q.  Now, we are going to come back to this in a moment.  In

16  addition to the sales of shares, was there margin activity in

17  some of these accounts?

18  A.  There was.

19  Q.  This chart is just about sort of net proceeds of sales and

20  net wires out, is that accurate?

21  A.  Yes.

22  Q.  So we will come back to the margin issue momentarily, but

23  why don't you walk us through the rest of this chart.

24          So what happens after?

25  A.  As I mentioned, the shares, once they are received in the

1    CK Cooper account, there's some fraction of the shares that are

2    sold, and those generate 9.9 million in proceeds, and 9.8

3    million of funds are transferred out as wires out of that

4    account.

5              But that's not all the shares.  So there's still some

6    shares left, and those shares are transferred in several

7    different transactions.

8              So on July 15, 1 million shares go to Raymond James,

9    which is another investment adviser broker account.

10   Q.  Let me stop you there and let's talk about Raymond James

11   before we move on to the last brokerage account.

12             What happens to the shares that are moved to Raymond

13   James?

14   A.  Those are also sold.  Some are sold and some are

15   transferred.

16             Let me start with the sales.  We have 1.8 million in

17   sales, and we have 1.8 million in wire transfers out of the

18   account.

19   Q.  No fees at Raymond James?

20   A.  Well, there were some fees.  They weren't doing it

21   completely for free, but they are small enough that they don't

22   show up because we are only showing things in millions here.

23   Q.  Are there shares that are transfered out of Raymond James?

24   A.  Yes.  About half the shares, you will see there is 550,000

25   shares that were transferred out and weren't sold by Raymond

1    James, but they were transferred on October 22 to yet another

2    investment adviser broker, this one Murphy & Durieu.

3    Q.  Is the transfer from Raymond James the only source of

4    Gerova shares transferred into Shahini's Murphy & Durieu

5    account?

6    A.  No.  They also receive 3 million shares from the CK Cooper

7    account.

8    Q.  What happens to the shares that are transferred to the

9    Murphy & Durieu account?

10   A.  Those are sold, almost all of them.  $8 million worth of

11   shares are sold, $7.5 million of proceeds are wired out of the

12   account, and then the remaining amount is shown in the box

13   there, 495.

14   Q.  Now, I asked you earlier whether or not this chart

15   accounted for any margin loans.  Have you done an analysis to

16   demonstrate the way in which margin loans operated in some of

17   these accounts?

18   A.  We have.

19   Q.  Let me direct your attention next to Government Exhibit

20   907.  What does this show?

21   A.  This is a chart that's showing over time when the wire

22   transfers were made in red.  So this is showing how the wire

23   transfers are built up over time.  So they end up adding up to

24   7.5 million.

25             On the top part of the chart in blue you're seeing the

1    net proceeds from selling the shares.  So at the end the time

2    period, you can see they sold that $8 million worth of shares.

3    So this chart shows you essentially when they are doing the

4    selling.

5           And the margin activity is this white area here.  And

6    what that enables the Shahini account to do is actually start

7    wiring money out of the account before they have even sold any

8    of the shares.  So they receive the shares, and they take a

9    loan against the shares, and they can use that money to start

10   wiring money out of the account.  And so the loan gets bigger

11   and bigger and bigger, until you get to about November, and

12   then they start to pay back the loan as they sell more of the

13   shares.

14   Q.  Then let's look at 908 as well.

15          What does this show?

16   A.  This is a similar graphic because there was a similar

17   margin account at CK Cooper.  Again, the margin account has

18   been used in a similar way, in that you will see that as soon

19   as the shares come into the account, you immediately see these

20   wire transfers, and in this case they were wire transfers of

21   $14 million within the first few weeks.  And at the same time,

22   you can see this is the margin activity, so you can see the

23   margin account went all the way up to 14 million also.

24          Then you will see that the margin account is paid

25   back, more quickly this time, and part of the payback is coming

1    from selling shares, which is the blue area, but part also is

2    coming from wire transfers back into the account so you see the

3    wire transfers come back down again.

4    Q.  OK.  Let's go back to 906 for one minute, if we can.

5           Again, this shows that there's a total of

6    approximately $19.1 million of money that's wired out of three

7    brokerage accounts in the name of Ymer Shahini?

8    A.  Yes.  We add up 9.8 to 1.8 to 7.5 and get 19.1.

9    Q.  Have you done any analysis of where that money went?

10   A.  Yes.

11   Q.  Let's now turn to Government Exhibit 909.

12          Walk us through how you made that chart.

13   A.  Well, this chart was made by identifying wire transfers out

14   of the three brokerage accounts -- CK Cooper, Murphy & Durieu

15   and Raymond James -- and the wire transfer information will

16   tell you where the money is going.

17          So then we would look at either wires or account

18   statements for the entity that received the funds and to see

19   whether it went somewhere else, and we kept following the flow

20   of money as far as we could.

21   Q.  OK.  Then which entities are listed here on the right side

22   of the chart?

23   A.  We wanted to list here the top beneficiary entities by the

24   amount of money they received from the 19 million.  So this is

25   a list that is sorted in rank order of size.

G9L8HIR5                          Hinton - Direct

1     So the most money from the 19 million that we were

2  able to trace went to Basileus Holdings for 3.8 million.

3  Q.  Then at the bottom there is an "other" indication.  What

4  does that mean?

5  A.  Well, in this chart we are only showing the top

6  beneficiaries, so we just grouped all the other beneficiaries

7  into that one box.  And there were, of course, some small

8  amounts that we weren't able to trace precisely to an entity so

9  those would also be included in there.

10     MS. MERMELSTEIN:  Let's pull up Government Exhibit 423

11  side-by-side with this, if we can.

12  Q.  What is Government Exhibit 423?

13  A.  It is an application form for a bank account.

14  Q.  Let's go to the third page of that, please.

15     What is the account number on this document?

16  A.  It's 1067.  It's at the top there.

17     MS. MERMELSTEIN:  Can we zoom in, Ms. Sheinwald, on

18  the "please tell us about your business" section.

19  Q.  What is the name of the business that holds this account?

20  A.  It is Taurus Global Opportunities.

21  Q.  What is the street address listed?

22  A.  It says, "Care of Axiat, Inc."

23  Q.  What is the mailing address?

24  A.  1515 International Parkway, Suite 2081.

25  Q.  Is it 2081 or 31?

1   A.  It's difficult to see actually.

2   Q.  OK.

3            MS. MERMELSTEIN:  Let's zoom back out for a moment.

4            If we can zoom in on the "please indicate authorized

5   signers."

6   Q.  Who was the authorized signer on that account?

7   A.  There is one authorized signer listed here.  It's Gary

8   Hirst.

9   Q.  What is Gary Hirst's title?

10  A.  It is investment manager.

11  Q.  What is the address listed for Mr. Hirst?

12  A.  It appears to be the same address, 1515 International

13  Parkway, Suite 20 -- this looks like 31.  The 3s and the 8s are

14  a little tricky to decipher.

15  Q.  Now, there is room here for the name of authorized signer

16  too.  Is there any listed authorized second signer?

17  A.  No.

18           MS. MERMELSTEIN:  Let's zoom back out to just

19  Government Exhibit 909.

20           Your Honor, if I may read a stipulation at this point.

21           THE COURT:  You may.

22           MS. MERMELSTEIN:  "It is hereby stipulated and agreed

23  by and among the United States of America, by Preet Bharara,

24  United States Attorney for the Southern District of New York,

25  Brian Blais, Aimee Hector and Rebecca Mermelstein, Assistant

1   United States Attorneys, of counsel, and Gary Hirst, the

2   defendant, by and with consent of his attorneys, Michael

3   Tremonte and Justine Harris, that:"

4           Ms. Sheinwald, let me ask you to highlight the

5   entities that I am referencing as we go here.

6           "Jason Galanis was the sole beneficiary of Stanwich

7   Absolute Return Ltd."

8           THE WITNESS:  I can do it.

9           MS. MERMELSTEIN:  Mr. Hinton has got it.

10          "Jason Galanis was the sole beneficiary of Basileus

11  Holdings, LLC.

12          "John Galanis, Jason Galanis, and Maureena Galindo

13  were the beneficiaries of Little Giggles, LLC.

14          "Jason Galanis was the sole beneficiary of 1920 Bell

15  Air LLC.

16          "Jason Galanis was the sole beneficiary of Emerging

17  Markets Global Hedge Ltd.

18          "Jason Galanis was the sole beneficiary of Pacific Rim

19  Assurance Company Ltd.

20          "It is further stipulated and agreed by and among the

21  parties that this stipulation is admissible as a government

22  exhibit at trial."

