UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :

UNITED STATES OF AMERICA

                                         :

      - v. -                           S1 15 Cr. 643 (PKC)

                                         :

JARED GALANIS,

                                         :

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S SENTENCING MEMORANDUM

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York
                              Attorney for the United States of America

Aimee Hector
Brian Blais
Rebecca Mermelstein
Assistant United States Attorneys
    Of Counsel

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, Jared Galanis, scheduled for January 11, 2017, at 12:00 p.m.  For the reasons discussed below, the Government submits that a sentence within the sentencing range provided by the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") of 21 to 27 months would be sufficient, but not greater than necessary, to comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2).  *See* 18 U.S.C. § 3553(a).

## BACKGROUND

**A.     The Indictment and Arrest**

On September 21, 2015, a grand jury sitting in this District returned Indictment 15 Cr. 643 (PKC) (the "Indictment") against Jared Galanis ("Galanis") and six co-defendants[1] charging them with participating in a fraudulent scheme to manipulate the share price of a publicly-traded company called Gerova Financial Group Ltd. ("Gerova") and to cause Gerova to fraudulently issues shares that inured to the benefit of Galanis and his co-defendants. Count One charged Jared Galanis with conspiracy to commit securities fraud, from at least in or about 2009 through in or about 2011, in violation of Title 18, United States Code, Section 371.  Count Two charged Jared Galanis with securities fraud, from at least in or about 2009 through in or about 2011, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.  Count Three charged Jared Galanis with conspiracy to commit wire fraud, from at least in or about 2009 through in or about 2011, in violation of Title 18, United States Code, Section 1349.  Count Four charged Jared Galanis with wire fraud, from at least in or about 2009 through in or about 2011, in violation of Title 18, United States Code, Sections 1343 and 2.  Count Five charged Jared Galanis with

---

[1] Galanis's co-defendants are John Galanis, Jared's father; Jason and Derek Galanis, Jared's brothers; Gary Hirst; Gavin Hamels; and Ymer Shahini.  Shahini remains a fugitive and is believed to be located outside the United States.

investment adviser fraud, from in or about June 2010 through in or about September 2010, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2.  Count Six charged Jared Galanis with investment advisor fraud, from in or about 2007 through 2011, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2.  Count Eight charged Jared Galanis with conspiracy to commit securities fraud, from at least in or about November 2007 up to and including in or about April 2010, in violation of Title 18, United States Code, Section 371. Count Nine charged Jared Galanis with securities fraud, from at least in or about 2007 through and including in or about 2010, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.  Counts and Eight and Nine related to certain transactions involving an investment adviser named James Tagliaferri.  Jared Galanis was arrested on September 24, 2015, pursuant to an arrest warrant issued in connection with the Indictment.

**B.      The Superseding Indictment and Jared Galanis's Guilty Plea**

On or about August 10, 2016, a grand jury returned a Superseding Indictment, S1 15 Cr. 643 (PKC) (the "Superseding Indictment"), which, among other things, added a charge against Jared Galanis for misprision of a felony, in violation of Title 18, United States Code, Section 4 (Count Eight).  On August 22, 2016, Jared Galanis pled guilty before this Court to Count Eight of the Superseding Indictment, pursuant to a plea agreement with the Government.

**C.      The Underlying Conduct**

The Indictment charged Jared Galanis and six co-conspirators with a scheme to defraud the shareholders of Gerova and the investing public by effecting securities transactions in Gerova stock for the purpose of conferring millions of dollars of undisclosed remuneration on members of

