H1BSGALS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                       15 CR 643 (PKC)

JARED GALANIS,

         Defendant.

------------------------------x

                                 New York, N.Y.
                                 January 11, 2017
                                 12:00 p.m.

Before:

              HON. P. KEVIN CASTEL,

                               District Judge

                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
AIMEE HECTOR
REBECCA MERMELSTEIN
BRIAN R. BLAIS
    Assistant United States Attorneys

MURPHY, PEARSON, BRADLEY & FEENEY
    Attorneys for Defendant
BY:  JAMES A. LASSART

ALSO PRESENT:
Shannon Bieniek, FBI Agent

H1BSGALS

```
 1              (case called)

 2              MS. HECTOR:  Good afternoon, your Honor.

 3     Aimee Hector, Rebecca Mermelstein, and Brian Blais for the

 4     government.  With us at counsel table is Shannon Bieniek from

 5     the FBI.

 6              THE COURT:  Good afternoon.

 7              For the defendant?

 8              MR. LASSART:  Good afternoon, your Honor.  James

 9     Lassart appearing on behalf of Jared Galanis.  My client is

10     present.

11              THE COURT:  Let me go through the materials I have,

12     and the question will be whether I have everything I should

13     have.

14              I have a presentence report recommendation and

15     addendum transmitted to me on December 28, 2016, I have a

16     submission from the government dated January 6, and a

17     supplemental submission dated January 10 from the government.

18              I also have a sentencing memorandum submitted by the

19     defense, which was filed in mid December, it looks like around

20     December 28, if I'm reading that correctly.  Of course, there

21     are many helpful exhibits attached to the defendant's

22     submission, including a report by a forensic medical individual

23     who has interpreted certain health records, and there are a

24     series of letters from family members, in-laws, and friends in

25     support of the defendant.
```

H1BSGALS

1          I also have a letter that was submitted by Paul Grand,

2   writing without any particular standing in this matter, former

3   counsel to Defendant John Galanis, and a response from the

4   government dated November 18, 2016.

5          Do I have everything I should have on the subject of

6   sentencing?

7          MS. HECTOR:  I believe so, your Honor.

8          MR. LASSART:  Yes, your Honor.

9          THE COURT:  Has the defendant, in fact, read,

10   reviewed, and discussed with you the presentence report

11   recommendation and addendum?

12          MR. LASSART:  He has, your Honor.

13          THE COURT:  Does the defendant have any objections to

14   the facts set forth in the presentence report?

15          MR. LASSART:  Our objections were noted and are noted

16   in the addendum, your Honor.

17          THE COURT:  Are there any that you continue to press?

18          MR. LASSART:  No, your Honor.

19          THE COURT:  Any objections to the guideline

20   calculation in the presentence report?

21          MR. LASSART:  No objection to the guideline

22   calculation.

23          THE COURT:  Let me hear from the government.  Do I

24   have everything I should have on sentencing?

25          MS. HECTOR:  Yes, your Honor, you do.

H1BSGALS

```
 1            THE COURT:  Any objection to the facts set forth in

 2    the presentence report?

 3            MS. HECTOR:  Your Honor, we do agree that the facts

 4    section recites the original indictment that does attribute the

 5    phone directly to Jared Galanis.  I think everyone is aware

 6    that we are all now in agreement that it more accurately should

 7    read "a phone subscribed in the name of Jared Galanis."  I

 8    think we are all on the same page as to the facts.

 9            THE COURT:  I took it that that was the original

10    indictment, and my understanding is that the phone was used by

11    John Galanis and not by Jared Galanis.

12            Is that correct, Mr. Lassart?

13            MR. LASSART:  Yes, your Honor.

14            THE COURT:  All right.  Now, I understand the

15    government does not agree with the methodology used in

16    calculating the guidelines, but does agree with the ultimate

17    conclusion that defendant is in total offense level 16,

18    criminal history category I?

19            MS. HECTOR:  Yes, your Honor.

20            THE COURT:  All right.  I will now give defense

21    counsel an opportunity to speak on behalf of the defendant.

22            MR. LASSART:  Thank you, your Honor.

23            In addition to the submissions that were sent in,

24    I have a few additional comments to make.  I think it is

25    important to note that Jared is not a coconspirator in this
```

1    matter, and he is guilty, as he pled guilty, to misprision of a

2    felony.  It is also important to note that he became aware of

3    his father's criminal impersonation and criminal conduct in

4    2011.  He stopped at that time the usage of his name, and

5    ultimately, in 2012, he moved to Maryland for a couple of

6    reasons.  One, to help assist in his wife's healthcare, but

7    also to distance himself from the problems that his brother and

8    father were engaged in.  Probably his separation is best

9    described by looking at what went on, which resulted in a

10   second indictment in both his father and his brother.

11            THE COURT:  Well, let me understand what you just

12   posited.  That when he learned that his father was using the

13   e-mail account, it promptly stopped or it caused him to stop

14   immediately?

