**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 15 CR 643-05(PKC) |
| Plaintiff, | ) ) | DEFENDANT'S SENTENCING MEMORANDUM |
| v. | ) ) | Date:  February 16, 2017 |
| | ) ) | Time:  2:00 p.m. |
| DEREK GALANIS, | ) ) | Hon. P. Kevin Castel United States District Court |
| Defendant. | ) ) ) | |
| _____ | ) | |

## I. **INTRODUCTION**

On September 24, 2015, the Government named Derek Galanis along with seven co-defendants, including his father and two brothers in an indictment charging, among other things, Conspiracy to Commit Securities Fraud.  The government filed a superseding indictment on August 10, 2016.  On August 15, 2016, Derek Galanis pled guilty to Count One, *Conspiracy to Commit Securities Fraud*, a violation of 15 U.S.C. 78j(b) and 78ff, and 17 C.F.R. 240.10b-5 and 18 U.S.C. 371, and Count Two, *Engaging in a Scheme to Defraud Gerova Financial Group, Ltd. Shareholders and the Investing Public*, a violation of 15 U.S.C. 78j(b) and 78ff, and 17 C.F.R. 240.10b-5 before the Honorable Kevin Nathaniel Fox. His change of plea was accepted by this Court on the same date.  It is undisputed that Derek's brother, Jason Galanis, and Derek's father, John Galanis were both in a position of greater knowledge, greater control, greater authority, and certainly in a position of greater financial gain than Derek.  In fact, although it is true that Derek Galanis knowingly participated in this conspiracy, it is also undisputed that he appears to have initially participated in the conspiracy without knowledge of the illegality of the conduct and without the securities sophistication enjoyed by his father and brother.

Derek now stands before the court having accepted full responsibility for his part in this conspiracy, with the understanding that he presents himself for sentencing at an offense level of 28, and in Criminal History Category III, yielding a United States Guideline Range of 97-121 months.

## II. **FACTUAL BACKGROUND**

Derek Galanis is charged with participating in a scheme that took place between 2009 and 2011, involving Gerova Financial Group, Ltd. (hereafter, "Gerova").  The conduct is described in broad terms in paragraph 21 of the Pre-Sentence Investigation report authored by United States Probation Officer Johnny Y. Kim.  Specifically, Derek conspired with his father and his brothers Jason and Jared, as well as co-defendants Ymer Shahini, Gavin Hamels and Gary Hirst to manipulate

> …Gerova's stock price in order to reap profits from its sale during the fluctuation of the stock price.  The defendants furthered their scheme through various methods including, but not limited to, gaining control of Gerova in order to issue more shares of the

company; by controlling more than half of Gerova's shares available to the investing public…, by disguising the true ownership of Gerova shares, particularly those owned by JASON GALANIS and JOHN GALANIS, through various nominees; and by providing compensation to investment advisers to induce their clients to purchase Gerova shares.

The scheme yielded approximately $20 million in profits, most of which lined the pockets of John and Jason Galanis. Before the inception of this conspiracy, both Jason and John were barred from participating in securities transactions. Jason was barred by the SEC, and John by suffering a previous conviction for securities fraud. (In 1986, John was sentenced to the Bureau of Prisons for several years for this offense). They therefore, needed a way to conceal their role in trading Gerova stock from investors. Additionally, in order to successfully reap the benefits of their scheme, Jason and John would require an individual to pose as a false foreign nominee. As stated in paragraph 41 of the PSR, "JASON GALANIS recognized that a foreign national who represented that he would only sell shares abroad could qualify for an exemption from the registration requirements…allowing them to be immediately resold." This individual would by necessity need to participate in the scheme and be trusted enough to own millions of dollars of Gerova stock, while allowing the Galanis family to secretly control those shares. Engaging this foreign nominee was Derek's primary role in this conspiracy.

Between 2000 and 2001, Derek had spent an extended period of time in the Republic of Kosovo doing business with Ymer Shahini. The two were engaged in establishing an insurance company in Kosovo and became close friends. Among those in the Galanis family, only Derek had actually developed a relationship of personal trust with an individual who could pose as a foreign nominee. Derek was suddenly, and unknowingly, essential to the scheme that was being hatched by John and Jason. The PSR accurately notes, "Without knowledge of the scheme, DEREK GALANIS introduced YMER SHAHINI to JASON GALANIS." (PSR, paragraph 41). In the same paragraph the PSR quotes two emails sent from Derek to Shahini:

- May 22, 2010: "All we need is a foreign national we trust which is where you come in my friend."

- May 23, 2010: "[t]his is it my friend. A way for us to help each other and our families."

