H1BSGALS

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              15 CR 643 (PKC)

5    JARED GALANIS,

6                  Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              January 11, 2017
9                                             12:00 p.m.

10
     Before:
11
                       HON. P. KEVIN CASTEL,
12
                                              District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     AIMEE HECTOR
17   REBECCA MERMELSTEIN
     BRIAN R. BLAIS
18        Assistant United States Attorneys

19   MURPHY, PEARSON, BRADLEY & FEENEY
          Attorneys for Defendant
20   BY:  JAMES A. LASSART

21   ALSO PRESENT:
     Shannon Bieniek, FBI Agent
22

23

24

25
```

H1BSGALS

```
 1              (case called)
 2              MS. HECTOR:  Good afternoon, your Honor.
 3    Aimee Hector, Rebecca Mermelstein, and Brian Blais for the
 4    government.  With us at counsel table is Shannon Bieniek from
 5    the FBI.
 6              THE COURT:  Good afternoon.
 7              For the defendant?
 8              MR. LASSART:  Good afternoon, your Honor.  James
 9    Lassart appearing on behalf of Jared Galanis.  My client is
10    present.
11              THE COURT:  Let me go through the materials I have,
12    and the question will be whether I have everything I should
13    have.
14              I have a presentence report recommendation and
15    addendum transmitted to me on December 28, 2016, I have a
16    submission from the government dated January 6, and a
17    supplemental submission dated January 10 from the government.
18              I also have a sentencing memorandum submitted by the
19    defense, which was filed in mid December, it looks like around
20    December 28, if I'm reading that correctly.  Of course, there
21    are many helpful exhibits attached to the defendant's
22    submission, including a report by a forensic medical individual
23    who has interpreted certain health records, and there are a
24    series of letters from family members, in-laws, and friends in
25    support of the defendant.
```

H1BSGALS

1            I also have a letter that was submitted by Paul Grand,

2    writing without any particular standing in this matter, former

3    counsel to Defendant John Galanis, and a response from the

4    government dated November 18, 2016.

5            Do I have everything I should have on the subject of

6    sentencing?

7            MS. HECTOR:  I believe so, your Honor.

8            MR. LASSART:  Yes, your Honor.

9            THE COURT:  Has the defendant, in fact, read,

10    reviewed, and discussed with you the presentence report

11    recommendation and addendum?

12            MR. LASSART:  He has, your Honor.

13            THE COURT:  Does the defendant have any objections to

14    the facts set forth in the presentence report?

15            MR. LASSART:  Our objections were noted and are noted

16    in the addendum, your Honor.

17            THE COURT:  Are there any that you continue to press?

18            MR. LASSART:  No, your Honor.

19            THE COURT:  Any objections to the guideline

20    calculation in the presentence report?

21            MR. LASSART:  No objection to the guideline

22    calculation.

23            THE COURT:  Let me hear from the government.  Do I

24    have everything I should have on sentencing?

25            MS. HECTOR:  Yes, your Honor, you do.

H1BSGALS

1          THE COURT:  Any objection to the facts set forth in

2     the presentence report?

3          MS. HECTOR:  Your Honor, we do agree that the facts

4     section recites the original indictment that does attribute the

5     phone directly to Jared Galanis.  I think everyone is aware

6     that we are all now in agreement that it more accurately should

7     read "a phone subscribed in the name of Jared Galanis."  I

8     think we are all on the same page as to the facts.

9          THE COURT:  I took it that that was the original

10     indictment, and my understanding is that the phone was used by

11     John Galanis and not by Jared Galanis.

12          Is that correct, Mr. Lassart?

13          MR. LASSART:  Yes, your Honor.

14          THE COURT:  All right.  Now, I understand the

15     government does not agree with the methodology used in

16     calculating the guidelines, but does agree with the ultimate

17     conclusion that defendant is in total offense level 16,

18     criminal history category I?

19          MS. HECTOR:  Yes, your Honor.

20          THE COURT:  All right.  I will now give defense

21     counsel an opportunity to speak on behalf of the defendant.

22          MR. LASSART:  Thank you, your Honor.

23          In addition to the submissions that were sent in,

24     I have a few additional comments to make.  I think it is

25     important to note that Jared is not a coconspirator in this

H1BSGALS

matter, and he is guilty, as he pled guilty, to misprision of a

felony.  It is also important to note that he became aware of

his father's criminal impersonation and criminal conduct in

2011.  He stopped at that time the usage of his name, and

ultimately, in 2012, he moved to Maryland for a couple of

reasons.  One, to help assist in his wife's healthcare, but

also to distance himself from the problems that his brother and

father were engaged in.  Probably his separation is best

described by looking at what went on, which resulted in a

second indictment in both his father and his brother.

THE COURT:  Well, let me understand what you just

posited.  That when he learned that his father was using the

e-mail account, it promptly stopped or it caused him to stop

immediately?

MR. LASSART:  Yes.  Not only the e-mail account, but

the phone.

In 2011, he basically discovered a lot of e-mail

activities when a subpoena occurred from the SEC.

THE COURT:  Are you arguing that he didn't commit any

crime here?

MR. LASSART:  No.  He concealed.  There was some

ongoing activity that he became aware of and he concealed it.

Also, he wasn't forthcoming with the SEC as to who the drafter

of those e-mails were.

THE COURT:  All right.

H1BSGALS

1          MR. LASSART:  In other words, he concealed items that

2     he should have revealed.

3          THE COURT:  When you say "not forthcoming," he was

4     asked about it and he did not tell them the truth as he knew

5     it?

6          MR. LASSART:  Exactly.  He basically treated the

7     e-mail as if they were his when he discovered them to the SEC.

8          THE COURT:  All right.  And tell me about what he did

9     to enable transfers out of the IOLTA account.

10          MR. LASSART:  The IOLTA account was primarily active

11     during the course, prior to the 2011 discovery.  His brother,

12     he represented his brother on transactional matters.

13          During that time, he would receive what were basically

14     settlement dollars and distribute those settlement dollars out

15     of his IOLTA account based on the direction of his brother.

16     That's what he did.

17          THE COURT:  Your position is there was no criminal

18     activity with regard to the disbursement of funds from the

19     IOLTA account, is that what you're saying?

20          MR. LASSART:  I am not say there was no criminal

21     activity, but it wasn't Jared's criminal activity.  These IOLTA

