UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
:
UNITED STATES OF AMERICA
:
       - v. -
:    15 Cr. 643 (PKC)
DEREK GALANIS,
:
       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                PREET BHARARA
                United States Attorney for the
                    Southern District of New York,
                Attorney for the United States
                    of America

Aimee Hector
Brian R. Blais
Rebecca Mermelstein
Assistant United States Attorneys

    - Of Counsel -

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in connection with the sentencing of defendant Derek Galanis ("Galanis" or "Derek"), which is scheduled for February 16, 2017, at 2:00 p.m. For the reasons that follow, the Government believes that a sentence within the applicable sentencing range of 97 to 121 months' imprisonment, calculated pursuant to the United States Sentencing Guidelines (the "Guidelines or "U.S.S.G."), is appropriate.

**FACTUAL BACKGROUND[1]**

A. The Offense Conduct

1. Formation of Gerova Financial Group Ltd.

In 2007, Jason Galanis and others formed and later facilitated the public offering of Asia Special Situations Acquisition Corp. ("ASSAC"), a special-purposed acquisition company ("SPAC"). Under the applicable SEC rules governing SPACs, ASSAC had a certain period of time to identify an acquisition or acquisitions amenable to the shareholders of ASSAC, barring which ASSAC would have had return the approximately $115 million of cash that it obtained through the public offering of its shares. In early 2010, after certain Asia-focused acquisitions had fallen through, ASSAC agreed to acquire three sets of assets: (1) certain illiquid hedge fund assets that had previously been managed by an entity called Stillwater; (2) certain illiquid hedge fund assets that had previously been managed by an entity called Weston; and (3) certain insurance and reinsurance assets. After these acquisitions, ASSAC renamed itself Gerova

---

[1] The information provided in the factual background discussed herein is derived from paragraphs 21-78 of the Presentence Investigation Report ("PSR"), the Indictment in this matter, as well as testimony during the trial of Gary Hirst.

2

Financial Group, Ltd. ("Gerova"). Gerova initially traded on the American Stock Exchange, which at the time was a subsidiary of the New York Stock Exchange ("NYSE"), and later traded on NYSE's "Big Board."

The operating theory behind Gerova was that the illiquid hedge fund assets could be used as regulatory capital that would support Gerova's insurance operations. After the formation of Gerova, Gary Hirst served as the President and Chairman of Gerova, and Gerova had a series of short-reigned Chief Executive Officers. Jason Galanis, who was subject to a five-year bar from serving as an officer or director of a publicly-traded company as a result of an enforcement action brought by the Securities and Exchange Commission ("SEC"), took no formal role at Gerova initially, but he later became the Chief Executive Officer of a Gerova subsidiary that managed Gerova's merger and acquisition activity.[2] Although Jason Galanis's role at Gerova was not publicly disclosed, he exerted significant control over Gerova as a result of close associations with Gerova's principals, including Hirst, and his background in business and in the financial sector.

**2. Issuance of 5,333,333 Gerova Shares to Ymer Shahini**

Shortly after Gerova's formation in early 2010, Derek Galanis, Jason Galanis, John Galanis, and others participated in a scheme to manipulate the market for Gerova and to cause the issuance of Gerova stock that could be sold for their benefit. In April and May 2010, Gerova's stock price rose substantially from the price at which it traded at the time of Gerova's formation, rising from approximately $6.50 on January 25, 2010 to as high as $15.96 on May 19,

---

[2] Gerova obtained a legal opinion from DLA Piper that opined that Jason Galanis's service in this role did not violate his SEC bar.

2010.[3] As the Government's evidence at the Hirst trial showed, in May 2010, Derek Galanis recruited his friend, Ymer Shahini, a citizen of Canada and Kosovo, to serve as a foreign nominee for the Galanis family. In particular, on May 21, 2010, Derek emailed Shahini a message which stated, "We should talk my friend." (GX 1003)[4]. The next day, Derek sent Shahini another message, which read "All we need is a foreign national we trust which is where you come in my friend." (GX 1004). On May 26, 2010, Derek sent another email to Shahini asking him to sign and return an attached letter to attorney Barry Feiner. (GX 1012). The attached letter stated that Shahini had exercised warrants resulting in the issuance of 5,333,333 Gerova shares and was seeking an opinion that they could be issued without a restrictive legend pursuant to Regulation S, an SEC-exemptive provision which, at a basic level, allows the shares of a foreign company to be issued to a foreign national without the necessity of SEC registration, so long as those shares are not traded in the United States market or to a United States national for a period of time. (GX 1012). The following day, on May 27, 2010, Hirst, acting at the instigation of Jason Galanis, authorized the issuance of 5,333,333 shares of Gerova to Shahini under Regulation S. At the time of their issuance, the shares given to Shahini were worth over $70 million and constituted about half of Gerova's public float. Also on May 27, 2010, Shahini and Derek engaged in an email exchange in which Shahini wrote, "I forgot to mention, accorting [sic] to this I'm rich!," to which Derek responded "If we do this just right, my friend, we all may be! …If we do it wrong…well let's not think about it :)" (GX 1014).

