UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA

        - v. -

JOHN GALANIS,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

        :

        :

        :

        :     15 Cr. 643 (PKC)

        :

        :

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America

Brian R. Blais
Aimee Hector
Rebecca Mermelstein
Assistant United States Attorneys

     - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant John Galanis ("Galanis" or "John"), which is scheduled for February 16, 2017, at 3:00 p.m.   For the reasons that follow, the Government believes that a sentence within the applicable sentencing range of 97 to 121 months' imprisonment, calculated pursuant to the United States Sentencing Guidelines (the "Guidelines or "U.S.S.G."), is appropriate.

## FACTUAL BACKGROUND[1]

### A.   John Galanis's Criminal Past[2]

In 1973, John Galanis was charged in this District with mail fraud and conspiracy to make false statements to the SEC, in connection with his participation in a scheme to hide investment losses by Microthermal Applications, Inc. from its investors through a fraudulent and backdated reverse merger.   On February 2, 1973, Galanis was sentenced to a term of imprisonment of 60 months' of which 54 months' was suspended, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.   On February 26, 1978, the defendant was discharged from probation.

Less than two years later, John Galanis resumed his criminal activities.   Over the course of the next several years, Galanis engaged in a number of tangentially interconnected criminal

---

[1]  The information provided in the factual background discussed herein is derived from paragraphs 19-64 of the Presentence Investigation Report ("PSR"), the Indictment in this matter, as well as testimony during the trial of Gary Hirst.

[2]  In addition to the criminal conduct in the United States, the PSR reveals that Galanis was charged in Quebec with an investor and bank fraud in 1973. That charge does not appear to have resulted in a conviction.

schemes relating to the oil and gas industry and to savings and loan institutions.   As is true in the present case, Galanis and his coconspirators hid their control of various entities, backdated documents, and defrauded investors through false representations.   They used the Transpac Drilling Venture Program to obtain fraudulent tax deductions, bribed bank employees to do their bidding, and used various entities to engage in fraudulent securities transactions.   Separately, between November 1985 and September 1987, Galanis and his conspirators defrauded various investors in funds managed by the ISI Corporation and misappropriated the funds for their own purposes.   In total, these fraudulent transactions generated more than $172 million in false deductions for Galanis and his cohorts.

In May 1987, the defendant was charged in this District with conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery in connection with the above described criminal conduct (the "Federal Charges" or the "1987 Federal Case").

Several months later, in January 1988, the defendant was charged in New York County Supreme Court with Grand Larceny in the Second Degree, arising out of a wholly separate criminal scheme focused on the real estate industry.   In that case, Galanis and his conspirators solicited investments in the Nashua Trust Company – a company purportedly acquiring and rehabilitating non-casino investments (the "State Charges" or the "1988 State Case").   In fact, however, no construction work was ever done and the investors' money was misappropriated and used to pay the defendants' personal expenses, among other purposes.

In July 1988, following a three-month trial in this District, the defendant was found guilty of 44 counts of conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery (the "Federal Conviction").   On September 28, 1988, the defendant was

sentenced by the Honorable Charles L. Brieant to 27 years' imprisonment.   As a result of this conviction, Galanis was subject to a judicially-imposed lifetime bar on executing securities trades in brokerage accounts other than accounts in his name or the names of his family members.

The defendant subsequently entered a guilty plea to the State Charges and was sentenced to a term of imprisonment of 7 to 20 years.   The sentence was imposed concurrently to the sentence imposed on the Federal Conviction.

On December 18, 1998, Galanis was paroled from federal custody to the custody of the New York State Department of Corrections, pursuant to a detainer.   In approximately September 2000, Galanis absconded from a state work release program.   He remained a fugitive for over a year.   On November 20, 2001, the defendant was remanded to state custody.   He was released on parole on July 2, 2007.

As described in further detail below, just a few years later, in 2010, John Galanis became involved in the securities fraud scheme for which he now faces sentencing.   The instant case, however, was not John Galanis's final criminal conduct.   In May 2016, the defendant was charged together with Jason Galanis and several others with participating in a complex securities fraud involving the issuance of more than $60 million of bonds by a Native American tribal entity (the "Tribal Entity").   The Government's indictment in that matter alleges that John Galanis fraudulently induced the Tribal Entity to issue bonds in order to gain control over the bond proceeds.   The indictment further alleges that the defendants gained control over an investment advisory firm in order to cause that firm to place the bonds with unwitting clients who were then unable to sell the bonds.   Finally, the indictment alleges that the defendants

diverted substantial portions of the proceeds of those bond issuances to their own personal use. With regard to John Galanis, the indictment alleges that days after the initial bond issuance $2,350,000 was wired to an account controlled by John Galanis in the name "Sovereign Nations."   John Galanis then distributed at least $355,000 of that money directly to himself and approximately $110,000 to various family members.   He also used approximately $38,000 to make payment to a luxury car loan servicer and spent approximately $180,000 at a luxury jeweler.   That matter is pending before the Honorable Ronnie Abrams.