23          The government offers Government Exhibit 1500, which

24  is the stipulation I just read.

25          THE COURT:  Any objection?

1              MS. HARRIS:  No, your Honor.

2              THE COURT:  Received.

3              (Government's Exhibit 1500 received in evidence)

4    BY MS. MERMELSTEIN:

5    Q.  So let me just ask you, Mr. Hinton, to run through the

6    amounts that went to these various entities starting from the

7    top.

8    A.  So we have 3.8 million to Basileus Holdings.

9              2.6 million to Taurus Global.

10             1.8 million to Murphy, Pearson, Bradley & Feeney.

11             1 million to Albert Hallac.

12             667,000 goes to Gerova Management, Inc.

13             576,000 goes to the Galanis Family Trust.

14             505,000 goes to Anslow Jaclin LLP Attorney Trust.

15             598,000 goes to Stanwich Absolute Return.

16   Q.  You said 598.  Does the chart say 498?

17   A.  Sorry.  You're right.  498.

18   Q.  Keep going.

19   A.  458,000 goes to Barry Feiner Family Trust.

20             400,000 goes to Prospect Global Resources.

21             374,000 goes to 1920 Bell Air.

22             350,000 goes to Earth Spectra Ltd.

23             331,000 goes to Little Giggles LLC.

24             310,000 goes to Ymer Shahini in Kosovo.

25             The remaining amount of the funds which, as I

1    mentioned before, goes to a number of organizations that are

2    not shown here, amounts to 5.4 million.

3    Q.  Now, have you done any further analysis of where the 2.6

4    million that went to Taurus Global, where it went after that?

5    A.  Yes.

6    Q.  Let's then turn our attention to Government Exhibit 910,

7    which is a multipage exhibit, and we are going to start on the

8    first page.

9         Now, before we walk through -- well, why don't you

10   walk us through what happened to the money and then we will

11   talk about the entities a little bit more.

12   A.  Sure.  The first entry is a transfer from the CK Cooper

13   account, which is a wire transfer, to Taurus Global, and it

14   happens on June 22, 2010, in the amount of 2 million --

15   Q.  2.6 million?

16   A.  Thank you.  2,620,000.

17   Q.  Where does that money go on June 22?

18   A.  It goes to the Taurus Global account.  But as you see on

19   this chart, it is actually then transferred from that account

20   on the same day to an account for Global Assets Fund/Pennine,

21   which is another account, it's another Hirst account.  And on

22   the same day, that funding is subsequently also further wired

23   to a Swiss bank account.

24   Q.  You mentioned that Global Asset/Pennine is a Hirst entity.

25   Let's look at some of the documents that led to that listing on

G9L8HIR5                    Hinton - Direct

1    this chart.

2            So we talked already about Taurus.  We just looked at

3    the account opening documents there.  Let's look at some of the

4    documents for Global Asset/Pennine.

5            MS. MERMELSTEIN:  If we can pull up 419, please.

6    Q.  What kind of document is this?

7    A.  This is also a form for opening a bank account at the same

8    bank that we looked at before.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9LOHIR6                    Hinton - Direct

1   BY MS. MERMELSTEIN:

2   Q.  In other words, Global Assets/Taurus both have bank

3   accounts at Grand Adirondack Federal Credit Union?

4   A.  Yes, that's correct.

5   Q.  What are the last four digits of the account number of this

6   account for Global Asset listed on this first page?

7   A.  It's 1064.

8           MS. MERMELSTEIN:  Let's go to page 3 of this document.

9   Again, if I can ask Ms. Sheinwald to zoom in on the "please

10  tell us about your business" section.

11  Q.  What is the name of this business entity?

12  A.  It's Global Asset Fund Ltd.

13  Q.  Again, what is the street address?

14  A.  It is care of Axiot Inc., and the main address is 1515

15  International Parkway, Suite 2031.

16  Q.  So Global Asset has the same business address as Taurus

17  Global.

18  A.  It does.

19  Q.  Then what is the business email address associated with

20  this business in the middle of that.  Please tell us that

21  business address.

22  A.  Right.  The email address here is Gary@Axiot.com.

23          MS. MERMELSTEIN:  Let's zoom out and back in at the

24  bottom of the page.

25  Q.  Who is the authorized signer of this account?

 1   A.   It's Gary Hirst.

 2   Q.   What is Gary Hirst's title?

 3   A.   He is investment manager.

 4   Q.   What is the address listed for Gary Hirst?

 5   A.   It's the same address, 1515 International Parkway, Suite

 6   2031.

 7   Q.   Is there any other authorized signer on that account?

 8   A.   There is not a second authorized signer on this page.

 9   Q.   Now, you indicate on the chart that it's Global

10   Asset/Pennine.  What caused that indication?

11   A.   We saw a document that showed that Global Asset changed its

12   name to Pennine.

13   Q.   Let's pull up Government's Exhibit 417.  Is that the

14   document you were referring to?

15   A.   Yes.

16          MS. MERMELSTEIN:  Then let's also look at Government's

17   Exhibit 418, please.  Let's zoom in on the primary business

18   member info.

19   Q.   This is also an account membership application and

20   agreement for the Global Asset account -- Global Asset/Pennine

21   account?

22   A.   Yes.  This is another bank opening membership application.

23   Q.   Let's look then at the name of the entity there.  And what

24   is the name?

25   A.   It says Pennine Investors Ltd.

1  Q.  What is the address associated with Pennine?

2  A.  It's 1515 International Parkway, Suite 2031.

3         MS. MERMELSTEIN:  Let's zoom out for a minute.  If we

4  can zoom in on the signer info.

5  Q.  Who is the signer for the bank account?

6  A.  The signer is Gary Hirst.

7  Q.  What is the address?

8  A.  1515 International Parkway, 2031.

9         MS. MERMELSTEIN:  Zoom back into that same

10  information, "signer information".

11  Q.  What is the indication there next to "signer information"

12  about the nature of the signer's -- well, what box is checked

13  there?

14  A.  Right.  There's a box here that indicates that Gary Hirst

15  is the joint owner.

16         MS. MERMELSTEIN:  Let's zoom back out for a moment.

17  Q.  Is there any other signer listed for this account?

18  A.  Not on this page.

19  Q.  Okay.  There's a section there for another signer to have

20  been filled out but it's blank.

21  A.  Right down here.

22  Q.  Okay.  Let's go back then to Government's Exhibit 910.  So

23  that's how you've come to describe these entities in this

24  fashion; is that accurate?

25  A.  Right.  We looked at the bank opening statements for both

 1   Taurus and Global Asset/Pennine, and that's how we identified

 2   them as Hirst entities.

 3   Q.  Let's look at some of the actual wire transfers that you

 4   have reflected on this chart, and let's start with Government's

 5   Exhibit 427.

 6           Let me ask, Mr. Hinton, if you can use the writing

 7   function because I think it can be hard to locate a place on

 8   this document.

 9   A.  Yes.

10   Q.  Let's start two-thirds of the way down under the

11   "beneficiary" section.  Who is listed as the beneficiary of

12   this wire?

13   A.  It's Taurus Global Opportunities Fund.

14   Q.  And if you look --

15   A.  It actually says "FU", but I don't think it really meant it

16   in that manner.

17   Q.  If we look above that section, who is the originator of

18   that wire?

19   A.  It's the originator is listed as Legent Clearing, LC.

20   Q.  You've identified in your chart that there's a transfer

21   from the Shahini/CK Cooper account to Taurus.  How did Legent

22   get on this wire?

23   A.  Well, it turns out Legent Clearing is actually the clearing

24   agent for the CK Cooper brokerage account that Shahini held.

25   Q.  Where on this document does it indicate the amount of wire

1   that's being sent?

2   A.  Right here.  It says 2.62 million.

3   Q.  Okay.  And then finally, what is the date of this wire?

4   A.  The date is June 22nd, 2010.

5   Q.  Let's go back to 910 for a moment.  Again, where does the

6   money go after it goes to Taurus?

7   A.  It goes down to Pennine.  I think it's also worth pointing

8   out that when it goes into Taurus, there's very little money in

9   the Taurus account.

10  Q.  You have jumped ahead.

11  A.  Okay.

12  Q.  So let me then ask you.  At the time that that

13  $2.62 million is transferred to Taurus, approximately how much

14  money is in the Taurus account?