the Galanis family and others.[2] As a part of the scheme to defraud, Jason Galanis and Gary Hirst obtained sufficient control over Gerova so as to be able to cause Gerova to enter into transactions for their benefit, including the issuance of Gerova stock. Among other means and methods, Jason Galanis and Gary Hirst caused over 5 million shares of Gerova stock, which represented nearly half the company's public float, to be issued to and held in the name of Ymer Shahini, who knowingly served as a foreign nominee for Jason Galanis. At the same time, and as a further part of the scheme to defraud, Jason Galanis, with the assistance of John Galanis, Derek Galanis and Jared Galanis, opened and managed brokerage accounts in the name of Shahini (the "Shahini Accounts"), effected the sale of Gerova stock from the Shahini Accounts, and received the proceeds. Jason Galanis also fraudulently induced investment advisers, including Gavin Hamels, to purchase shares of Gerova stock in the investment advisers' client accounts by offering compensation and/or other benefits to the respective investment adviser. By causing the purchase of Gerova stock at the time, quantity, and/or price of their choosing, Jason Galanis and others were able to, among other things, effectuate the sale of large quantities of Gerova stock from the Shahini Accounts that Jason Galanis controlled while artificially maintaining the price of Gerova stock through coordinated match trading. Such coordinated trading served to manipulate the market for Gerova stock and deceive the investing public.

D.     **The Guidelines Analysis**

The Guidelines applicable to the offense charged in Count Eight of the Superseding Indictment is U.S.S.G. § 2X4.1. Pursuant to U.S.S.G. § 2X4.1, the base offense level is 9 levels lower than the offense level for the underlying offense, but in no event more than 19. The

---

[2] Given the offense to which Jared Galanis pled guilty and the Court's familiarity with the underlying facts of this case, only a brief summary of the underlying offense conduct is recited herein. The Government will provide a more fulsome description of the offense conduct in connection with the sentencing submissions for Jared Galanis's co-defendants, who were convicted of participation in the underlying offense conduct described herein.

underlying offense is conspiracy to commit securities fraud, in violation of Title 18, United States Code Section 371, which was charged in Count One of the Superseding Indictment. Pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 2X1.1(a), the base offense level for the underlying offense is 7.[3] Because the loss amounts for the underlying offense exceeded $25,000,000 but did not exceed $65,000,000, the offense level is increased 22 levels to 29, pursuant to U.S.S.G. § 2B1.1(b)(1)(L). Further, because the underlying offense involved 10 or more victims, the offense level is increased by 2 levels to 31, pursuant to U.S.S.G. § 2B1.1(b)(2)(A).  Accordingly, the total offense level for the underlying offense in 31, and the base offense level for Count Eight of the Indictment is 22. *See* U.S.S.G. § 2X4.1(a).  However, because § 2X4.1 limits the base offense level to no more than 19, the base offense level becomes 19.  Accounting for Jared Galanis's acceptance of responsibility, the total offense level is 16.  At Criminal History Category I, the resulting sentencing range is 21 to 27 months' imprisonment.

## DISCUSSION

**A.     The Applicable Law and Appropriate Sentence**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005). Thus, the

---

[3] The Government disagrees with the PSR's assessment that the base offense level is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).  According to U.S.S.G. § 2X4.1, the base offense level for misprision is 9 levels below the offense level for the underlying offense, which in this case is conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.  Pursuant to U.S.S.G. § 2X1.1, the base offense level for a conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 is "[t]he base offense level from the guideline for the substantive offense," which is securities fraud. Pursuant to § 2B1.1(a)(1), the base offense level for the securities fraud charged in Count One is 7, not 6.  Regardless, the aforementioned distinction has no impact on the resulting guideline calculation, because, pursuant to U.S.S.G. § 2X4.1, the resulting offense level is reduced to 19. Nonetheless, the Government concedes that the Plea Agreement miscalculates the applicable guidelines range because it fails to reduce the base offense level to 19, pursuant to U.S.S.G. § 2X4.1.  The correct Guidelines range in this matter is therefore the 21 to 27 months reflected in the PSR, not the 30 to 36 months reflected in the Plea Agreement.

Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the

Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. ' 3553(a). The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

**B.     A Sentence Within the Guidelines Is Sufficient But Not Greater than Necessary to Serve the Purposes of Sentencing**

    1.     <u>Jared Galanis's Role in the Offense</u>

The original Indictment alleged that Jared Galanis performed three principal roles in connection with the charged offenses.  In sum, after the fraudulent issue of the Gerova shares to Ymer Shahini ("Shahini"), the Indictment alleged that Jared Galanis participated in: (1) opening U.S. brokerage accounts in Shahini's name for the purpose of depositing the Gerova shares, obtaining margin loans, and thereafter directing the sale of shares from those account, many of which were sold as part of the matched trading scheme; (2) communicating with Gavin Hamels regarding the matched trading designed to maximize the proceeds of the sale of the Shahini shares; and (3) participating in a related fraud with a separate investment advisor, James Tagliaferri, which

included both matched trading in Gerova shares and other fraudulent investments in Galanis-related entities.  Notably, Jared Galanis's participation in these activities was not alleged to be via in-person meetings, but rather through telephone communications on a phone subscribed to "Jared Galanis" and whose user, in pertinent communications, identified himself as "Jared Galanis" (the "Phone") and in emails sent to/from Jared Galanis's law firm account, jmg@sentinellawgroup.com (the "JMG Account").  For example, the Phone was used to conduct matched trading with Gavin Hamels, a principal of Martin Kelly Capital, whose clients purchased, in a coordinated fashion, significant quantities of the Gerova shares sold from the Shahini Accounts.  As Hamels testified during the trial of Jared Galanis's co-defendant, Gary Hirst, the person using the Phone to conduct the matched trading identified himself as "Jared."

After the Indictment, Jared Galanis averred, through counsel, that: (1) he was not the user of the Phone, but rather that his father, John Galanis, had impersonated him; (2) he had given John Galanis access to the JMG Account and John Galanis had also impersonated him via the JMG Account in connection with the charged conduct; and (3) more specifically, that John Galanis had set up a filtering system in the email account to hide the extent of his use of the account.  Notably, Jared Galanis did not claim that the JMG Account was used solely by John Galanis, nor did he provide any specificity regarding how the alleged filtering was set up or which email addresses had purportedly been "filtered."

The Government endeavored to exhaustively investigate Jared Galanis's claims regarding the Phone and the JMG Account.  With respect to the Phone, the Government analyzed historical cellsite data and performed a call frequency analysis regarding the Phone, as well as another phone that was also subscribed to Jared Galanis (the "Jared Phone") at the relevant times.  Although not conclusive, the cellsite analysis strongly suggested that the Phone was utilized by John Galanis

during the period of coordinated matched trading with Gavin Hamels.  Further, the call frequency analysis also strongly suggested that the Phone was utilized principally by John Galanis.[4] Accordingly, the Government concluded that although the user of the Phone identified himself as "Jared" during telephone calls with Gavin Hamels, it was most likely John Galanis impersonating his son.

The Government's investigation regarding the JMG Account was less clear.  Unfortunately, the internet service provider for the JMG Account was unable to provide internet protocol data that could be used to determine the location of the user of the JMG Account during the relevant time period, so locational analysis could not be used to isolate the user of that account on any particular date.  Nor could the service provider provide any substantiation of the claimed filtering.  Accordingly, the only method available for determination of the identity of the user of the JMG Account was analysis of the content of the emails themselves.  The Government conducted an extensive review of the JMG Account, from which the following conclusions could be drawn:

- Both Jared and John Galanis utilized the JMG Account during the relevant time period.  This conclusion is based on: (1) emails which reference personal matters pertaining to either John or Jared; (2) emails in which the sender references a specific call, which the Government can identify though phone records as having come from/to Jared or John Galanis; (3) emails directing wire transfers, which are then followed by actual wire transfers from Jared's law firm account.  Nonetheless, there are large numbers of emails that do not contain any of these attributes and for which, as a result, no specific author could be ascertained.