15            MR. LASSART:  Yes.  Not only the e-mail account, but

16   the phone.

17            In 2011, he basically discovered a lot of e-mail

18   activities when a subpoena occurred from the SEC.

19            THE COURT:  Are you arguing that he didn't commit any

20   crime here?

21            MR. LASSART:  No.  He concealed.  There was some

22   ongoing activity that he became aware of and he concealed it.

23   Also, he wasn't forthcoming with the SEC as to who the drafter

24   of those e-mails were.

25            THE COURT:  All right.

H1BSGALS

1          MR. LASSART:  In other words, he concealed items that

2     he should have revealed.

3          THE COURT:  When you say "not forthcoming," he was

4     asked about it and he did not tell them the truth as he knew

5     it?

6          MR. LASSART:  Exactly.  He basically treated the

7     e-mail as if they were his when he discovered them to the SEC.

8          THE COURT:  All right.  And tell me about what he did

9     to enable transfers out of the IOLTA account.

10          MR. LASSART:  The IOLTA account was primarily active

11     during the course, prior to the 2011 discovery.  His brother,

12     he represented his brother on transactional matters.

13          During that time, he would receive what were basically

14     settlement dollars and distribute those settlement dollars out

15     of his IOLTA account based on the direction of his brother.

16     That's what he did.

17          THE COURT:  Your position is there was no criminal

18     activity with regard to the disbursement of funds from the

19     IOLTA account, is that what you're saying?

20          MR. LASSART:  I am not say there was no criminal

21     activity, but it wasn't Jared's criminal activity.  These IOLTA

22     funds came from transactions that his brother engaged in and

23     his father engaged in in which there was criminal conduct.

24     However, Jared's action was basically to treat them as if they

25     were settlement dollars coming out of business transactions.

H1BSGALS

1    THE COURT:  Well, that may have been how he treated

2    them.  What I am trying to get to the bottom of is whether he

3    knew the truth of their origins and treated them as if they

4    were settlement funds.  That's an entirely different situation.

5    And it is important that I understand how he directed funds

6    from that account and whether he did so aware of criminal

7    activity by his father and his brother.

8    MR. LASSART:  He was unaware of the criminal activity

9    that developed those funds and disbursed them according to the

10   direction of his brother.

11   THE COURT:  Thinking that they were lawfully obtained

12   dollars?

13   MR. LASSART:  That's right.

14   The funds are accounted for in the distribution, so

15   there wasn't any attempt to in any way structure or hide the

16   direction of the funds or the source of the funds.

17   THE COURT:  All right.

18   MR. LASSART:  Did I answer your question, your Honor?

19   THE COURT:  Thank you.

20   MR. LASSART:  Now, the fact of the matter is that the

21   government has gathered a large deal of information regarding

22   Jared's financials, and I think what they will have discovered

23   is that he did not lead a lavish lifestyle, that he is a renter

24   now in Maryland, that he now drives to support his family

25   through Lyft.  He is not benefactor of these huge dollars that

H1BSGALS

1    were generated from the criminal activity.

2            This conviction ended his legal career, and he is now

3    the essential and primary caregiver for his wife, as we get to

4    the 3553 criteria.  In looking at this, the purpose of

5    sentencing is that just punishment, of course, general

6    deterrence, specific deterrence, and rehabilitation, these

7    policies basically direct that a minimal sentence is needed to

8    achieve those goals.

9            Now, one of the critical factors in the 3553 is his

10   care and extremely important care for his disabled wife.  He is

11   an essential caregiver, and our medical submissions, I think,

12   explain his role, the necessity of his role, and the terrible

13   disease she suffers from.

14           Now, in conjunction with that, we ask the court to

15   take that into consideration at the time of sentencing.

16           THE COURT:  This is the submission from the forensic

17   nurse who has reviewed medical records for the purpose of

18   opining on the subject?

19           MR. LASSART:  Yes, your Honor.

20           In addition to that, we have a letter directly from

21   her caregiver, a doctor --

22           THE COURT:  The geneticist?

23           MR. LASSART:  Yes.

24           THE COURT:  I saw that.

25           MR. LASSART:  Those are what I am referring to.

H1BSGALS

1        THE COURT:  OK.

2        MR. LASSART:  Now, let me address briefly the

3    restitution issue in the case, that which we received

4    information on in the last few days.

5        In this matter, restitution for Jared should not be

6    assessed as joint several liability with the coconspirators in

7    this case, with the persons who are coconspirators, of which he

8    is not one of them.

9        He did not participate in that conspiracy and the

10   attributable harm, which it's difficult to attribute, I think,

11   and not appropriate to attribute to Jared his conduct as to

12   causing any form of harm in the form of taking of money from

13   the purported victims.