After Derek introduced Shahini to Jason, the two (Jason and Shahini) established a fraudulent consulting agreement as well as brokerage and bank accounts which Jason would control.  Derek was not a part of these arrangements.   However, Derek was involved in driving Shahini to different brokerage houses to set up accounts for the Gerova stock that Shahini was to receive.  As noted in the PSR at paragraph 52, "After profits were realized from the sale of Gerova shares, SHAHINI was directed by JASON GALANIS, JOHN GALANIS, JARED GALANIS, and *to a lesser degree*, DEREK GALANIS, to wire funds to GALANIS family members, HIRST, and others." [emphasis added]  Eventually, when it became obvious that Shahini was not going to be compensated in a manner anywhere near what was originally promised, Derek was tasked with serving as an apologist for the Galanis scheme and their rather blatant rip off of Shahini.

To understand the context in which Derek joined in this conspiracy, it is worth noting that in 2001,  Derek had suffered a conviction for Conspiracy to Distribute and Possess Ecstasy in the U.S. District Court for the Southern District of California.  He was released by the Bureau of Prisons in 2008.  As a recently released convicted felon, Derek had very few employment prospects.  By the time that Derek was released, John and Jason had already devised this scheme and had put it in play.  Derek was initially not privy to the plan.  It was unfortunate for Derek that he alone had developed a relationship of trust with a foreign national.  His friendship with Shahini was not developed for the purpose of any conspiracy, but it became a valuable commodity to his father and his brother.  In response to Jason's request, Derek introduced his trusted friend into the scheme without knowledge of its illegality.  By the time Derek realized that he had put his trusted friend into a criminal conspiracy it was too late.

### III. AN EVALUATION OF DEREK'S CIRCUMSTANCE WARRANTS A MODEST DOWNWARD VARIANCE

Pursuant to *United States v. Booker*, 543 U.S. 220, 244-246, the United States Sentencing Guidelines are no longer binding but advisory, with the mission for the District Court to "impose a sentence sufficient, but not greater than necessary." *Kimbrough v. United States*, 522 U.S. 85, 102 (2007).  As articulated in *Gall v. United States*, 522 U.S. 38, 52 (2007), the Court should

"consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Here, it is Derek's role in the offense that is mitigating, when compared with that of John and Jason.

John Galanis was imprisoned for a securities fraud scheme in the 1980's, and it can be said without fear of contradiction that he was both the most experienced member of this conspiracy but also the ring-leader in this scheme. Jason, enjoyed a high level of sophistication in the securities business, and had spent years being groomed by his father. Jared had a law degree and his own practice, and as such had utility to his family business. Derek on the other hand, had been convicted at the age of 29 for possession of an ecstasy lab. He was imprisoned from 2001 until 2008, and emerged into the world without a home, a job, a family of his own, or any prospects.

After his time in prison, Derek returned to a career as a competitive mixed martial arts fighter, and to earn a few dollars as a martial arts instructor for children. To say his income was modest would be an understatement. He was an outcast from his family. Indeed, the only asset he had was the trust and friendship of his former business partner, Ymer Shahini. Of course, the value of this asset was known only to John Galanis who had devised a scheme that would require a foreign national that could be trusted. Developing trust appears to not have been among the skills possessed by John Galanis, and therefore, perhaps for the first time, he had need of Derek.

From Derek's point of view, he himself was not only an outsider in his family, but also something of a failure. His father was focused on the lucrative securities business which brought him all of the trappings of wealth. Jason was regarded as the heir to John's money generating ability and was being groomed to be the front man for John's schemes. Jared had earned a law degree, and although an outsider of sorts, had gained a legal education, instead of spending seven years in the Bureau of Prisons for a failed ecstasy lab. (Though it is true that Derek was involved with a number of entrepreneurial pursuits, in most of these he was little more than an employee for his family.)

It was in this setting, that Derek finally received an invitation to come in from the cold and join the family business. Just months after his release, Jason explained to Derek that the

family business required a foreign national that could be trusted.  At this point, Derek had no idea that this was for an illegal venture.  In fact, the details of the business plan were not laid out for Derek.  He candidly admits that he should have suspected his father of doing something underhanded, but in this instance he had no reason to suspect criminality.  Instead he was flattered by feeling important and necessary to the family for the first time.  Derek introduced Shahini to Jason, and in so doing put himself squarely into the scheme that led to this case.

     Because Derek recruited Shahini into the Galanis scheme, it is difficult to argue that Derek played a minor role in the conspiracy.  However, when one compares Derek's role to that of his brother or his father, his role seems minor indeed.  Further, when one considers that at the time of Shahini's recruitment, Derek was not even aware that this was a criminal conspiracy, his role is diminished even further.  Naturally, Derek accepts full responsibility for the fact that he did learn that the conspiracy was indeed a criminal enterprise, and for the fact that he remained in the conspiracy and helped to accomplish its goal.  He does not deny his part in this.  But he did not design this conspiracy, or have knowledge of its criminal nature when he put his trusted friend into a position where he would have criminal liability.  Moreover, even though it is true that a person recently released from the Bureau of Prisons should have every incentive to stay on the straight and narrow, it is also true that at such a time a person is especially vulnerable due to a lack of prospects.  Derek Galanis returned to his family after his release from prison because it was the only place he had to go.  The fact that he was born the son of a criminal ring leader who was willing to exploit him was his misfortune and one that can be considered worthy of tempering justice with mercy in the form of a modest downward variance.