22     funds came from transactions that his brother engaged in and

23     his father engaged in in which there was criminal conduct.

24     However, Jared's action was basically to treat them as if they

25     were settlement dollars coming out of business transactions.

H1BSGALS

1          THE COURT:  Well, that may have been how he treated

2     them.  What I am trying to get to the bottom of is whether he

3     knew the truth of their origins and treated them as if they

4     were settlement funds.  That's an entirely different situation.

5     And it is important that I understand how he directed funds

6     from that account and whether he did so aware of criminal

7     activity by his father and his brother.

8          MR. LASSART:  He was unaware of the criminal activity

9     that developed those funds and disbursed them according to the

10    direction of his brother.

11         THE COURT:  Thinking that they were lawfully obtained

12    dollars?

13         MR. LASSART:  That's right.

14         The funds are accounted for in the distribution, so

15    there wasn't any attempt to in any way structure or hide the

16    direction of the funds or the source of the funds.

17         THE COURT:  All right.

18         MR. LASSART:  Did I answer your question, your Honor?

19         THE COURT:  Thank you.

20         MR. LASSART:  Now, the fact of the matter is that the

21    government has gathered a large deal of information regarding

22    Jared's financials, and I think what they will have discovered

23    is that he did not lead a lavish lifestyle, that he is a renter

24    now in Maryland, that he now drives to support his family

25    through Lyft.  He is not benefactor of these huge dollars that

1    were generated from the criminal activity.

2              This conviction ended his legal career, and he is now

3    the essential and primary caregiver for his wife, as we get to

4    the 3553 criteria.  In looking at this, the purpose of

5    sentencing is that just punishment, of course, general

6    deterrence, specific deterrence, and rehabilitation, these

7    policies basically direct that a minimal sentence is needed to

8    achieve those goals.

9              Now, one of the critical factors in the 3553 is his

10   care and extremely important care for his disabled wife.  He is

11   an essential caregiver, and our medical submissions, I think,

12   explain his role, the necessity of his role, and the terrible

13   disease she suffers from.

14             Now, in conjunction with that, we ask the court to

15   take that into consideration at the time of sentencing.

16             THE COURT:  This is the submission from the forensic

17   nurse who has reviewed medical records for the purpose of

18   opining on the subject?

19             MR. LASSART:  Yes, your Honor.

20             In addition to that, we have a letter directly from

21   her caregiver, a doctor --

22             THE COURT:  The geneticist?

23             MR. LASSART:  Yes.

24             THE COURT:  I saw that.

25             MR. LASSART:  Those are what I am referring to.

H1BSGALS

1          THE COURT:  OK.

2          MR. LASSART:  Now, let me address briefly the

3     restitution issue in the case, that which we received

4     information on in the last few days.

5          In this matter, restitution for Jared should not be

6     assessed as joint several liability with the coconspirators in

7     this case, with the persons who are coconspirators, of which he

8     is not one of them.

9          He did not participate in that conspiracy and the

10    attributable harm, which it's difficult to attribute, I think,

11    and not appropriate to attribute to Jared his conduct as to

12    causing any form of harm in the form of taking of money from

13    the purported victims.

14          What I think the government has relied on is both the

15    Marine case and the Lentil case.  We cited the Mariano case.

16    The point of that particular authority in those is that there

17    can be, at times, restitution attributed to misprision of a

18    felony.  Those cases are clearly distinguishable from the facts

19    of this case in both of those cases.  There was a long-term

20    knowledge and a concealment of a lengthy ongoing fraud, that if

21    it had been identified earlier, would have caused the cessation

22    of some of these losses.

23          In this instance, Jared's conduct, though allowing for

24    some additional harm to victims, was so late in the game, that

25    much of the fraud and the harm of these victims was caused

H1BSGALS

before his discovery of that in 2011.  As a result, a majority

of the damage, in our view, was done prior to Jared's

discovery, and therefore he should not be penalized in a joint

several manner with individuals who created this particular

scheme, these schemes.

Now, I know some of the issues that the government has

raised is that Jared had provided the tools of this to his

father, but it should be known that his father was given a

phone in 2004 by Jared when he couldn't get a phone and he was

just coming out of prison.  And he did authorize his father to

use his e-mail to assist in dealing with the credit issues of

his mother.

THE COURT:  Well, let's talk about that so that I have

a better understanding.

What did he authorize in terms of e-mail usage?  He

authorized John Galanis to have an e-mail account through his

law firm, or he authorized John Galanis to use an account

which, to other persons, would appear to be an e-mail sent by

Jared Galanis?

MR. LASSART:  My belief is he authorized John Galanis,

the way I understand it, to use the account.  John then took

liberties and created his own e-mail within that account, but

also used Jared's.  We have e-mails that show John's use of the

Google account with different e-mail addresses, but he used

Jared's e-mail address.

H1BSGALS

1          THE COURT:  Well, this is a little confusing to me,

2    given the ease with which one can open a Gmail account in five

3    minutes for free.

4          What was Jared's intent in authorizing his father to

5    use -- was this the sentinel e-mail account?

6          MR. LASSART:  Yes.

7          THE COURT:  -- using a sentinel account if the father

8    was not associated with sentinel?

9          MR. LASSART:  His intent was that his father would

10   deal with his mother's credit.  I don't think there was much

11   more thought about it than that.

12         THE COURT:  But why wouldn't you say, Dad, come over

13   here.  I am going to do this for you.  We are going to get you

14   a Gmail account.  We'll be done in five minutes.  Here you go.

15         MR. LASSART:  I can't answer that question.  I can

16   just tell you what occurred.

17         What I can tell you is that he allowed his father to

18   use his e-mail account and never monitored that nor gave it any

19   additional thought.  What John Galanis ended up doing was

20   created a filter on that e-mail account, and then filtered

21   incoming e-mail from certain individuals into an account that

22   was a file.  It was basically for his mother's credit.  And

23   that was as a result, they didn't get into the general e-mail

24   that Jared was reviewing, at least most of them didn't, and

25   they would go to this filtered file.

H1BSGALS