---

[3] The Government has not been able to definitively determine the cause of the run-up in Gerova's stock, although at least some of the increase appears to be attributable to expectations by Wall Street traders that Gerova would be added to the Russell 3000 index, which did in fact occur in June 2010.

[4] "GX" refers to Government exhibits introduced at the trial of co-defendant Gary Hirst.

In an effort to mask the fact that a substantial quantity of shares were being issued to a foreign national for no legitimate business purpose, various back-dated agreements were created, which together purported to suggest that Shahini had earned a $2 million consulting fee for introducing certain investment opportunities to Gerova, that Shahini had been paid this fee in warrants and that he had exercised the warrants in such a fashion as to generate shares worth more than $70 million. At Hirst's trial, the Government demonstrated that these documents were fraudulent – Shahini had never provided any consulting services to Gerova or made introductions[5]; Shahini was first introduced to the scheme months after the dates on the agreements he purportedly signed; the numbers of shares given to Shahini exactly matched the number of shares that Gerova's first CEO had returned to Gerova and which Hirst directed be canceled on the same day as the Shahini share issuance; and the calculations used to justify the Shahini share issuance contained several mistakes that appeared designed to ensure that Shahini's shares totaled the exact number turned in by Gerova's CEO.

### 3. Deposit of Shahini Shares in U.S. Brokerage Accounts

Almost immediately after the issuance of the shares to Shahini, efforts to deposit Shahini's shares in U.S. brokerage accounts commenced. These efforts were spearheaded by John Galanis, Jason's father, but included the assistance of Derek, who remained the primary point of contact with Shahini. For instance, on June 9, 2010, Derek sent an email to Shahini with a form securities and margin account agreement, noting that "[t]he brokerage house is our only sure bet to liquidity BUT you cannot attach anything with my or Jared's name on it. The

---

[5] Indeed, at the Hirst trial, the Government introduced an email in which John Galanis provided to Shahini a description of Weston Capital, the entity that Shahini supposedly introduced to Gerova.

forms are already fully processed by me (I took the liberty my friend, I hope you do not mind. Time is of the essence)." (GX 1027). Later that day, Derek wrote to Shahini again, noting that it had been "a difficult day" because the "original broker has refused the account…We are scrambling now to open several accounts that have margin…Time is of the essence right now for all of us my friend." (GX 1028). Still later in June, Derek exchanged emails with Shahini regarding his efforts to find willing brokers, including providing false background information that Shahini could provide to potential brokers if asked during introductory telephone calls. (*See, e.g.*, GX 1036, 1039, 1040, 1045).

As the Court is aware based on evidence presented at the Hirst trial, the conspirators first sought to deposit the shares in an account at Roth Capital, which had a preexisting investment banking relationship with Gerova, but Roth ultimately rejected the shares given its inability to identify their origin. Over time, Shahini's shares were ultimately deposited into accounts at three brokerage firms – C.K. Cooper, Raymond James and Murphy & Durieu. As a general matter, Shahini typically granted powers of attorney over his brokerage accounts to members of the Galanis family, usually Jared Galanis, who effectively functioned as the Galanis family's lawyer. (*See* GX 1043 (email in which Derek provides Shahini with a power of attorney to execute, stating "Do me a favor and sign and fax this back to Jared below. It will give him comfort as a lawyer"). In correspondence with Jason Galanis, Derek further indicated that his friend, Shahini, appreciated being included and was interested in being "involved in future deals," to which Jason Galanis responded, "I suspect he will be." (GX 1092).

After being deposited into brokerage accounts, a substantial quantity of Shahini's shares were sold, largely at the direction of John Galanis. In addition, efforts were also made to take

6

substantial margin loans from the accounts that held the shares.  However, because Gerova was a relatively low-volume stock, the initial efforts to sell Shahini's shares caused the market price of Gerova to decline substantially.  Gerova's stock price dropped from $17.25 on June 14, 2010, to $6.44 on June 28, 2010.