## B. The Offense Conduct

### 1. The Gerova Scheme

In 2007, Jason Galanis and others formed, and then later facilitated the public offering of, a special-purposed acquisition company ("SPAC") called Asia Special Situations Acquisition Corp. ("ASSAC").   Under the applicable SEC rules governing SPACs, ASSAC had a certain period of time to identify an acquisition or acquisitions amenable to the shareholders of ASSAC, barring which ASSAC would have had return the approximately $115 million of cash that it obtained through the public offering of its shares.   In early 2010, after certain Asia-focused acquisitions had fallen through, ASSAC agreed to acquire three sets of assets: (1) certain illiquid hedge fund assets that had previously been managed by an entity called Stillwater; (2) certain illiquid hedge fund assets that had previously been managed by an entity called Weston; and (3) certain insurance and reinsurance assets.   After these acquisitions, ASSAC renamed itself Gerova Financial Group, Ltd. ("Gerova").   Gerova initially traded on the American Stock Exchange, which at the time was a subsidiary of the New York Stock Exchange ("NYSE"), and later traded on NYSE's "Big Board."

The operating theory behind Gerova was that the illiquid hedge fund assets could be used as regulatory capital that would support Gerova's insurance operations.   After the formation of Gerova, Gary Hirst served as the President and Chairman of Gerova, and Gerova had a series of short-reigned Chief Executive Officers.   Jason Galanis, in the face of his SEC bar, took no formal role at Gerova initially, but he later became the Chief Executive Officer of a Gerova subsidiary that managed Gerova's merger and acquisition activity.[3]   Although Jason Galanis's role at Gerova was not publicly disclosed, he exerted significant control over Gerova as a result of close associations with Gerova's principals, including Hirst, and his background in business and in the financial sector.

Shortly after Gerova's formation in early 2010, John Galanis and other members of his family participated in a scheme to manipulate the market for Gerova and to cause the issuance of Gerova stock that could be sold for their benefit.   In April and May 2010, Gerova's stock price rose substantially from the price at which it traded at the time of Gerova's formation, rising from approximately $6.50 on January 25, 2010 to as high as $15.96 on May 19, 2010.[4]   As the Government's evidence at the Hirst trial showed, in May 2010, Derek Galanis ("Derek"), Jason's brother, recruited his friend, Ymer Shahini, a citizen of Canada and Kosovo, to serve as a foreign nominee for the Galanis family.   In particular, on May 21, 2010, Derek emailed Shahini a message which stated, "We should talk my friend."   The next day, Derek sent Shahini another

---

[3] Gerova obtained a legal opinion from DLA Piper that opined that Jason Galanis's service in this role did not violate his SEC bar.

[4] The Government has not been able to definitively determine the cause of the run-up in Gerova's stock, although at least some of the increase appears to be attributable to expectations by Wall Street traders that Gerova would be added to the Russell 3000 index, which did in fact occur in June 2010.

message, which read "All need is a foreign national we trust which is where you come in my friend."   Just a few days later, on May 27, 2010, Hirst authorized the issuance of 5,333,333 shares of Gerova to Shahini under Regulation S, an SEC-exemptive provision which, at a basic level, allows the shares of a foreign company to be issued to a foreign national without the necessity of SEC registration, so long as those shares are not traded in the United States market or to a United States national for a period of time.   At the time of their issuance, the shares given to Shahini were worth over $70 million and constituted about half of Gerova's public float.

In an effort to mask the fact that a substantial quantity of shares were being issued to a foreign national for no purpose, various back-dated agreements were created, which together purported to suggest that Shahini had earned a $2 million consulting fee for introducing certain investment opportunities to Gerova, that Shahini had been paid this fee in warrants and that he had exercised the warrants in such a fashion as to generate shares worth more than $70 million. At Hirst's trial, the Government demonstrated that these documents were fraudulent – Shahini had never provided any consulting services to Gerova or made introductions[5]; Shahini was first introduced to the scheme months after the dates on the agreements he purportedly signed; the numbers of shares given to Shahini exactly matched the number of shares that Gerova's first CEO had returned to Gerova and which Hirst directed be canceled on the same day as the Shahini share issuance; and the calculations used to justify the Shahini share issuance contained several mistakes that appeared designed to ensure that Shahini's shares totaled the exact number turned in by Gerova's CEO.