15  A.  I think it's a few thousand dollars.

16  Q.  And similarly, the same day that 2.62 million is moved to

17  Global Asset/Pennine, what's the approximate amount of money in

18  that account at the time of the transfer?

19  A.  Only about $300.

20  Q.  Okay.  Now, where does the money go after it is deposited

21  into Global Asset/Pennine?

22  A.  Right.  That's the wire transfer to a Swiss bank account.

23  Q.  Let's look at that wire.  It's Government's Exhibit 410.

24  Let's start here with the originator.  So Pennine Investors is

25  the originator?

G9LOHIR6                      Hinton - Direct

1    A.   Yes.

2    Q.   Is the name of the beneficiary listed here?

3    A.   No, it just has a bank account number.

4    Q.   Have you reviewed other documents that associate this bank

5    account with an entity called Weston?

6    A.   I have.

7    Q.   So let's go back to 910 then.  That's the indication for

8    the Weston/Swiss bank account.

9    A.   That's right.

10   Q.   Just so we're clear, you mentioned that at the time of the

11   transfer of the 2.6 to Taurus, Taurus had just a few thousand

12   dollars, and then at the time of the transfer to Pennine,

13   Pennine had just about over $300.  What is the source of that

14   information?

15   A.   Those are the account statements.

16   Q.   Okay.  Beyond this set of transfers, have you done any

17   other analysis of the movement of money between these entities?

18   A.   Yes.  We investigated whether there were any other

19   transfers between the entities.

20   Q.   So let's move to the second exhibit.  What does this show?

21   A.   This shows that when we looked at the other source

22   documents we had for these entities, we identified that there

23   was a wire transfer from the Swiss bank account to Pennine in

24   February, 2010 for $5 million.

25   Q.   At the time that that $5 million was transferred to Global

1  Asset/Pennine, again, at that point in time, how much money is

2  documented was in the Global Asset/Pennine account?

3  A.  I believe about $36,000.

4  Q.  Now let's turn then to the next page of this exhibit.  What

5  is the date at the top of this chart?

6  A.  This is dated March 29th, and what we've done here is show

7  in green the additional transactions that happened between

8  February 5th, which is when the $5 million was wired, through

9  March 29th.

10 Q.  Before we start going through these entities, there is

11 another Global Asset entity that's appeared on this chart on

12 the left.  How is that entity account related to the account we

13 talked about already on the chart?

14 A.  Well, it's also an account for Global Asset Fund, and

15 that's why we made it the same color.

16 Q.  Okay.  Other than that there are two, are they different

17 kinds of accounts?

18 A.  Right.  So this new account we added here is a brokerage

19 account.

20         MS. HARRIS:  Objection.

21         THE COURT:  Overruled.

22         MS. HARRIS:  Foundation for new account.

23         MS. MERMELSTEIN:  I meant that it's new to the charts

24 we're showing only.

25         THE COURT:  Why don't you clarify that with the

1    witness.

2    Q.  When I asked you about the new account on this document, to

3    be clear, you weren't saying that the account itself was

4    somehow new, only that it is newly appeared on the series of

5    charts.

6    A.  Yes.  We just added that box to the chart.

7    Q.  Okay.

8           MS. MERMELSTEIN:  So let's look at Government's

9    Exhibit 340, please.  If we can jump to page 9, please.

10   Q.  These are account applications for the Global Asset

11   brokerage account.  Let me direct your attention to the middle

12   of the page.  What is the entity that is the owner of this

13   brokerage account?

14   A.  Global Asset Fund. Ltd.

15          MS. MERMELSTEIN:  Can we zoom in, please, on the

16   bottom there?

17   Q.  Who is the primary contact for this account?

18   A.  Gary Hirst.

19   Q.  What is the address associated with Gary Hirst?

20   A.  1515 International Parkway, 2031.

21          MS. MERMELSTEIN:  Ms. Sheinwald, let me ask you to

22   jump to page 14 of this document, please.

23   Q.  Who has signed this document on behalf of Global Asset

24   Fund?

25   A.  Gary Hirst.

1   Q.  What is the title listed for Gary Hirst?

2   A.  It says -- this appears to say "pres" and "investment

3   manager".

4   Q.  If you can turn one more page, please, to page 15.  If we

5   can look at the bottom of the page under "business entities".

6   Again, what is the name of the entity here?

7   A.  Global Asset Fund. Ltd.

8            MS. MERMELSTEIN:  If we can zoom back out and turn to

9   the next page.

10  Q.  What is this document asking for in question number 7?

11  A.  It says, "Please list any owners, both individuals and

12  legal entities, including any person with a beneficial

13  ownership interest in the funds on the account."

14  Q.  And who is listed?

15  A.  Gary Hirst.

16  Q.  Looking at question 9 for a moment, what is that asking

17  for?

18  A.  It asks for each owner of the account and each person with

19  authority on the account, to list all significant business

20  locations or business owned by each.

21  Q.  And what's listed?

22  A.  It lists the 1515 International Parkway address.

23  Q.  Let's go back to Government's Exhibit 910, to the third

24  page where we were.  That now explains your indication that the

25  Global Asset Fund brokerage account is related to Hirst.

1   A.   That's right.

2   Q.   Now walk us through what you're showing has happened

3   between the $5 million transfer and March 29th of 2010.

4   A.   Right.  So after the February $5 million wire from the

5   Swiss bank account to Pennine, there are two main transactions

6   that occur here, which was a $4 million transfer to the

7   brokerage account and about $1.5 million is transferred in a

8   series of wires to a number of different entities.

9           MS. HARRIS:  Objection.

10          THE COURT:  Basis?

11          MS. HARRIS:  The witness has testified to related

12   accounts.

13          THE COURT:  Finish your answer.  And Ms. Mermelstein,

14   if you can clean it up, I appreciate it.

15          MS. MERMELSTEIN:  Of course, your Honor.

16   Q.   Go ahead and finish what you were explaining.

17   A.   I was just trying to explain that we started with the $5

18   million transfer into Pennine.  Before that there was only

19   $36,000 in the account.  Then there's $5 million in the

20   account.  So we then look to see, well, what happened to the

21   5 million?  And the biggest transfer was a wire of $4 million

22   to the brokerage account that we just described, and that was

23   on March 29th, but there were also a number of other wires to

24   other entities, and we've listed the entities up here that had

25   transfers, individual transfers of more than $100,000.

G9LOHIR6                        Hinton - Direct

1   Q.  Let me clarify one matter.  You describe the Global

2   Asset/Pennine bank account and the Global Asset Fund brokerage

3   account as being related.  What do you mean by that?

4   A.  Both in name of the same organization.

5   Q.  And they have the same signer?

6   A.  They have the same signer with the same address.

7   Q.  They're not linked in the sense that you can link your

8   checking or savings account or some such thing.

9   A.  Not as far as I know.  One is at Morgan Stanley, I believe,

10  and the other was at the Adirondack bank that changed its name

11  eventually later on.

12  Q.  Just so it's clear now.  In this same time period we're

13  discussing, are there any other transfers in the Global

14  Asset/Pennine bank account?

15  A.  Yes.  For completeness, we wanted to include some other

16  transactions, and there was a transfer during this time period

17  from an entity called ICA for $687,500.

18  Q.  You mentioned that in listing the entities that got money

19  from -- that came out of Pennine, how did you decide which ones

20  to put on this chart?

21  A.  As I mentioned before, we just wanted to summarize the

22  largest ones or anyone that received a wire transfer that was

23  greater than $100,000.

24  Q.  So there are some other entities not listed, and that's

25  captured in other --

1    A.   Yeah.  That's why we just put that "other" there, just to

2    say that there are some other entities that we haven't listed.

3    Q.   Let's turn to the next page.  Again, how is the green and

4    blue line operating to tell us what's going on?

5    A.   Now we're just showing for the additional transactions

6    through April 30th.  So it was an additional month.  And so

7    we're saying in green, the additional transactions that

8    occurred in that next month.  So all of the transactions we

9    previously described are now blue, and you can see the new ones

10   that we're going to talk about on this chart are green.

11   Q.   And this chart takes us timeframe-wise up to where?

12   A.   Through March 30th.

13   Q.   Now, if you can walk us through --

14   A.   I'm sorry.  April 30th.

15   Q.   4/30, April?

16   A.   Yes.

17   Q.   Now, can you explain to the jury what these new green

18   transfers are showing?

19   A.   Well, they're reporting the results of our investigation of

20   the fund flows, and just picking up from where we left off on

21   the last chart, if you remember, we saw that $4 million going

22   into the brokerage account, we see $3.56 million getting wired

23   into Taurus Global, and then a few days later the same amount

24   of money is wired from Taurus Global back to Pennine.