- The JMG Account was used to facilitate the criminal conduct described in the Indictment, including communications regarding: the opening of the brokerage accounts into which the Shahini shares were deposited; the obtaining of related margin loans; directing the sale or movement of the Shahini shares; directing the wiring of the proceeds of the Shahini shares; and matched trading and fraudulent notes transactions with Tagliaferri.[5]

---

[4] For instance, during the relevant time period, the Phone was in frequent contact with John Galanis's wife, and had minimal calls with Jared Galanis's wife.

[5] It should be noted that the Phone, believed to be used by John Galanis, was in more frequent contact with the brokerage firms at which the Shahini Accounts were housed than was the Jared

- Given the number of emails related to the Gerova conduct and the number of individuals involved in such correspondence, it is not clear how any alleged filtering system could be designed to completely shield Jared Galanis from communications related to the Gerova fraud.

Finally, it should also be noted that proceeds of the Gerova fraud were dispersed through Jared Galanis's law firm's Interest on Lawyer's Trust Account (IOLTA).

In sum, although it is clear that *both* Jared Galanis and John Galanis were using the JMG Account and there is no question that the JMG Account was used to facilitate and further the Gerova fraud, it is very difficult to attribute any particular email specifically to Jared Galanis or John Galanis, except in the limited circumstances where phone records could be used to match a particular email with a particular author or where the content of the email contained clear personal information about the sender. However, given the nature and volume of the emails, it appeared clear to the Government that Jared Galanis was, as he acknowledged during his plea allocution, aware that the Gerova fraud existed and that both his email account and law firm IOLTA account were being used to facilitate the fraud, even if it was impossible, because of the dual use of the email, to attribute specific inculpatory emails in the JMG Account to any particular author.

As a result of this analysis, the Government sought and obtained the Superseding Indictment adding the misprision of felony count (Count Eight), to which Jared Galanis pled guilty on August 22, 2016.

---

Phone. Nonetheless, the Jared Phone was in contact with the brokerage firm at which the co-conspirators originally sought to deposit the Shahini shares – Roth Capital – and the principals at Roth recall that their phone conversations regarding the Shahini shares were with someone identifying himself as "Jared Galanis." As the Court will recall from the testimony at the trial of co-defendant Hirst, Roth Capital ultimately rejected the Shahini shares because of uncertainty about the origin of these shares. In light of these facts, the Government believes it is reasonable to conclude that Jared, and not his father, John, was involved in the initial efforts to deposit the Shahini shares at Roth Capital.

2. <u>Defense Arguments Do Not Support a Non-Guidelines Sentence</u>

Jared Galanis advances two principal arguments in favor of a non-incarcerative below-Guidelines sentence. First, he argues that he was not involved in nor a beneficiary of the Gerova scheme but, instead, was a victim of John Galanis. Second, he argues that incarceration is not appropriate because he is needed at home to care for his ill wife. Neither justify a below-Guidelines sentence in this case.

As an initial matter, Jared Galanis has pled guilty in open court to the misprision offense. In doing so, he acknowledged that he was aware that his father – an individual previously convicted of securities fraud in this Court – was committing yet another fraud offense and instead of reporting that offense to the appropriate authorities, Jared Galanis instead facilitated the commission of that offense by taking an act that concealed that offense. In particular, Jared Galanis allowed John Galanis to assume Jared's identity as a lawyer by giving his father access to his law firm email address. In light of this, Jared Galanis's "babe in the woods" argument offered in mitigation at sentencing borders perilously close to a denial of responsibility and, as described further below, is belied by the facts.