14       What I think the government has relied on is both the

15   Marine case and the Lentil case.  We cited the Mariano case.

16   The point of that particular authority in those is that there

17   can be, at times, restitution attributed to misprision of a

18   felony.  Those cases are clearly distinguishable from the facts

19   of this case in both of those cases.  There was a long-term

20   knowledge and a concealment of a lengthy ongoing fraud, that if

21   it had been identified earlier, would have caused the cessation

22   of some of these losses.

23       In this instance, Jared's conduct, though allowing for

24   some additional harm to victims, was so late in the game, that

25   much of the fraud and the harm of these victims was caused

H1BSGALS

```
1    before his discovery of that in 2011.  As a result, a majority
2    of the damage, in our view, was done prior to Jared's
3    discovery, and therefore he should not be penalized in a joint
4    several manner with individuals who created this particular
5    scheme, these schemes.
6           Now, I know some of the issues that the government has
7    raised is that Jared had provided the tools of this to his
8    father, but it should be known that his father was given a
9    phone in 2004 by Jared when he couldn't get a phone and he was
10   just coming out of prison.  And he did authorize his father to
11   use his e-mail to assist in dealing with the credit issues of
12   his mother.
13          THE COURT:  Well, let's talk about that so that I have
14   a better understanding.
15          What did he authorize in terms of e-mail usage?  He
16   authorized John Galanis to have an e-mail account through his
17   law firm, or he authorized John Galanis to use an account
18   which, to other persons, would appear to be an e-mail sent by
19   Jared Galanis?
20          MR. LASSART:  My belief is he authorized John Galanis,
21   the way I understand it, to use the account.  John then took
22   liberties and created his own e-mail within that account, but
23   also used Jared's.  We have e-mails that show John's use of the
24   Google account with different e-mail addresses, but he used
25   Jared's e-mail address.
```

H1BSGALS

1          THE COURT:  Well, this is a little confusing to me,

2     given the ease with which one can open a Gmail account in five

3     minutes for free.

4          What was Jared's intent in authorizing his father to

5     use -- was this the sentinel e-mail account?

6          MR. LASSART:  Yes.

7          THE COURT:  -- using a sentinel account if the father

8     was not associated with sentinel?

9          MR. LASSART:  His intent was that his father would

10    deal with his mother's credit.  I don't think there was much

11    more thought about it than that.

12         THE COURT:  But why wouldn't you say, Dad, come over

13    here.  I am going to do this for you.  We are going to get you

14    a Gmail account.  We'll be done in five minutes.  Here you go.

15         MR. LASSART:  I can't answer that question.  I can

16    just tell you what occurred.

17         What I can tell you is that he allowed his father to

18    use his e-mail account and never monitored that nor gave it any

19    additional thought.  What John Galanis ended up doing was

20    created a filter on that e-mail account, and then filtered

21    incoming e-mail from certain individuals into an account that

22    was a file.  It was basically for his mother's credit.  And

23    that was as a result, they didn't get into the general e-mail

24    that Jared was reviewing, at least most of them didn't, and

25    they would go to this filtered file.

H1BSGALS

```
1          As far as the phone, he basically impersonated Jared

2   in phone calls and used that phone to end up in tracting

3   activities.  Jared gave him that phone and he used that number

4   from 2004 on, and then there was a switch of phones and he

5   never monitored what his father was doing on that.

6          THE COURT:  How is the phone any different to a person

7   receiving a call on the phone than one purchased at a

8   convenience store as a prepaid phone?

9          MR. LASSART:  I'm sorry.  I guess I don't understand

10  it.

11         THE COURT:  I guess what I'm getting at is the phone

12  number identified with that phone publicly identified as a

13  Sentinel telephone number, so that the person getting the call

14  would think they were getting a call from the law firm, or was

15  it just a randomly assigned number, the same as one would get

16  if you purchased a prepaid phone?

17         MR. LASSART:  It was a randomly assigned number.  The

18  billing went and subscription was Jared's at the firm, but it

19  wasn't the firm's number.

20         THE COURT:  And this would not be something that would

21  be apparent to anyone else in the world?

22         MR. LASSART:  That's right.

23         THE COURT:  You wouldn't know that you were getting a

24  call on Jared's phone at all?

25         MR. LASSART:  That's right.
```

H1BSGALS

1          THE COURT:  Unlike the Sentinel e-mail, where you

2     would know the Sentinel name would be in the e-mail address.

3          MR. LASSART:  That's correct.

4          THE COURT:  Go ahead.

5          MR. LASSART:  Now, with all these factors before this

6     court, I would ask the court to consider doing the following:

7     to follow the recommendation of the probation in the PSR.

8     However, if the court does not follow the recommendation in the

9     PSR.  I would ask that the court impose a sentence that would

10    allow for home detention.  In conjunction with that, of course

11    if there is a need for custodial time.  I would ask for an

12    opportunity to have Jared self-surrender.

13          I ask the court to look at this young man and

14    understand the position he was put in by his family, a family

15    whose father was not available during the first 20-some odd

16    years of his life, and the fact of trust he allowed, whether

17    you call it foolish or not, which is largely the type of person

18    you'll see reflected in the various people who wrote on his

19    behalf.