### IV. 18 U.S.C. SECTION 3553 FACTORS FORTIFY THE NOTION THAT A DOWNWARD VARIANCE IS WARRANTED

Mr. Galanis agrees with the sentencing calculations in the Pre-Sentence Report, specifically, that he comes to the Court in offense level 28 and in a Criminal History Category III, yielding a guideline range of 97-121 months.

Pursuant to 18 U.S.C. 3553 (a)(1), the Court is authorized to consider a defendant's history and characteristics, in order to accomplish the goals of: 1) just punishment, 2) general deterrence, 3) specific deterrence, and 4) rehabilitation.

Here, the loss amount drives the guideline range, as it accounts for a 22 level increase. Although the law is clear that whether a particular conspirator grasped the vastness of the conspiracy is not the issue when holding a defendant accountable for loss amount. Likewise, how much a conspirator personally profited is not the correct analysis. But a mechanical application of the loss amount guidelines may not be appropriate in this case. As articulated in *United States v. Emenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004),

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence…(Id. at 47).

However, the court went on to point out that, the "amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." (Id. at 427).

There is no question that Derek's motivation in joining the conspiracy was in part greed, but he was also motivated by being important to his family. This was certainly an opportunity to make money, but Derek did not have the information or the sophistication to grasp the vastness of the ill-gotten gain that this conspiracy would yield. Derek's lack of vision was no accident. Both John and Jason had every incentive to keep this information from Derek in order to minimize his ability to estimate his cut of the take. Furthermore, while John and Jason enjoyed vast wealth from this conspiracy, Derek saw little more than room and board. In the end, Derek emerged with nothing more than a 1997 Ford Mustang and the clothes on his back. Succinctly put, as a convicted felon with no prospects, Derek returned home to a patriarch who was a fraudster and a master confidence man. John Galanis was an expert at human manipulation, and his powers were enhanced by the dynamic of being able to grant or withhold a father's approval from a son who so badly craved it. There is no denying that Derek stayed in this scheme out of greed, and that warrants severity in his punishment, but his family circumstance warrants consideration in the application of the guidelines.

Mr. Galanis respectfully asks the court for a sentence of 60 months. This would represent a punishment in at the lower end of offense level 24 in CHC III. Certainly 60 months meets the criteria as set forth in 18 U.S.C. 3553(a) in the following manner:

1) <u>Just punishment</u>: Five years is considerable punishment when one considers that Derek was recruited to join a scheme already set in motion by his father. At a time when Derek was vulnerable due to lack of prospects, he was living with a master con man who needed him to join the conspiracy. His role is small when compared to that of his father and brother, and this is reflected in the fact that his compensation for his role was minimal.

2) <u>General deterrence</u>: Five years represents a punishment meaningful enough to deter any white collar offender. This is especially true when one considers that there was never an upside for Derek, who at no point realized or enjoyed significant wealth, and emerged destitute.

3) <u>Specific deterrence</u>: Derek has fully accepted responsibility for his actions. The evidence in this case makes it clear that he at no time could have or would have engaged in this type of scheme had it not been conceived and put into action by his father and his brother.

4) <u>Rehabilitation</u>: If Derek were sentenced to a five year term, by the time he is released he will have spent 12 of the last 21 years in the B.O.P. It is difficult to imagine that Derek's motivation to abandon criminality would be enhanced by more years behind bars. The manipulative pull of being born into a crime family represented the greatest threat to Derek's ability to become a law abiding citizen. Derek was not only convicted, but also betrayed by his family. It is unimaginable that Derek has not learned to resist his family's influence already, let alone by serving 60 months in the bureau of prisons.

## V. CONCLUSION

Derek Galanis cannot escape being accountable for his role in this criminal conspiracy. He has addressed that in real world terms, by accepting responsibility and facing the undiluted consequences before this Court.  His prior conviction ratchets up these consequences even further.  Mitigation for Derek comes from the human story of being the ostracized son of a master con man.  A son who had been unable to find any success, and suffered the twin misfortunes of being the son of John Galanis, and being the only viable connection to a necessary component for John to execute his scheme, a foreign national who could be trusted. The father-son dynamic only enhanced the already powerful lure of the promise of easy money. Balancing this serious criminal conduct with these misfortunes can be accomplished adequately with a sentence of 60 months.  Five years represents a just sentence that delivers general and specific deterrence while also taking into consideration Derek's circumstance and rehabilitation

Dated:  February 2, 2017                                                       Respectfully Submitted,


    __/s/ Anthony Brass
    ANTHONY J. BRASS
    Attorney for Defendant
    DEREK GALANIS