```
 1              As far as the phone, he basically impersonated Jared
 2    in phone calls and used that phone to end up in tracting
 3    activities.  Jared gave him that phone and he used that number
 4    from 2004 on, and then there was a switch of phones and he
 5    never monitored what his father was doing on that.
 6              THE COURT:  How is the phone any different to a person
 7    receiving a call on the phone than one purchased at a
 8    convenience store as a prepaid phone?
 9              MR. LASSART:  I'm sorry.  I guess I don't understand
10    it.
11              THE COURT:  I guess what I'm getting at is the phone
12    number identified with that phone publicly identified as a
13    Sentinel telephone number, so that the person getting the call
14    would think they were getting a call from the law firm, or was
15    it just a randomly assigned number, the same as one would get
16    if you purchased a prepaid phone?
17              MR. LASSART:  It was a randomly assigned number.  The
18    billing went and subscription was Jared's at the firm, but it
19    wasn't the firm's number.
20              THE COURT:  And this would not be something that would
21    be apparent to anyone else in the world?
22              MR. LASSART:  That's right.
23              THE COURT:  You wouldn't know that you were getting a
24    call on Jared's phone at all?
25              MR. LASSART:  That's right.
```

H1BSGALS

1          THE COURT:  Unlike the Sentinel e-mail, where you

2    would know the Sentinel name would be in the e-mail address.

3          MR. LASSART:  That's correct.

4          THE COURT:  Go ahead.

5          MR. LASSART:  Now, with all these factors before this

6    court, I would ask the court to consider doing the following:

7    to follow the recommendation of the probation in the PSR.

8    However, if the court does not follow the recommendation in the

9    PSR.  I would ask that the court impose a sentence that would

10   allow for home detention.  In conjunction with that, of course

11   if there is a need for custodial time.  I would ask for an

12   opportunity to have Jared self-surrender.

13          I ask the court to look at this young man and

14   understand the position he was put in by his family, a family

15   whose father was not available during the first 20-some odd

16   years of his life, and the fact of trust he allowed, whether

17   you call it foolish or not, which is largely the type of person

18   you'll see reflected in the various people who wrote on his

19   behalf.

20          They placed him in a terrible position and he reacted

21   improperly once he understood that there was activity going on

22   and you can see it.  He's not benefactor of this, and though,

23   to some degree, the activities of his family have ruined his

24   professional career, he is not going to practice law.  He can't

25   practice law any longer, and his focus now is on what he can do

H1BSGALS