### 4. Matched Trading in Gerova Shares

In effort to control the price decline caused by the open-market sales of Gerova, Jason Galanis and his co-conspirators lined up corrupt investment advisers who were willing to buy Gerova stock at the time, price and quantity dictated by the conspirators.  In particular, as Gavin Hamels testified during the Hirst trial, he and his partner, Bill Crafton, ran an investment advisory firm called Martin Kelly Capital, which at the time of the events in question had become part of SunTrust Bank.  Martin Kelly's clients had substantial investments in an entity called Westmoore, the assets of which were frozen by the SEC in June 2010 because Westmoore was operating, in essence, as a Ponzi scheme.  After Hamels and Crafton contacted Matthew Jennings, the proprietor of Westmoore, he suggested that Crafton and Hamels meet with Jason Galanis, which occurred in late June 2010.  At that meeting, Jason Galanis offered to provide Crafton and Hamels "free" shares of two publicly-traded entities he controlled, Rineon and WLMG Holding, for their clients, so long as they agreed to purchase $10 million (later amended to $5 million) of shares of Gerova.  The Martin Kelly proprietors agreed and from approximately June to approximately September 2010, Crafton and Hamels purchased nearly $5 million of Gerova stock for their clients (while also receiving the free Rineon and WLMG Holding shares).  Hamels testified that he coordinated with members of the Galanis family

regarding the timing and amount of his trades.[6]  As the Government demonstrated at the Hirst trial, during this period of "matched" trading, the stock price of Gerova remained relatively stable.

In September 2010, SunTrust learned of Crafton's and Hamels's trading activity involving Gerova and the free shares contributed by Jason Galanis.  After a short investigation, Crafton and Hamels were terminated by SunTrust.[7]  The Government's evidence suggests that the conspirators then began matched trading with another investment adviser, James Tagliaferri, who had done other business with Jason Galanis and his family in the past.  Beginning in late October 2010 and continuing through the time trading in Gerova was halted, Tagliaferri's clients purchased millions of Gerova shares, in close coordination with shares being sold from Shahini's accounts.

Ultimately, in early 2011, a research report by the investment firm Dalrymple Finance LLC and an article in Forbes magazine highlighted Jason Galanis's undisclosed role at Gerova and traced the history of financial fraud involving his family.  Soon thereafter, the NYSE halted trading in Gerova's shares.  Months later, Gerova was de-listed and, later that year, Gerova filed

---

[6] Hamels testified that the person he spoke to regarding these trades identified himself as Jared Galanis.  However, based on phone record analysis and other investigation by the Government, while the phone used to make calls to Hamels regarding the trading activity was registered to Jared Galanis, it spears likely that the person coordinating the Gerova with Hamels was in fact John Galanis, posing as his son Jared.

[7] SunTrust ultimately sold all of the Gerova shares in Martin Kelly client accounts on the open market, and made the Martin Kelly clients whole for any losses they suffered.  Although the Government has made numerous efforts to contact SunTrust, as a potential victim of the criminal conduct in this case, to ascertain whether SunTrust wished to make a claim for restitution, SunTrust has not responded to the Government's inquiries.

for bankruptcy protection. Individuals holding shares of Gerova at the time of the trading halt, including many of Tagliaferri's clients, suffered substantial losses in Gerova.

Before Gerova was de-listed, more than $19 million of proceeds were generated from the sale of Gerova shares from Shahini's accounts, substantial portions of which were used to benefit various members of the Galanis family. Although the Government did not identify proceeds that were wired directly to Derek Galanis, as the Government demonstrated during the Hirst trial, one of the significant recipients of proceeds from the sales of the illegally issued Shahini shares was an entity called the Galanis Family Trust, which account was used to support expenditures that benefitted members of the Galanis family, including Derek Galanis.

### B. Derek Galanis's Plea and Applicable Sentencing Guidelines

On August 15, 2016, Galanis entered a plea of guilty to Counts One and Two of the Indictment in this case. Count One charged conspiracy to commit securities fraud in connection with the Gerova offense conduct described above, and Count Two charged securities fraud in connection with that same conduct.