---

[5] Indeed, at the Hirst trial, the Government introduced an email in which John Galanis provided to Shahini a description of Weston Capital, the entity that Shahini supposedly introduced to Gerova.

Almost immediately after the issuance of the shares to Shahini, efforts to deposit Shahini's shares in U.S. brokerage accounts commenced.   These efforts were spearheaded by John Galanis.   The conspirators first sought to deposit the shares in an account at Roth Capital, which had a preexisting investment banking relationship with Gerova, but Roth ultimately rejected the shares given its inability to identify the origin of the shares.   Over time, Shahini's shares were ultimately deposited into accounts at three brokerage firms – C.K. Cooper, Raymond James and Murphy & Durieu (the "Shahini Accounts").   As a general matter, Shahini typically granted powers of attorney over his brokerage accounts to members and associates of the Galanis family, including Jared Galanis, who effectively functioned as the Galanis family's lawyer, and another individual ("Associate-1") who was employed by John Galanis.   A substantial quantity of Shahini's shares were sold, largely at the direction of John Galanis.   For example, on or about November 15, 2010, John Galanis emailed Associate-1, copying Jared Galanis, and instructed Associate-1 to transfer almost three million shares of Gerova among the Shahini Accounts and to "sell 40,000 shares of [Gerova] from the [Shahini] Account."   In particular, John Galanis instructed Associate-1 that it was "[m]ost important you put 10,000 shares at a time every hour on the [hour] starting at 10:00PST with the last one 10 minutes before the close."   In some instances, in order to conceal his involvement in directing the stock trading in the Shahini Accounts in direct violation of his lifetime bar, John Galanis utilized (i) an email account subscribed to Jared Galanis and used by both Jared and John (the "JMG Account"); and (ii) an email account in the name of an attorney who worked for John Galanis and his family (the "Attorney Account"), rather than in his own name.

8

In addition to the direct sales of shares, efforts were also made to take substantial margin loans from the accounts that held the shares.   However, because Gerova was a relatively low-volume stock, the initial efforts to sell Shahini's shares caused the market price of Gerova to decline substantially.   Gerova's stock price dropped from $17.25 on June 14, 2010, to $6.44 on June 28, 2010.

In an effort to "staunch the bleeding" caused by the open-market sales of Gerova, the co-conspirators lined up corrupt investment advisers who were willing to buy Gerova stock at the time, price and quantity dictated by the conspirators.   In particular, as Gavin Hamels testified during the Hirst trial, he and his partner, Bill Crafton, ran an investment advisory firm called Martin Kelly Capital, which at the time of the events in question had become part of SunTrust Bank.   Martin Kelly's clients had substantial investments in an entity called Westmoore, the assets of which were frozen by the SEC in June 2010 because Westmoore was operating, in essence, as a Ponzi scheme.   Hamels and Crafton were introduced to Jason Galanis, who offered to provide Crafton and Hamels "free" shares of two publicly-traded entities he controlled, Rineon and WLMG Holding, for their clients, so long as they agreed to purchase $10 million (later amended to $5 million) of shares of Gerova.   The Martin Kelly proprietors agreed and from approximately June to approximately September 2010, Crafton and Hamels purchased nearly $5 million of Gerova stock for their clients (while also receiving the free Rineon and WLMG Holding shares).   Hamels testified that he coordinated with members of the Galanis family regarding the timing and amount of his trades. Hamels testified that the person he spoke to regarding these trades identified himself as "Jared Galanis."   However, based on phone record analysis and other investigation by the Government, while the phone used to make calls to

Hamels regarding the trading activity (the "John Phone") was registered to Jared Galanis, it appears that the person coordinating the Gerova with Hamels was in fact John Galanis, posing as his son Jared.   The matched trading orchestrated by John Galanis was successful and as the Government demonstrated at the Hirst trial, during this period of "matched" trading, the stock price of Gerova remained relatively stable.

In September 2010, SunTrust learned of Crafton's and Hamels's trading activity involving Gerova and the free shares of Rineon and WLMG.   After a short investigation, Crafton and Hamels were terminated by SunTrust.[6]   The Government's evidence suggests that the conspirators then began matched trading with another investment adviser, James Tagliaferri, who had done other business with Galanis and his family in the past.   Beginning in late October 2010 and continuing through the time trading in Gerova was halted, Tagliaferri's clients purchased millions of Gerova shares, in close coordination with shares being sold from Shahini's accounts.   Notably, between January 2010 and January 2011, the John Phone was in touch with Tagliaferri approximately 500 times.   This matched trading too then was orchestrated by John Galanis.