25   Q.   Let me stop you for one moment there.  Between the time

1    when the $4 million goes into the Global Asset brokerage

2    account on March 29th of 2010 and the 3.56 million is wired out

3    of it about two weeks later, does the Global Asset Fund

4    brokerage account purchase any securities?

5    A.  No.  There isn't any trading activity during that time

6    period in the account.

7    Q.  Okay.  Then I interrupted you as you had gotten us back to

8    Global Asset/Pennine.  What, if any, transfers happened from

9    Global Asset/Pennine in this timeframe?

10   A.  Well, now there's this 3.5 million that's showed up in

11   Pennine, and so we wanted to see what happened to that money.

12   So then we're looking back at Pennine and we see there are a

13   number of additional entities that received wire transfers.  So

14   you can see 1.4 is indicated as coming out of this account in a

15   series of wires to a number of the entities that are shown on

16   the right, but there's also 2.38 million that is being wired to

17   the Swiss bank account on April 30th.  And that, we understood

18   from correspondence, this is actually a partial repayment of an

19   investment, which was the $5 million that came in in February.

20   Q.  Just so we complete the chart, is there any additional

21   money that comes into Pennine in this timeframe?

22   A.  Yes.  Again, for completeness, there were some transactions

23   coming into the account, so we just put them on the chart.

24   It's 190,000 that was wired in, I think transferred in from

25   another entity we didn't know the identity of, so we listed it

1   as "other".

2   Q.  And it was a bank account without an identifying party?

3   A.  Yes.

4   Q.  Then what, if any, money, other than to the Weston/Swiss

5   bank account, what, if any, money leaves the Pennine account in

6   this timeframe?  What's the 1.4?

7   A.  Right.  So the 1.4, as I mentioned, is the sum of a number

8   of different wire transfers that go to the entities that are

9   shown on the right.

10  Q.  Same rule about $100,000 cutoff for what gets included?

11  A.  That's right.  We list those three entities listed there

12  that got individual wires that were greater than 100,000.

13  Q.  So let's turn to the next page.  What timeframe are we

14  coming up to now?

15  A.  So now this brings us all the way up to the date of the

16  transfer of the Shahini proceeds on June 22nd.

17          MS. HARRIS:  Objection.

18          THE COURT:  Clarify what you mean by that term.

19          THE WITNESS:  Yes.  So what I mean is that the

20  Shahini/CK Cooper account, which we showed on the previous

21  account, there was shares of Gerova that were sold from that

22  account and that generated proceeds that were wired out to the

23  account, and so when I say "the Shahini proceeds", I mean the

24  proceeds of the sale of Gerova stock in the Shahini account --

25          THE COURT:  Thank you.

                    THE WITNESS:  -- that are wired into the Taurus

account.

Q.  Let me clarify one thing with you.  Let's move back to 908

for one moment.  You just mentioned that when you say "Shahini

proceeds", you mean money wired out of brokerage accounts in

Shahini's name, right?

                    MS. HARRIS:  Objection, leading.

                    THE COURT:  I'll allow it.

Q.  Just so we're clarified.  So the Shahini proceeds is a

reference to money being wired out of the Shahini brokerage

accounts.

A.  Right.  So of that 9.8 million, one of the wires is the

wire to Taurus.

Q.  I think you may have mentioned it was proceeds of the sale

of the Gerova shares.  Can you tell from looking at this chart

whether or not that particular 2.6 million is proceeds of the

margin on the shares versus the sale of the shares?

A.  No, you can't tell from this chart.

Q.  Do you know from reviewing other documents?

A.  Well, you could infer it from looking at the account

statements.

Q.  Okay.

A.  But ultimately, as I said before, whether the money came

initially from the margin and then was repaid by the sale of

the shares, the value is really coming from the Gerova shares

1    either way.

2    Q.  Okay.  So let's go back to the last page of 910, please.  I

3    think you were starting to explain where we are.

4    A.  Yes.  So I know there's a lot of lines on here now, so it's

5    getting a little overwhelming.  But again, it's the same thing.

6    We're now coming up -- it's almost two months further in time,

7    and we're showing -- the new transactions are in green, but we

8    also overlay the red arrows, which were the transfers we

9    already described of the transfers from the CK Cooper account,

10   those are showing up in red here.

11   Q.  Okay.  What is the significance of the date 6/22?

12   A.  It's the date of that wire transfer.

13   Q.  This chart is now telling the story from that $5 million

14   from the Weston/Swiss bank account to Global Asset/Pennine all

15   the way through the 2.6 million coming out of the Shahini/CK

16   Cooper account and going to Weston.  Is that an accurate

17   summary?

18   A.  That's right.

19   Q.  Now walk us through what's happened on this chart since the

20   prior chart.

21   A.  Right.  Let's start with the green arrows.  You'll see

22   there's 440,000 that are being wired from the brokerage account

23   back to Pennine, and there's 621,000 in transfers out of

24   Pennine to other entities.  But really, the main activity in

25   this time period is these red lines, the funds that were

1    coming -- the 2.62 million that was coming from the CK Cooper

2    account through Global, towards Global and Global Asset, to the

3    Swiss bank account.

4              MS. MERMELSTEIN:  Your Honor, may I have one moment?

5              THE COURT:  You may.

6              MS. MERMELSTEIN:  Thank you.

7              (Pause)

8    BY MS. MERMELSTEIN:

9    Q.  As many arrows as there are on this chart, does this

10   encompass every single monetary transaction in the

11   February 5th, 2010 to June 22nd, 2010 time period?

12   A.  No.  We tried to summarize the transactions to simplify the

13   presentation, even though this is a little complicated even

14   now.

15   Q.  You took us back to the red arrows, so let's go back to the

16   first page of 910.  Just so we're clear on where we ended in

17   that more complicated chart, walk us through one more time the

18   timing of these transfers.

19   A.  I think the point of all those other charts is to try to

20   put some context for what we saw with these wire transfers that

21   happen on 6/22 coming in from CK Cooper to Taurus, and then

22   from Taurus into Pennine.  And if you remember, at that time,

23   as I said before, there was only about $300 left in the Pennine

24   account, and then the same day, that same amount of money is

25   wired to Weston, the Swiss bank account, and that's a second

1    repayment for the investment that Weston made in Pennine.

2              MS. MERMELSTEIN:  Nothing further, your Honor.

3              THE COURT:  Cross examination?

4              MS. HARRIS:  Your Honor, may I take a quick break?

5              THE COURT:  Yes, you may.

6              Ladies and gentlemen, we'll stand up and stretch.  If

7    anybody needs to make a comfort break, you may go into the jury

8    room.  I'll tell you what.  Why don't you all go in the jury

9    room for five minutes and then we'll resume.  Thank you.

10             (Recess)

11             THE COURT:  Ms. Harris.

12             MS. HARRIS:  Thank you, your Honor.

13   CROSS EXAMINATION

14   BY MS. HARRIS:

15   Q.  Good afternoon, Mr. Hinton.

16   A.  Good afternoon.

17   Q.  Just a moment ago we were talking about the various charts

18   you prepared.  You explained to the jury that not everything

19   had been put on the chart; is that right?

20   A.  Well, the chart summarized a lot of detailed documents, so

21   yes, that's right.

22   Q.  Right.  You were trying to simplify the information --

23   A.  That's right.

24   Q.  -- that you reviewed --

25   A.  That's right.

G9LOHIR6                        Hinton - Cross

1    Q.  -- in a fashion that you thought might be easier to

2    understand; is that right?

3    A.  Yes.

4    Q.  You were retained -- your firm, Brattle Group, was retained

5    by the government, correct?

6    A.  That's right.

7    Q.  In connection with that retention -- I'm sorry.  Withdrawn.

8        That was last year, correct?

9    A.  Yes.

10   Q.  In 2015?

11   A.  I believe so.

12   Q.  You've been working on this matter since sometime in 2015,

13   correct?

14   A.  Yes.

15   Q.  Do you remember the date?  Is it Fall of 2015 or Summer?

16   A.  No, I think it was in the Spring.

17   Q.  In the Spring.  So over a year, correct, that you've been

18   working on the matter?

19   A.  I guess so.

20   Q.  In connection with your work, you communicated frequently

21   with the government lawyers, correct?

22   A.  Yes.

23   Q.  By email?

24   A.  Sometimes.

25   Q.  And by phone?

1    A.  Sometimes.

2    Q.  And it's not just you working on this matter?

3    A.  No.  I have a team who have been helping, because there's

4    been a lot of detailed financial documents.