While the Government agrees that Jared Galanis's level of culpability falls far short of his co-defendants', his claim that he was in fact an unknowing and innocent victim of his father's malfeasance understates his level of culpability. Even taking the defendant's explanation as true, following his thrice-convicted father's release from prison on various fraud offenses, Jared Galanis provided him with access to his official law firm email account so that John Galanis could communicate with creditors under the guise of his attorney son's identity. Jared Galanis further avers that after he provided his father with his email address for the purpose of allowing his father to impersonate him – *i.e.*, assume Jared's identity as a lawyer, which is not only a clear breach of

his ethical obligations as a lawyer, but which may itself be an independent criminal offense – his father thereafter set up an "elaborate filter system in the email account for the purpose of screening his email activities from his son to include those he received from certain individuals." (Def. Mem. at 3). Outside of counsel's *ipse dixit* assertion that such a filtering mechanism existed, there is no independently verifiable way to corroborate the existence of the purported filtering system or whether Jared Galanis had access to or visibility as to such purportedly filtered emails. Nor has Jared Galanis provided additional specificity regarding which "certain individuals" were filtered in such a fashion, from which the Government may be able to further evaluate the claim.[6] Regardless, during his allocution, Jared Galanis admitted, without temporal specificity, that he "ultimately acquired actual knowledge of [his] father, John Galanis' participation in an agreement to commit securities fraud" and concealed his participation in that scheme. (Def. Mem., Ex. B at 13). Thus, Jared Galanis's efforts to shield himself from culpability are not supported by the evidence. He allowed his father to impersonate him and knew that his father was using his identity to commit fraudulent activity. This is serious conduct that merits a substantial sentence.

Nor is it true that Jared Galanis was not a beneficiary of the Gerova fraud. As a lawyer, Jared's primary clients were his family and the various entities created by his family to conduct business transactions, many of which were used to commit fraud, to facilitate fraud and to otherwise enrich the Galanis family through illegal conduct. Jared Galanis's livelihood as a lawyer, the legal fees he received for the legal services he provided, in large measure were derived from the fraudulent activities in which his other family members were engaged. Further, as the Government demonstrated during the Hirst trial, one of the significant recipients of proceeds from the sales of the illegally issued Shahini shares – receiving millions of dollars of proceeds – was an

---

[6] For example, there is no explanation as to whether only incoming emails from these unspecified individual were filtered or whether emails sent to these individuals from the JMG Account were also purportedly filtered, i.e., whether both incoming and outgoing emails were filtered.

entity called the Galanis Family Trust, which account was used to support expenditures that benefitted members of the Galanis family, including Jared Galanis.

Second, as further support for a below-Guidelines sentence, Jared Galanis notes that he provides care and emotional support to his wife, who suffers from a significant illness. The hardships that Jared Galanis's wife and family are likely to suffer from his imprisonment are sympathetic, but it is unfortunately often the case that those who suffer the most from a defendant's crimes are his own family, who have to live with the consequences in much the same way as the victims. While Jared Galanis's specific family circumstances may present significant challenges during his incarceration, he has had time to prepare for his possible imprisonment and has not demonstrated that he is unable to make accommodations for the care of his wife, either through her nearby family or other means. Downward departures are typically granted only in such circumstances. *See, e.g.*, *United States* v. *Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure where defendant provided primary support for two children, his wife spoke limited English, his father was critically ill and on life support in a chronic care facility, his mother was a 66-year old factory worker, and incarceration "would probably … destroy[]" "the family unit"); *United States* v. *Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) (upholding departure where defendant was sole support of four young children); *United States* v. *Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (upholding departure where defendant worked two jobs to support his wife, two children, and grandmother, and his disabled father relied on him to get in and out of wheelchair).

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 21 to 27 months' imprisonment, as it is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[7]

Dated:  New York, New York
        January 6, 2017

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York

                                By:     /s/ Aimee Hector
                                        Aimee Hector
                                        Brian Blais
                                        Rebecca Mermelstein
                                        Special Assistant United States Attorneys
                                        (212) 637-2203/2521/2360

cc: Counsel of record (by email)

---

[7] The Government will submit a supplemental memorandum addressing the issue of restitution in advance of sentencing.