20          They placed him in a terrible position and he reacted

21    improperly once he understood that there was activity going on

22    and you can see it.  He's not benefactor of this, and though,

23    to some degree, the activities of his family have ruined his

24    professional career, he is not going to practice law.  He can't

25    practice law any longer, and his focus now is on what he can do

H1BSGALS

```
1    to benefit himself in the sense of my family and move on from

2    his life.  I think that probation's recommendation is

3    reasonable and I would ask the court to follow that.

4           If the court ultimately, after the discussion from the

5    prosecution, wishes to hear from Jared directly, he is prepared

6    to talk to the court as necessary.

7           THE COURT:  All right.

8           MR. LASSART:  Thank you, your Honor.

9           THE COURT:  Mr. Galanis, this is your opportunity to

10   speak, to address the court directly, to bring to my attention

11   any facts or circumstances that you believe I should take

12   account of.  If there is anything you wish to say, this is the

13   time to say it.

14           MR. MADDOX:  Thank you, your Honor.

15           THE COURT:  I can hear you fine.  You can stand up.

16           MR. MADDOX:  Thank you, your Honor.

17           I stand before you today, I can honestly tell you that

18   I truly and deeply regret the crime that committed and the harm

19   that I have caused.

20           Concealing the conspiracy is by far the biggest

21   mistake of my life.  I put myself and others in my family

22   before the good of others.  I wish I could take back those

23   errors.  I do, and conduct myself in a way that I know is the

24   right way and a bay that I know I will conduct myself in the

25   future.
```

H1BSGALS

1          I am so ashamed that I was not able to exhibit the

2    judgment and the character that I know I am capable of.  I will

3    spend the rest of my life regretting these decisions and

4    figuring out a way to make things better in this world.  I

5    don't know that I'll ever be able to restore the harm caused by

6    my bad decisions, but I can tell you that I will try.  I will

7    make it my life's work never to make an error like this again.

8          I failed society, my wife, my family, especially my

9    family in Maryland, my friends, I failed myself.  A person who

10   does these things is not the person that I have spent so many

11   years building and cultivating, and it is not the person I will

12   be in the future.

13         If given the chance by your Honor, I will plan to

14   continue to be of help to my wife, especially in navigating her

15   difficult health situation, and I plan to continue to push my

16   career in new directions.  While I know my work life has been

17   forever altered by what I have done, I do believe I can be a

18   contributing member of society.

19             THE COURT:  Thank you, Mr. Galanis.

20             MR. MADDOX:  Thank you, your Honor.

21             THE COURT:  This is the government's opportunity to

22   speak.

23             MS. HECTOR:  Thank you, your Honor.

24         A few responses to what defense counsel has said and

25   what was articulated in his papers.

H1BSGALS

1          I think the thrust of the defense argument in favor of

2   Mr. Galanis is that he was a victim in many ways of this fraud.

3   We believe that really understates both his level of

4   culpability and level of involvement.

5          You know, first, focusing on this e-mail account.

6   There are not two e-mail accounts here.  This is an e-mail

7   account set up as a law firm personal e-mail account,

8   *JMG@Sentinellaw.com*, subscribed by Mr. Galanis, paid for by

9   Mr. Galanis.  He gave access to that account, not a separate --

10  there's not a separate *JohnGalanis@Sentinellaw*.  It is that

11  account that he gave access to his father to allegedly for

12  purposes of allowing his father to communicate with credit

13  reporting agencies under the guise of a lawyer.  Clearly the

14  purpose of this was to give his father either greater

15  credibility, greater negotiating power, whatever, in

16  communication with these credit reporting agencies.

17         John Galanis had, throughout the course of this case,

18  other e-mail addresses and he could make another e-mail

19  address.  So the sort of initiation of this access was

20  fraudulent itself.  Mr. Jared Galanis is a lawyer and he has

21  ethical obligations.  So that, according to Jared Galanis, was

22  the onset of his father's use of his account.

23         Now, there is no dispute that this account was used

24  extensively in connection with and in furtherance of the fraud.

25  There was e-mails to brokerage accounts, e-mails directing

H1BSGALS

1    movement of shares, e-mails directing transfers of shares,

2    e-mails directing wires.  Your Honor heard at the trial of

3    Mr. Hurst about how the shares were deposited into an account

4    at Roth and how they moved through various different accounts

5    with different brokerage firms, as particular brokerage firms

6    got concerns about the shares.  There was e-mails with Ymer

7    Shahini.  There was e-mails with Jason Galanis.  There are lots

8    of e-mails relevant to the conduct.