```
1    to benefit himself in the sense of my family and move on from
2    his life.  I think that probation's recommendation is
3    reasonable and I would ask the court to follow that.
4            If the court ultimately, after the discussion from the
5    prosecution, wishes to hear from Jared directly, he is prepared
6    to talk to the court as necessary.
7            THE COURT:  All right.
8            MR. LASSART:  Thank you, your Honor.
9            THE COURT:  Mr. Galanis, this is your opportunity to
10   speak, to address the court directly, to bring to my attention
11   any facts or circumstances that you believe I should take
12   account of.  If there is anything you wish to say, this is the
13   time to say it.
14           MR. MADDOX:  Thank you, your Honor.
15           THE COURT:  I can hear you fine.  You can stand up.
16           MR. MADDOX:  Thank you, your Honor.
17           I stand before you today, I can honestly tell you that
18   I truly and deeply regret the crime that committed and the harm
19   that I have caused.
20           Concealing the conspiracy is by far the biggest
21   mistake of my life.  I put myself and others in my family
22   before the good of others.  I wish I could take back those
23   errors.  I do, and conduct myself in a way that I know is the
24   right way and a bay that I know I will conduct myself in the
25   future.
```

H1BSGALS

1          I am so ashamed that I was not able to exhibit the

2     judgment and the character that I know I am capable of.  I will

3     spend the rest of my life regretting these decisions and

4     figuring out a way to make things better in this world.  I

5     don't know that I'll ever be able to restore the harm caused by

6     my bad decisions, but I can tell you that I will try.  I will

7     make it my life's work never to make an error like this again.

8          I failed society, my wife, my family, especially my

9     family in Maryland, my friends, I failed myself.  A person who

10    does these things is not the person that I have spent so many

11    years building and cultivating, and it is not the person I will

12    be in the future.

13         If given the chance by your Honor, I will plan to

14    continue to be of help to my wife, especially in navigating her

15    difficult health situation, and I plan to continue to push my

16    career in new directions.  While I know my work life has been

17    forever altered by what I have done, I do believe I can be a

18    contributing member of society.

19         THE COURT:  Thank you, Mr. Galanis.

20         MR. MADDOX:  Thank you, your Honor.

21         THE COURT:  This is the government's opportunity to

22    speak.

23         MS. HECTOR:  Thank you, your Honor.

24         A few responses to what defense counsel has said and

25    what was articulated in his papers.

H1BSGALS

```
1          I think the thrust of the defense argument in favor of

2   Mr. Galanis is that he was a victim in many ways of this fraud.

3   We believe that really understates both his level of

4   culpability and level of involvement.

5          You know, first, focusing on this e-mail account.

6   There are not two e-mail accounts here.  This is an e-mail

7   account set up as a law firm personal e-mail account,

8   JMG@Sentinellaw.com, subscribed by Mr. Galanis, paid for by

9   Mr. Galanis.  He gave access to that account, not a separate --

10  there's not a separate JohnGalanis@Sentinellaw.  It is that

11  account that he gave access to his father to allegedly for

12  purposes of allowing his father to communicate with credit

13  reporting agencies under the guise of a lawyer.  Clearly the

14  purpose of this was to give his father either greater

15  credibility, greater negotiating power, whatever, in

16  communication with these credit reporting agencies.

17         John Galanis had, throughout the course of this case,

18  other e-mail addresses and he could make another e-mail

19  address.  So the sort of initiation of this access was

20  fraudulent itself.  Mr. Jared Galanis is a lawyer and he has

21  ethical obligations.  So that, according to Jared Galanis, was

22  the onset of his father's use of his account.

23         Now, there is no dispute that this account was used

24  extensively in connection with and in furtherance of the fraud.