Galanis's plea agreement with the Government, attached hereto as Exhibit A, reflects an agreement among the parties as to how the Guidelines apply to Galanis's sentencing and is consistent with the conclusion of the Probation Department. The parties stipulated that under U.S.S.G. § 3D1.2(d), Galanis's offenses constitute a single group because the offense level is largely driven by the amount of loss caused. Galanis's base offense level is seven, under U.S.S.G. § 2B1.1(a)(1), because at least one of his offenses of conviction has a statutory maximum sentence of 20 years. Twenty-two levels are added, under U.S.S.G. § 2B1.1(b)(1)(L) because the losses caused by Galanis's offenses of conviction were between $25 million and $65

million.   In addition, a two-level enhancement, under U.S.S.G. § 2B1.1(b)(2)(A), is warranted because Galanis's offenses of conviction had 10 or more victims.   Further, the parties agree that a three-level decrease is warranted under U.S.S.G. § 3E1.1 for Galanis's acceptance of responsibility.   Thus, the parties agree that the applicable offense level is 28.

The parties also agree that Galanis has a total of five criminal history points, resulting in a Criminal History Category of III.   Specifically, he has three criminal history points associated with his 2003 conviction in the Southern District of California for conspiracy to distribute and possess with intent to distribute ecstasy, for which he received a sentence of 108 months' imprisonment.   (PSR ¶ 95).   In addition, two additional criminal history points are added because the defendant committed the instant offense while under federal supervised release for his prior conviction.   (PSR ¶ 102).   Accordingly, at offense level of 28 and a Criminal History Category of III, the applicable Guidelines range is 97 to 121 months' imprisonment.   The Government believes that this range is consistent with the parties' plea agreement and reflects an accurate calculation of the applicable Guidelines.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States v. Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.   *United States v. Rubenstein*, 403

F.3d 93, 98-99 (2d Cir. 2005).   In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims."   *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered.   Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.   That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

11

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  *See Crosby*, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *Id*. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  *Id*.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence.  *Id.* at 113.  In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances."  *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

In light of the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment is "sufficient but not greater than necessary" to serve the goals of sentencing in this case.

The offense conduct in this case, which involved both securities fraud and market manipulation, is incredibly serious, as such activity threatens the integrity of the U.S. capital markets, the efficient functioning of a free market, and the public's confidence in both. Moreover, the criminal activity was particularly troublesome, as it worked to line the pockets of the Galanis family and friends, while victimizing numerous innocents who lost their hard-earned savings in whole or in part, sometimes with financially devastating consequences.  Derek played an integral role in the offense, without which it could not have succeeded.  Specifically, Derek

was able to procure a foreign nominee, Shahini, to receive unrestricted shares of Gerova, under the false pretense of a consulting relationship, and transfer them into U.S. brokerage accounts to be sold for the benefit of the defendants and their associates. He thereafter was a conduit for ongoing communications with Shahini and assisted in setting up U.S.-based brokerage accounts for the unlawful shares. This conduct, driven by greed and a callous disregard for others, is serious and deserving of substantial punishment within the Guidelines range.

The goals of specific and general deterrence also counsel in favor of a Guidelines sentence. This is not Derek Galanis's first criminal conviction. He served a substantial sentence – approximately seven years – for a federal narcotics offense. His prior punishment, however, did not adequately deter him from re-engaging in illegal activity, as it was not long after his release in 2008 that he became involved in the instant conduct. Arguably, a longer sentence is warranted in this case if it is likely to have any specific deterrent effect at all. The need for general deterrence in this case also calls for a substantial sentence. Market manipulation schemes, such as the one at issue, can be both highly lucrative (as was the case here) and difficult to detect. In such circumstances, significant punishment is necessary to deter others from similar conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). A significant sentence will serve to deter others who may consider engaging in similar crimes, and buttress confidence in the integrity of the public markets by sending the message to the investing public that individuals who manipulate the market will be adequately punished.