Ultimately, in early 2011, a research report by the investment firm Dalrymple Finance LLC and an article in Forbes magazine highlighted Galanis's undisclosed role at Gerova and traced the history of financial fraud involving his family.   Soon thereafter, the NYSE halted trading in Gerova's shares.   Months later, Gerova was de-listed and, later that year, Gerova filed

---

[6] SunTrust ultimately sold all of the Gerova shares in Martin Kelly client accounts on the open market, and made the Martin Kelly clients whole for any losses they suffered.   Although the Government has made numerous efforts to contact SunTrust, as a potential victim of the criminal conduct in this case, to ascertain whether SunTrust wished to make a claim for restitution, SunTrust has not responded to the Government's inquiries.

for bankruptcy protection.   Individuals holding shares of Gerova at the time of the trading halt, including many of Tagliaferri's clients, suffered substantial losses in Gerova.

Before Gerova was de-listed, more than $19 million of proceeds were generated from the sale of Gerova shares from Shahini's accounts, substantial portions of which were used to benefit the Galanis family.   As the Government demonstrated at the Hirst trial, more than $4,675,000 went to entities controlled by Jason Galanis; $575,000 went to the Galanis Family Trust, an entity controlled by John Galanis for the benefit of the Galanis family; and $330,000 went to Little Giggles LLC, an entity controlled by John Galanis, Maureena Galindo,[7] and Jason Galanis.   In addition, more than $2 million was used to pay various lawyers and other expenses, and funds were used to pay other members of the conspiracy, including $310,000 paid to Shahini and $2.6 million that was used by Hirst to pay a debt that an investment fund he ran owed to various Weston entities.

Tagliaferri was indicted by this Office in 2013 for, among other things, his involvement in the fraudulent placement of Gerova shares in his client accounts.   *See United States v. Tagliaferri*, 13 Cr. 115 (RA).   Tagliaferri was convicted after a jury trial and sentenced by Judge Abrams to 72 months' imprisonment.

### C.   Galanis's Plea and Applicable Sentencing Guidelines

On July 20, 2016, Galanis entered a plea of guilty to Counts One and Two of the Indictment in this case.   Count One charged conspiracy to commit securities fraud in connection with the Gerova offense conduct described above, and Count Two charged securities fraud in connection with that same conduct.

---

[7] Maureena Galindo appears to have been John Galanis's paramour.

Galanis's plea agreement with the Government, reflects an agreement among the parties as to how the Guidelines apply to Galanis's sentencing.   The parties stipulated that under U.S.S.G. § 3D1.2(d), Galanis's offenses constitute a single group because the offense level is largely driven by the amount of loss caused.   Galanis's base offense level is seven, under U.S.S.G. § 2B1.1(a)(1), because at least one of his offenses of conviction has a statutory maximum sentence of 20 years.

Twenty-two levels are added, under U.S.S.G. § 2B1.1(b)(1)(L) because the losses caused by Galanis's offenses of conviction were between $25 million and $65 million.   There are at least two ways to reach the loss amount of between $25 million and $65 million. First, Tagliaferri and Martin Kelly clients suffered substantial losses in Gerova.[8]   As described above, both Tagliaferri and Martin Kelly clients were essentially the "end of the chain" of the matched trading conduct, left holding substantial quantities of Gerova shares at the time when trading in Gerova was halted.   The losses suffered by Tagliaferri clients and other identifiable individuals in Gerova were $26,280,798.77.   Together, these losses are well within the $25 million to $65 million loss bracket.

An alternative measure of loss can be generated using Application Note 3(F)(ix) to U.S.S.G. §2B1.1.   That note, which provides guidance for loss calculations in market manipulation cases provides that one measure of loss in such cases is to calculate the difference in average price of the manipulated security during the period of the fraud and the average price during the 90-day period following disclosure, multiplied by the number of shares outstanding.

---

[8] Martin Kelly clients were made whole by SunTrust bank, with the result that SunTrust became the ultimate victim of those losses.

Here, the average stock price of Gerova from its first day of trading, December 31, 2009, through the publication of the Dalrymple report, January 10, 2011, which arguably represents the time period of the Gerova fraud, is $7.03.   The average stock price from the date of the Dalrymple report through the date that trading in Gerova was halted, February 23, 2011, was $3.65.   During the relevant time period, the public float of Gerova was approximately 11 million shares.   This calculation leads to a loss amount for the Gerova conduct of approximately $37 million.   Using this alternative measure of loss also yields a loss amount of between $25 million and $65 million.