5          THE COURT:  You've answered the question.  Thank you.

6    Go ahead.

7    Q.  And sometimes members of your team communicate with the

8    government lawyers, correct?

9    A.  Yes.

10   Q.  And really, you're part of the government team, in a sense,

11   correct?

12   A.  I wouldn't say that.

13   Q.  Well, you're working to help them prepare their case to the

14   jury, correct?

15   A.  Well, I mean, we were retained to do the financial analysis

16   for them, yes.

17   Q.  And in connection with that, the government lawyers told

18   you what they would need for their presentation to the jury,

19   correct?

20   A.  Well, we met originally, they asked us to do an analysis,

21   and then we reported our results and we presented those.

22   Q.  You were given information about the charges and their

23   investigation, correct?

24   A.  Some information.

25   Q.  When you did your results or you prepared results, you

1    sometimes gave them drafts of your results, correct?

2    A.  Yes, that's right.

3    Q.  They would give you feedback on those draft results,

4    correct?

5    A.  We discussed the results and explained them.

6    Q.  And sometimes they would suggest modifications or further

7    avenues of investigation, correct?

8    A.  That's -- yeah, that could happen.

9    Q.  And then, based on those additional investigations, you

10   might change the chart, correct?

11   A.  Yeah, if we got more information or we decided to change

12   the presentation to make it clearer.

13   Q.  And even as recently as last night, for example, the chart

14   was changed to make some new additions, correct?

15   A.  Yes.

16   Q.  For example, to make sure that the names of the entities

17   were correct; is that fair?

18   A.  Well, just to make sure -- sometimes some of the names

19   changed, so the questions were which names to put on and

20   whether you put multiple names and that type of thing.

21   Q.  Right.  But there are choices to be made on what

22   information to put on the chart, correct?

23   A.  Yes.

24   Q.  In making those choices, you communicated frequently with

25   the government, correct?

G9LOHIR6                         Hinton - Cross

1    A.   Yes.

2    Q.   Sometimes before submitting another draft of your work,

3    would you call the government to discuss your results in a

4    preliminary fashion?

5    A.   I mean, all the way through the process we've met

6    intermittently to look at the status of our work.

7    Q.   I want to draw your attention to Government's Exhibit 901.

8    It's going to take us a minute with the switching of the

9    computers to get that up on the screen, so I apologize.

10   A.   Sure.

11   Q.   Now, 901, I think you testified, describes or shows in

12   visual fashion the different fluctuations in the price of

13   Gerova stock; is that right?

14   A.   Yes.

15   Q.   Now, you have a little arrow at the beginning that shows

16   that Gerova formed as a reinsurance company.

17   A.   Yes.

18   Q.   Now, isn't it more accurate to say that Gerova was an

19   entity that resulted from what, in technical terms what we've

20   been talking about here, a de-SPAC process of a special purpose

21   acquisition company?

22   A.   I believe ASSAC, which is mentioned here, was such a

23   company.

24   Q.   Right.  But Gerova was essentially a subsequent entity from

25   ASSAC, correct?

G9LOHIR6                        Hinton - Cross

1   A.  Yes.

2   Q.  And in looking at some of these materials relating to the

3   stock of Gerova, it's possible for someone to -- especially

4   someone connected to the company -- to own founder's share,

5   correct, of ASSAC, and subsequently Gerova?

6           MS. MERMELSTEIN:  Objection, your Honor, as being

7   beyond the scope of this witness' testimony.

8           THE COURT:  I'm going to allow him to answer this

9   question.

10          THE WITNESS:  I don't know.

11  Q.  Well, let's take that date, January 19th, 2010.  If you

12  owned 125,000 shares of Gerova stock as of that date, by the

13  time you got to June 14th, 2010, and the stock was at its peak

14  of $17.25, you could sell a good portion of that stock for

15  $17.25, correct?

16  A.  Well, whether you can sell a lot or not depends on how much

17  liquidity there is in the market.

18  Q.  Understood.  Assuming the stock could be sold, you could

19  sell 125,000 shares at $17.25, correct?

20  A.  Yeah.  I mean, that was the share price later on, so as

21  long as you were able to find someone to buy them from you, you

22  would be able to sell them.

23  Q.  Your math is probably better than mine, but $17.25 times

24  125,000 comes to a little over 2 million, fair to say?

25  A.  Right.  It goes up from $10 so --

 1    Q.  There's a --

 2    A.  -- there's a gain of maybe close to a million.

 3    Q.  Assuming that you got the stock on January 19th.

 4    A.  Yeah.  I mean, I don't know what you mean by "got the

 5    stock".  Do you buy it or --

 6    Q.  Right.  So there's some adjustment for the basis for the

 7    price of the stock?

 8    A.  Right.

 9    Q.  And we don't know what it was, under my hypothetical, but

10    fair to say, you deduct the price, but you could make a hefty

11    profit, correct?

12    A.  Yes.

13    Q.  Now, you also indicate there was a one for five share

14    consolidation on November 23rd, 2010?

15    A.  Yes.

16    Q.  And that's also known as a reverse stock split, correct?

17    A.  Yes.

18    Q.  And essentially, if you could just perhaps explain a little

19    bit more for the jury, but essentially that means is that the

20    stock increases in value but decreases in quantity.  Is that a

21    fair shorthand?

22    A.  Yeah, I would --

23    Q.  Perhaps you can do better.

24    A.  I would like to -- because actually what's really going on

25    is the amount of the value of what each investor holds doesn't

1    change at all, they're just changing the denomination.  So you

2    used to hold five shares, and now you hold one share.  So it's

3    going to have to have a price that's five times as high so that

4    you end up holding the same amount of value.

5    Q.  Okay.  So if someone owned 125,000 shares on November 22nd,

6    2010, after the one for five share consolidation, that would be

7    25,000 shares, correct?

8    A.  Yes.

9    Q.  Thank you.  In preparing this chart, did you look at all at

10   short selling activity?

11   A.  Not particularly.

12   Q.  I want to draw your attention to Government's Exhibit 903,

13   please.  On this chart, you've begun analyzing the sales of

14   stock just on July 6th, 2010, correct?

15   A.  Well, it starts -- yes, it starts on July 6th, this chart,

16   yes.

17   Q.  But there were sales from the Shahini brokerage accounts

18   before July 6th, 2010, correct?

19   A.  Well, I think I've marked the first sale from that account

20   on the previous chart.

21   Q.  On 902?

22   A.  Yes.

23   Q.  That's 902.

24   A.  Yes.

25   Q.  So let's look at 903 and 904.  I'm sorry.  Was this the

1    other chart you were thinking of?

2    A.  No, I was referring to 902 where that indicates the date of

3    the first sale of Gerova shares out of the Shahini account.

4    Q.  I apologize.  My mistake.  So 902.  On 902, where the sales

5    begin looks like in June, 2010.

6    A.  Yes.

7    Q.  There's no matched trading at that point in time, correct?

8    A.  No, that's right.

9    Q.  So all these trades from, I suppose, early June, 2010

10   through and the trades indicated on this chart, through

11   July 31st, 2010, were trades done without any coordinated

12   market manipulation, correct?

13   A.  No.

14   Q.  No, there is no market manipulation, or no, my statement is

15   not correct?

16   A.  Both.

17   Q.  Okay.  Please clarify.

18   A.  Well, I mean, I don't know what you mean by "market

19   manipulation", so I'm not really -- I should probably withdraw

20   my answer.  I don't really have a sense of what you're

21   referring to.  But you were asking whether or not there's any

22   selling activity that is -- that we've subsequently analyzed.

23   I think you were referring to the analysis in 903.  That 903

24   chart overlaps with this chart.  Right?  So the coordinated or

25   correlated trading between the Martin Kelly account and the

G9LOHIR6                      Hinton - Cross

1   Shahini account begins in July.  So that's the last four weeks

2   of this chart.

3   Q.  Fair enough.  Let's take a look at 903.  And where there's

4   a dark blue and light blue matching squares are days where

5   there's coordinated trading activity, correct?

6   A.  Well, it appears to be coordinated because there are

7   telephone calls on those days and the timing matches up.

8   Q.  And the first real instance of that is July 22nd, 2010,

9   correct?

10  A.  Yes.

11  Q.  On your analysis?

12  A.  Yes.

13  Q.  But we see some light blue, as you indicated on your direct

14  testimony, some light blue squares above the line, correct?