9            Now, defense counsel has proffered this explanation

10   that there was an "elaborate filtering system setup," but we

11   have been provided with no further specificity as to how that

12   filtering system was set up, whose e-mail addresses were

13   filtered.  When one said filtered, I guess what comes to mind,

14   could it have been filtered into a sub folder, was that sub

15   folder nonetheless accessible, were responses to those e-mails

16   still in the sent mail.  There are so many e-mail addresses and

17   sort of counter parties to these e-mails that it becomes hard

18   to disentangle.

19           So we have an e-mail account that we agree was used

20   by both Jared Galanis and John Galanis.  There are e-mails, the

21   content of which has personal information that it is clearly

22   one or the other, but then there is a large segment of e-mails

23   that are more difficult.  And the government has endeavored

24   extensively to go through these e-mails and to try to pair it

25   up with phone calls on phones attributed to Jared or John to

H1BSGALS

1   try to disaggregate, and it is very difficult to do so.

2          But Jared admitted in his allocution that, at some

3   point, he became aware of this.  He says 2011.  We don't know,

4   your Honor.  There are a lot of e-mails in 2010 along these

5   lines.

6          THE COURT:  Yes, but let's look at where we are.

7          MS. HECTOR:  Yes.

8          THE COURT:  He has admitted his guilt to the crime of

9   misprision of felony.  He, through his counsel, asserts that he

10  had guilty knowledge sometime in 2011.  While it is relevant to

11  the sentencing decision, it is considerably more relevant to

12  the restitution issue.

13         MS. HECTOR:  Fair enough.

14         THE COURT:  Certainly on the restitution issue, it's

15  the government's burden of proof.  It would seem to me that the

16  construct is correct, that it doesn't begin with joint and

17  several liability as it might in a conspiracy case.  But one

18  engages in the exercise of what would have happened to the

19  victims if Mr. Jared Galanis had not committed the crime of

20  misprision of felony.

21         What I am hearing is that he became aware in 2011, and

22  he lied to the SEC about it.  Presumably, at the time of the

23  lies to the SEC, I think you're going to tell me the horse was

24  already out of the barn, so that could not have caused anyone

25  injury.  I don't know enough about the timing to know what the

H1BSGALS

consequence of 2011 is, but it seems to me -- and maybe this

makes things easier for today's purposes -- that I have 90 days

to resolve the restitution issue, and that the government has

to sit down across the table from Mr. Lassart -- and maybe

since he's in town, this is not a bad day to do it -- and talk

about the evidence and see whether or not you can get close to

an agreement.  And if you can't get close to an agreement, then

your alternative is to have a hearing and see whether you can

prove your case by a preponderance of the evidence.  I think

the legal principles, I don't think there is going to be a

disagreement in this room as to what those principles are.

Now, it is still relevant to the sentencing decision

of whether there is evidence that Jared Galanis is not being

straight with the court even today on January 11, when he says

to his lawyer that he first learned in 2011.  But I think that

requires more than pointing out that it's difficult.  It's the

government's burden to show what it has in that regard.

MS. HECTOR:  Yes, your Honor.

I am not surprised that your Honor is coming to this

issue, obviously.  I don't think, to the extent that we were to

provide additional evidence to substantiate or to evidence

exactly when Mr. Galanis was likely to have come into greater

knowledge, I don't necessarily think it would be a hearing with

testimony.  I don't frankly think there would be a witness to

that.  I think it would be greater detail and specificity of

H1BSGALS

1    the e-mails and argument around what those e-mails demonstrate

2    as to who was the likely recipient or sender of those e-mails.

3          Your Honor, the government could do that.  I agree

4    with your Honor that it is maybe even more relevant with

5    respect to the restitution issue of whether if he had alerted

6    someone to this fraud at the time, whether the loss of these

7    victims would have been prevented.  But to the extent that your

8    Honor is interested, for purposes of the appropriate sentence

9    in this case, for the government to provide additional

10   information with respect to the timing of his likely knowledge,

11   we can do that.

12         THE COURT:  Well, the problem I have here is this

13   sentencing date has been known for a long time.  The government

14   has devoted enormous resources to this case.  The government

15   had the opportunity to prepare and did prepare not only a

16   sentencing submission, but a supplemental sentencing

17   submission.  I don't think it is appropriate.  It may be one

18   thing to require it with regard to the restitution obligation,

19   but this is judgment day.  And while it is judgment day for

20   Jared Galanis, it is also judgment day for the government.

21         MS. HECTOR:  Certainly, your Honor.

22         I hear you on that, and while we may be able to

23   proffer to your Honor some additional specificity, obviously

24   that may not be adequate in this context.

25         THE COURT:  There's a difference between, listen,

H1BSGALS

1    the nature of my job is I do a lot of civil cases in this

2    courthouse.  What someone could show on a knew or

3    should-have-known standard is not the relevant standard here.

4    You could make out a very compelling case that a reasonable

5    person should have engaged in an inquiry.

6         But for you, maybe not beyond a reasonable doubt, but

7    beyond a preponderance, make out a local blindness case in that

8    direction.  If you don't have evidence otherwise, it's not

9    simply enough to show that somebody should have inquired

10   further.  That's a standard the law accepts in many arenas, but

11   this is not one of them.