25  There was e-mails to brokerage accounts, e-mails directing
```

H1BSGALS

1   movement of shares, e-mails directing transfers of shares,

2   e-mails directing wires.  Your Honor heard at the trial of

3   Mr. Hurst about how the shares were deposited into an account

4   at Roth and how they moved through various different accounts

5   with different brokerage firms, as particular brokerage firms

6   got concerns about the shares.  There was e-mails with Ymer

7   Shahini.  There was e-mails with Jason Galanis.  There are lots

8   of e-mails relevant to the conduct.

9          Now, defense counsel has proffered this explanation

10  that there was an "elaborate filtering system setup," but we

11  have been provided with no further specificity as to how that

12  filtering system was set up, whose e-mail addresses were

13  filtered.  When one said filtered, I guess what comes to mind,

14  could it have been filtered into a sub folder, was that sub

15  folder nonetheless accessible, were responses to those e-mails

16  still in the sent mail.  There are so many e-mail addresses and

17  sort of counter parties to these e-mails that it becomes hard

18  to disentangle.

19         So we have an e-mail account that we agree was used

20  by both Jared Galanis and John Galanis.  There are e-mails, the

21  content of which has personal information that it is clearly

22  one or the other, but then there is a large segment of e-mails

23  that are more difficult.  And the government has endeavored

24  extensively to go through these e-mails and to try to pair it

25  up with phone calls on phones attributed to Jared or John to

H1BSGALS

1    try to disaggregate, and it is very difficult to do so.

2            But Jared admitted in his allocution that, at some

3    point, he became aware of this.  He says 2011.  We don't know,

4    your Honor.  There are a lot of e-mails in 2010 along these

5    lines.

6            THE COURT:  Yes, but let's look at where we are.

7            MS. HECTOR:  Yes.

8            THE COURT:  He has admitted his guilt to the crime of

9    misprision of felony.  He, through his counsel, asserts that he

10   had guilty knowledge sometime in 2011.  While it is relevant to

11   the sentencing decision, it is considerably more relevant to

12   the restitution issue.

13           MS. HECTOR:  Fair enough.

14           THE COURT:  Certainly on the restitution issue, it's

15   the government's burden of proof.  It would seem to me that the

16   construct is correct, that it doesn't begin with joint and

17   several liability as it might in a conspiracy case.  But one

18   engages in the exercise of what would have happened to the

19   victims if Mr. Jared Galanis had not committed the crime of

20   misprision of felony.

21           What I am hearing is that he became aware in 2011, and

22   he lied to the SEC about it.  Presumably, at the time of the

23   lies to the SEC, I think you're going to tell me the horse was

24   already out of the barn, so that could not have caused anyone

25   injury.  I don't know enough about the timing to know what the

H1BSGALS

1   consequence of 2011 is, but it seems to me -- and maybe this

2   makes things easier for today's purposes -- that I have 90 days

3   to resolve the restitution issue, and that the government has

4   to sit down across the table from Mr. Lassart -- and maybe

5   since he's in town, this is not a bad day to do it -- and talk

6   about the evidence and see whether or not you can get close to

7   an agreement.  And if you can't get close to an agreement, then

8   your alternative is to have a hearing and see whether you can

9   prove your case by a preponderance of the evidence.  I think

10  the legal principles, I don't think there is going to be a

11  disagreement in this room as to what those principles are.

12          Now, it is still relevant to the sentencing decision

13  of whether there is evidence that Jared Galanis is not being

14  straight with the court even today on January 11, when he says

15  to his lawyer that he first learned in 2011.  But I think that

16  requires more than pointing out that it's difficult.  It's the

17  government's burden to show what it has in that regard.

18          MS. HECTOR:  Yes, your Honor.

19          I am not surprised that your Honor is coming to this

20  issue, obviously.  I don't think, to the extent that we were to

21  provide additional evidence to substantiate or to evidence

22  exactly when Mr. Galanis was likely to have come into greater

23  knowledge, I don't necessarily think it would be a hearing with

24  testimony.  I don't frankly think there would be a witness to

25  that.  I think it would be greater detail and specificity of

H1BSGALS

1   the e-mails and argument around what those e-mails demonstrate

2   as to who was the likely recipient or sender of those e-mails.

3           Your Honor, the government could do that.  I agree

4   with your Honor that it is maybe even more relevant with

5   respect to the restitution issue of whether if he had alerted

6   someone to this fraud at the time, whether the loss of these

7   victims would have been prevented.  But to the extent that your

8   Honor is interested, for purposes of the appropriate sentence

9   in this case, for the government to provide additional

10  information with respect to the timing of his likely knowledge,

11  we can do that.

12          THE COURT:  Well, the problem I have here is this

13  sentencing date has been known for a long time.  The government

14  has devoted enormous resources to this case.  The government

15  had the opportunity to prepare and did prepare not only a

16  sentencing submission, but a supplemental sentencing

17  submission.  I don't think it is appropriate.  It may be one

18  thing to require it with regard to the restitution obligation,

19  but this is judgment day.  And while it is judgment day for

20  Jared Galanis, it is also judgment day for the government.

21          MS. HECTOR:  Certainly, your Honor.

22          I hear you on that, and while we may be able to

23  proffer to your Honor some additional specificity, obviously

24  that may not be adequate in this context.

25          THE COURT:  There's a difference between, listen,

H1BSGALS