Derek Galanis's arguments in favor of a below-Guidelines sentence do not compel a contrary result. First, Derek argues that he deserves leniency on the basis of his family circumstances because he was manipulated into joining the conspiracy out of desire to be accepted by his criminal family members, who were far more financially sophisticated than he. While the Government does not deny the difficult circumstances and pressures that Derek describes as pervading the Galanis household during his youth and young adulthood, they cannot excuse his conduct in this case. At the time he became involved in the charged conduct, Derek was no longer a child. Rather, Derek was 38 years old and already had significant, personal experience with criminal activity, having served approximately seven years in prison for a narcotics offense. He was also fully aware of his father's criminal past and his brother Jason's regulatory infractions, giving him ample reason to be cautious before entering into any business endeavors with them. Further, although he may not have had the same level of financial sophistication as his father or brother, he was not a financial neophyte. In fact, as recounted in the PSR, he was a college graduate who also had at least some post-graduate training in finance at both the New York School of Finance and the University of Reading in London, England, although it appears that he failed to complete either program. (PSR ¶¶ 127-128). Derek also had some involvement in previous Galanis-related business ventures, including a business that provided consulting services to registered investment advisors, (PSR ¶ 142), a European third-party limited liability insurance company, (PSR ¶ 146), and an asset management fund, (PSR ¶ 148). In short, Derek should not be considered a victim of his family circumstances. He had the knowledge and experience to be skeptical of joining a business venture involving his brother or father; the basic skills necessary to evaluate the conduct he was being asked to participate in;

14

and the ability to earn a living separate and apart from engaging in criminal endeavors if he so chose.

Relatedly, Derek's argument that his limited role in the offense justifies a below-Guidelines sentence is similarly unavailing and belied by the evidence. Derek appears to distance himself from the conduct in which he engaged by claiming that he didn't recognize the illegality of the scheme until sometime after he initially introduced Shahini as a foreign nominee. (Defendant Derek Galanis's Sentencing Memorandum ("Mem.") at 4 (stating that "Derek introduced his trusted friend into the scheme without knowledge of its illegality"). In fact, the evidence demonstrates that Derek's awareness of the criminal nature of the scheme was contemporaneous with his first contact with Shahini. Derek first reached out to Shahini by email dated May 21, 2010. (GX 1003 (noting "We should talk my friend"). Only six days later, Derek engaged in a telling email exchange in which Shahini joked that "accorting [sic] to this I'm rich!" (a clear acknowledgement that he is the owner of the Gerova shares in name only) and Derek responded "If we do this just right, my friend, we all may be! …If we do it wrong…well let's not think about it :)." (GX 1014). This exchange makes clear that both Derek and Shahini were aware of the criminal nature of their relationship, and optimistically gambled that the financial rewards would outweigh the risk of getting caught. Further, in contrast to his claim that he lacked "the sophistication to grasp the vastness of the ill-gotten gain that this conspiracy would yield," (Def. Mem. at 7), this email also demonstrates that both Derek and Shahini were well aware of the scheme's financial magnitude. (GX 1014 & 1012 (conferring 5,333,333 shares of Gerova, which at the time were worth in excess of $70 million). Similarly, in regard to the establishing of bank and brokerage accounts for the depositing of the

15

Shahini shares, Derek claims that he "was not a part of these arrangements," (*id*.), but only "was involved in driving Shahini to different brokerage houses to set up accounts," (*id*.). In contrast, email correspondence between Derek and Shahini (described more fully above) evidences that he did in fact play an initial role in helping to establish brokerage accounts into which Shahini's Gerova shares could be deposited. The Government does not dispute that Derek did not play as extensive a role in the scheme as Jason[8] or John Galanis, but his involvement – which is understated in his submission – was nonetheless integral. This criminal scheme could not have succeeded without a foreign nominee who was willing to receive unrestricted shares of Gerova, under the guise of a fake consulting relationship, and transfer them into U.S. brokerage accounts to be sold for the benefit of the defendants and their associates.

## RESTITUTION AND FORFEITURE

Derek Galanis has already consented to the entry of a forfeiture order against him and the Court has already entered the appropriate orders. Nonetheless, the Court is required, at sentencing, to orally pronounce the imposition of forfeiture, which in this case includes the forfeiture of a sum of money equal to $19,038,650.53, representing the proceeds of Galanis's offense.

The Government will provide a supplemental submission on the issue of restitution, as well as a proposed restitution order, in advance of sentencing.

## CONCLUSION

---

[8] The Government is seeking a three-level Guidelines enhancement for Jason Galanis, pursuant to U.S.S.G. § 3B1.1(b), because he was a manager or supervisor of this criminal activity.

For the foregoing reasons, the Government respectfully submits that Galanis has committed serious offenses, the appropriate punishment for which is adequately reflected in the applicable Guidelines range. Accordingly, the Government requests that the Court impose a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/ Aimee Hector_____
     Brian R. Blais/Aimee Hector/
     Rebecca Mermelstein
     Assistant United States Attorneys
Tel.:  (212) 637-2521/2203/2360

Dated: February 9, 2017
      New York, New York