In addition to the above, the parties have agreed, in the plea agreement that additional enhancements apply.   In particular, the parties agree that a two-level enhancement, under U.S.S.G. § 2B1.1(b)(2)(A), is warranted because Galanis's offenses of conviction had 10 or more victims.   Finally, the parties agree that a three-level decrease is warranted under U.S.S.G. § 3E1.1 for Galanis's acceptance of responsibility.   Thus, the parties agree that the applicable offense level is 28.

The Probation Office ("Probation"), in its Presentence Investigation Report ("PSR"), has determined that an additional two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) is applicable because the offense involved sophisticated means.   (PSR ¶ 85).   Although the Government, during plea negotiations, considered the applicability of such an enhancement, it ultimately concluded that such an enhancement was not warranted by the facts of this case and, consistent with its plea agreement with Galanis, is not seeking application of this enhancement at sentencing.

Both the parties and Probation concur with respect to Galanis's criminal history calculation.   (PSR ¶ 10).

At the time of Galanis's plea agreement, he had six criminal history points.   His 1973 conviction for mail fraud and conspiracy to make false statements to the SEC resulted in no criminal history points.   (PSR ¶ 95).   His 1987 conviction in this District for conspiracy to defraud the IRS, tax fraud, racketeering, securities fraud, bank fraud and bribery, for which he received 27 years' imprisonment, resulted in 3 criminal history points.   (PSR ¶ 100). Finally, his 1988 conviction for grand larceny in the second degree in New York County Supreme Court, for which he received a sentence of 7 to 20 years', also resulted in 3 criminal history points. (PSR ¶ 112).   Accordingly, Galanis is in Criminal History Category III.

At an offense level of 28 and a Criminal History Category of III, Galanis's applicable Guidelines range is 97 to 121 months' imprisonment.   The Government believes that this range is consistent with the parties' plea agreement and reflects an accurate calculation of the applicable Guidelines.

## **APPLICABLE LAW**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States v. Booker*, 543 U.S. 220, 252 (2005).   Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose.   *United States v. Rubenstein*, 403

F.3d 93, 98-99 (2d Cir. 2005).   In furtherance of that goal, a sentencing court is required to

"consider the Guidelines 'sentencing range established for . . . the applicable category of offense

committed by the applicable category of defendant,' the pertinent Sentencing Commission policy

statements, the need to avoid unwarranted sentencing disparities, and the need to provide

restitution to victims."   *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be

considered.   Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater

than necessary" to comply with the purposes set forth in paragraph two.   That sub-paragraph

sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to

impose – to consider: (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of

sentences available; (4) the kinds of sentence and the sentencing range as set forth in the

Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid

unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the

offense.   *See* 18 U.S.C. § 3553(a).

15

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.   *See Crosby*, 397 F.3d at 103.   First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."   *Id*. at 112.   Second, the Court must consider whether a departure from that Guidelines range is appropriate.   *Id*.   Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence.   *Id.* at 113.   In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances."   *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## DISCUSSION

In light of the factors set forth in Title 18, United States Code, Section 3553(a), a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment is "sufficient but not greater than necessary" to serve the goals of sentencing in this case.

The seriousness of Galanis's offense cannot be disputed.   As he himself recognizes it was a "grave offense not only against the law but also against society."   (Sub. at 9).   Market manipulation and securities fraud undermine the integrity of the market and the public's confidence in a market that is free and fair.   This market manipulation, however, did more than simply undermine the integrity of the markets; it permanently affected the financial well-being of Gerova investors, whose hard earned money was stolen to fund the Galanis family's high-end lifestyle.   As a result of the schemes to which Galanis has pled guilty, millions of dollars were

16

funneled from innocent victims to John Galanis, to his co-defendant sons, and to other members of the Galanis family.   John Galanis used his share of those funds to live full-time in a luxury hotel suite and to pay for extravagances like expensive cars and jewelry.   His family members did the same.   Galanis and his co-defendants did not steal out of need or necessity; they stole out of selfishness and greed and without regard to terrible financial consequences visited on their victims.   At the end of the day, real people lost real money as a result of Galanis's crimes.   That is serious conduct that warrants substantial punishment.