15  A.  Yes.  These light blue bars here.

16  Q.  And there's, in fact, some light blue bars that are sort of

17  hiding behind some dark blue bars, correct?

18  A.  I wouldn't say hiding, they're on top of them, actually.

19  Q.  Right.  So for example, on 8/17/2010, there's a dark blue

20  above the line marker, and we can't really tell if there's any

21  light blue underneath that dark blue, correct?

22  A.  No.  I'm sorry if the chart's confusing.  Maybe I should

23  explain.  There's nothing hidden behind.  The point is, the

24  light blue on the top is just indicating that on that day there

25  were actually purchases in the Shahini account and there were

1    sales in the Shahini account.  So you can see the amount of the

2    blue bar, height of the blue bar is smaller than the height of

3    the blue bar that's below the line, it's a larger bar.  So

4    there's more sales than there are purchases.

5    Q.  So you just adjust the blue bar below the line.

6    A.  Well, you don't need to adjust anything, I'm just

7    indicating on the chart, to be complete, days on which there

8    were purchases in the Shahini account and there were sales.

9    But I think you can see visually from this chart that there's

10   many more sales than there are purchases.

11   Q.  Let me ask you.  When you analyzed the matched trading, you

12   didn't review any records that show that Mr. Gary Hirst was

13   involved in any of the coordinated trading activities, correct?

14   A.  Correct.

15   Q.  And there were no brokerage accounts that contained his

16   name associated with the matched trading activity, correct?

17   A.  Correct.

18   Q.  And there were no phone records that linked to his name

19   that related to matched trading activity, correct?

20   A.  Nothing that I saw.

21   Q.  I want to talk to you about the tracing analysis that you

22   did.  Could I turn your attention to Government's Exhibit 909?

23   Now, you testified you looked at various records to compile

24   this exhibit, correct?

25   A.  Yes.

1  Q.  You looked at account statements?

2  A.  Yes.

3  Q.  And you looked at wire details?

4  A.  Yes.

5  Q.  This is your effort to track money that left accounts

6  associated with Ymer Shahini during a certain time period,

7  correct?

8  A.  Yes.

9  Q.  In particular, you identified $2.6 million is going to an

10  entity by the name of Taurus Global.

11  A.  Yes.

12  Q.  I want to talk to you a little bit about this flow of money

13  from the perspective of the Taurus Global account holder.

14          MS. HARRIS:  If I could look at Government's

15  Exhibit 412, please.  I'm going to ask, Mr. Pollock, for you to

16  go to page 4 of that exhibit.  I'm sorry, page 14.

17  Q.  This is one of the account statements that you reviewed in

18  connection with your analysis, correct?

19  A.  Yes.

20  Q.  This account statement, as you can see at the top, is for

21  Taurus Global Opportunities Fund, correct?

22  A.  Yes.

23  Q.  And now, at the bottom of the page shows the date 6/22?

24  A.  Yes, that's right.  Here.

25  Q.  And it shows an incoming wire transfer --

1   A.   Yes, it does.

2   Q.   -- of $2.62 million, correct?

3   A.   Yes.

4   Q.   And that is the $2.62 million that you reflected on your

5   chart in Government's Exhibit 909, correct?

6   A.   Yes.

7   Q.   There is nothing on this account statement that shows the

8   name of the person sending the wire, correct?  You can take a

9   moment and maybe you can zoom back out.

10  A.   Well, all it's showing is that it's coming out of the

11  Taurus account.  You'd have to look at the wire to see more

12  information.

13  Q.   Well, I'm sorry.  This is 6/22.  This is an incoming wire

14  to the Taurus account, correct?

15  A.   Right, that's true.

16  Q.   So the incoming for the Taurus account holder looking at

17  this account statement, there's no information on this account

18  statement about where that money's coming from, correct?

19  A.   No, but it would be on the wire.

20  Q.   We'll talk about that in a little bit.

21  A.   Okay.

22  Q.   And there's nowhere on this account statement that you were

23  able to see the name Shahini, Ymer Shahini, correct?

24  A.   That's correct.

25  Q.   As you said, and it's in my outline, you'd have to look at

1    the wire to get some more details.  So if I could draw your

2    attention to Government's Exhibit 427.  This, in fact, is the

3    wire detail for the incoming wire that we were just looking at

4    on the Taurus account statement, correct?

5    A.  Yes.

6    Q.  And it shows the originator; is that right?

7    A.  Well, it lists the originator as Legent Clearing.

8    Q.  Correct.  But it actually doesn't have the name of the

9    account holder at Legent Clearing listed, correct?

10   A.  Correct.

11   Q.  And down below it has more information about the

12   originator.

13   A.  Yes.

14   Q.  Financial information, and it indicates Legent Clearing

15   again, correct?

16   A.  And the account number.

17   Q.  But no name, correct?

18   A.  That's right.

19   Q.  Okay.  So if all you had access to was the wire detail and

20   the account statement, it wouldn't be self-evident who was

21   actually sending this money, correct?

22   A.  If that's all you had.

23   Q.  You would need more information.

24   A.  Yes.

25   Q.  There would have to be some other communication with the

1   account holder of the Taurus account in order for the account

2   holder to know exactly who was sending that money, correct?

3   A.  Well, I think they would need other information.  I'm not

4   sure who they would have to communicate with.

5   Q.  And in your analysis, you haven't seen any communication

6   that would indicate that the owner of the Taurus account

7   received any information about who sent that money, correct?

8   A.  I don't recall seeing anything.

9   Q.  Now you had access, obviously, to more than just those two

10  pieces of paper when you did your analysis, correct?

11  A.  Yes.

12  Q.  You actually had access to the Legent account at CK Cooper,

13  right?

14  A.  Yes.

15  Q.  The account into which the Shahini shares were deposited,

16  correct?

17  A.  Yes.

18  Q.  And so when you did this chart, you had both sides; you had

19  the account statements from Legent and you had the account

20  statements from Taurus.

21  A.  Yes.

22  Q.  So you were able to connect the dots and draw those arrows.

23  A.  Yes.

24  Q.  I want to talk to you about -- you said on direct that you

25  were tracing -- well, withdrawn.

1           If we look at Government's Exhibit 910, it's a

2    multi-page chart.  I think it comes -- the last page has

3    multiple arrows on it.

4           It's your testimony that this was really an attempt to

5    trace -- these four pages was an attempt to trace the proceeds

6    of the sale of the Shahini shares; is that right?

7    A.  Well, not just that, but also to then investigate whether

8    there were any other financial transactions between the related

9    entities that we had identified through tracing the proceeds.

10   Q.  Okay.  We'll come back to those related entities in a

11   minute.  But if I could draw your attention to Government's

12   Exhibit-- well, withdrawn.

13          The arrow at the top that shows the $2.62 million from

14   the CK Cooper account to Taurus Global that we just talked

15   about, that transfer, just so we're clear, is on June 22nd,

16   right, 2010?

17   A.  Yes.

18   Q.  Okay.  So now if I could have you step out and look at

19   Government's Exhibit 908.  I keep forgetting that everyone has

20   paper, too.  In Government's Exhibit 908, it shows activity,

21   wires out in red from the CK Cooper account, correct?

22   A.  Yes.

23   Q.  And the chart begins, I think -- it looks like -- you might

24   have to help me, because I'm not visually -- can't be totally

25   precise, but right after June 14th, 2010, correct?

G9LOHIR6                        Hinton - Cross

1    A.  Yes.

2    Q.  And so June 22nd comes really just about where the red

3    spike drops down, correct?

4    A.  Yes.  It would be quite early in the chart.

5    Q.  Quite early, but a little bit more position -- it really

6    comes right at that moment where the red line drops all the way

7    down, correct?

8    A.  You really can't tell exactly because there's not a

9    position on the chart.  I think it looks like this distance

10   here is about a month, so half the distance would be about two

11   weeks, so I think we're really talking about one week from the

12   beginning of the chart.  So I think you'd probably be -- you'd

13   have to divide this into the four parts, right?  I think you'd

14   be in this sort of area.  Pretty close.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

G9L8HIR7

1   Q.   Right.  So this area that you have circled with the circle

2   is the area you just indicated?

3   A.   Yes, in here somewhere.

4   Q.   So based on your chart, as of that moment in time, the

5   account at CK Cooper, it looks like it's fully or almost

6   exclusively on margin funds, is that fair to say?

7   A.   Yeah.  The Gerova shares haven't been -- most of them

8   haven't been sold yet.  So the account mainly consists of the

9   shares of Gerova that are held in the account and the margin

10  loan.