12        MS. HECTOR:  Well, your Honor, then, you know, I think

13   it may be most useful to focus on what is not in dispute for

14   purposes of today.

15        I think that is sort of where I began my remarks,

16   which is, you know, it is not in dispute that Jared Galanis

17   provided his father, who had three prior convictions for

18   fraudulent conduct, with access to his law firm e-mail account

19   for the purpose of conducting business.  And that, in fact,

20   Mr. Galanis went on to utilize that account in other capacities

21   beyond this initial authority, which was problematic authority

22   from the outset.

23        THE COURT:  It sounds to me like there's almost

24   agreement that that was the original sin.  Now, whether it's

25   not necessarily the crime to which he's entered a plea of

H1BSGALS

1    guilty here, it originates with that.

2            MS. HECTOR:  So the account was therefore utilized

3    to conduct a lot of this activity.  And just to be clear, you

4    know, the government believes that Jared Galanis was aware of

5    that activity prior to 2011, but that it was utilized to

6    conduct a lot of this activity.

7            I don't think they dispute that Jared Galanis was

8    involved in e-mail correspondence in furtherance of the fraud.

9    They dispute, I think, his level of knowledge.  But he

10   certainly -- and I don't think they can dispute this -- was

11   involved in e-mail correspondence around the bringing over of

12   these shares, the depositing of them into accounts, the moving

13   of them, and the transfer of proceeds through his IOLTA account

14   that his father did not have access to.

15           THE COURT:  Well, what's been proffered here today is

16   that, with regard to his IOLTA account, this is why I asked the

17   question with regard to that.  He had no knowledge he was

18   assisting in a criminal activity.  He thought that the transfer

19   was lawful.

20           Now, it doesn't surprise me that a defendant's lawyer

21   might make that assertion.  You have evidence that contradicts

22   that assertion.

23           MS. HECTOR:  Your Honor, how I would respond to that

24   is Jared Galanis was certainly in communication with Roth

25   Capital.  That is the first brokerage firm into which the

1    Shahini shares were deposited.

2            If your Honor remembers from the trial, the shares

3    came into the account, and Mason Octanis (phonetic) had

4    concerns about the providence of those shares, the

5    appropriateness of those shares, because there was an e-mail to

6    Roth Capital from Jared Galanis attaching documentation, the

7    Barry Finer letters and some other letters that demonstrated

8    that those shares had restrictions on them, and that there were

9    restrictions with respect to the sale of those shares in the

10   United States.

11           Now, there are phone communications from the Jared

12   phone, not the phone that was allegedly used and that we

13   believe to be used by the father, from the Jared phone to Roth

14   Capital around that time to suggest that Jared was the person

15   in communication with Roth Capital.  And as you recall, then

16   the shares, Roth Capital rejects the shares and they get moved

17   to C.K. Cooper.  Then those shares eventually are sold, and

18   proceeds of those Shahini sales are funneled through the IOLTA

19   account.

20           Now, does that set up a fairly strong argument that

21   Jared Galanis, at least, was aware that shares came into an

22   account?  He was aware that there were problems perceived by

23   Roth Capital about these shares, that they get moved to another

24   account.  He is aware of the movement of these shares to

25   various accounts and that the shares are sold and then money

1  gets funneled through his IOLTA account.  OK.

2       So I bring forth these facts because while I

3  understand the court's concern that we are sort of engaging in

4  a significant factual dispute here, about which there is, you

5  know, not definitive evidence, I understand that, but I also

6  don't want to stand here and let the court have a misimpression

7  about the state of our belief as to the evidence of Jared's

8  involvement and knowledge in this case.

9       So that sort of goes back to the point that, you know,

10  I don't think they dispute that Jared is involved in the

11  conduct, the underlying conduct.  The question, of course, is

12  what is the state of his knowledge.  You know, he admitted in

13  his allocution that at some point he became -- without temporal

14  specificity, at some point he became aware of the fraud and

15  concealed it.  And we are proffering to your Honor that this

16  e-mail account has numerous e-mails, and it is difficult and,

17  in fact, in some ways I know they don't have a burden to do so.

18       We are hamstrung by the fact that we are given a very

19  incomplete and scant explanation for this elaborate filtering

20  system.  If we were given more of an explanation, we might be

21  in a better position to refute it.  Because if someone said to

22  us, here is a list of the e-mail accounts that were filtered

23  and this is how they were filtered, we could then go back to

24  those specific e-mails and say, does it make sense that that

25  was what happening?  And we can't, so...