```
 1    the nature of my job is I do a lot of civil cases in this
 2    courthouse.  What someone could show on a knew or
 3    should-have-known standard is not the relevant standard here.
 4    You could make out a very compelling case that a reasonable
 5    person should have engaged in an inquiry.
 6           But for you, maybe not beyond a reasonable doubt, but
 7    beyond a preponderance, make out a local blindness case in that
 8    direction.  If you don't have evidence otherwise, it's not
 9    simply enough to show that somebody should have inquired
10    further.  That's a standard the law accepts in many arenas, but
11    this is not one of them.
12           MS. HECTOR:  Well, your Honor, then, you know, I think
13    it may be most useful to focus on what is not in dispute for
14    purposes of today.
15           I think that is sort of where I began my remarks,
16    which is, you know, it is not in dispute that Jared Galanis
17    provided his father, who had three prior convictions for
18    fraudulent conduct, with access to his law firm e-mail account
19    for the purpose of conducting business.  And that, in fact,
20    Mr. Galanis went on to utilize that account in other capacities
21    beyond this initial authority, which was problematic authority
22    from the outset.
23           THE COURT:  It sounds to me like there's almost
24    agreement that that was the original sin.  Now, whether it's
25    not necessarily the crime to which he's entered a plea of
```

1    guilty here, it originates with that.

2              MS. HECTOR:  So the account was therefore utilized

3    to conduct a lot of this activity.  And just to be clear, you

4    know, the government believes that Jared Galanis was aware of

5    that activity prior to 2011, but that it was utilized to

6    conduct a lot of this activity.

7              I don't think they dispute that Jared Galanis was

8    involved in e-mail correspondence in furtherance of the fraud.

9    They dispute, I think, his level of knowledge.  But he

10   certainly -- and I don't think they can dispute this -- was

11   involved in e-mail correspondence around the bringing over of

12   these shares, the depositing of them into accounts, the moving

13   of them, and the transfer of proceeds through his IOLTA account

14   that his father did not have access to.

15             THE COURT:  Well, what's been proffered here today is

16   that, with regard to his IOLTA account, this is why I asked the

17   question with regard to that.  He had no knowledge he was

18   assisting in a criminal activity.  He thought that the transfer

19   was lawful.

20             Now, it doesn't surprise me that a defendant's lawyer

21   might make that assertion.  You have evidence that contradicts

22   that assertion.

23             MS. HECTOR:  Your Honor, how I would respond to that

24   is Jared Galanis was certainly in communication with Roth

25   Capital.  That is the first brokerage firm into which the

H1BSGALS

1    Shahini shares were deposited.

2            If your Honor remembers from the trial, the shares

3    came into the account, and Mason Octanis (phonetic) had

4    concerns about the providence of those shares, the

5    appropriateness of those shares, because there was an e-mail to

6    Roth Capital from Jared Galanis attaching documentation, the

7    Barry Finer letters and some other letters that demonstrated

8    that those shares had restrictions on them, and that there were

9    restrictions with respect to the sale of those shares in the

10   United States.

11           Now, there are phone communications from the Jared

12   phone, not the phone that was allegedly used and that we

13   believe to be used by the father, from the Jared phone to Roth

14   Capital around that time to suggest that Jared was the person

15   in communication with Roth Capital.  And as you recall, then

16   the shares, Roth Capital rejects the shares and they get moved

17   to C.K. Cooper.  Then those shares eventually are sold, and

18   proceeds of those Shahini sales are funneled through the IOLTA

19   account.

20           Now, does that set up a fairly strong argument that

21   Jared Galanis, at least, was aware that shares came into an

22   account?  He was aware that there were problems perceived by

23   Roth Capital about these shares, that they get moved to another

24   account.  He is aware of the movement of these shares to

25   various accounts and that the shares are sold and then money

24

H1BSGALS

1    gets funneled through his IOLTA account.  OK.

2             So I bring forth these facts because while I

3    understand the court's concern that we are sort of engaging in

4    a significant factual dispute here, about which there is, you

5    know, not definitive evidence, I understand that, but I also

6    don't want to stand here and let the court have a misimpression

7    about the state of our belief as to the evidence of Jared's

8    involvement and knowledge in this case.

9             So that sort of goes back to the point that, you know,

10   I don't think they dispute that Jared is involved in the

11   conduct, the underlying conduct.  The question, of course, is

12   what is the state of his knowledge.  You know, he admitted in

13   his allocution that at some point he became -- without temporal

14   specificity, at some point he became aware of the fraud and

15   concealed it.  And we are proffering to your Honor that this

16   e-mail account has numerous e-mails, and it is difficult and,

17   in fact, in some ways I know they don't have a burden to do so.

18            We are hamstrung by the fact that we are given a very

19   incomplete and scant explanation for this elaborate filtering

20   system.  If we were given more of an explanation, we might be

21   in a better position to refute it.  Because if someone said to

22   us, here is a list of the e-mail accounts that were filtered

23   and this is how they were filtered, we could then go back to

24   those specific e-mails and say, does it make sense that that

25   was what happening?  And we can't, so...

H1BSGALS

1          THE COURT:  Do you want me to adjourn the sentencing?

2     Are you asking me to adjourn the sentencing?