The goals of specific and general deterrence also mandate a sentence within the Guidelines.   John Galanis is a thrice-convicted securities fraudster, having twice before been convicted in this very District for crimes very similar to the instant offense.   His period of incarceration on his most recent convictions was significantly longer than the Guidelines sentence the Government now seeks, and yet did nothing to dissuade him from reengaging in criminal conduct within years of his release.   A sentence far longer than the five years the defendant seeks is thus warranted in this case if there is any hope that John Galanis can be deterred from a lifetime of criminal conduct.   Market manipulation schemes, such as the one at issue, can be both highly lucrative (as was the case here) and difficult to detect.   In such circumstances, significant punishment is necessary to deter others from similar conduct.   *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").   A significant sentence will serve to deter others who may consider engaging in similar crimes, and buttress confidence in the

integrity of the public markets by sending the message to the investing public that individuals who manipulate the market will be adequately punished.

Galanis offers several arguments in mitigation, none of which are availing.   First, he argues that his son Jason was the orchestrator of the Gerova fraud, that when he became involved he believed Gerova to be a legitimate business endeavor, and that his involvement in criminal conduct resulted from his role as a "fiercely loyal father."   (Galanis Sentencing Submission ("Sub.") at 1-3).   Interestingly, Jason Galanis, in his sentencing submission, argues the converse—that John was the orchestrator of the offense.   (Jason Galanis Sentencing Submission at 3).   It is undoubtedly true that Jason Galanis was a driving force behind the day-to-day activities at Gerova, orchestrated the acquisitions that formed the core of Gerova's operations, and caused Hirst to authorize the issuance of shares to Shahini.   But John played an independent and significant role.   As described above, he was responsible for orchestrating the depositing and subsequent sales of the Shahini shares from various brokerage accounts, and providing the matched trading instructions to Hamels and Tagliaferri.   That Jason also played a significant role does nothing to mitigate John's culpability.

John Galanis's claims to have become involved in Gerova for legitimate purposes, only to find himself involved in criminal conduct out of love for his son simply strains credulity. John argues that Jason came and "asked him for help to arrange . . . the Gerova deal" and that John accepted because – in light of the involvement of other legitimate professionals ███████

████████████████████████████████████████████████████ – John believed the deal to be legitimate.   (Sub. at 2-3).   He further claims that he "learned the truth behind the deal" only after agreeing to become involved, and that it was this understanding that

led to the present charges.   (Sub. at 3) ("[A]fter getting involved John Galanis learned the truth behind the deal, which in turn led him to standing before Your Honor for sentencing for the criminal acts he committed").   The notion that a three-time convicted felon could plausibly have believed that his son – himself under indictment – could need his father's assistance in a legitimate business endeavor is itself implausible.   More significantly, however, John cannot have believed his role in Gerova to have been legitimate, because his involvement was criminal from the outset.   John's function was orchestrating the depositing and subsequent sales of the Shahini shares from various brokerage accounts and the coordination of the matched trading of sales of Shahini shares with purchases by Martin Kelly and Tagliaferri clients.   *Nothing* about this conduct was legitimate or legal.   John did not enter into a seemingly legitimate business, only to later learn he had been misled; he knowingly joined a criminal conspiracy in which his most important role was to manage the fraudulently obtained shares and to manipulate the price for those shares through matched trading.

The defendant's suggestion, moreover, that he found himself engaged in criminal conduct solely because he was a "fiercely loyal father" is difficult to fathom.   (Sub. at 3).   It is now apparent that the defendant used a phone number subscribed to his son Jared to coordinate the matched trading with both Gavin Hamels and Tagliaferri, and that he specifically identified himself as "Jared," when speaking with Gavin Hamels.   John also sent emails in furtherance of the fraud from (i) an email account that was subscribed to Jared and which was simultaneously being used by Jared; and (ii) from an email account in the name of another attorney, who was a Galanis family friend.   In doing so, John Galanis actively hid his own involvement in the fraud at Jared's expense.   Although, as the Court is aware, Jared Galanis has pled guilty to misprision

in connection with the Gerova scheme, his father's misuse of his identity made his involvement appear more extensive that it was and increased the likelihood that Jared would be criminally charged.   This is not the conduct of a "fiercely loyal father" – it is the conduct of an individual so selfish that he is willing to put himself ahead of even his own children.   That the defendant did not persist in his efforts to shield himself from criminal exposure at Jared's expense once charges were handed down is the bare minimum of human decency – it is hardly worthy of praise and does not remotely approach the conduct one would expect from a "fiercely loyal father."[9]