11  Q.   Right.  Isn't it true that before the June 22, 2010 wire,

12  there had actually been a fair number of purchases in the

13  account?

14  A.   Purchases of what?

15  Q.   Of shares.

16  A.   Of Gerova?

17  Q.   Actually, of both Gerova and other shares, correct?

18  A.   I don't recall exactly.  I just have to look at the account

19  statements.

20          THE COURT:  Ladies and gentlemen, we are going to

21  leave it at that for the day.  Thank you for your patience and

22  your cooperation.  Remember, please do not discuss the case

23  among yourselves or with anyone.  Keep an open mind.  See you

24  tomorrow morning at 10:00 and stay safe and healthy.  We will

25  try and give you an update on Juror No. 2 when we get it.

G9L8HIR7

1        (Jury exits courtroom)

2        THE COURT:  You may step down, sir.

3        I expect to be able to rule with regard to the Shant

4   Chalian issue tomorrow morning, and I will be looking at the

5   results of the e-mail search.

6        There are approximately 400 e-mails that have been

7   furnished to us, furnished to me for in camera review.  So that

8   will be going on this evening.

9        A question about the jury instructions and the

10   position of the defendant.  Does the defendant contend or is

11   the defendant urging a withdrawal defense relative to the

12   statute of limitations?

13        In other words, I propose to give the statute of

14   limitations instruction.  There is a doctrine in law known as

15   withdrawal on which the defendant bears the burden of proof.  I

16   did not see any evidence in this record that would support a

17   withdrawal defense, and I am putting the question to you.

18        MR. TREMONTE:  Thank you, your Honor.

19        We are not looking for a withdrawal instruction.

20        THE COURT:  Thank you.

21        All right.  So I will see you tomorrow morning then.

22        Go ahead, Ms. Harris.

23        MS. HARRIS:  Your Honor, just on Mr. Chalian issue, it

24   would seem like we have beaten the issue to death and then

25   some.  I do want to note that, based on the colloquy we had at

G9L8HIR7

1    sidebar, there are some additional -- you asked us earlier

2    today to proffer what our cross-examination might be and this

3    puts on full display the challenges sometimes of the defense

4    role and information changing constantly.

5            Based on our sidebar, there are actually new and

6    additional issues of concern and avenues that we would pursue

7    even on the limited proffer of direct testimony of Mr. Chalian.

8    We can do that in open court, but we are also obviously

9    advocates who have duties to our client and avenues of

10   cross-examination are not often fully laid out to the opposing

11   party in advance.

12           So they do raise other issues with respect to e-mails

13   that your Honor may or may not be reviewing, depending on what

14   was given to the Court, and I just wanted to put that on the

15   record, and if additional information would be helpful to your

16   Honor, we will be happy to proceed in whatever way your Honor

17   sees fit.

18           THE COURT:  If there is something you want to

19   supplement from what you said at the sidebar, go ahead.

20           MS. HARRIS:  Your Honor, I think part of our confusion

21   a little bit is we understood the Kevin Kearny affidavit to be

22   providing e-mails over a course of a week or two weeks.  I

23   wasn't sure what is actually in your Honor's possession now in

24   terms of time span.  So this may or may not overlap with what

25   the Court already has.  But there is a time period from

G9L8HIR7

1    probably the beginning early May, mid-May, through the end of

2    June where we would want to see all correspondence involving

3    not only Mr. Chalian, but also his colleague, Mr. Pinero, Eric

4    Pinero, who also was a lawyer very active on the Gerova matter,

5    relating to the same kinds of topics.

6              THE COURT:  I understand that.  In fact, I thought you

7    were looking for the period January 1 to a date in October.  Am

8    I wrong?

9              MS. HARRIS:  We are, your Honor.  I didn't actually

10   know if those materials had been -- I just didn't know what

11   your Honor has.

12             THE COURT:  I don't have those materials.  I will give

13   you the date range on what I have.  I will report that to you

14   tomorrow.  I still am waiting from the defense for a copy of

15   the subpoena.

16             MS. HARRIS:  We had someone in our office pull

17   together --

18             THE COURT:  And any correspondence.

19             MS. HARRIS:  We have that pulled together and we will

20   be able to forward it when we are done.

21             MR. TREMONTE:  Just to make the point one more time,

22   your Honor, Eric Pinero also performed these calculations in

23   connection with warrants, in connection with at least one other

24   private warrant in the June time frame, and did it in

25   connection with a separate private warrant applying the

G9L8HIR7

1    information in the analysis, which would suggest that it is

2    equally relevant to know about communications with Eric Pinero

3    as it is with Shant Chalian.  I think in terms of doing this

4    kind of work, they were interchangeable members of the team.

5              THE COURT:  Ms. Mermelstein.

6              MS. MERMELSTEIN:  Thank you, your Honor.  I have, I

7    guess, a logistics matter and then two legal matters.

8              So on the logistics front, as your Honor knows, this

9    is either our last witness or our next-to-last witness,

10   depending on the Shant Chalian situation.  We are going to play

11   a recording and then the government is going to rest.  I expect

12   the defense case is going to be short, so I expect we may be

13   done with testimony by tomorrow.  So we are curious, if your

14   Honor knows yet, if you're going to sit Friday.  If we finish

15   tomorrow, will we have a charge conference tomorrow afternoon,

16   with closings Friday, if we are sitting, or Monday, if your

17   Honor has a sense of what the schedule looks like.

18             THE COURT:  In terms of the charge conference, because

19   of the process that I have used of handing out the draft

20   instructions, obtaining comments in letter form, now supplying

21   a further draft, I anticipate that the charge conference will

22   not take very long based on past experience.

23             With regard to the timing of everything, in a perfect

24   world, and it's not one, if the case were over early tomorrow,

25   I would be looking to have closing arguments and jury

G9L8HIR7

 1    instructions, and then the jury can come back on Friday.  But I

 2    don't view that as a realistic possibility.

 3            So as a result, what I anticipate is that we will get

 4    through tomorrow the testimony, I expect, and I expect we will

 5    be through the charging conference.  If we are not through the

 6    charging conference, if something needs to be further

 7    addressed, we can do it on Friday.  Then on Monday morning we

 8    will have closing arguments and jury instructions, if the

 9    evidence is closed by then.  That would be the thought.

10            So I am not proposing to have closings on Friday, if

11    that's the question.

12            MS. MERMELSTEIN:  It is and that's very helpful.

13    Thank you.

14            Two outstanding legal issues.

15            THE COURT:  Do you want to give me an idea of how long

16    the government anticipates for its closing argument.

17            MR. BLAIS:  I will be doing the closing on behalf of

18    the government.  In an abundance of caution, I would say

19    approximately 90 minutes.

20            THE COURT:  And you're going to have to figure out,

21    you want to retain 15 of the 90 for your rebuttal?

22            MS. MERMELSTEIN:  I think Mr. Blais just meant for the

23    principal summation, your Honor.

24            MR. BLAIS:  For my summation, your Honor.

25            THE COURT:  I will take it under advisement.  But in

1    any event, the rebuttal would be 15 minutes, is that correct?

2        MS. HECTOR:  I will be handling the rebuttal, and I

3    anticipated it would be more along the lines of a half hour, 45

4    minutes.

5        THE COURT:  Well, the defense is -- I am looking at

6    them.  They are so incredibly efficient, that would be

7    outrageous.  I am going to be surprised if their closing is

8    even that long.  So I don't know what you're referring to.

9        MS. HECTOR:  May I go after the defense then?

10       THE COURT:  Let me hear from the defense.

11   Approximately how long do you anticipate?

12       MR. TREMONTE:  After consulting with counsel, I have

13   been advised that I should probably not put a number on it.

14       I have thought about it.  With the benefit of the

15   weekend, we will make every effort to make it as efficient as

16   possible.  The obvious problem here is that, in order to

17   adequately lay out the defense case to the jury, we are going

18   to have to talk about quite a few of these documents, and we

19   are going to have to put up on a screen --

20       THE COURT:  Give me a number.

21       MR. TREMONTE:  Two hours.

22       THE COURT:  That's awfully long.  I will take that

23   under advisement.  And I think the longer you are, the better

24   the case that Ms. Hector has for my elongating her rebuttal.

25       MR. TREMONTE:  I am keenly aware of that, and I will

G9L8HIR7

1    do my level best to keep it as short as possible.

2           THE COURT:  I may ask you this round of questions

3    again tomorrow and see whether both sides do any better on

4    that.