H1BSGALS

```
1          THE COURT:  Do you want me to adjourn the sentencing?
2    Are you asking me to adjourn the sentencing?
3          MS. HECTOR:  Your Honor, can I have a moment?
4          THE COURT:  Yes.
5          (Pause)
6          MS. HECTOR:  Your Honor, no.  We are not requesting
7    to adjourn the sentencing.  We would prefer to move forward on
8    the record as it stands right now before your Honor.  To the
9    extent that additional work needs to be done with respect to
10   the restitution, we obviously will do that and, you know, and
11   follow your Honor's instructions to meet with Mr. Lassert on
12   that.
13         But I think we prefer to leave it, at this point, that
14   the filtering is something that has been proffered by the
15   defendant, that there is no evidence of its existence or not.
16         THE COURT:  Well, as a result of the grand jury's
17   investigation, I assume you had access to the relevant e-mails
18   and to the system?
19         MS. HECTOR:  We contacted the service provider, and
20   they unfortunately have no information on their system that
21   could demonstrate whether or not that filtering occurred.  So
22   we made efforts to try to substantiate that, but were unable to
23   do so.
24         THE COURT:  OK.  Anything else?
25         MS. HECTOR:  Unless your Honor has further questions,
```

1    no.

2         THE COURT:  All right.  Mr. Lassert, I don't

3    ordinarily do this, but I will extend you an opportunity for a

4    brief response if there is any point that was raised that you

5    feel you wish to respond to.

6         MR. LASSART:  Your Honor, I don't see any additional

7    comment on what is a dispute on the facts.  I think the court

8    knows.  If the court has a question, I would be more than happy

9    to answer it.

10         THE COURT:  Thank you.

11         This is the court's statement of reasons for the

12    sentence to be imposed on Jared Galanis.  In sentencing the

13    defendant, I have considered all the materials that I

14    referenced at the outset, I have considered the thoughtful

15    comments of Ms. Hector and Mr. Lassart, as well as the sincere

16    statement of Mr. Galanis.  I have considered each of the

17    factors set forth in Section 3553(a).  I need not recount all

18    that I have considered, but I have considered it all.

19         There is little doubt here about one aspect of the

20    facts, and that is that the defendant has admitted Count Eight

21    of the indictment, that he was aware of his father's

22    participation in a conspiracy to defraud Gerova and he

23    concealed the fraudulent scheme and did not report the same to

24    law enforcement authorities.

25         There is really no dispute that he allowed his father

H1BSGALS

1   to have access to his law firm e-mail address, that he arranged

2   for his father to have a phone, and that he effectuated certain

3   transfers out of his lawyer IOLTA account, and further, that he

4   lied to the SEC.  There are disputes as to the timing of when

5   he had guilty knowledge, and certainly that's been explored on

6   the record here today.  And the court proceeds from the

7   assumption that that guilty knowledge occurred at some time in

8   2011.

9          The defendant is different from many people who have

10  appeared before me in that he grew up initially or he began

11  life in a privileged setting.  His family had multiple staff

12  members in their home in Greenwich, and they owned multiple

13  residences in Manhattan, San Diego, Del Mar, Rancho Santa Fe.

14  And then things changed when the defendant was a very young

15  boy, after his father's arrest, and certainly the lifestyle of

16  the family changed radically and his mother became a substitute

17  teacher.

18         I can't imagine that it would be an easy experience

19  for a young boy to see that.  Well, Jared Galanis did something

20  right along the way in pursuing an education, in staying

21  productive, and he earned a JD degree from University of San

22  Francisco, and he had a bachelor of arts degree from St. Mary's

23  in California.  Someplace along the line he also obtained an

24  MBA degree and a master's of law, which he received about a

25  year ago.  Actually, I said MBA.  There is some conflicting

information whether it was an MBA or a master of science major in financial analysis. But, in any event, he did obtain an additional degree.

He is not a young man. He is 37 years of age. He is a person different from his father. He knew of his father's history. As an individual, he's allowed to love his father, even with all the wrongful conduct he may have engaged in or did engage in and despite his criminal background. But as a smart person, a lawyer, well-educated person, he crossed the line into criminal behavior in knowing of his father's criminal conduct and concealing it and lying about it, and that is why he is called upon to pay a heavy price.

He will no longer practice law, and as part of this sentencing proceeding, I am directing him to notify any jurisdiction, state or federal, where he is admitted to practice law of the fact of his conviction and enclosing a copy of the judgment of conviction. That is to avoid doubt, and that will be one of the conditions of supervised release in this case.

He has a wife who is also well-educated as a software engineer and a computer science professor. And since 2003, she has suffered from a disease known as Ehlers Danlos syndrome, a group of genetic connective tissue disorders. And while there are a lot of discussions, many discussions, of the disease and of her symptoms, there is just no doubt that his wife has

H1BSGALS

undergone multiple surgeries, including spinal surgery in

December 2015 to implant an intracranial pressure device to

monitor the pressure inside the skull, and in July 2016, to

treat something known as Eagle syndrome and left internal

jugular vein stenosis.  His wife receives disability benefits

and wears a neck brace daily and is unable to engage in many of

the ordinary life functions or engage in them with any great

ease.  By all reports, the defendant has been a devoted spouse.