3          MS. HECTOR:  Your Honor, can I have a moment?

4          THE COURT:  Yes.

5          (Pause)

6          MS. HECTOR:  Your Honor, no.  We are not requesting

7     to adjourn the sentencing.  We would prefer to move forward on

8     the record as it stands right now before your Honor.  To the

9     extent that additional work needs to be done with respect to

10    the restitution, we obviously will do that and, you know, and

11    follow your Honor's instructions to meet with Mr. Lassert on

12    that.

13          But I think we prefer to leave it, at this point, that

14    the filtering is something that has been proffered by the

15    defendant, that there is no evidence of its existence or not.

16          THE COURT:  Well, as a result of the grand jury's

17    investigation, I assume you had access to the relevant e-mails

18    and to the system?

19          MS. HECTOR:  We contacted the service provider, and

20    they unfortunately have no information on their system that

21    could demonstrate whether or not that filtering occurred.  So

22    we made efforts to try to substantiate that, but were unable to

23    do so.

24          THE COURT:  OK.  Anything else?

25          MS. HECTOR:  Unless your Honor has further questions,

H1BSGALS

1    no.

2              THE COURT:  All right.  Mr. Lassert, I don't

3    ordinarily do this, but I will extend you an opportunity for a

4    brief response if there is any point that was raised that you

5    feel you wish to respond to.

6              MR. LASSART:  Your Honor, I don't see any additional

7    comment on what is a dispute on the facts.  I think the court

8    knows.  If the court has a question, I would be more than happy

9    to answer it.

10             THE COURT:  Thank you.

11             This is the court's statement of reasons for the

12   sentence to be imposed on Jared Galanis.  In sentencing the

13   defendant, I have considered all the materials that I

14   referenced at the outset, I have considered the thoughtful

15   comments of Ms. Hector and Mr. Lassart, as well as the sincere

16   statement of Mr. Galanis.  I have considered each of the

17   factors set forth in Section 3553(a).  I need not recount all

18   that I have considered, but I have considered it all.

19             There is little doubt here about one aspect of the

20   facts, and that is that the defendant has admitted Count Eight

21   of the indictment, that he was aware of his father's

22   participation in a conspiracy to defraud Gerova and he

23   concealed the fraudulent scheme and did not report the same to

24   law enforcement authorities.

25             There is really no dispute that he allowed his father

H1BSGALS

1    to have access to his law firm e-mail address, that he arranged

2    for his father to have a phone, and that he effectuated certain

3    transfers out of his lawyer IOLTA account, and further, that he

4    lied to the SEC.  There are disputes as to the timing of when

5    he had guilty knowledge, and certainly that's been explored on

6    the record here today.  And the court proceeds from the

7    assumption that that guilty knowledge occurred at some time in

8    2011.

9             The defendant is different from many people who have

10   appeared before me in that he grew up initially or he began

11   life in a privileged setting.  His family had multiple staff

12   members in their home in Greenwich, and they owned multiple

13   residences in Manhattan, San Diego, Del Mar, Rancho Santa Fe.

14   And then things changed when the defendant was a very young

15   boy, after his father's arrest, and certainly the lifestyle of

16   the family changed radically and his mother became a substitute

17   teacher.

18             I can't imagine that it would be an easy experience

19   for a young boy to see that.  Well, Jared Galanis did something

20   right along the way in pursuing an education, in staying

21   productive, and he earned a JD degree from University of San

22   Francisco, and he had a bachelor of arts degree from St. Mary's

23   in California.  Someplace along the line he also obtained an

24   MBA degree and a master's of law, which he received about a

25   year ago.  Actually, I said MBA.  There is some conflicting

H1BSGALS

1    information whether it was an MBA or a master of science major

2    in financial analysis.  But, in any event, he did obtain an

3    additional degree.

4          He is not a young man.  He is 37 years of age.  He is

5    a person different from his father.  He knew of his father's

6    history.  As an individual, he's allowed to love his father,

7    even with all the wrongful conduct he may have engaged in or

8    did engage in and despite his criminal background.  But as a

9    smart person, a lawyer, well-educated person, he crossed the

10   line into criminal behavior in knowing of his father's criminal

11   conduct and concealing it and lying about it, and that is why

12   he is called upon to pay a heavy price.

13         He will no longer practice law, and as part of this

14   sentencing proceeding, I am directing him to notify any

15   jurisdiction, state or federal, where he is admitted to

16   practice law of the fact of his conviction and enclosing a copy

17   of the judgment of conviction.  That is to avoid doubt, and

18   that will be one of the conditions of supervised release in

19   this case.

20         He has a wife who is also well-educated as a software

21   engineer and a computer science professor.  And since 2003, she

22   has suffered from a disease known as Ehlers Danlos syndrome, a

23   group of genetic connective tissue disorders.  And while there

24   are a lot of discussions, many discussions, of the disease and

25   of her symptoms, there is just no doubt that his wife has

H1BSGALS

undergone multiple surgeries, including spinal surgery in

December 2015 to implant an intracranial pressure device to

monitor the pressure inside the skull, and in July 2016, to

treat something known as Eagle syndrome and left internal

jugular vein stenosis.  His wife receives disability benefits

and wears a neck brace daily and is unable to engage in many of

the ordinary life functions or engage in them with any great

ease.  By all reports, the defendant has been a devoted spouse.