Finally, John's claims to have been interested only in law abiding business endeavors and to have learned of the fraudulent nature of the Gerova scheme only after he became involved are belied by his conduct following that fraud.   As the Court is aware, the Gerova fraud was complete in approximately 2011.   If John had been a recalcitrant participant in that fraud, one would expect him to have refused to participate in any other business ventures with Jason. Instead, however, in March of 2014, John Galanis began meeting with members of the Tribal Entity, which would ultimately be induced to issue approximately $60 million of bonds, only to have their money stolen by John and Jason Galanis and their coconspirators.   As John has not yet pled guilty in the case before Judge Abrams, he may claim – falsely – that he also believed

---

[9] To be clear, while John Galanis did proffer with the Government in an effort to exonerate Jared, the Government did not find John Galanis's inconsistent and protean story credible. The Government did not adjust its position on Jared's involvement in the case based on John's incredible and unverified information, but did so based on incontrovertible cell site evidence and a close analysis of the email account shared by John and Jared.   John's claim of Jared's innocence is further belied by Jared's own admission of guilt in connection with his guilty plea in this case.

the bond issuances to have been a legitimate business endeavor.[10] But the mere fact that John was willing to enter into another business transaction with Jason makes clear that John was not deceived into joining the Gerova scheme, but was a willing and knowing participant from the beginning.

The defendant next argues that his Criminal History Category of III overstates his criminal history because – while the calculation is legally correct[11] – his State Conviction and his Federal Conviction were the result of the "same conduct" such that he "should not now be punished by double counting the three points" for each. (Sub. at 6).[12]  In advancing this argument, the defendant relies heavily a remark by Judge Brieant that the 1988 State Case "probably should not have been prosecuted separately."   (Sub. at 6, quoting Brieant Opinion). As noted above, however, the criminal conduct at issue in the two cases was different: one related principally to the oil and gas business, the other to the real estate industry.[13]

---

[10] As Jason Galanis has pled guilty to his involvement in the fraudulent bonds, there can be no argument that the bond issuances themselves were legitimate.

[11] As indicated above, John Galanis stipulated in his Plea Agreement with the Government that he has six criminal history points and is in Criminal History Category III.

[12] The defendant seems to go beyond arguing that this "double counting" is inequitable to suggest that it rises to the level of a constitutional violation.   (Sub. at 6-7) (the 1988 State Case was "improperly brought;" Galanis was "wrongfully charged in both jurisdictions," and double punishing Galanis for the two convictions "violates his constitutional rights against double jeopardy and due process").   This is plainly wrong.   Leaving aside the issue of separate sovereigns, the state charges contained in the 1988 State Case and the federal charges contained in the 1987 Federal Case each contain elements different from the other, and there is thus no double jeopardy violation.   *Blockburger* v. *United States*, 284 U.S. 299 (1932) (whether two offenses are in fact the same for Double Jeopardy purposes is determined by reference to the so-called "same-elements" test, which asks whether each offense contains an element not contained in the other, and provides that, if not, they are the same offense and double jeopardy bars additional punishment). More fundamentally, and as described above, the two convictions arose out of separate criminal schemes.

[13] Based on a conversation with the ADA responsible for the 1988 State Prosecution, the

Whatever Judge Brieant's reasoning, there is simply no reasonable argument that a Criminal History Category of III *overstates* this defendant's criminal culpability.   Indeed, had the multiple frauds contained in the 1987 Federal Case been charged separately, the defendant's criminal history might be far higher.   So too if the defendant had been charged – as he might have been – with absconding from custody.   Given this defendant's extensive criminal history and his lifetime of criminal conduct there is no reason for this Court to reevaluate the sentences imposed on Galanis nearly 30 years ago, nor to conclude that his criminal history in any way overstates his criminal past.

Galanis also argues that a below-Guidelines sentence is warranted because his conduct is comparable to Tagliaferri's (Sub. at 13) ("Tagliaferri and John Galanis were on the same level in the Gerova matter") and that he should receive a lower sentence that Tagliaferri because (i) Galanis accepted responsibility while Tagliaferri proceeded to trial; and (ii) Tagliaferri was involved in other schemes with Jason Galanis beyond Gerova. (*Id.*).   Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide."   *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).   Because Section 3553(a)(6) was intended to address national disparities, "a district court

---

Government understands that the two schemes were unrelated except in so far as an overlap in participants. That is, just as John Galanis, Jason Galanis and Gary Hirst each participated both in the instant offense and in the conduct charged separately before Judge Abrams, certain of the coconspirators in the 1987 Federal Case were also participants in the 1988 State Case.   The mere overlap of participants, however, in no way suggests that the cases should (or even could) have been brought together.

may – but is not required to – consider sentencing disparity among co-defendants under 18

U.S.C. § 3553(a)(6)."   *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)).