5           Go ahead, Ms. Mermelstein.

6           MS. MERMELSTEIN:  Two issues.  One, there is still the

7    outstanding issue of the defense indication that they intend to

8    elicit evidence that they are the ones who first received

9    Government Exhibits 509A through D.  As we said in our letter,

10   we think that that's an improper attempt to suggest to the jury

11   that the view of defense counsel about what the meaning of that

12   evidence is is significant in some fashion in how they should

13   view it.

14          THE COURT:  It wasn't clear to me that's what the

15   defendants were even planning on eliciting that.

16          Are you planning on eliciting that?

17          MR. TREMONTE:  We are still mulling this over and

18   planning well in advance of the presentation of any evidence on

19   this point to raise it with the Court.  We are still sort of

20   trying to figure out a way to provide the jury with information

21   that is probative, that is admissible, and that is relevant to

22   this point.  We are not there yet, but we will be in the

23   morning.

24          THE COURT:  I certainly understand the last comment

25   because it could be problematic.

1           Go ahead.

2           MS. MERMELSTEIN:  Then I am on to my last issue, which

3      is the issue of the Cayman Island law expert.  I have gone back

4      through the significant --

5           THE COURT:  Let's just pause on that because the word

6      I had before was that the defendant was perhaps not going to

7      call an expert on Cayman Island law, but rather was going to

8      have some kind of a summary witness.

9           Perhaps defense counsel can educate me.

10          MR. TREMONTE:  I think that's where we are.  I think

11     our witness will, like Professor Laby, be a summary witness,

12     who will describe certain very basic facts about, for example,

13     articles of incorporation and bylaws and how they work under

14     Cayman's practice, generally.

15          THE COURT:  I take it I will not be asked to instruct

16     on Cayman Islands law.

17          MR. TREMONTE:  Yes, your Honor, that's correct.

18          THE COURT:  OK.  Ms. Mermelstein.

19          MS. MERMELSTEIN:  Thank you.

20          I think that that is hugely problematic.  I think that

21     the defense has repeatedly referred to Professor Laby as a

22     summary witness, but the defense seems to want to do two things

23     with this witness.  One is they have provided us with these

24     summary charts, which are summaries and excerpts of

25     documents -- board minutes, articles of association -- that I

G9L8HIR7

think they intend to call -- I can't pronounce the witness's
last name, but the Cayman Islands lawyer to go through.  That
seems completely unobjectionable.  They can call any witness
they would like for that.

        The idea that somehow there is a permissible basis to
have the witness testify, in the fashion that Professor Laby
did, about Cayman Islands law in the U.S. district court is a
totally different ball game.

        THE COURT:  You are going to stand up and, presumably,
if there is an objectionable question, if the witness is
opining on a point of Cayman Islands law, you will object,
because the law is -- and we have been through this in this
case -- that this would be a matter in which the Court would,
if asked, give an instruction to the jury.  And the request
that I instruct on Cayman Islands has been withdrawn, which
means the witness cannot opine on Cayman Islands law.

        MS. MERMELSTEIN:  We seem to have come full circle in
that sense, because when this witness was first proffered, the
government raised the notion that he could not discuss an issue
of foreign law pursuant to Rule 26.1 without meeting the
qualifications therein.

        So I guess my problem is I don't understand what
permissible factual testimony he could provide about anything
about Cayman Island law that would not run afoul of 26.1.  I
don't think it requires an opinion, a statement by him, as to

G9L8HIR7

1   what the law is.  I think it runs afoul of the rule, is going

2   to be completely misleading and confusing to the jury.  And the

3   kind of evolving nature in the submissions by the defendant

4   about what this witness might say -- as your Honor knows, not

5   to recount the correspondence, but there was one disclosure and

6   it was deemed insufficient, and there was second disclosure,

7   and the early disclosures appear to say something different

8   about what this witness would say the law is than what Mr.

9   Tremonte said yesterday.

10            THE COURT:  Let me ask the government.  Have you

11   talked to anybody about Cayman Islands law?

12            MS. MERMELSTEIN:  No, your Honor.

13            I think it's wholly irrelevant to this trial, and I

14   think that there are many steps that have to be met before it

15   would be appropriate to allow this witness to say anything on

16   Cayman Islands law.

17            THE COURT:  As of about a day ago, the defendant was

18   asking me to charge the jury on Cayman Islands law, right?

19   That's where we were, I think, 24 hours ago.

20            MS. MERMELSTEIN:  Agreed.

21            THE COURT:  And you received a declaration as to what

22   this individual's view was of Cayman Islands law.  No?

23            MS. MERMELSTEIN:  No.  We received a declaration from

24   a different individual.

25            THE COURT:  A different individual, you're right, now

G9L8HIR7

1    that I think about it.  But, nevertheless, as to Cayman Islands

2    law.

3            MS. MERMELSTEIN:  Yes, your Honor.

4            THE COURT:  I heard -- maybe it came out of the mouth

5    of Mr. Blais yesterday, but I heard the common sense

6    proposition of law that for a board to act on the matter, there

7    would have to be truthful disclosure, that you couldn't have a

8    ratification unless the board was fully apprised of the

9    circumstances.

10           MS. MERMELSTEIN:  Agreed.  Mr. Blais did say that and

11   that does seem to be an obvious proposition of common sense.

12           THE COURT:  So it would seem to me, provided I am

13   furnished with some support -- this is a matter for the

14   government to do, not for me, I'm not doing research on this --

15   that if that is, in fact, a correct proposition of law, and I

16   hear anything out of the mouth of this witness about

17   unauthorized acts being ratified ab initio under Cayman Islands

18   law, I will turn around and instruct the jury that for there to

19   be ratification there must be a complete and truthful

20   description of the circumstances.  And that will be on the

21   table.

22           Now, I can do that if I am furnished with something

23   that enables me to do that.

24           MS. MERMELSTEIN:  I understand, your Honor.  I guess

25   the trouble that I am having is that, because the purported

G9L8HIR7

1    testimony that would be offered by this witness has been

2    somewhat of a moving target, we don't have any sense of what

3    actual factual testimony this witness would offer.

4              THE COURT:  What factual testimony is this witness

5    going to offer?

6              MS. HARRIS:  I think the bulk, in fact, the entirety

7    of it, is simply going to be reading the relevant provisions of

8    the minutes, the resolutions, the articles of association.  In

9    the course of doing that, there are terms, for example, like

10   ancillary documents, and he may pause and explain in layperson

11   terms what ancillary documents are.

12             MR. TREMONTE:  We plan to ask him, your Honor, in your

13   experience, is it typical for a Cayman's company to have a set

14   of articles of incorporation and what are those generally?

15             THE COURT:  Listen, I have told you what I think.

16   This case is not going to the jury, it looks like, until

17   Monday.  If the witness delves into opining, I will make

18   rulings.  So that's where we are.

19             MS. MERMELSTEIN:  Thank you, your Honor.

20             THE COURT:  Anything else?

21             MR. TREMONTE:  Nothing.

22             THE COURT:  I am going to get something on Reg S, and

23   I am also going to get the materials from the defense.  Whether

24   you want to furnish them electronically to my law clerk or have

25   them delivered to chambers, I leave that to you.

G9L8HIR7

1           MR. TREMONTE:  Thank you, your Honor.

2           THE COURT:  Thank you.

3           (Adjourned to September 22, 2016, at 10:00 a.m.)

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    ALEX MONTANO

4    Direct By Mr. Blais . . . . . . . . . . . .1124

5    Cross By Mr. Biale . . . . . . . . . . . . .1133

6    Redirect By Mr. Blais . . . . . . . . . . .1143

7    ALBERT HALLAC

8    Direct By Mr. Blais . . . . . . . . . . . .1151

9    Cross By Mr. Tremonte . . . . . . . . . . .1197

10   Redirect By Mr. Blais . . . . . . . . . . .1211

11   PAUL HINTON

12   Direct By Ms. Mermelstein . . . . . . . . .1226

13   Cross By Ms. Harris . . . . . . . . . . . .1280

14                       GOVERNMENT EXHIBITS

15   Exhibit No.                              Received

16    3505-11 . . . . . . . . . . . . . . . . .1212

17    450, 451, 452, 453, 454, 455, 1510 . . . .1220

18    901 through 910 . . . . . . . . . . . . .1230

19    1500 . . . . . . . . . . . . . . . . . . .1260

20                        DEFENDANT EXHIBITS

21   Exhibit No.                              Received

22    1256 . . . . . . . . . . . . . . . . . . .1141

23

24

25
```