So this is a particularly difficult sentencing

decision in this case.  The Office of Probation has given the

following recommendation to the court, though the guideline

range is 21 to 27 months' imprisonment.  They recommend that

I sentence the defendant to three months' imprisonment.

I don't think that the recommendation quite fits the

conduct, but I do conclude that on the confluence of

circumstances, including the role in the offense and the

extraordinary care that Jared Galanis is called upon to give to

his wife, that a sentence of 150 days' imprisonment, of

one-year supervised release, and waiver of the fine based on

limited assets and limited earning ability, and the imposition

of a $100 special amendment is sufficient but not greater than

necessary to achieve the purposes of Section 3553(a).

Does the defendant or his counsel have any objection

to the court's proposed sentence or to the statement of reasons

for that sentence?

H1BSGALS

1          MR. LASSART:  No, your Honor.

2          THE COURT:  Same question for the government.

3          MS. HECTOR:  No, your Honor.

4          THE COURT:  The defendant will please stand and I will

5  impose sentence.

6          Jared Galanis, it is the judgment of this court that

7  you're hereby remanded to the custody of the United States

8  Bureau of Prisons to be imprisoned for 150 days.  Following

9  release from imprisonment, you shall be placed on supervised

10  release with the following terms and conditions:  You shall not

11  commit another federal, state, or local crime, nor illegally

12  possess a controlled substance, nor possess a firearm or

13  destructive device.  You shall refrain from any unlawful use of

14  a controlled substance and submit to one drug test within

15  15 days of placement on supervised release and at least two

16  scheduled drug tests thereafter.  You shall cooperate in the

17  collection of DNA.

18          The standard terms of supervision 1 through 13 are

19  imposed with the following special conditions:  You shall pay

20  15 percent of your gross monthly income towards the

21  satisfaction of any imposition of restitution which I will make

22  in this case, and restitution will be deferred but will be done

23  within the next 90 days.

24          You shall provide probation with access to any

25  requested financial information and shall not incur credit card

charges or open additional lines of credit without the approval
of the probation officer.  You shall submit your person,
residence, place of business, vehicle and any property,
computer, electronic communications, data storage devices, and
or other media under your control to a search on the basis that
the probation officer has reasonable suspicion that contraband
or evidence of a violation of the conditions of release may be
found.  The search must be conducted in a reasonable time and a
reasonable manner.  Failure to submit may be grounds for
revocation.  You shall inform any other residents that the
premises may be subject to search pursuant to this condition.
You shall refrain from engaging in any legal or financial
transactions directly or in an advisory capacity involving your
family members, your parents, and all of your siblings.  This
condition does not apply to you, your spouse, or any children
of yours.

        You shall report to the nearest probation office
within 72 hours of release of custody.  You may be supervised
in the district of residence.  As noted, you shall report to
any jurisdiction where you're admitted to the bar the fact of
this conviction, and enclosing a copy of the judgment of
conviction.  As noted and for the reasons stated, the fine is
waived, and the $100 mandatory special assessment is imposed.
Restitution will be imposed at a later date.

        Mr. Galanis, you have the right to appeal the sentence

H1BSGALS

1    I have imposed in this case.  If you cannot afford the cost of

2    an appeal, you may apply for leave to appeal as a poor person.

3    The time limits for filing a notice of appeal are strictly

4    enforced and they are brief.  If you request, the Clerk of

5    Court will prepare and file a notice of appeal on your behalf

6    immediately.

7              Do you understand all that?

8              MR. MADDOX:  Yes, your Honor.

9              THE COURT:  Anything further from the government?

10             MS. HECTOR:  Just that any remaining open counts be

11   dismissed.

12             THE COURT:  All right.  Any open remaining counts as

13   to Jared Galanis are dismissed.

14             Let me hear you with regard to surrender date.  Let me

15   propose something and then you can tell me whether it works.

16             March 14 at 2:00 p.m. to the institution designated by

17   the Bureau of Prisons, or if none is designated, then to the

18   United States Marshal for this district.

19             In terms of recommendation as to location, as close as

20   feasible to Maryland, is that the request?

21             MR. LASSART:  Yes, your Honor.

22             THE COURT:  And that request will be made.

23             Anything else from the defendant?

24             MR. LASSART:  No, your Honor.  Thank you.  We will be

25   surrendering on the Ides of March.

H1BSGALS

1          THE COURT:  Please be seated, if you will.

2          Mr. Galanis, I choose to believe the statements that

3    you made today.  This is an ugly and very costly chapter in

4    your life.  You have obligations to your wife, your wife's

5    family, and those who have stood by you in this time of need,

6    as well as to the victims of this fraud.  I believe you will

7    make amends, and I sincerely hope that you will get past this

8    episode and live a law-abiding life, and perhaps be an example

9    to others of the costly consequences of a mistake like this.

10   And when I say mistake, it's not a mistake, it's a crime.

11         We are adjourned.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25