          So this is a particularly difficult sentencing

decision in this case.  The Office of Probation has given the

following recommendation to the court, though the guideline

range is 21 to 27 months' imprisonment.  They recommend that

I sentence the defendant to three months' imprisonment.

          I don't think that the recommendation quite fits the

conduct, but I do conclude that on the confluence of

circumstances, including the role in the offense and the

extraordinary care that Jared Galanis is called upon to give to

his wife, that a sentence of 150 days' imprisonment, of

one-year supervised release, and waiver of the fine based on

limited assets and limited earning ability, and the imposition

of a $100 special amendment is sufficient but not greater than

necessary to achieve the purposes of Section 3553(a).

          Does the defendant or his counsel have any objection

to the court's proposed sentence or to the statement of reasons

for that sentence?

H1BSGALS

1              MR. LASSART:  No, your Honor.

2              THE COURT:  Same question for the government.

3              MS. HECTOR:  No, your Honor.

4              THE COURT:  The defendant will please stand and I will

5    impose sentence.

6              Jared Galanis, it is the judgment of this court that

7    you're hereby remanded to the custody of the United States

8    Bureau of Prisons to be imprisoned for 150 days.  Following

9    release from imprisonment, you shall be placed on supervised

10   release with the following terms and conditions:  You shall not

11   commit another federal, state, or local crime, nor illegally

12   possess a controlled substance, nor possess a firearm or

13   destructive device.  You shall refrain from any unlawful use of

14   a controlled substance and submit to one drug test within

15   15 days of placement on supervised release and at least two

16   scheduled drug tests thereafter.  You shall cooperate in the

17   collection of DNA.

18             The standard terms of supervision 1 through 13 are

19   imposed with the following special conditions:  You shall pay

20   15 percent of your gross monthly income towards the

21   satisfaction of any imposition of restitution which I will make

22   in this case, and restitution will be deferred but will be done

23   within the next 90 days.

24             You shall provide probation with access to any

25   requested financial information and shall not incur credit card

H1BSGALS

1    charges or open additional lines of credit without the approval

2    of the probation officer.  You shall submit your person,

3    residence, place of business, vehicle and any property,

4    computer, electronic communications, data storage devices, and

5    or other media under your control to a search on the basis that

6    the probation officer has reasonable suspicion that contraband

7    or evidence of a violation of the conditions of release may be

8    found.  The search must be conducted in a reasonable time and a

9    reasonable manner.  Failure to submit may be grounds for

10   revocation.  You shall inform any other residents that the

11   premises may be subject to search pursuant to this condition.

12   You shall refrain from engaging in any legal or financial

13   transactions directly or in an advisory capacity involving your

14   family members, your parents, and all of your siblings.  This

15   condition does not apply to you, your spouse, or any children

16   of yours.

17          You shall report to the nearest probation office

18   within 72 hours of release of custody.  You may be supervised

19   in the district of residence.  As noted, you shall report to

20   any jurisdiction where you're admitted to the bar the fact of

21   this conviction, and enclosing a copy of the judgment of

22   conviction.  As noted and for the reasons stated, the fine is

23   waived, and the $100 mandatory special assessment is imposed.

24   Restitution will be imposed at a later date.

25          Mr. Galanis, you have the right to appeal the sentence

H1BSGALS

1    I have imposed in this case.  If you cannot afford the cost of

2    an appeal, you may apply for leave to appeal as a poor person.

3    The time limits for filing a notice of appeal are strictly

4    enforced and they are brief.  If you request, the Clerk of

5    Court will prepare and file a notice of appeal on your behalf

6    immediately.

7             Do you understand all that?

8             MR. MADDOX:  Yes, your Honor.

9             THE COURT:  Anything further from the government?

10            MS. HECTOR:  Just that any remaining open counts be

11   dismissed.

12            THE COURT:  All right.  Any open remaining counts as

13   to Jared Galanis are dismissed.

14            Let me hear you with regard to surrender date.  Let me

15   propose something and then you can tell me whether it works.

16            March 14 at 2:00 p.m. to the institution designated by

17   the Bureau of Prisons, or if none is designated, then to the

18   United States Marshal for this district.

19            In terms of recommendation as to location, as close as

20   feasible to Maryland, is that the request?

21            MR. LASSART:  Yes, your Honor.

22            THE COURT:  And that request will be made.

23            Anything else from the defendant?

24            MR. LASSART:  No, your Honor.  Thank you.  We will be

25   surrendering on the Ides of March.

H1BSGALS

1              THE COURT:  Please be seated, if you will.

2              Mr. Galanis, I choose to believe the statements that

3     you made today.  This is an ugly and very costly chapter in

4     your life.  You have obligations to your wife, your wife's

5     family, and those who have stood by you in this time of need,

6     as well as to the victims of this fraud.  I believe you will

7     make amends, and I sincerely hope that you will get past this

8     episode and live a law-abiding life, and perhaps be an example

9     to others of the costly consequences of a mistake like this.

10    And when I say mistake, it's not a mistake, it's a crime.

11             We are adjourned.

12                             o0o

13

14

15

16

17

18

19

20

21

22

23

24

25