"Precisely because § 3553(a)(6) is only one of several factors that must be weighted and balanced by the sentencing judge, a district court's identification of disparity does not necessarily require it to adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable."   *United States v. Florez*, 447 F.3d 145, 157-58 (2d Cir. 2006) (internal quotation marks and citations omitted).   Rather, "the weight to be given such disparities, like the weight to be given any § 3553(a) factor, 'is a matter firmly committed to the discretion of the sentencing judge and is beyond [appellate] review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.'" *Id.* at 158 (quoting *Fernandez,* 443 F.3d at 32).

Here, Tagliaferri and Galanis are not similarly situated.   While there is no doubt that Tagliaferri engaged in an egregious breach of his clients' trust, he ultimately did so in deals orchestrated by Jason Galanis (the Galanis-entity notes and fund.com transactions) or at the direction of John Galanis (the Shahini share issuance and matched trading).   In directing the matched trading in Gerova, John Galanis himself bears responsibility for many of the losses suffered by Tagliaferri's clients and is thus is no way less culpable than Tagliaferri.   Further, Galanis's efforts to suggest that it is Tagliaferri who is deserving of the harsher punishment are absurd.   While it in no way diminishes Tagliaferri's own culpability, Tagliaferri spent his life as a law abiding investment adviser who first turned to criminal conduct after becoming involved with the Galanises.   John Galanis is a recidivist securities fraudster who has been undeterred by

23

multiple conviction and lengthy terms of imprisonment.   Of the two, it is clear that a more significant sentence is necessary for Galanis.

Finally, Galanis argues that there is no need for individual deterrence because he "will not be a threat to the public upon his release from jail," "will have no desire to commit any crimes" or the "realistic ability to do so," and has chosen to lead a modest life living with his son Jesse.   (Sub. at 10).   But notwithstanding Galanis's claims to the contrary, it is clear that he has always been motivated by a need to fund a luxurious lifestyle.   Prior to his convictions in the 1980's, Galanis lived in a mansion in Greenwich, with several domestic servants, and was known in the community for flaunting his wealth.   He owned and used multiple residences and vacation homes in Manhattan, San Diego, Del Mar, and Rancho Santa.   Although the defendant claims that he is a changed man who now lives modestly with his youngest son, this is a recent development that arose only after Galanis's arrest and his depletion of the fraudulent proceeds earned from the Gerova (and the Tribal Bonds) funds.   Indeed, prior to September 2016, John was living full time in a luxury suite in a hotel in Del Mar, California.   In addition to the cost of the hotel, he also spent significant sums on luxury car expenses and on jewelry. Thus, for the reasons already discussed above, there is an absolute need for a sentence designed to cause specific deterrence.

Finally, Galanis argues that mercy is warranted because "[w]hatever sentence this Court gives [him] is in all likelihood going to turn out to be a life sentence," and focusing the Court on his various ailments. (Sub. at 16). But Galanis was already in his late 60's when he joined in the Gerova scheme and his health was already suffering.   (Letter of Dr. Gary Ross at 1) (indicating that Dr. Ross has been treating Galanis for more than ten years).   Given Galanis's own history,

he certainly understood the consequences of engaging in yet another securities fraud and he chose to do so notwithstanding his age and his health.   Those factors simply do not warrant leniency in this case.   To the contrary, Galanis's significant criminal past, his failure to be deterred by significant prison sentences, and his involvement in large scale securities fraud at his advanced age suggest that there is every reason to believe that if released from prison, Galanis will again seek out a life of crime.   Incapacitating Galanis may well be the only way to protect his future victims.

## RESTITUION AND FORFEITURE

Galanis has already consented to the entry of a forfeiture order against him and the Court has already entered the appropriate orders.   Nonetheless, the Court is required, at sentencing, to orally pronounce the imposition of forfeiture, which in this case includes the forfeiture of a sum of money equal to $19,038,650.53, representing the proceeds of Galanis's offense.

The Government will provide a supplemental submission on the issue of restitution, as well as a proposed restitution order, in advance of sentencing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that Galanis has committed serious offenses, the appropriate punishment for which is adequately reflected in the applicable Guidelines range.   Accordingly, the Government requests that the Court impose a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:    /s/ Rebecca Mermelstein
Brian R. Blais/Aimee Hector/
Rebecca Mermelstein
Assistant United States Attorneys
Tel.:   (212) 637-2521/2203/2360

Dated: February 9, 2017
New York, New York