**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

           -against-

GARY HIRST,

                  Defendant.

15-cr-643 (PKC)

**SENTENCING MEMORANDUM OF GARY HIRST**

Michael Tremonte
Justine A. Harris
Noam Biale
Emily Burgess
SHER TREMONTE LLP
80 Broad Street, 13th Floor
New York, NY 10004
Phone: (212) 202-2600
Fax: (212) 202-4156
Email: mtremonte@shertremonte.com

## PRELIMINARY STATEMENT

Gary Hirst never had many friends.  He thought he found the friend of a lifetime in Jason Galanis.  When the charming Bel Air playboy who partied with celebrities and drove a Bentley met the awkward Englishman, who had been a shy, stuttering, overweight child with a penchant for modeling electrical circuits, Gary was smitten.  Jason masterfully exploited Gary's neediness and vulnerability, homing in on the one thing Gary wanted more than anything:  companionship.  Jason cultivated Gary, texting him when he was boarding a flight to wish Gary safe travels, calling to him brag about a meeting with a famous financier or to relate gossip first-hand from the latest Hollywood party, or just to share a joke or an observation.  Gary had acquaintances, and had been married – but he never had a charismatic, dynamic, and devoted friend like Jason.  He was captivated.  And when Jason asked for Gary's help to get an exciting new business venture off the ground, seeking out his expertise and praising his talent for complex financial concepts, all the while promising to connect him with well-known and respected business leaders, Gary jumped at the opportunity.  He agreed to be president of Jason's new company, Gerova, and devoted all of his energies – and a substantial portion of his savings – to it.  Gary yearned to help his friend succeed.  He did whatever Jason asked, including – fatefully – signing documents at Jason's behest.  One such document transferred Gerova shares to Ymer Shahini, who Gary believed was partners with Jason in a promising overseas venture.  That act led Gary Hirst to a place he never thought he would be after more than sixty years and a long career of legitimate (and successful) business endeavors and scientific and creative accomplishments: convicted of federal crimes and standing before this Court for sentencing.

We acknowledge that the crimes charged here are serious ones.  The jury's verdict, which we accept for purposes of sentencing, established that Gary agreed with Jason to transfer stock

into the possession of a foreign nominee, knowing that such stock would ultimately be controlled at least in part by Jason, and that Gary failed to contemporaneously inform Gerova's CFO and Board of Directors about the stock transfer, including details such as the number and value of the transferred shares.  Subsequently, unbeknownst to Gary, Jason and others, including members of his family, transferred those shares to U.S. brokerage accounts, and ultimately sold them in violation of SEC rules through illegal matched trading arrangements, facilitated by corrupt investment advisers.  That subsequent conduct caused severe harm to innocent investors, and neither Gary nor we underestimate or minimize the suffering of those investors and their families.  Although the Court ruled as a matter of substantive conspiracy law that this conduct by Jason and others was part of the wide-ranging conspiracy that Gary joined, the Sentencing Guidelines and Second Circuit precedent make clear that Gary's relevant conduct for sentencing purposes is not co-extensive with his conspiracy liability.  For sentencing purposes, the Court faces different questions from the one it addressed at trial:  namely, whether, under the Sentencing Guidelines' definition of relevant conduct, U.S.S.G. § 1B1.3, Jason's conduct was within the scope of the jointly undertaken criminal activity Gary agreed to join, and whether, for sentencing purposes, it was reasonably foreseeable to him.  Because the answer to both questions is no, neither the losses suffered by the investor-victims nor losses calculated on a market manipulation theory are attributable to Gary.  The proper application of the Sentencing Guidelines thus yields a sentencing range far below that advocated by the government and the Probation Department.

In addition to the Sentencing Guidelines, the Court must consider the appropriate sentence pursuant to 18 U.S.C. § 3553(a), based on the nature and circumstance of the offense and the history and characteristics of the defendant.  As the trial made apparent, and this

submission further explores, to understand Gary's actions in this case, it is necessary to understand Gary's complex relationship with Jason, and in particular Jason's exploitation of Gary's unique psychological vulnerability and longing for the kind of passionate friendship that Jason purportedly offered.  Although Gary did not know Jason's plans – and never dreamed Jason would brazenly steal from investors by, among other things, recruiting corrupt investment professionals to help him manipulate Gerova's stock price through a pump-and-dump scheme and matched trading – Gary was particularly vulnerable to, and blinded by, Jason's charms and flattery. ████████████████████████

████████████████████████████████

████████████████████████ He was taken in completely by Jason, and now feels profound shame and remorse for dropping his guard and playing a role in Jason's fraudulent scheme.  This case proves Nietzsche's aphorism, "Love is blind; friendship closes its eyes."

We append to this submission the following documents:  Objections to the Draft PSR (**Exhibit A**); the Government's Response to the Objections to the Draft PSR (**Exhibit B**); Black-Scholes Analysis of the Fair Market Value of the Shahini Warrants (**Exhibit C**); Report on Examination of Gary Hirst by Dr. Alexander Sasha Bardey (**Exhibit D**); Neurology Consultation Report on Gary Hirst (**Exhibit E**); Letter from Counseling Center for Growth and Recovery (**Exhibit F**); and Letters from Family Members and Business Associates (**Exhibit G**).

## FACTUAL BACKGROUND

**A.     Personal History and Characteristics**

Gary Hirst grew up in Humberston, a small seaside village in the north of England.  He was an overweight, oddball child, who had a lisp and a stutter.[1]  Due to allergies, his nose was always running.  His physical appearance, speech, and above-average intelligence made him a target of vicious bullying at school.  Other children mocked his interest in academics and called him "Piggy."  Young Gary withdrew and had no friends, spending all his time with his parents and designing various science experiments, such as electrical circuits he built on his own at home.  His was a lonely childhood that significantly stunted his emotional and social maturity.  While Gary has managed to come up with strategies for interacting with others and finds people "interesting," he has never developed normal social relationships outside his family.

Gary arrived in the United States in 1972 and began college at the University of Miami.  He found America intoxicating, and relished the chance to shed identity as an awkward provincial from a small English village.  He excelled in college and entered University of Miami School of Law on a full scholarship.  Around that time, he met Nancy Niec, who later became his wife.  Gary completed law school and took the Florida bar, but practiced for only a year performing real estate title searches before joining a company that built animatronic robots, similar to those at Disneyworld, for pizza restaurants.  He and Nancy moved to Orlando, where Gary held a variety of engineering jobs, including with a contractor for the U.S. Navy where he designed simulators.

---

[1]      This account of Gary's life story is based on conversations with counsel, Gary's interview with U.S. Probation, and the Report of Dr. Alexander Sasha Bardey, Exhibit D.

Gary and Nancy had two children, Tracey and Robert.  By all accounts, Gary has always been deeply committed to his family.  ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████ she had to undergo numerous surgeries throughout her childhood. The recovery from these surgeries was difficult and painful.  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ This was an excruciating experience for father and daughter alike.  Notably, the preparation for the surgery and the operation itself occurred during the relevant time period of the Indictment, causing Gary to be largely focused on his family rather than his business activities at Gerova.  Indeed, in 2011, Gary resigned from Gerova to care for Tracey fulltime.  Although Tracey's medical condition was a strain on the family and Gary and Nancy amicably divorced, the family remained tight-knit and Gary and Nancy are still good friends.  Tracey works as a real estate agent in the Orlando area and lives with Gary.  Robert works as an accountant living in California.  Both Tracey and Robert are close to their father.

As Nancy states in her letter, "Gary is quiet and unassuming by nature. . . .  [I]f he sees someone having a problem, he always just does whatever needs doing to fix the issue if he has the power to do so . . . .  Gary is motivated by kindness."  Letter of Nancy Niec Hirst, Exhibit G, at 1.  She speaks of his going out of his way to help relatives, employees, and Nancy's church, though he never attended it.  She also notes that despite their daughter Tracey's physical impairments, "Gary was determined that Tracey would achieve success by finding ways for her to work around any challenges that arose with daily living.  With research and years of hard

work by both Gary and Tracey, she was able to accomplish her goals, even learning to play piano with both hands."  *Id.* at 2.

For her part, Tracey describes in her letter that her "Dad sees the world through eyes of wonder; he's never lost his inner child. He is curious and delights in sharing the wonders of the world with his children."  Letter of Tracey Hirst, Exhibit G, at 1.  She describes Gary nursing her brother Robert back to health after he suffered an accident that left him bedridden.  And she describes her father's support of her, both for her medical condition and her psychological wellbeing, stating:

> I was talking before I was a year old, but walking didn't come nearly as easily, and it was nearly two years before it finally happened, two years during which my parents feared at times I never would.  But from the start, Dad was constantly researching therapies, techniques, and equipment that would help me. ██████████
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
> ██████████████████████████████████████████████
> ████████████████████████████

*Id.* at 2.

Tracey says that her father never believed that her disabilities would prevent her from doing things she wanted to do, and he took special effort to make sure she could learn to play the piano and to drive.  ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Gary's son Robert also describes his father as "loving" and "caring," not just a good father, but "a good man."  Letter of Robert Hirst, Exhibit G, at 1.  He describes small acts that

Gary does to help people "without looking for recognition," simply because "that's who he is." *Id.* at 2.

In 1985, Gary contracted chicken pox and became extremely ill with a high fever. He had to be hospitalized and came close to death. To Gary, not having a detailed understanding of his own medical condition was terrifying, and he enrolled in medical school when he recovered. Gary completed medical school in 1990 and began a residency at Baptist Memorial Hospital in Memphis, TN. While in his residency program, Gary began using computers and mathematical algorithms to engage in futures trading. He found that using coding, he could make good money trading in the futures market. He subsequently left the practice of medicine and started Hirst Investment Management, which at its height managed over $600 million in assets. In the late 1990's, as computer modeling of futures and stock trading became more common, Gary's company became less profitable. In 2006, he was approached by Rory Knight, the dean of the business school at Oxford University, who expressed interest in purchasing his company. Knight sent his investment banker to meet with Gary and negotiate the deal. That is how Gary met Jason Galanis.[2]

Jason was a good-looking, smooth-talking playboy with famous connections all over the world. He befriended and charmed the shy Englishman. The two developed what Gary believed to be a deep bond – what Gary thought was his deep friendship; unlike anything he'd experienced before. Gary talked to Jason about personal matters he had never shared with anyone. He was enthralled by Jason's stories of his meetings with celebrity entrepreneurs, big deals and lavish lifestyle. Gary visited Jason frequently and the two would regularly text and talk on the phone. Jason treated Gary as a confidante, but in fact concealed information from

---

[2]     For the sake of brevity, the Galanis defendants are referred to herein by their first names.

him, ███████████████████████████████.  In 2007, Jason sought Gary's help with, and asked him to join, his latest business venture, Asia Special Situation Acquisition Company ("ASSAC") – an exciting opportunity involving famous people and complex financial arrangements that would result in a highly-publicized initial public offering on a major exchange – which would later become Gerova Financial Group, Inc. ("Gerova").

### B.     Arrest and Trial

On September 25, 2015, Gary was arrested and arraigned on an Indictment that charged him with conspiracy to commit and the actual commission of securities fraud and wire fraud, to which he pleaded not guilty.   Sealed Indictment ¶¶ 68, 72, 74, 77, Dkt. No. 2.  On August 10, 2016, Gary was arraigned on a Superseding Indictment, which was materially identical to the original Indictment as to him.  Superseding Indictment, Dkt. No. 225.

The jury trial commenced on September 12, 2016.  The evidence at trial established the following facts relevant to sentencing:  During a portion of the time period covered by the Superseding Indictment, Gary was the president and interim chairman of the Gerova's Board of Directors.  Trial Tr. 207:8-9, 354:3-4.  Gerova's predecessor company, ASSAC, was a Special Purpose Acquisition Company ("SPAC"), which meant that under governing SEC rules, it had a limited period of time to acquire assets and "de-SPAC," *i.e.*, become a non-special purpose publicly-traded company listed on the New York Stock Exchange.  Tr. 342:6-9; 344:1-8.  To that end, in late 2009, Gerova was seeking potential acquisitions, and its principal investment banker was Jason.  Tr. 100-25-101:1-2.  Because Jason was subject to a three-year officer/director bar imposed by the Securities and Exchange Commission ("SEC"), he was prohibited from serving as an officer or director of Gerova.  Gerova's officers and directors were well aware of the SEC officer/director bar against Jason, and notwithstanding that prohibition engaged him to perform

investment banking services for the company.  The directors of Gerova also later approved

Jason's employment as an officer of a Gerova subsidiary, and obtained an opinion letter from a

former high-level SEC attorney, who advised that Jason could lawfully serve as an officer of the

subsidiary.  Def. Exhibit 1250.

Jason identified potential transactions in order to complete the de-SPAC process,

including two that were ultimately selected – namely, the purchase of certain assets of the

Stillwater funds and the Wimbledon funds.  The Stillwater funds were owned by Stillwater

Capital Management, an entity controlled by Jack Doueck and Richard Rudy.  The proposed

Stillwater transaction contemplated the exchange of Gerova stock for certain Stillwater assets,

Although Doueck valued the relevant Stillwater assets at over $1 billion, the registration of the

Gerova shares to be exchanged for such assets was contingent on a valuation and unqualified

audit of the Stillwater assets, which was never completed and consequently never provided to

Gerova.  Tr. 99:2-4.   Similarly, Gerova agreed to obtain assets of the Wimbledon funds, which

were owned by Weston Capital Management, an entity controlled by Albert Hallac, in exchange

for a specified quantity of Gerova stock, which would become freely trading upon the filing of

Gerova's registration statement.  Tr. 1161:12-18; 1164:20-24.

For Jason's efforts to source these transactions, the company agreed to pay him certain

fees, including a $2 million fee for sourcing the Wimbledon transaction.  However, instead of

this money being paid directly to him, Jason arranged for a consulting agreement dated January

22, 2010 (the "Consulting Agreement") that promised the payment of the $2 million consulting

fee to Ymer Shahini.  Gov't Ex. 250.  Shahini, a defendant in this case still at large, was a

Kosovo national who had previously done business with both Jason and Derek Galanis,

including as the beneficial owner of more than five percent of the outstanding shares of

Fund.com, a publicly-traded company of which Jason was the "architect."  Tr. 515:11; Def.

Exhibit 800.  Despite evidence of his longtime association with the Galanis family and his prior

investment in Fund.com, the evidence at trial showed that Shahini did not personally perform

any work in connection with Gerova's acquisition of the Wimbledon funds' assets.

Nevertheless, the Consulting Agreement bears the signature of Gerova's CEO, Marshall Manley.

Although Manley testified that he did not recall signing the Consulting Agreement, Gerova's

CFO, Michael Hlavsa, testified that Manley told him that he had, in fact, signed the document.

*See id.*; T. 393:19-21; *but see* Tr. 266:25-267:1.

The $2 million cash payment due to Shahini under the Consulting Agreement was

converted to warrants, which could be converted into shares at Shahini's election, by operation

of a warrant agreement, dated March 29, 2010 (the "Warrant Agreement"), which was signed by

Gary.  Gov't Ex. 251.[3]  In May 2010, Shahini's warrants were exercised and Gary sent a letter to

Continental Stock Transfer authorizing the issuance of 5.3 million shares in accordance with the

terms of the Warrant Agreement.

The shares transferred to Shahini were subject to SEC Regulation S ("Reg S"), a

designation that prevented the shares from being traded on the U.S. market.  *See* Tr. 1760:22-

1761:22 (Court's instruction on Reg S).  Such shares can be held in U.S. brokerage accounts – as

---

[3]     The parties disputed at trial when Gary signed the Warrant Agreement.  The government
argued that the document was backdated, based on a single email, in which Derek stated:  "All
we need is a foreign national we trust which is where you come in my friend."  Gov't Ex. 1004.
The defense meanwhile relied on forensic evidence relating to the metadata associated with the
document, which indicated that the scanned PDF of the signed Warrant Agreement was created
in early April 2010, just days after the date on the document indicates it was signed.  Tr. 1366-
1400.  The government appears now to have abandoned its position that Gary backdated the
Warrant Agreement or any other document.  *Compare* Tr. 1570:19 (Government summation:
"Hirst manipulated the create date.") *with* Gov't Response to Hirst Objections to Draft PSR 2,
Exhibit B ("Paragraph 44 as drafted does not suggest that Hirst backdated the warrant agreement;
it only states that the warrant agreement was backdated.").

the evidence established they were in this case – but the shares bore a "Reg S" designation in the relevant brokerage accounts, indicating that they could not be sold domestically.  Tr. 1051:2-12.

Shortly after the issuance of the shares, the company's CFO, Michael Hlavsa was preparing a financial statement for filing with the SEC, known as Form 20-F.  Gov't Exhibit 201.  A few weeks after the issuance of the 20-F, Hlavsa prepared an amended version of the 20-F, known as the 20-F/A.  Gov't Exhibit 201-A.  These documents, and their failure to note the issuance of the Shahini shares in a list of beneficial owners of the company, *see id.* at 62, became at trial the centerpiece of the government's allegation that Gary committed securities fraud.[4]  Between the filing of the 20-F and the subsequent filing of the 20-F/A, Gary sent Hlavsa email correspondence asking him to confirm that he had recorded the finder's fee for the Wimbledon transaction.  Gov't Exhibit 613; Tr. 760:23-761:5.  Correspondence between Hlavsa and others from that time period also established that Hlavsa had been told that the finder's fee was "trying to be settled for stock," *i.e.*, that the payment of the fee involved the issuance of warrants.  Gov't Exhibit 609.  However, no evidence was presented at trial to indicate that Gary specifically informed Hlavsa of the details of the warrant agreement or that the stock in question had in fact been issued, and, for purposes of this sentencing, the jury's verdict establishes that he should have.  Nevertheless, it remains significant that the information was available at all times from the stock transfer agent, based on information provided to the agent by Gary, and Hlavsa did not update the shareholder information between the filing of the 20-F and the 20-FA.  Tr. 687:5-9.  Indeed, Hlavsa testified that he did not obtain updated shareholder information – along with the

---

[4]     This was so even though the evidence at trial established that the 5.3 million shares transferred to Shahini represented *less* than 5% of the total shares issued, and thus were not required to be included in the list of beneficial owners on the Form 20-F or 20-FA.  *See id.*; *see also* Tr. 1046:24-1047:1.

Consulting Agreement and Warrant Agreement underlying the issuance of the Shahini shares –

until September 2010.  Tr. 405:4-25.  In October 2010, the Gerova Board of Directors ratified the

issuance of the Shahini shares.  Gov't Exhibit 222.

While the foregoing events were taking place, a separate drama was unfolding, of which

Gary was unaware.  First, Jason's father, John Galanis, whom Gary had never met and with

whom he has never communicated, "spearheaded" an effort to deposit Shahini's shares in U.S.

brokerage accounts.  Gov't Sentencing Submission as to Jason Galanis at 5, ECF No. 376 (Feb.

8, 2017) (hereinafter "Gov't Jason Br.").  John and a third Galanis brother, Jared, then

orchestrated the sale of substantial amounts of Shahini's shares on the U.S. market.  *Id.*  As

mentioned above, such shares were designated "Reg S" on brokerage statements and thus could

not legally be sold, but sales went forward nevertheless thanks to either corrupt or ignorant

broker-dealers at the brokerage firms and at clearing brokers.  *See* Tr. 1136:1-18 (testimony of

broker-dealer Alex Montano, stating he was "not 100% clear" on requirements of Reg S).  The

clearing broker used by Montano for the trades was Legent Clearing, the largest independent

clearing broker in the United States, at the time owned by Berkshire Hathaway.  Despite the

shares being clearly described as Reg S, and the sale of Reg S shares in the U.S. market being

illegal, Legent Clearing executed the trades.

Several weeks after the Shahini shares were issued, in a completely unrelated series of

events, an investment advisory firm called Martin Kelly Capital Management was reeling from

news that a substantial bloc of its investments had been frozen by the SEC.  On June 17, 2010,

the SEC announced a freeze on the assets of Westmoore Securities, which the SEC alleged had

been operating a Ponzi scheme.  *See* Gov't Jason Br. 6.  Approximately 20% of Martin Kelly's

client assets were invested in Westmoore.  Tr. 848:4-5. As a result of the asset freeze, the firm's

investment advisers, Gavin Hamels and Billy Crafton, needed a solution to save their clients'
investments.  Westmoore's principal, Matthew Jennings, brought Jason Galanis to a meeting
with Hamels the next day.  Tr. 848:17-23.  At that meeting, Jason's role was "as a friend to Matt
– trying to help come up with ideas on how to move forward."  Tr. 849:12-13.  The following
week, Hamels and Crafton met with Jennings and Jason again.  At that meeting, Jason for the
first time offered a proposal that they engage in "matched" trading of Gerova stock, whereby
Martin Kelly would purchase large amounts of Gerova stock as directed by Jason.  Tr: 850:1-20.
The investment advisers agreed and subsequently bought Gerova stock in specific quantities and
at specific times as directed by John Galanis impersonating Jared Galanis.  Gov't Jason Br. 6-7
& n.5.  No evidence was presented at trial to suggest that Gary had any role in or had any
awareness of any of the matched trading.  Hamels testified that he had never met Gary.  Tr.
858:8-9.

Following the matched trading scheme with Hamels, Jason and certain of his family
members conspired with another investment adviser, James Tagliaferri similarly to engage in
matched trading and invest his client's money in Gerova.  *See* Gov't Jason Br. 7.  No evidence
was presented at trial indicating that Gary was aware of or had any role in those trades.

The Shahini shares were initially held at Roth Capital and later transferred to an account
at the C.K. Cooper brokerage firm.  C.K. Cooper initially extended margin loans, secured by the
Reg S Shahini shares, in the amount of $2.6 million.  Those margin funds, in turn, were
temporarily transferred to Taurus Global Opportunities Fund, Ltd. ("Taurus"), an entity
controlled by Gary.  Tr. 1126:11-12.  Within minutes, those same margin funds were transferred
to the account of Pennine Investors Ltd. ("Pennine") at the same financial institution. Pennine
was an entity controlled by its sole director, Arne Van Roon.  Def. Exhibit 900F.  Although Gary

had previously been affiliated with Pennine, he did not control it at the time the $2.6 million margin loan proceeds were transferred from C.K. Cooper via Taurus. *Id.*; *see also* Def. Exhibit 900D. These funds were then transferred the same day to a Swiss Bank Account held by Weston, the entity controlled by the government's cooperating witness, Albert Hallac. Gov't Exhibits 542, 543. Gary introduced evidence at trial proving that this transaction was governed by an agreement between Hallac and *Jason*, not Gary, to invest $5 million in Global Asset Fund, the previous name of Pennine. Tr. 1168:8-19. When Gary notified Jason that Weston had made a redemption request for its $5 million investment, Jason sent Gary an email indicating the funds would come from Master Trust, a separate acquisition that Jason was known to be pursuing. Def. Ex. 1142 ("Master Trust, I suppose."); Tr. 127:10-23 (Jack Doueck testimony about his understanding that Jason was pursuing deal with Master Trust for the purpose of obtaining liquidity).[5] Thus, the evidence at trial did not establish (nor was the jury required to find) that Gary personally received or benefitted directly or indirectly from any proceeds stemming from the transfer of shares to Shahini, or that Gary had any knowledge that the $2.6 million that briefly passed through Taurus before Pennine returned it to Weston's Swiss bank account was margin loan funds based on the Shahini shares.

On September 28, 2016, Gary was convicted on all charges. He was subsequently incarcerated at the MDC for a period of approximately six weeks until he was released on a modified bond.

---

[5]     The financial institution did not provide notification of the name of the sender of the wire to Gary. *See* Gov't Exhibits 411, 412.

███████████████████████████████████

███████████████████████████████████

### D.      Presentence Report Guidelines Calculation

The Presentence Report, filed by the Probation Office of the United States District Court for the Southern District of New York ("Probation"), determined that the four counts on which Gary was convicted are grouped, pursuant to § 3D1.2(d) of the Guidelines, because the offense level is determined largely based on the total loss involved in the offense, and that the Guideline most applicable to these counts is § 2B1.1.  Presentence Report ¶¶ 81-82, dated February 27, 2016 [hereinafter "PSR"].  Probation calculated the Guidelines range as follows:

- The base offense level is seven, because the offenses have a statutory maximum term of 20 years.  U.S.S.G. § 2B1.1(a)(1).

- The "loss resulting from the offense is more than $25,000,000 but not more than $65,000,000," which increased the offense level by twenty-two levels.  PSR ¶ 82 (citing U.S.S.G. § 2B1.1(b)(1)(L).

- Because the offense involved ten or more victims, the offense level was increased by two levels.  PSR ¶ 83 (citing U.S.S.G. § 2B1.1(b)(2)(A)(i)).

- Because Probation found that the offense involved abuse of a position of trust, the offense level was increased by two levels.  PSR ¶ 86 (citing U.S.S.G. § 3B1.3).

- Accordingly, Probation has calculated the total offense level as 33.  PSR ¶ 91.


- Gary has no criminal history, so his Criminal History Score is zero, and his Criminal History Category is I.  PSR ¶ 94.

- The Guidelines range for an individual with an offense level of 35 and a Criminal History Category of I is 135 –168 months' imprisonment.  U.S.S.G. § 5 (Sentencing Table).

- Because the offenses are class C and D felonies, the Guidelines range for a term of supervised release is one to three years.  PSR ¶ 148 (citing 18 U.S.C. § 3583(b)(2) (2012)).

- The PSR found that a variance from the Sentencing Guidelines was warranted, and recommended a sentence of 96 months' imprisonment. *See* PSR at 39.

The defense objected to numerous factual assertions made in the draft PSR that were not supported by the trial evidence.  *See* Hirst Objections to Draft PSR, Exhibit A.  The defense also objected to (1) the imposition of an enhancement under U.S.S.G. § 2B1.1(b)(1) for a "loss resulting from the offense is more than $25,000,000 but not more than $65,000,000"; (2) the imposition of an enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved ten or more victims; and (3) an adjustment under U.S.S.G. § 3B1.3 for abuse of a position of trust.

## ARGUMENT

### I.    Legal Standard

In imposing a sentence in a criminal case, district courts are guided by the factors set forth in 18 U.S.C. § 3553(a).  In applying these factors, courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary, to serve the purposes of sentencing.'"  *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).  Though one of the § 3553(a) factors is the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Guidelines]," 18 U.S.C. § 3553(a)(4), "calculating the correct Guideline range [is] 'just an initial step in the sentencing process.'"  *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014).  A "district court may not presume that a [G]uidelines sentence is reasonable."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  Rather, as the Supreme

Court explained in *Gall v. United States*, 552 U.S. 41 (2005), the court must "make an individualized assessment based on the facts presented." *Id.* at 50; *see also United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014). Thus, in addition to the Guidelines, courts are also required to consider the other factors set forth in § 3553(a), including the "nature and circumstances of the offense" and the "history and personal characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Here, an evaluation of Gary's relevant conduct under the Sentencing Guidelines and applicable Second Circuit precedent yields significantly lower losses and removes certain enhancements, resulting in a Guidelines range well below that calculated by Probation. But whatever the correct calculation of the Guidelines, Gary's history and characteristics, his role and level of culpability in the offense, the sentences of other defendants in the case, and the purposes of punishment outlined in § 3553(a) all counsel in favor of a lenient sentence.

## II.     The PSR Improperly Calculates the Guidelines

The PSR erred in enhancing the Sentencing Guidelines range based on (1) the total loss attributed to the overall conspiracy; (2) the number of victims of the overall conspiracy; and (3) an adjustment for abuse of a position of trust. The application notes to the Guidelines and binding Second Circuit law make clear that these enhancements should not be imposed on Gary. A correct calculation of the Guidelines either puts the total offense level at 7, given that the loss attributable to Gary is zero, or, at most, at a total offense level of 21 if the fair market value of the shares transferred to Shahini is used as the loss figure. Thus, the correct Sentencing Guidelines range is either 0-6 months or, at most, 37-46 months.

A.  Loss Calculation

The PSR attributed to Gary a loss amount between $25 million and $65 million, which corresponds to a 22-level enhancement under U.S.S.G. § 2B1.1.  *See* PSR ¶ 82.  For the reasons that follow, this was error.  While Probation did not provide an explanation for its calculation of the loss amount attributable to Gary, the government provided two alternative metrics for calculating the loss amount – one based on the losses suffered by the victims of the matched trading scheme and the other based on a theory of market manipulation.  Neither metric is applicable to Gary.

> 1.  *The losses stemming from the matched trading scheme are not within the scope of the jointly undertaken criminal activity.*

In Jason's Sentencing Memorandum, the government claimed a loss figure with reference to the total amount of losses suffered by victims of the matched trading scheme, in which Gary played no role and of which he was not aware.  The government stated that the losses suffered by these victims, who were principally clients of James Tagliaferri, "were essentially the 'end of the chain' of the matched trading conduct, left holding substantial quantities of Gerova shares at the time when trading in Gerova was halted.  The losses suffered by Tagliaferri clients and other identifiable individuals in Gerova were $26,280,798.77."  Gov't Jason Br. 11.[6]  Such losses resulted from the investment adviser fraud perpetrated by Jason, other members of Jason's family, Tagliaferri, and Hamels.  In response to Gary's motion *in limine*, the government argued that the depositing of shares into the brokerage accounts of corrupt broker-dealers, as well as the matched trading that others orchestrated together with corrupt investment advisers, were

---

[6]     The government does not provide the evidentiary support for this calculation.  To the extent that the Court is inclined to rely on it for any purpose, an evidentiary hearing may be necessary to determine its foundation and the accuracy of the calculation.

reasonably foreseeable because there was no other way to dispose of these shares, once they had been placed into the hands of a foreign nominee, Gov't Response to Hirst Mot. in Limine 4-5, ECF No. 240 (Aug. 31, 2016), and it now relies on the Court's ruling permitting testimony on the matched trading scheme to argue that all the losses resulting from those schemes are attributable to Gary.  Gov't Response to Hirst Objections, Exhibit B, at 4 ("Hirst argues that the matched trading losses were not foreseeable to him and so the loss amount attributable to him should be zero, but Judge Castel has already rejected this argument.").

While on appeal we will challenge whether the investment adviser fraud was a reasonably foreseeable part of the same criminal conspiracy that the government argued Gary joined and whether that prejudicial evidence should fairly have been admitted at trial, the question for *sentencing* is different, as the scope of the jointly undertaken criminal activity is distinct from the scope of the conspiracy for the purpose of establishing criminal liability. U.S.S.G. § 1B1.3 provides that "in the case of a jointly undertaken criminal activity" relevant conduct includes only the "acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B). The application notes make clear that "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." *Id*. application note 1.  Indeed, "[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy."  *Id.*, application note 3(B).  In accordance with this principle, the Second Circuit has held, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is *significantly*

*narrower* than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (emphasis added) (internal quotation marks omitted). Consequently, even though this Court permitted the introduction at trial of testimony concerning the investment adviser fraud and matched trading scheme, it now faces a different question – namely, to determine whether, under § 1B1.3 of the Guidelines, the investment adviser fraud and the matched trading scheme were within the scope of jointly undertaken criminal activity in which Gary agreed to participate, *and* whether such conduct was reasonably foreseeable to him. Because the losses resulting from these schemes were neither within the scope of any jointly undertaken criminal activity in which Gary agreed to participate, as a matter of law, those losses cannot be attributed to him.

Thus, as to the "jointly undertaken criminal activity," the Court must make a particularized finding as to the scope of the criminal activity in which *Gary* agreed to participate. It is not permissible to simply "lump[ ] [one defendant] together with . . . the other defendant[s] in finding him responsible" for every aspect of the criminal conduct that falls within the ambit of the wider conspiracy. *United States v. Capri*, 111 F. App'x 32, 36 (2d Cir. 2004). Thus, in contrast to the scope of all conduct comprised by the charged conspiracy, for the purposes of calculating loss amount under the Guidelines, "relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, application note 3(B). In this context, Gary's responsibility for sentencing purposes is "limited by the scope of his . . . agreement to jointly undertake the particular criminal activity" and "[a]cts of others that were not within the scope of [Gary's] agreement, *even if those acts were known or reasonably foreseeable to [Gary]*, are not relevant conduct." *Id.* (emphasis added). In other words, even if acts were reasonably

foreseeable to Gary for purposes of establishing criminal liability, those acts are not necessarily within the scope for sentencing purposes.

In responding to *in limine* motions, the government conceded that the matching trading and investment adviser fraud was conduct "in which Hirst is not alleged to have directly participated or about which he did not have prior knowledge." Gov't Response to Hirst Mot. in Limine at 6. Consistent with that view of the case, *no* evidence was presented at trial that Gary even knew about, let alone agreed to, a criminal scheme that involved corrupt broker-dealers or matched trading. To the contrary, Gavin Hamels' testimony made clear that Jason floated the idea of the investment adviser fraud well after the stock transfer to Shahini was complete and after he had met Hamels and learned of Martin Kelly's troubles with the Westmoore investment, *see* Trial Tr. 849-50, that Hamels only engaged in such conduct because of that wholly separate intervening circumstance, *see* Tr. 848, and that Hamels never met or discussed the scheme with Gary, *id.* 858:8-9. Based on the evidence presented at trial, the jury's verdict *at most* established that Gary agreed with Jason to transfer stock into the possession of Shahini, knowing that such stock would ultimately be controlled by Jason, at least in part, and that Gary failed to contemporaneously alert Gerova's CFO and Board of Directors as to the specifics of the stock transfer, such as the number and value of the shares. Certainly, no evidence was presented to suggest that Gary agreed to undertake the selling of Shahini shares on the U.S. market, in violation of Reg S, using multiple corrupt investment advisers selling large volumes of Gerova stock into a thinly-traded market by means of a complicated matched trading scheme.

An illustration included in the Guidelines makes clear that subsequent bad conduct unrelated to the jointly undertaken criminal activity that the defendant agreed to join is not within the scope of that activity, and therefore cannot be attributed to the defendant:

> Defendant D pays Defendant E a small amount to forge an endorsement on an $800 stolen government check. Unknown to Defendant E, Defendant D then uses that check as a down payment in a scheme to fraudulently obtain $15,000 worth of merchandise. Defendant E is convicted of forging the $800 check and is accountable for the forgery of this check under subsection (a)(1)(A). Defendant E is not accountable for the $15,000 because the fraudulent scheme to obtain $15,000 was not within the scope of the jointly undertaken criminal activity (i.e., the forgery of the $800 check).

U.S.S.G. § 1B1.3, application note 4(C)(i).  Here, like Defendant E, Gary's actions in signing the Warrant Agreement and writing the letter authorizing the stock issuance to Shahini arguably facilitated Jason's transfer of Gerova stock into the hands of a foreign nominee.  But the disposition of those shares, after the transfer to the foreign nominee had been completed, by means of an elaborate, highly orchestrated fraud involving multiple co-conspirators engaging in an elaborate scheme to manipulate the market over an extended period of time, was not within the scope of the jointly undertaken criminal activity – *i.e.*, the transfer of the shares to Shahini – and is therefore akin to Defendant D's use of the forged government check to fraudulently obtain merchandise.  Indeed, the government did not even attempt to introduce evidence at trial to support the contention that the investment adviser and matched trading fraud was within the scope of the jointly undertaken criminal activity to which Gary agreed, within the meaning of the application notes to Guideline § 1B1.3.

Moreover, even if Gary had *actual knowledge* of the matched trading scheme – which even the government does not argue – the Second Circuit has held that, under U.S.S.G. § 1B1.3, "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts."  *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995).  Thus, "aware[ness] of the scope of the overall operation is not enough to hold [a defendant] accountable for the activities of the whole operation."  *Id.*.  Rather, the scope of the defendant's agreement must be proved by competent evidence showing that he "assisted other" co-

conspirators, "shared in the profits," "pooled resources," "or participated . . . in the management of the operation."  *Id.* at 572, 576 (internal quotation marks omitted).  The government presented no evidence that Gary engaged in any such acts *vis a vis* the matched trading scheme.  He did not assist other co-conspirators with any aspect of the investment advisor fraud and matched trading scheme; nor did he share in the profits of these activities; nor did he pool resources with any participant in these activities; nor did he participate in any way in the management of the operation of these activities.  And, to the extent the government introduced evidence that a business affiliated with Gary received $2.6 million, that transfer is not relevant to the "jointly undertaken criminal activity" analysis, because those funds were not the proceeds of the illegal matched trading scheme.  Rather, the $2.6 million were the proceeds of *margin loans*, secured by the Shahini stock, and distributed prior to any matched trades.[7]  The losses to the Martin Kelly and the Tagliaferri investors were accordingly the result of actions taken outside the scope of any jointly undertaken criminal scheme to which Gary agreed.

> 2.  *The matched trading and associated losses were not reasonably foreseeable under § 1B1.3.*

As noted above, under § 1B1.3, the Court must determine *both* that the relevant conduct is within the scope of the jointly undertaken criminal activity *and* that it is reasonably foreseeable (as well as that the conduct is in furtherance of the jointly undertaken criminal activity).  Whatever the scope of the agreement here, it strains credulity to argue that the illegal conduct of Jason and others in making a market for the Reg S shares, and the resulting losses, were reasonably foreseeable to Gary.  First, it was not foreseeable to Gary that the Shahini

---

[7]     The government introduced no evidence of any legal prohibition against obtaining loans secured by Reg S shares maintained in a U.S. brokerage account, and the defense is aware of none.

shares, which were subject to Reg S (as clearly stated on the brokerage statements that were introduced into evidence at trial) and therefore could not have been sold on the U.S. market, would in fact be sold to U.S. investors.  As the testimony of Alex Montano established, those sales were caused by the negligence (or perhaps the corruption) of employees of the brokerage firms, and by Legent Clearing, the largest independent clearing broker in the United States, ignoring the clear designation of the Shahini shares as Reg S restricted, and therefore unable to be sold in the United States.  There was no evidence that Gary played any role in selecting ignorant brokers (or in corrupting them), nor could he reasonably have foreseen that such ignorance (or corruption) would result in the unlawful sale of the shares in violation of Reg S.

Second, as Hamels testified, the willingness of investment advisers to engage in illegal matched trading was a fortuitous occurrence based on a wholly separate, particular set of circumstances, occurring after the shares were issued to Shahini, that Martin Kelly was facing concerning its investment in Westmoore.  Again, the government introduced no evidence that Gary was aware of this happenstance, nor could he have foreseen it.[8]

Third, to the extent the government renews the argument it made at trial, that it was reasonably foreseeable that the shares would be disposed of "through some form of market manipulation," Tr. 1100:22-23, that argument was further undermined by the testimony of Michael Hlavsa that he and other individuals involved in the management of Gerova, including the outside lawyers *and Gary*, were working on an F-1 Registration Statement in order to register

---

[8]    No evidence was presented at Gary's trial concerning the circumstance of Tagliaferri's matched trading; however, the government provides a narrative of Tagliaferri's conduct in its sentencing submission in Jason's case, which describes in some detail Tagliaferri and Jason's efforts to invest Tagliaferri's clients' money in Fund.com, an entity with which Gary had no involvement.  *See* Gov't Jason Br. 9.

the shares and allow them to be traded publicly.  Tr. 441:18-442:17.  Had the F-1 been filed, as

Gary and the other Gerova principals expected, Shahini's shares could have been traded, after the

required waiting period, much like the hundreds of millions of shares held by Stillwater and

others.  From Gary's perspective, therefore, there was no reason to anticipate that the shares

would be disposed of through market manipulation.

Finally, Gary introduced evidence at trial showing that based on sources, including public

reports of increasing short interest and emails from Jason, he believed the share price of Gerova

was declining as the result of short selling, and that he devised and circulated a plan to stop the

short sellers and defend the value of Gerova's shares.  *See* Def. Exhibits 1000, 1001A, 1001E,

1001L.  The evidence undermines the government's insupportable contention that Gary

reasonably could have foreseen the losses to investors "at the end of the chain" of the matched

trading scheme.  Although the harm to the Tagliaferri victim-investors was real and substantial,

that harm was not a reasonably foreseeable part of any jointly undertaken criminal activity that

Gary arguably joined, within the meaning of the application notes to Guideline § 1B1.3.

Accordingly, those losses cannot be attributed to Gary for the purpose of calculating the loss

amount under the Sentencing Guidelines.

3.  *The government's market manipulation theory of loss does not overcome
§ 1B1.3's clear dictates.*

The government's alternative measure of loss – applying U.S.S.G. § 2B1.1, application

note 3(F)(ix), which proposes two metrics the Court may use in cases "involving the fraudulent

inflation or deflation in the value of a publicly traded security or commodity" – is also

inapposite.  This so-called "market manipulation" method of calculating loss is inappropriate

because the government introduced no evidence to prove that Gary "was aware that [market]

manipulation was going on."  *United States v. Newman*, 74 F. App'x 126, 130 (2d Cir. 2003)

(losses caused by market manipulation properly attributed to defendant where "[t]he government introduced evidence indicating that even if Newman was not aware of all of the methods used to manipulate the price of the securities, he was aware that manipulation was going on").  For the reasons discussed above, Gary neither agreed to engage in any market manipulation, nor was such market manipulation reasonably foreseeable to him.  Accordingly, there is no merit to the government's proposed use of the market manipulation as an alternative basis for calculating loss amount under the Sentencing Guidelines as to Gary.

4.  *Gain is not a proper substitute for loss in this case.*

Under U.S.S.G. § 1B1.3 and § 2B1.1, application note 3(F)(ix), the loss attributable to Gary should be  zero.  Given that, the Court cannot use gain as a substitute for loss, because, pursuant to the Guidelines, gain may be used as a substitute for loss "only if there *is* a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1, application note 3(B) (emphasis added).

In any event, Gary received no gain.  The evidence at trial established that Albert Hallac made an agreement with Jason to invest $5 million in Global Asset Fund, later known as Pennine, a hedge fund that had previously been controlled by Gary.  Def. Exhibit 900A-900F. By the time of the relevant transaction, however, Gary no longer had any involvement in the fund other than being an authorized signatory on its accounts.  Sole ownership of Pennine had previously been transferred to Arne Van Roon, who alone controlled the fund at the time Hallac submitted a redemption request for return of Weston's full $5 million investment.  Thus, contrary to the government's argument, $2.6 million in margin loans from the Shahini shares were not used to repay a debt of Gary:  Gary no longer had any ownership interest in or control of the Pennine fund; and even if Gary had retained such an interest – which uncontradicted evidence established he did not – the government's argument that Gary *personally* benefitted from the

transfer of margin loans to Pennine ignores the undisputed fact of Pennine's independent corporate existence, separate and apart from Gary.  The obligation to repay Weston was an obligation of Pennine, not Gary, who owed no personal debt to Hallac.  The evidence at trial did not establish that Gary personally profited in any way, directly or indirectly, from the charged fraud.  Thus, even if personal gain were used as a substitute for loss, as to Gary that number would still be zero.

5.      *To the extent the Court measures the loss based on the value of the shares transferred, the value should be measured at $1.119 million.*

If the Court were to disagree that the loss amount is zero, and instead use the value of the shares transferred to Shahini as the actual loss amount (even though such value does not actually constitute "loss"), it should apply the fair market value of the shares – not, as the government improperly argued in its rebuttal summation, the $72 million face value of the Shahini shares.[9] *Cf.* U.S.S.G. § 2B1.1, application note 3(C)(i).  The fair market value of those shares was substantially less than the quoted share price at that time, for several reasons, including but not limited to the fact that the shares were subject to Reg S and therefore could not be sold domestically, and the fact that it would not have been possible (even absent the Reg S restriction) to sell all of the transferred shares into the market at even a fraction of the face value, given how thinly-traded Gerova's shares were at the time.

The actual fair market value of the transferred shares is capable of determination using the Black-Scholes model.  In preparation for trial, defense counsel engaged an expert from

---

[9]      *See* Tr. 1683:24-1684:3 ("You know what?  It's not $2.2 million anymore, ladies and gentlemen, it's over $73 million worth of stock – excuse me – I think over $72 million worth of stock.  If he wanted the 2.2 in, he surely would have wanted the 73 in."); Tr. 1693:25-1694:9 (objecting to above-quoted argument); Tr. 1696:2-15 (Court's instruction that attorneys' arguments are not evidence, even when attorneys "use shorthand language in the belief that you understand what they are referring to").

Berdon Accountants to prepare a Black-Scholes valuation analysis of the Shahini warrants.  That analysis, attached hereto as Exhibit C, determined that the fair market value of the Shahini warrants was $0.21 per share, for a total value of $1,119,999.93.  Applying that value, the loss amount enhancement would be 14 levels under U.S.S.G. § 2B1.1(b)(1)(H), for a total offense level of 21.

B.  Victim Enhancement

The PSR applied a 2-point enhancement for the offense involving 10 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).  *See* PSR ¶ 83.  That enhancement should not be attributed to Gary because, as discussed above, the number of victims affected by the investment advisor fraud was not part of the scope of any activity to which Gary agreed, nor was it relevant conduct on the part of co-conspirators that was foreseeable to Gary.  *See United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013) (court must make particularized findings as to each defendant with regard to relevant conduct under U.S.S.G. § 1B1.3 both for "collective loss amount" *and "total number of victims"* (emphasis added)).  Accordingly, the § 2B1.1(b)(2)(A)(i) does not apply to Gary.

C.  Abuse of a Position of Trust

The PSR applied an upward adjustment for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3.  *See* PSR ¶ 86.  The application notes to the Guideline state that such a position of trust is "characterized by professional or managerial discretion," U.S.S.G. § 3B1.3, application note 1, a description that would seem on its face to include the positions of president and Board chairman.  However, the Second Circuit has held that the enhancement for abuse of a position of trust does not apply to "*anyone* with 'professional or managerial discretion," rather, the "discretion must be entrusted to the defendant *by the victim*."  *United States v. Broderson*, 67

F.3d 452, 455-56 (2d Cir. 1995) (emphasis added).  Gary's positions as president and interim

chairman of Gerova's Board did not endow him with discretion entrusted by the victims, *i.e.*,

Gerova's shareholders, nor did he owe a duty of care to the shareholders as a result of holding

those positions.  *See* Tr. 130:6-8 (THE COURT:  "[A] director of a corporation under the laws of

most jurisdictions in the United States hold[s] no fiduciary duties to the shareholders."); *see also*

*Broderson*, 67 F.3d at 456 ("[E]very example of an abuse of trust in the Commentary

accompanying Section 3B1.3 . . . involves a victim entrusting an agent or employee with

discretion.").

In addition, the conduct that is the basis for the defendant's conviction cannot itself be the

basis for an enhancement for abuse of a position of trust.  Rather, "conduct that is the basis for

the conviction must be independently criminal . . . and not itself the abuse of trust."  *Broderson*,

67 F.3d at 456.  Here, the only evidence from which it could plausibly be argued that Gary

abused a position of trust was his failure, as president and Board chairman, to

contemporaneously inform the company's CFO and Board of Directors as to the complete details

relating to the exercise of the Warrant Agreement.  That conduct, however, constitutes the

material omission relied on by the government to form the basis of the charged crimes.

The government argued in its response to Gary's objections to the draft PSR that *United

States v. Ntshona*, 156 F.3d 318 (2d Cir. 1998), "clarified" *Broderson* in noting that "the abuse of

trust need not be entirely unrelated to the commission of the base offense."  Gov't Response to

Draft PSR, Exhibit B, at 5 (quoting *Ntshona*, 156 F.3d at 320)).  *Ntoshona* did not clarify,

however, *how* unrelated the abuse of trust must be in order for the enhancement to apply.

Rather, the Second Circuit simply expressed its agreement with two other circuits that had held,

specifically in the context of *doctors*, that the enhancement may be warranted for Medicare fraud

convictions. 156 F.3d at 321. That context depends on the particular nature of doctors' duties to their patients and the government's position as the victim of Medicare fraud. This case plainly does not fall within that narrow category, and thus the holding of *Broderson* and the language of the Guideline apply. Furthermore, even if *Broderson* has been abrogated to the extent that the government argues, the trial produced no evidence that Gary abused a position of trust based on a fiduciary duty to the victims. Thus, U.S.S.G. § 3B1.3 does not apply.

*       *       *

Given that the enhancements included in the PSR and urged by the government do not apply under either the Guidelines or Second Circuit precedent, Gary's offense level is determined solely by adding the loss amount to the base offense level. Thus, assuming a loss amount of zero, Gary's total offense level is 7, which, because Gary has no criminal history, yields a Guidelines range of 0-6 months (of which Gary has already served nearly two months). Alternatively, assuming *arguendo* a loss amount calculation based on the value of the shares transferred to Shahini of $1.119 million, the base offense level would be increased 14 levels to a total offense level of 21, yielding a Guidelines range of 37-46 months.

### III.    If the Entire Loss Amount Set Forth in the PSR Is Included, Imposition of a Guidelines Sentence Would Be Unreasonable

As demonstrated above, the loss properly attributable to Gary is zero. Even assuming a higher loss calculation – whether the value of the Shahini shares, $1.119 million, or the PSR's unsupported $26 million loss amount calculation – the Court should impose a lenient sentence because, as a general matter, the fraud Guidelines unduly emphasize loss amount and, to the extent their application would result in a loss amount calculation of greater than zero in this case, such application would result in a sentence significantly greater than necessary to achieve the purposes of sentencing.

A.    The Fraud Guidelines Unduly Emphasize Loss Amount Without Considering a
Defendant's Limited Role

As the Second Circuit has recognized, the Guidelines establish a "sentencing regime in

which the amount of loss caused by a fraud is a critical determinant in the length of a defendant's

sentence." *United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007).  Though the United

States Sentencing Commission has acknowledged that "loss . . . is a principal factor in

determining the offense level" in fraud cases, U.S.S.G. § 2B1.1 Background Commentary, it has

not "explain[ed] why it is appropriate to accord such huge weight" to the loss amount.  *United*

*States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citing Kate Stith & Jose Cabranes,

*Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)).  Moreover, "[e]ach of

the increases in the recommended Guideline ranges for fraud crimes was directed by Congress,

without the benefit of empirical study of actual fraud sentences by the Sentencing Commission."

*United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring); *see also*

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("The Guidelines . . . reflect

an ever more draconian approach to white collar crime, unsupported by any empirical data.").  In

fact, one recent study has found that "the data suggest that loss is an unsound measure of the

seriousness of many offenses."  Vera Inst. of Justice, *Drawn from Nowhere: A Review of the U.S.*

*Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g

Rep. 19, 19 (2013); *see also United States v. Mohammed*, 315 F. Supp. 2d 354, 357 (S.D.N.Y.

2003) ("[A]cross a wide range of diverse types of schemes and thefts, the amount of the loss . . .

may be a less accurate proxy for the seriousness of the offense.").  The fact that the fraud loss

Guidelines are not based on empirical data or any other clearly articulated rationale suggests that

a Guidelines sentence that is predominantly based on loss amount calculation is presumptively

unreasonable.  As the Supreme Court noted in *Kimbrough v. United States*, 552 U.S. 85 (2007),

where the Sentencing Commission is not "exercis[ing] its characteristic institutional role" by "tak[ing] account of 'empirical data and national experience,'" the Guidelines are much more likely to "yield[ ] a sentence 'greater than necessary to achieve § 3553(a)'s purposes.'"  *Id.* at 109-110 (citation omitted).

Consistent with these precepts, in a recent decision, the Second Circuit remanded for consideration of whether the "the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  In that case, the loss table increased one defendant's offense level from six to eighteen, as the court noted, "a three-fold increase," and the other from six to sixteen.  *Id.*  The Second Circuit noted, "the Commission could have approached monetary offense quite differently.  For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of the typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss."  *Id.*  The Commission's decision instead to choose a base offense level of 7 in this case means that the loss amount included in the PSR increases the offense level by *more than four times* to a level 29, ballooning the sentencing range from possible probation to 87-108 months.  The "unusualness" of such a circumstance is one, the Second Circuit held, "a sentencing court is entitled to consider" and the combination of the low base offense level with a significant increase based on a loss enhancement "entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

B.     A Guidelines Sentence is Not Necessary to Achieve the Purposes of Sentencing

As mentioned above, district courts have an "overarching duty" to determine a sentence that is "sufficient but not greater than necessary to achieve the purposes of sentencing."  *Pepper*,

552 U.S. at 493.  These purposes, set forth in § 3553(a)(2), include:  "[t]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct;" and "to protect the public from further crimes of the defendant."[10]  18 U.S.C. § 3553(a)(2). Here, for the reasons discussed below, a Guidelines sentence including loss amount would be significantly greater than necessary to achieve these purposes.

1.     *Seriousness of the Offense and Provision of Just Punishment*

While the defense does not dispute the seriousness of the overall fraud and the resulting harm to the investor-victims, a Guidelines calculation based on the losses suffered by investors as a result of the matching trading would significantly overstate the seriousness of Gary's role in that offense and violate the principle of "incremental immorality" that underlies the notion of just punishment under § 3553(a).  *United States v. Martinez-Rios*, 143 F.3d 562, 670-71 (2d Cir. 1998).  With respect to Gary alone, the evidence at trial at best establishes that he authorized the transfer of shares to a foreign nominee without contemporaneously providing all of the details relating to the transaction to Gerova's CFO and Board of Directors.  It bears emphasizing that Gary's authorization was subsequently not only disclosed to, but expressly reviewed and ratified by, Gerova's Board with the advice of outside counsel.  Thus, although there exists a causal link between Gary's conduct and the ultimate injury suffered by the victim-investors in this case, that link, while magnifying the applicable Guidelines range 28 times (at the top of the respective ranges), does not render Gary 28 times more culpable.

---

[10]     Section 3553(a)(2) also includes a fourth factor, the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D) (2012).

Numerous decisions in this and other circuits clearly support the conclusion that a Guidelines sentence is not warranted where, as here, application of the Guidelines significantly magnifies the sentence based on a loss amount that grossly overstates the defendant's actual role in the offense.   *See, e.g.*, *United States v. Williams*, 529 F. App'x 6, 9 & n.4 (2d Cir. 2013) (affirming district court's below-Guidelines sentence where, "inasmuch as the intended loss amount generated a 30-level increase in [the defendant's] offense level, . . . it 'substantially overstated' the seriousness of the offense"); *United States v. Levenson*, 314 F. App'x 347, 349-50 (2d Cir. 2008) (affirming below-Guidelines sentence where "loss amount of $40 million overstated the seriousness of Levenson's role in the offense" (internal quotation marks and alteration omitted); *United States v. Mohan*, 62 F. App'x 372, 373 (2d Cir. 2003) (affirming downward departure in a bank fraud cause "on the ground that the intended loss amount . . . overstated [the defendant's] culpability"); *United States v. Stuart*, 22 F.3d 76, 83 (3d Cir. 1994) ("Where the application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward.").  In addition, loss amount is a poor metric for providing just punishment, since "the amount of loss that actually winds up resulting from a person's conduct can be arbitrary and can result from any number of factors in the market." *Smirlock v. United States*, No. 04-cv-9670 (GEL), 2005 WL 975875, at *2 (S.D.N.Y. Apr. 25, 2005) (Lynch, J.); *accord Cavera*, 550 F.3d at 192 (acknowledging that there may be a "wide variety of culpability" among defendants with the same loss amount).  Thus, a Guidelines sentence is inappropriate here, as it substantially overstates Gary's culpability and fails to provide for just punishment.

    3.    *Deterrence of Future Criminal Conduct and Promotion of Respect for the Law*

A Guidelines sentence is also not necessary to deter future criminal conduct and promote respect for the law.  Prior to his conviction in this case, which is based on conduct that occurred when Gary was in his late 50's, Gary's life was marked by an unbroken chain of lawful, successful business endeavors, productive activity, and support of family and community.  It was not until he met Jason that Gary became involved in anything closely resembling the conduct at issue in this case or the second case in which Gary is indicted based on alleged facilitation of another of Jason's schemes.  *See United States v. Galanis*, No. 16-cr-371 (RA) (S.D.N.Y.).  ██

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████  While the dysfunction of Gary's relationship to Jason is no excuse for criminal conduct, its unique quality and power means that there is little to no risk that Gary will re-engage in criminal conduct in the future: Jason has been sentenced to a lengthy prison term and will therefore be incapacitated from involving Gary in any further criminal behavior.  Thus, in this case and given the particular history and characteristics of Gary over the entire course of his lifetime,– a Guidelines sentence is manifestly unnecessary to deter future criminal conduct or promote respect for the law.  *See*

*United States v. Khalid*, No. 09-cr-734 (JBW), 2011 WL 6967933, at *2 (E.D.N.Y. Dec. 13, 2011) (imposing a below-Guidelines sentence where defendant's conduct is "out-of-keeping with [the defendant's] otherwise law-abiding and responsible life"); *United States v. Toback*, No. 01-cr-410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) (same).

### IV.    Imposition of a Lenient Sentence is Appropriate

As noted above, in addition to the sentence suggested by the Guidelines and the purposes of sentencing, § 3553(a) also directs courts to consider several other factors, including the "nature and circumstances of the offense" and the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).  Indeed, the Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'"  *Pepper*, 562 U.S. at 487-88 (citations omitted) (alterations in original).  For reasons discussed below, both of these factors indicate that a lenient sentence – whether consistent with the Court's calculation of the Guidelines based on a loss amount of zero or imposed as a below-Guidelines sentence – is appropriate here.

First, the circumstances surrounding Gary's conviction distinguish it from other financial fraud offenses in a manner that renders a lenient sentence appropriate.  This case, unlike other securities fraud cases, did not involve a Ponzi scheme.  The architect of a Ponzi scheme intends, from the beginning, to steal money from his investors in order to generate profits and create the appearance of solvency.  Thus, a Ponzi scheme is clearly distinguishable from a business enterprise that, like the business here, was not established for the purpose of perpetrating fraud and has been solvent throughout its existence.  Courts have recognized this distinction and, as such, have imposed below-Guidelines sentences when, though a defendant engaged in fraud, his

business was otherwise legitimate.  *See United States v. Ovid*, No. 09-cr-216 (JG), 2010 WL 3940724, at *3 (E.D.N.Y. Oct. 1, 2010) (imposing a below-Guidelines sentence in part because defendant's business "was not . . . started as a fraud" and "was started with the best of intentions"); *Toback*, 2005 WL 992004, at *2 (imposing below-Guidelines sentence where defendant "developed [his] business into a thriving company with significant sales, a substantial workforce . . . , and a strong positive reputation within the community and among its customers").  Here, Gerova was a legitimate business established for the purpose of acquiring operating companies.  In contrast to a Ponzi scheme which, by definition, is never solvent, Gerova had real value and significant potential for increased value had the F-1 Registration Statement been filed and the shares registered for free trading.  Though others involved in the charged scheme may have had the intent to obtain money or property from Gerova's shareholders, Gary had no such intent.  Rather, he hoped to build Gerova into a solid investment vehicle that would generate strong returns for the shareholders, and with the result that his own shares (all of which he still holds to this day) would become more valuable.[11]

Second, Gary's actions were not motivated by a desire for personal gain.  As discussed above, he did not receive any profits from the sale of Shahini shares.  Nor did he reap any benefits from the substantial number of Gerova shares he purchased for cash and never made any effort to sell.[12] ████████████████████████████

---

[11]    Indeed, the government's decision to treat as witnesses other officers and directors of Gerova who were closely involved in the company's business – and who ratified the issuance of the Shahini shares in October 2010 – suggests its belief that Gerova was a legitimate business.

[12]    Unlike his co-defendants, Gary lives a modest lifestyle, living in a guest bedroom of his daughter's house in Lake Mary, Florida, and driving a 2007 Ford Expedition with a value of $5,000.

███████████████████████ Thus, unlike a criminal defendant in a fraud case who is motivated by greed, a below-Guidelines sentence is appropriate. *See* Sentencing Tr.21:22-22:1, *United States v. Collins*, No. 07-cr-1170 (LAP) (S.D.N.Y. Oct. 17, 2013), ECF No. 244 (noting that the defendant  "did not receive or even attempt to receive any profit from the fraud" and "[h]is lack of any intended or actual personal gain distinguishes him from the other . . . defendants [in his case] and from most other white collar offenders in this district," and thus finding that a below-Guidelines sentence was appropriate); *see also United States v. Thavaraja*, 740 F.3d 253, 260 (2d Cir. 2014) (affirming below-Guidelines sentence where defendant "was not motivated by 'power' or 'self-aggrandizement'"); *United States v. Connors*, No. 06-cr-189 (JRP), No. 2007 WL 29655612, at *4 (E.D. Pa. Oct. 9, 2007) (noting that "motivation is clearly a circumstance of [an] offense since it can both motivate and aggravate culpability" and finding that a defendant's "lack of greed" was a relevant consideration under the § 3553(a) factors).

Gary's personal history and characteristics support a lenient sentence.  As described above, Gary's commitment to his family is deep and passionate.  *See Toback*, 2005 WL 992004, at *5 (imposing a below-Guidelines sentence when "letters from [the defendant's] family, colleagues and friends speak to his outstanding and reliable character, his devotion to his family and his dedication to his business"); *United States v. Gorodetsky*, 288 F.R.D. 248, 248 (E.D.N.Y. 2013) (imposing below-Guidelines sentence where defendant is "married with three children" and "plays an active, positive role in [his] community"); *United States v. Butler*, No. 08-cr-370, 2011 WL 4073672, at *4 (E.D.N.Y. Sept. 13, 2011) (declining to reconsider a below-Guidelines sentence where the "defendant was 'supported by . . . family and friends, and a wife and child, who have attested to his good character in written submissions to the court'"), *aff'd*, 501 F.

App'x 8 (2d Cir. 2012).  He was a devoted husband (he and his wife amicably divorced and maintain a friendship) and an active father.  ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████  This was an excruciating experience for both Tracey and Gary.  Notably, the preparation for the surgery and the operation itself occurred during the relevant time period of the Indictment, causing Gary to be largely focused on his family rather than his business activities at Gerova.  Indeed, in 2011, Gary left Gerova to care for Tracey fulltime.  He continues to be a devoted father, living with his daughter and staying in close touch with his son Robert, who lives in California.

Gary's support and dedication are not limited to those in his family; they also extend to those in the community and all those who have worked with or for him.  Two acquaintances who know Gary through business endeavors speak of his kindness, his altruism, and his genuine care for other people.  Letter of Gerald D. Anderton; Letter of Burt Kozloff, Exhibit G.  As Burt Kozloff states, "There is nothing heroic here – no epic sacrifices, no grand gestures, no earth-shaking remedies for the ills of mankind.  What there is, and has been, is a consistent and fair charity of spirit that he applies to all his relationships, and for which he has long been known for by his associates, colleagues, family and friends."  Kozloff Letter, at 2.

In addition, Gary has a long record of dedication to lawful business endeavors prior to meeting Jason and becoming involved with Gerova.  *See Khalid*, 2011 WL 6967993, at *2

(imposing below-Guidelines sentence where defendant "owns several businesses . . . and employs over a dozen people"). Until his conviction in this case, Gary had for years run a successful insurance company, Insurance Company of the Americas ("ICA"). ICA provided workman's compensation insurance for workers injured on the job. In addition to being in the business of providing such insurance, Gary personally visited injured insureds to determine that they were receiving the care they needed, including personally flying an injured worker to see a specialist physician in another part of the country. Prior to his work with ICA, Gary ran a successful futures trading and investment business. He also managed engineering design for animatronic robots (similar to those in Disney theme parks) for pizza restaurants, and designed simulators for the United States Navy. He holds degrees in law and medicine and practiced medicine briefly in the 1990's. In short, prior to his association with Jason and the instant offense, Gary had a long background of legitimate employment and lawful business endeavors.

        Besides his business endeavors, Gary has contributed time, effort, and financial support to various charitable causes. Most notably, he provided the initial seed money – an investment of $250,000 – in a scientific project that analyzes the genomes of supercentenarians (individuals who have lived past age 110) to investigate ways to prevent disease and increase life expectancy. Beyond his financial investment, Gary put substantial work into the project, spending several months traveling to collect blood samples. In addition, Gary has donated money to the International Red Cross and supported various local concerns, including hurricane relief in the Caribbean, support for a church damaged in Hurricane Katrina, and providing support to a homeless shelter in Arizona. Gary also finds ways to help employees and business associates, paying for emergency expenses and assisting with mortgage payments and children's tuition. Gary has fostered several injured animals, ensuring that they receive veterinary care and finding

them homes.  This record of "public service and good works" warrants a lenient sentence.

*United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2013)); *see also United States v. Shuster*,

331 F.3d 294, 296 (2d Cir. 2003) (affirming downward departure based on, among other factors,

the defendant's charitable works); Sentencing Tr. 22:25 – 23:2, *Collins*, ECF No. 244 (imposing

below-Guidelines sentence where defendant "worked for his church, his family, his schools, and

numerous other deserving organizations that work to better individuals' lives for decades");

*Gupta*, 904 F. Supp. 2d at 353 (imposing below-Guidelines sentence where defendant "devoted a

huge amount of time and effort to a very wide variety of socially beneficial activities");

Sentencing Tr., *United States v. Holzer*, 09-cr-470 (VM) (S.D.N.Y. Oct. 28, 2009); ECF Nos. 26

& 28 (citing defendant's "community service and his pro bono work with various not-for-profit

organizations" as reasons for imposing a sentence of five years' probation).

██████████████████████████████████████████████████████

████████████████████████████████████████████

A lenient sentence will suffice to achieve the purposes of punishment, taking into account the nature and circumstances of the offense and Gary's history and characteristics.

### V.      The Court Should Avoid Unwarranted Sentencing Disparity

The Court may also consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6), *see United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009), and in so doing, should impose on Gary a sentence well below that of his co-defendants.  *See* Government Sentencing Memorandum re: John Galanis 17-18, (Feb. 10, 2017) ECF No. 379 (noting that John Galanis "is a thrice-convicted securities fraudster" who was "responsible for orchestrating the depositing and subsequent sales of the Shahini shares . . . and providing the matched trading instructions to Hamels and Tagliaferri" and "used his share of those funds to live full-time in a luxury hotel suite and to pay for extravagances like expensive cars and jewelry"); Government Sentencing Memorandum re: Derek Galanis, 12-13, (Feb. 9, 2017) ECF No. 377  (noting that Derek Galanis played an "integral" and "ongoing" role in the offense, was "driven by greed and a callous disregard for others," and already served a seven year sentence for a federal narcotics offense).

## **CONCLUSION**

For the reasons set forth above, we respectfully request that the court impose a lenient sentence, which will be sufficient but not greater than necessary to achieve the purposes of sentencing set forth in § 3553(a).

Respectfully submitted,

/s/Michael Tremonte
Michael Tremonte
Justine A. Harris
Noam Biale
Emily Burgess
SHER TREMONTE LLP
80 Broad Street, 13th Floor
New York, NY 10004
Phone: (212) 202-2600
Fax: (212) 202-4156
Email: mtremonte@shertremonte.com

*Attorneys for Gary Hirst*

# Exhibit A

# SHER TREMONTE LLP

February 12, 2017

**BY EMAIL**

Probation Officer Johnny Y. Kim
United States Probation Office
Southern District of New York
500 Pearl Street
New York, New York 10279

> Re:   ***United States v. Gary Hirst***
>        Case No. 15 Cr. 643 (PKC)

Dear Officer Kim:

We write on behalf of our client, Gary Hirst, to propose certain objections and modifications to the draft Presentence Investigation Report (the "PSR"). We respectfully urge you to amend the PSR as follows:

- In paragraph 11, please note that sentencing has now been adjourned to March 17, 2017.

- We object to paragraph 21 insofar as it states that "the defendants reaped approximately $20 million in profits." The evidence at trial did not establish that Mr. Hirst obtained *any* profit from the charged scheme, let alone $20 million.

- We object to paragraph 27, because Mr. Hirst was not president and chairman of Gerova's board of directors during the entire period covered by the Indictment. We also object to the statement "HIRST served as an advisor to other companies affiliated with JASON GALANIS," because it is vague and unsupported by evidence presented at trial.

- We object to paragraph 40 insofar as it states that Mr. Hirst was an "indirect controlling shareholder[ ] of Rineon Group" and that "Rineon was Gerova's largest shareholder." No evidence was presented at trial to establish that Mr. Hirst was an indirect controlling shareholder of Rineon. Public filings establish that an entity managed by Mr. Hirst held less than 5% of the outstanding shares of Rineon. Further, it is inaccurate that Rineon was Gerova's largest shareholder: Following the DeSPAC in January 2010, the

Johnny Y. Kim
February 12, 2017
Page 2

Stillwater Funds and Wimbledon Funds both held substantially greater positions in Gerova than Rineon.

- We object to paragraph 41 insofar as it suggests that in the spring of 2010, Derek Galanis introduced Ymer Shahini to Jason Galanis.  To the contrary, the evidence presented at trial established that Shahini and Jason Galanis were business associates for years before 2010, including Shahini owning 2,250,000 shares in a Galanis-controlled entity called Fund.com (in which Mr. Hirst had no involvement), representing a 5.7% stake in that company.

- We object to paragraph 42 insofar as it states that Mr. Hirst "drafted several agreements to support the fraudulent issuances of shares to SHAHINI."  The paragraph goes on to describe the January 22, 2010 Consulting Agreement; however, the evidence at trial did not establish that Mr. Hirst drafted, signed, or indeed was aware of the Consulting Agreement at the time it was executed. The paragraph does not specify what other agreements are included in the "several agreements" it references, but with respect to the March 29, 2010 Warrant Agreement, later described in paragraph 44, no evidence was presented at trial to indicate that Mr. Hirst drafted that agreement.

- We object to paragraph 43 insofar as it states that the Consulting Agreement was prepared in May 2010 and backdated to January 22, 2010.  The evidence at trial did not establish that Mr. Hirst created or had any involvement whatsoever with the Consulting Agreement.  Further, the government's witness, Michael Hlavsa, testified that Marshall Manley, who left the company in April 2010, signed the document.

- We object to paragraph 44 insofar as it suggests that Mr. Hirst backdated the Warrant Agreement.  The evidence at trial established that Mr. Hirst signed the document, but did not establish that it was backdated.  To the contrary, two experts testified that metadata associated with the document indicated that it was created shortly after the date of signing and neither expert found any evidence that the metadata associated with the document had been altered in any way.

- We object to paragraph 45 insofar as it states that Mr. Hirst knew that "John Galanis arranged for Attorney-1 to represent SHAHINI and to write an opinion letter to Gerova's Transfer Agent."  There was no evidence introduced at trial to indicate that Mr. Hirst ever had any knowledge of John Galanis's involvement in any transaction.

- We object to paragraph 46 on two grounds:  First, the evidence at trial did not establish that the 5.3 million shares transferred to Shahini represented "approximately half of Gerova's public float."  To the contrary, the evidence

Johnny Y. Kim
February 12, 2017
Page 3

at trial established that the shares were restricted under Regulation S ("Reg-S"), and therefore could not be sold on the domestic public market.  Second, as a result of this Reg-S restriction, the real, market value of the shares was significantly less than that $72 million face value.  No evidence whatsoever was presented at trial as to the market value of the Shahini shares.

- We object to paragraph 47 insofar as it states that "it was nearly impossible that SHAHINI would receive the exact number of shares the former CEO had just returned to the company."  The paragraph provides no basis for that conclusion, and no evidence whatsoever was presented at trial to establish the statistical likelihood or unlikelihood that the two transactions, each of which was based on a mathematical formula, would yield the same number of shares, namely 5.3 million.  The government presented *argument* that the number of shares received by Shahini and returned by Marshall Manley were coincidentally the same, but did not attempt to establish through any competent evidence that such coincidence was "nearly impossible" or in any way indicative of a criminal scheme.

- We object to paragraph 48 insofar as it states that Mr. Hirst failed to disclose to the Board of Directors that (1) the shares issued to Shahini represented "nearly half of the entire [shares] issued," and (2) that they were "unrestricted," for the same reasons discussed above with respect to paragraph 46.  In addition, public filings show that 133,400,000 shares were issued and outstanding at the time that shares were issued to Shahini, most of which were owned by Stillwater.  Thus, Mr. Hirst would have no reason to disclose such facts to the Board, because they were untrue.  Further, we object to the paragraph's statement that Mr. Hirst failed to disclose that Shahini had sold 1.6 million shares as of October 6, 2010.  The evidence at trial did not establish – indeed, *no evidence was put on to attempt to establish* – that Mr. Hirst knew of any sales of stock by Shahini or proceeds derived therefrom as of that date.

- We object to paragraph 49 insofar as it characterizes the Shahini shares as "unrestricted," for the reasons described above.

- We object to paragraph 52 in that it states that Shahini wired funds to Mr. Hirst; the evidence at trial did not establish that any funds were transferred to Mr. Hirst personally, nor that he ultimately received any profits derived from the Shahini shares.

- We object to paragraph 64 insofar as it states that $2.62 million in Shahini "stock sale proceeds" were transferred "to a corporation controlled by HIRST."  The evidence at trial did not establish that the corporation that

Johnny Y. Kim
February 12, 2017
Page 4

received these funds (which were in fact margin loan funds, not stock sale proceeds) was controlled at that time by Mr. Hirst.

- We object to paragraph 70, because there is no basis in the evidence presented at trial for attributing to Mr. Hirst a loss amount between $25 million and $65 million.

As an initial matter, it is not clear from the draft PSR how that loss range was calculated. To the extent, however, that it is based on losses suffered by investors who were victims of the investment adviser fraud perpetrated by Jason Galanis, Gavin Hamels, and others, such losses cannot be attributable to Mr. Hirst because they were neither reasonably foreseeable to him nor within the scope of any jointly undertaken criminal activity in which he agreed to participate. *See* U.S.S.G. § 1B1.3(a)(1)(B)(i), (iii). As the Second Circuit has long held, and as the 2015 amendments to the Sentencing Guidelines made clear, "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy," and hence the court must "determine the scope of the criminal activity *the particular defendant* agreed to jointly undertake." *Id.* application note 3 (emphasis added); *see United States v. Capri*, 111 F. App'x 32, 36 (2d Cir. 2004) (the "district court must make a particularized finding of the scope of the criminal activity agreed upon by the defendant," and cannot simply "lump[ ] [one defendant] together with . . . the other defendant[s] in finding him responsible" for the criminal scheme (internal quotation marks omitted)); *see also United States v. Platt*, 608 F. App'x 22, 31 (2d Cir. 2015); *United States v. Studley*, 47 F.3d 569, 575-76 (2d Cir. 1995).

Here, the jury's verdict *at most* established that Mr. Hirst agreed with Jason Galanis to transfer stock into the possession of Shahini, knowing that such stock would ultimately be controlled in part by Jason Galanis, and that he failed to timely alert Gerova's CFO and Board of Directors as to the magnitude of the stock transfer at the time it was completed. No evidence was presented to suggest that Mr. Hirst agreed to undertake the investment adviser fraud or that such fraud was reasonably foreseeable to him. To the contrary, Gavin Hamels testified that Jason Galanis floated the idea of the investment adviser fraud after the stock transfer to Shahini was complete, *see* Trial Tr. 850:1-20, and that Hamels never met or discussed the scheme with Mr. Hirst, *id.* 858:8-9.

Even assuming that the jury found a single conspiracy, as opposed to multiple conspiracies, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (internal quotation marks omitted). Even if the

Johnny Y. Kim
February 12, 2017
Page 5

evidence at trial established that Mr. Hirst had knowledge of the investment adviser fraud, which it did not, such knowledge "does not make a defendant criminally responsible" for purposes of sentencing where "the participants worked independently and did not 'pool their profits and resources.'" *Platt*, 608 F. App'x at 31 (quoting *Studley*, 47 F.3d at 575). Thus, under the Guidelines and well-established Second Circuit caselaw, the losses to victims of the investment adviser fraud cannot be attributed to Mr. Hirst.[1]  Rather, given that the evidence at trial established that the extent of Mr. Hirst's relevant conduct was limited to conspiring with Jason Galanis to transfer shares to Shahini without informing Gerova's CFO, the loss particularly attributable to Mr. Hirst is zero, whether calculated as actual or intended loss.[2]

- We object to paragraphs 72, 73 and 74 insofar as they state that Mr. Hirst "intentionally engaged in or caused the conduct constituting sophisticated means."  Paragraph 72 describes various actions taken by *Jason Galanis* that constitute sophisticated means.  But the 2015 amendments to the Guidelines make clear that sophisticated means must be determined based on the defendant's *own* conduct, rather than the sophistication of the overall scheme. *See* 2015 Guidelines Amendments at 25.  Accordingly, the enhancement cannot be applied to Mr. Hirst based on the actions of Jason Galanis.

  Similarly, paragraph 73 principally describes actions taken by John Galanis that constitute sophisticated means.  Under the Guidelines, such actions cannot be attributed to Mr. Hirst for purposes of applying the enhancement. The only mention of Mr. Hirst in paragraph 73 is its statement that John Galanis "had HIRST contact and write a letter to an attorney with whom JOHN GALANIS had a longtime relationship."  There was no evidence presented at trial, however, to establish that Mr. Hirst had any contact or involvement with John Galanis.

  Finally, paragraph 74, which purports to describe actions taken by Mr. Hirst constituting sophisticated means is objectionable because its assertions are not supported by the evidence presented at trial.  First, as discussed above, the evidence at trial did not establish that Mr. Hirst signed the Consulting Agreement; the evidence established instead that Marshall Manley signed it.

---

[1]     Nor can the loss amount under § 2B1.1 be calculated based on the value lost in Gerova stock from its peak to its bankruptcy filing in 2012, since multiple intervening circumstances, most notably the actions of David Bergstein, who has been charged in a separate indictment, caused the stock to become valueless.

[2]     The Probation Office should not attempt to use gain as an alternative measure because gain may used "only if there *is* a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, application note 3(B) (emphasis added).

Johnny Y. Kim
February 12, 2017
Page 6

Second, although Mr. Hirst did sign the Warrant Agreement, the evidence at trial did not establish that he did so knowing that this agreement was intended "to further a stock fraud scheme involving the shares of Gerova and to conceal HIRST's participation therein." Indeed, it is nonsensical that Mr. Hirst would *attempt to conceal his participation by signing his name* to the document. Third, as discussed above, the evidence at trial did not establish that Mr. Hirst backdated any document. Fourth, there was *no* evidence adduced at trial even to suggest that Mr. Hirst "oversaw the transfer of Rineon stock to clients associated with Tagliaferri." Fifth, the evidence at trial did not establish that Mr. Hirst received any ill-gotten gains from "SHAHINI's Bank Accounts." Sixth, even if Mr. Hirst received funds from a Shahini bank account, which he did not, no evidence was presented at trial to suggest that Mr. Hirst was under an obligation "to notify Gerova's board of directors of his receipt of these funds."

At most, the evidence at trial established that Mr. Hirst signed the Warrant Agreement, sent a letter in accordance with the contractual obligations imposed on the company by that agreement to a stock transfer company authorizing the issuance of shares to Shahini, and he did not timely inform Gerova's CFO of the issuance of the shares. Such actions are not "especially complex or especially intricate" to trigger the sophisticated means enhancement. U.S.S.G. § 2B1.1, application note 9(B).

- We object to paragraph 75 on the grounds that, as discussed in our objection to paragraph 70, losses suffered by victims of the investment adviser fraud are not properly attributable to Mr. Hirst under U.S.S.G. § 1B1.3.

- We object to paragraph 77 insofar as it suggests that Houlihan Smith & Company, Inc. prepared a valuation of the Stillwater assets. Houlihan Smith was retained by Stillwater to render a *fairness opinion* for redeeming Stillwater shareholders as to the transaction with Gerova, which *assumed* the values of Stillwater's assets *that were provided by Stillwater*. Houlihan Smith never conducted a valuation of Stillwater's assets – indeed, as Jack Doueck testified at trial, *no one* ever completed a final, verified, unqualified audit of Stillwater's assets. *See* Trial Tr. 99:2-4.

- We object to paragraph 78 insofar as it states that "Stillwater never received Gerova stock as promised in their agreement," because public records show that 90,475,001 shares were issued in the name of the Stillwater funds, and were held in escrow by Hodgson Russ. The final transfer of stock was contingent on Stillwater receiving a final, unqualified audit, which, as mentioned above, it never did.

Johnny Y. Kim
February 12, 2017
Page 7

- We object to paragraph 85 for the same reasons as stated in our objection to paragraph 70.

- We object to paragraph 87 for the same reasons discussed with respect to paragraphs 72, 73, and 74, and based on the multiple factual assertions contained in paragraph 87 that are not supported by the trial record, including: (1) As mentioned above, no evidence was adduced at trial to establish that Mr. Hirst had any awareness of John Galanis's involvement in Gerova; (2) the evidence at trial established that Jason Galanis had a five-year *officer or director bar*; he was not barred by the SEC "from trading or benefitting in securities trades"; (3) as mentioned above, the evidence at trial did not establish that Mr. Hirst backdated documents; (4) the evidence at trial established that Mr. Hirst *did* notify Gerova's Board of Directors of the Shahini stock transfer and the Board ratified it; (5) the evidence at trial established that the Gerova Board was aware of Shahini's "relationship to the Galanis family"; (6) as mentioned above, no evidence was introduced at trial concerning Mr. Hirst's ever having any awareness of or any contact with John Galanis; (7) no evidence was presented at trial to establish that Mr. Hirst "assisted in coordinating the activities in the brokerage accounts controlled by John and Jason Galanis."  Accordingly, we object to the imposition of a sophisticated means enhancement that is neither legally nor factually supported.

- We object to paragraph 89 insofar as it states that Mr. Hirst abused a position of trust.  First, several of the factual assertions in the paragraph are not supported by the trial evidence, as described above.

  Second, the Second Circuit has held that the enhancement of for abuse of a position of trust does not apply to "anyone with 'professional or managerial discretion," rather, the "discretion must be entrusted to the defendant *by the victim*."  *United States v. Broderson*, 67 F.3d 452, 454-55 (2d Cir. 1995) (emphasis added).  Mr. Hirst's positions as president and interim chairman of Gerova's Board did not endow him with discretion entrusted by the victims, *i.e.*, Gerova's shareholders, nor did he owe a duty of care to the shareholders as a result of holding those positions.  *See* Trial Tr. 130:6-8 (THE COURT: "[A] director of a corporation under the laws of most jurisdictions in the United States hold[s] no fiduciary duties to the shareholders.").

  Third, the conduct that is the basis for the defendant's conviction cannot itself be the basis for an enhancement for abuse of a position of trust.  Rather, "conduct that is the basis for the conviction must be independently criminal . . . and not itself the abuse of trust."  *Id.* at 56.  Here, paragraph 89 states that Mr. Hirst abused of a position of trust "by failing to properly oversee the company's business dealings and transactions."  But the only

Johnny Y. Kim
February 12, 2017
Page 8

arguable such failure adduced at trial was Mr. Hirst's failure to timely inform the company's CFO and Board of Directors of the magnitude of the issuance of stock to Shahini at the time it was issued.  That conduct, however, constitutes the material omission relied on by the government to form the basis of the charged crimes.  Accordingly, the conduct that paragraph 89 identifies as the abuse of a position of trust is not independent of the charged crime.  For that reason, and the other reasons foregoing, an enhancement under U.S.S.G. § 3B1.3 does not apply.

- We object to paragraph 90's application of an enhancement for obstruction of justice under U.S.S.G. § 3C1.3, but we understand from discussions with you that this enhancement will not be applied.

- In paragraph 113, we respectfully request that the last sentence be replaced with the following sentence (or that the following sentence be added):  "The defendant also noted that his wrist injury makes it very difficult for him to write, but he has no difficulty using a keyboard."

- In paragraph 114, we respectfully request that you add the following medical conditions:  Memory loss; pernicious anemia; hypothyroidism; dementia; possible Alzheimer's disease.  We respectfully request that you add the following treatments:  Cyanocobalamin 1000 mcg intra-muscular injection weekly; Donepezil 5 mg tablet daily.

- In paragraph 117, we respectfully request that the third and fourth sentences be replaced with the following:  "As an adult, he drinks daily at night in an effort to self-medicate.  The Defendant indicated since 2011, he has become dependent upon Valium and alcohol consumption to sleep.  The defendant is currently undergoing counseling to help him cope with his dependency on these substances."

- In paragraph 124, we respectfully request that you replace the second sentence with the following:  "During the 1980s, he did electronic engineering and design of animatronic shows, like at Disney theme parks, including the shows at Chuck E. Cheese's and ShowBiz Pizza Place, and he also designed simulators for the United States Navy, including the Boilerfront Watchstation Simulator for the aircraft carrier USS Saratoga (CV-60)."

- In paragraph 133, please note that the Deposit Account at UBS Financial Services was closed in December 2016.  Please note that the Shell Credit Card account was closed in December 2016.

- We object to paragraph 135 because, as discussed above, other than being a small, non-controlling shareholder, he does not have an "affiliation" with

Johnny Y. Kim
February 12, 2017
Page 9

Rineon and, moreover, no evidence was presented at trial to establish that he transferred shares of Rineon to Tagliaferri's clients or had any knowledge that Tagliafferi was doing so.

- With respect to paragraph 137, Mr. Hirst did not provide information about the assets of the Sestertia 2006 Irrevocable Trust because he does not know the value of the assets that the trust currently has.

- With respect to paragraph 142, we have now provided you with the last three years of Mr. Hirst's federal tax returns.

Sincerely,


 /s/
Michael Tremonte
Justine A. Harris
Noam Biale

*Attorneys for Gary Hirst*


cc:     AUSAs Aimee Hector, Brian Blais, Rebecca Mermelstein (by email)

# SHER TREMONTE LLP

February 22, 2017

**BY EMAIL**

Probation Officer Johnny Y. Kim
United States Probation Office
Southern District of New York
500 Pearl Street
New York, New York 10007

          **Re:**    ***United States v. Gary Hirst***
                 Case No. 15 Cr. 643 (PKC)

Dear Officer Kim:

      We write on behalf of our client, Gary Hirst, with one supplemental objection to the draft PSR:

- We object to paragraph 86, insofar as it applies an enhancement based on the offense involving ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).  For the same reasons stated in our objection to paragraph 70 in our letter dated February 12, 2017, the number of victims affected by the investment advisor fraud was not part of the scope of any activity to which Mr. Hirst agreed, nor was it relevant conduct on the part of co-conspirators that was foreseeable to Mr. Hirst.  *See United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013) (court must make particularized findings as to each defendant with regard to relevant conduct under U.S.S.G. § 1B1.3 both for "collective loss amount" and "total number of victims").  Accordingly, the § 2B1.1(b)(2)(A)(i) does not apply to Mr. Hirst.

                        Sincerely,

                        /s/_____
                        Michael Tremonte
                        Justine A. Harris
                        Noam Biale

                        *Attorneys for Gary Hirst*

cc:     AUSAs Aimee Hector, Brian Blais, Rebecca Mermelstein (by email)

# Exhibit B

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 16, 2017

Probation Officer Johnny Y. Kim
United States Probation Office
Southern District of New York
500 Pearl Street
New York, New York 10279

Re: *United States v. Gary Hirst* - **15 Cr. 643 (PKC)**

Dear Mr. Kim:

The Government provides the following responses to the PSR objections lodged by Gary Hirst:

- The Government does not object to changing the sentencing date reflected in paragraph 11

- The Government objects to Hirst's proposed deletion in paragraph 21. The evidence at trial did establish that the defendants, collectively, obtained approximately $20 million from the sale of shares issued to Ymer Shahini, so there is nothing factually inaccurate about the sentence as currently presented. Further, the Government disputes Hirst's contention that he received no profit from the scheme; the evidence at trial established that an entity controlled by Hirst received approximately $2.6 million of the Shahini sale proceeds, which was used pay a debt owed by that entity to a third party.

- The Government has no objection to changing paragraph 27 to read "For portions of the relevant time period, GARY HIRST was the president of Gerova and the chairman of Gerova's board of directors." Although the Government believes that the second sentence of paragraph 27 is factually accurate, as Hirst and Jason Galanis have a long history of business dealings together, the Government does not object to deleting that sentence because there was limited evidence at trial about these other business dealings.

- The Government has no objection to deleting the reference, in paragraph 40, to Hirst as one of the indirect controlling shareholders of Rineon. The Government does object to deleting the statement that Rineon was the largest shareholder of Gerova. Although Stillwater and Wimbledon were slated to receive a substantial number of shares in Gerova, those shares appear never to have been received by Stillwater or Wimbledon. *See* Trial Transcript ("Tr.") 119 (testimony of Jack Doueck of Stillwater) ("Q. At any time from the time that you entered into this deal until Gerova stock was removed from the stock exchange, did the shares belonging to the Stillwater investors ever become publicly

tradeable? A. No.  Q. Was there ever a time when you could have sold them?  A. No. There was never a time that we even got them. Q. You never even received them?  A. No.").

- The Government has no objection to deleting the following sentence in paragraph 41: "Without knowledge of the scheme, DEREK GALANIS introduced YMER SHAHINI to JASON GALANIS."  If that deletion is accepted, the Government would propose altering the next sentence to read: "On May 22, 2010, DEREK GALANIS emailed YMER SHAHINI, with whom he was previously acquainted, in which he wrote…"

- The Government has no objection to deleting Hirst's name from the first sentence of paragraph 42.  Because the Government has limited evidence as to who actually drafted the sham agreements, the Government would suggest altering that sentence to read, "After SHAHINI agreed to participate in the scheme, JASON GALANIS caused the drafting of several agreements . . . ."

- The evidence at trial actually suggests that the sham consulting agreement was drafted and signed in June 2010.  (Tr. 1563-64 (Government's summary of the evidence establishing that the consulting agreement was signed in June)).  Although Hlavsa testified that Manley told him that he signed the consulting agreement, Manley himself testified otherwise.  (Tr. 266-67 ("Q. Is that your signature? A. No.  Q. Did you sign this document?  A. No.  Q. Why do you believe that's not your signature?  A. Well, one, because it isn't; two, because I never saw this document until the government showed it to me; and three, I had never heard of Ymer Shahini; and, four, I never did business with anybody from the Czech Republic.")).

- Paragraph 44 as drafted does not suggest that Hirst backdated the warrant agreement; it only states that the warrant agreement was backdated.  The Government's position is that the warrant agreement was signed by Shahini at the same time in June 2010 that he signed the consulting agreement.   (Tr. 1563-64 (Government's summary of the evidence establishing that the consulting agreement was signed in June)).   The Government established at trial, through testimony of its expert and through cross-examination of the defense's expert, that the metadata regarding creation dates was easily manipulable.  The Government argued that the strongest inference, given all of the other evidence pointing to the backdating of this document (including that Shahini was not recruited into the scheme until May 2010), was that the metadata regarding the create date of the warrant agreement had been manipulated in some fashion.

- The Government believes that Hirst's knowledge of the fraudulent nature of the Shahini transaction is a fair inference from the fact that, rather than using Gerova's regular outside counsel to write an opinion letter regarding these shares, the conspirators relied on a solo practitioner who happened to be a close personal friend of John Galanis.  Thus, the Government objects to any alterations to paragraph 45.

- The Government objects to any changes to paragraph 46.  The market value of the shares at the time of issuance was $72 million; despite the restrictions on the shares, they were sold in the public market just as any other shares, at the then-prevailing market values.

And, contrary to Hirst's suggestion, the evidence at trial did establish that the Shahini shares were approximately half of Gerova's public float.  *See* Tr. 409 (testimony of Michael Hlavsa ("Q. What is it that you say to Mr. Bianco at this time?  A. I said, "Joe, in case you are interested, see summary at bottom of page for all shareholders. It shows that we have 10,989,552 shares in the float as of July 31, 2010."  Q. What does "in the float" mean?  A. Those are the shares that are freely tradeable.").

- With respect to paragraph 47, the Government objects to any alterations.  The Government believes that it is a fair inference from the evidence at trial, including evidence that the calculations used to arrive at the number of shares to be issued to Shahini were manipulated in several ways, that the cancellation of 5,333,333 shares on the same day that the exact same number of shares were issued to Shahini was "nearly impossible" absent criminality.

- The Government objects to any alterations to paragraph 48.  For the reasons set forth above, Shahini's shares represented half of the public float of Gerova.  According to Doueck, the Stillwater shares were never actually issued to Stillwater and, in any event, such shares were restricted and never became unrestricted, and thus never became part of the public float of Gerova.  Given the evidence of trial that Hirst received $2.6 million from the sale of the Shahini shares in June 2010, the Government believes it is a fair inference that Hirst was aware of such sales.

- The Government has no objection to deleting the word "unrestricted" in paragraph 49.

- The evidence at trial established that proceeds of the Shahini sales were wired to an entity controlled by Hirst.  As such, the Government believes that it is fair, in this summary statement, to state that funds were wired to Hirst and thus objects to any alteration to paragraph 52.

- The Government objects to any alteration to paragraph 64 and believes that the evidence at trial established that Hirst controlled Taurus, the entity that received funds from the Shahini sales proceeds.  That evidence included bank records showing Hirst as the only authorized signer for the bank account of Taurus.  (Tr. 1257-59).

- The loss amount attributable to scheme of which Hirst was apart is between $25 million and $65 million.  The Government's sentencing submission for Jason Galanis describes how this loss calculation was undertaken:  "Twenty-two levels are added, under U.S.S.G. § 2B1.1(b)(1)(L) because the losses caused by Galanis's offenses of conviction were between $25 million and $65 million. . . .  As described above, Tagliaferri clients were essentially the "end of the chain" of the matched trading conduct, left holding substantial quantities of Gerova shares at the time when trading in Gerova was halted.  The losses suffered by Tagliaferri clients and other identifiable individuals in Gerova were $26,280,798.77. . . ."

"An alternative measure of loss can be generated using Application Note 3(F)(ix) to U.S.S.G. §2B1.1.  That note, which provides guidance for loss calculations in market manipulation cases provides that one measure of loss in such cases is to calculate the

difference in average price of the manipulated security during the period of the fraud and the average price during the 90-day period following disclosure, multiplied by the number of shares outstanding. Here, the average stock price of Gerova from its first day of trading, December 31, 2009, through the publication of the Dalrymple report, January 10, 2011, which arguably represents the time period of the Gerova fraud, is $7.03. The average stock price from the date of the Dalrymple report through the date that trading in Gerova was halted, February 23, 2011, was $3.65. During the relevant time period, the public float of Gerova was approximately 11 million shares. This calculation leads to a loss amount for the Gerova conduct of approximately $37 million. Using this alternative measure of loss also yields a loss amount of between $25 million and $65 million."

Hirst argues that the matched trading losses were not foreseeable to him and so the loss amount attributable to him should be zero, but Judge Castel has already rejected this argument. Indeed, Hirst moved during trial to strike the matched trading evidence provided by Gavin Hamels on the grounds that such conduct was not reasonably foreseeable to him. The Court denied the motion, finding "The government has come forward with credible evidence of a single overarching conspiracy as alleged in the grand jury's indictment. So the testimony will stand." (Tr. 1103). The Government's position at trial regarding foreseeability remains true here, "I think they are all part of the same conspiracy, and I certainly think that it was reasonably foreseeable at the time that the Shahini shares were issued, at a time when they were more than half of the public float of Gerova, that the only realistic way to dispose of those shares was through some form of market manipulation. Mr. Hamels has testified that is in fact what happened, that there was a matched trading scheme through which a significant portion of the Shahini shares were disposed of. And I think it's entirely reasonably foreseeable to a member of the conspiracy, particularly a member who we allege issued the shares in question, I think it's entirely reasonably foreseeable that those shares would be disposed of in an improper fashion, and we don't believe the testimony should be stricken." (Tr. 1100-01).

- Because it did not seek a sophisticated means enhancement as to other defendants in this matter, it is not seeking such an enhancement as to Hirst.

- For the reasons set forth above, Hirst is responsible for the losses suffered by the investment advisory clients who invested in Gerova. Hirst was convicted as part of a single conspiracy, of which the matched trading conduct was a part. His efforts to try to position the conduct at issue here as two separate conspiracies – an issuance conspiracy and an investment adviser fraud conspiracy – failed at trial and fails here as well. Thus, no alteration to paragraph 75 is required.

- The Government objects to any changes in paragraphs 77 and 78, as this is information that was provided by victims of the offense.

- For the reasons set forth above, no alteration to paragraph 85 is required.

- The Government is not seeking the enhancements reflected is paragraphs 87 or 90.

- The Government believes that an abuse of trust enhancement is appropriate and that paragraph 89 should therefore not be altered.  Although Hirst cites *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995) for the proposition that "conduct that is the bass for the conviction must be independently criminal … and not itself the abuse of trust," that holding was clarified in *United States v. Ntshona*, 156 F.3d 318, 320 (2d Cir 1998), in which the Second Circuit held that "an abuse of trust enhancement must involve a fiduciary-like relationship that goes beyond 'simply the reliance of the victim on the misleading statements or conduct of the defendant.'  However, the abuse of  trust need not be entirely unrelated to the commission of the base offense."  (internal citation omitted).  Here, Hirst, as an officer and director of Gerova, owed fiduciary duties to Gerova which required him to act in Gerova's best interest.  By causing the issuance of millions of shares of Gerova for no legitimate business purpose, Hirst abused the trust reposed in him in his officer and director role.

- The Government has no objection to any of the remaining changes proposed by Hirst, except that it objects to Hirst's proposed change in paragraph 135 because Hirst did have an affiliation with Rineon.  The Government further notes that references to "Tagliaferri" in that paragraph should be changed to "Martin Kelly."


                    Very truly yours,

                    PREET BHARARA
                    United States Attorney


              by:  ___/s/ Brian R. Blais_____
                    Brian R. Blais/Aimee Hector/
                    Rebecca Mermelstein
                    Assistant United States Attorneys
                    (212) 637-2521/2203/2360

Exhibit C

OPTION WORKSHEET: WARRANTS

## Valuing Management Options or Warrants when there is dilution

This program is designed to value options, the exercise of which can create more shares and thus affect the stock price. This is the case with warrants and management options. It is also the case with convertible bonds. As a general rule, using an unadjusted option pricing model to value these options will overstate their value.

Note: Before you run this program, check under preferences (under tools), and calculations, and ensure that there is a check against the iteration box. You will get a circular reasoning warning, but this program needs circular reasoning to compute the option value.

| | |
|---|---|
| Enter the current stock price = | 5.88 |
| Enter the strike price on the option = | 7.5 |
| Enter the expiration of the option = | 1.805555556 |
| Enter the standard deviation in stock prices = | 63.10% (volatility) |
| Enter the annualized dividend yield on stock = | 0.00% |
| Enter the treasury bond rate = | 1.04% |
| Enter the number of warrants (options) outstanding | 17,700,000 |
| Enter the number of shares outstanding = | 14,000,000 |

### VALUING WARRANTS WHEN THERE IS DILUTION

| | | | |
|---|---|---|---|
| Stock Price= | 5.88 | # Warrants issued= | 17,700,000 |
| Strike Price= | 7.5 | # Shares outstanding= | 14,000,000 |
| Adjusted S = | 2.714107209 | T.Bond rate= | 1.04% |
| Adjusted K= | 7.5 | Variance= | 0.3982 |
| Expiration (in years) = | 1.805555556 | Annualized dividend yield= | 0.00% |
| | | Div. Adj. interest rate= | 1.04% |

| | |
|---|---|
| d1 = | -0.752713468 |
| N (d1) = | 0.225811058 |
| | |
| d2 = | -1.600594241 |
| N (d2) = | 0.054733409 |

| | |
|---|---|
| **Value of the call =** | **$0.2100** |

OPTION WORKSHEET: WARRANTS

## Valuing Management Options or Warrants when there is dilution

This program is designed to value options, the exercise of which can create more shares and thus affect the stock price. This is the case with warrants and management options. It is also the case with convertible bonds. As a general rule, using an unadjusted option pricing model to value these options will overstate their value.

Note: Before you run this program, check under preferences (under tools), and calculations, and ensure that there is a check against the iteration box. You will get a circular reasoning warning, but this program needs circular reasoning to compute the option value.

| | |
|---|---|
| Enter the current stock price = | 5.88 |
| Enter the strike price on the option = | 7.5 |
| Enter the expiration of the option = | 3 |
| Enter the standard deviation in stock prices = | 63.10% (volatility) |
| Enter the annualized dividend yield on stock = | 0.00% |
| Enter the treasury bond rate = | 1.64% |
| Enter the number of warrants (options) outstanding = | 28,700,000 |
| Enter the number of shares outstanding = | 14,000,000 |

### VALUING WARRANTS WHEN THERE IS DILUTION

| | | | |
|---|---|---|---|
| Stock Price= | 5.88 | # Warrants issued= | 28,700,000 |
| Strike Price= | 7.5 | # Shares outstanding= | 14,000,000 |
| Adjusted S = | 2.097619276 | T.Bond rate= | 1.64% |
| Adjusted K= | 7.5 | Variance= | 0.3982 |
| Expiration (in years) = | 3 | Annualized dividend yield= | 0.00% |
| | | Div. Adj. interest rate= | 1.64% |

| | |
|---|---|
| $d1 =$ | -0.574292872 |
| $N(d1) =$ | 0.282884816 |
| | |
| $d2 =$ | -1.667216931 |
| $N(d2) =$ | 0.047735639 |

| | |
|---|---|
| **Value of the call =** | **$0.2526** |

## Valuing Management Options or Warrants when there is dilution

This program is designed to value options, the exercise of which can create more shares and thus affect the stock price. This is the case with warrants and management options. It is also the case with convertible bonds. As a general rule, using an unadjusted option pricing model to value these options will overstate their value.

Note: Before you run this program, check under preferences (under tools), and calculations, and ensure that  there is a check against the iteration box. You will get a circular reasoning warning, but this program needs circular reasoning to compute the option value.

| | | |
|---|---|---|
| Enter the current stock price = | 5.88 | |
| Enter the strike price on the option = | 7.5 | |
| Enter the expiration of the option = | 3 | |
| Enter the standard deviation in stock prices = | 4.20% | (volatility) |
| Enter the annualized dividend yield on stock = | 0.00% | |
| Enter the treasury bond rate = | 1.64% | |
| Enter the number of warrants (options) outstanding | 28,700,000 | |
| Enter the number of shares outstanding = | 14,000,000 | |

### VALUING WARRANTS WHEN THERE IS DILUTION

| | | | |
|---|---|---|---|
| Stock Price= | 5.88 | # Warrants issued= | 28,700,000 |
| Strike Price= | 7.5 | # Shares outstanding= | 14,000,000 |
| Adjusted S = | 1.927868852 | T.Bond rate= | 1.64% |
| Adjusted K= | 7.5 | Variance= | 0.0018 |
| Expiration (in years) = | 3 | Annualized dividend yield= | 0.00% |
| | | Div. Adj. interest rate= | 1.64% |

$d1 =$     -17.96166722
$N (d1) =$     1.94474E-72

$d2 =$     -18.03441336
$N (d2) =$     5.22998E-73

**Value of the call =**     $0.0000

## Valuing Management Options or Warrants when there is dilution

This program is designed to value options, the exercise of which can create more shares and thus affect the stock price. This is the case

with warrants and management options. It is also the case with convertible bonds. As a general rule, using an unadjusted

option pricing model to value these options will overstate their value.

Note: Before you run this program, check under preferences (under tools), and calculations, and ensure that there is a check against the iteration

box. You will get a circular reasoning warning, but this program needs circular reasoning to compute the option value.

| | |
|---|---|
| Enter the current stock price = | 5.88 |
| Enter the strike price on the option = | 7.5 |
| Enter the expiration of the option = | 3 |
| Enter the standard deviation in stock prices = | 15.10% (volatility) |
| Enter the annualized dividend yield on stock = | 0.00% |
| Enter the treasury bond rate = | 1.64% |
| Enter the number of warrants (options) outstanding | 28,700,000 |
| Enter the number of shares outstanding = | 14,000,000 |

#### VALUING WARRANTS WHEN THERE IS DILUTION

| | | | |
|---|---|---|---|
| Stock Price= | 5.88 | # Warrants issued= | 28,700,000 |
| Strike Price= | 7.5 | # Shares outstanding= | 14,000,000 |
| Adjusted S = | 1.927868886 | T.Bond rate= | 1.64% |
| Adjusted K= | 7.5 | Variance= | 0.0228 |
| Expiration (in years) = | 3 | Annualized dividend yield= | 0.00% |
| | | Div. Adj. interest rate= | 1.64% |

$d1 =$   -4.875307529
$N(d1) =$   5.43195E-07

$d2 =$   -5.136847201
$N(d2) =$   1.39693E-07

**Value of the call =**   $0.0000

## Valuing Management Options or Warrants when there is dilution

This program is designed to value options, the exercise of which can create more shares and thus affect the stock price. This is the case with warrants and management options. It is also the case with convertible bonds. As a general rule, using an unadjusted option pricing model to value these options will overstate their value.

Note: Before you run this program, check under preferences (under tools), and calculations, and ensure that there is a check against the iteration box. You will get a circular reasoning warning, but this program needs circular reasoning to compute the option value.

| | | |
|---|---|---|
| Enter the current stock price = | 5.88 | |
| Enter the strike price on the option = | 7.5 | |
| Enter the expiration of the option = | 3 | |
| Enter the standard deviation in stock prices = | 9.45% | (volatility) |
| Enter the annualized dividend yield on stock = | 0.00% | |
| Enter the treasury bond rate = | 1.64% | |
| Enter the number of warrants (options) outstanding | 28,700,000 | |
| Enter the number of shares outstanding = | 14,000,000 | |

### VALUING WARRANTS WHEN THERE IS DILUTION

| | | | |
|---|---|---|---|
| Stock Price= | 5.88 | # Warrants issued= | 28,700,000 |
| Strike Price= | 7.5 | # Shares outstanding= | 14,000,000 |
| Adjusted S = | 1.927868852 | T.Bond rate= | 1.64% |
| Adjusted K= | 7.5 | Variance= | 0.0089 |
| Expiration (in years) = | 3 | Annualized dividend yield= | 0.00% |
| | | Div. Adj. interest rate= | 1.64% |

$d1 =$     -7.917289617
$N(d1) =$     1.21372E-15

$d2 =$     -8.080968419
$N(d2) =$     3.21272E-16

**Value of the call =**      $0.0000

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*
*PRELIMINARY DRAFT & SUBJECT TO CHANGE*

Net Number = [(AxB) - (AxC)]/B

A=          The total number of shares with respect to which this warrant is then being exercised.
            **10,000,000  (Source: Exercise Notice)**

B=          the Closing price as defined in Paragraph (e ) of Section 4 of Common Stock on the trading day immediately preceding the date of the Exercise Notice.
            Paragraph 4(e ):  Average of daily closing prices, 3 consecutive trading days prior to the receipt of the notice. The Closing Price is the last reported sales price
            Exercise Date: May 21, 2010

|  |  |  |
|---|---|---|
| 5/20/2010 | 15.28 |
| 5/19/2010 | 15.31 |
| 5/18/2010 | 15.96 |
| **Average** | **15.51667** |

C=          the Warrant Exercise Price then in effect for the applicable Warrant Shares at the time of such exercise.
            **$7.00**

**Net Number =**        **5,488,721.80**

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*
*PRELIMINARY DRAFT & SUBJECT TO CHANGE*

|  |  | Gov 245 | |
| Date | Warrant Price | Warrant Price | |
| 3/28/2010 | 0.21 | 0.26 | No Trades |
| 3/27/2010 | 0.21 | 0.26 | No Trades |
| 3/26/2010 | 0.21 | 0.26 | |
| 3/25/2010 | 0.26 | 0.26 | |
| 3/24/2010 | 0.2999 | 0.2999 | |
| 3/23/2010 | 0.25 | 0.25 | |
| 3/22/2010 | 0.2999 | 0.2999 | No Trades |
| 3/21/2010 | 0.2999 | 0.2999 | No Trades |
| 3/20/2010 | 0.2999 | 0.2999 | No Trades |
| 3/19/2010 | 0.2999 | 0.2999 | |
| 3/18/2010 | 0.32 | 0.32 | No Trades |
| 3/17/2010 | 0.32 | 0.32 | No Trades |
| 3/16/2010 | 0.32 | 0.32 | No Trades |
| 3/15/2010 | 0.32 | 0.32 | |
| 3/14/2010 | 0.3 | 0.3 | No Trades |
| 3/13/2010 | 0.3 | 0.3 | No Trades |
| 3/12/2010 | 0.3 | 0.3 | No Trades |
| 3/11/2010 | 0.3 | 0.3 | |
| 3/10/2010 | 0.26 | 0.26 | |
| 3/9/2010 | 0.26 | 0.26 | |
| 3/8/2010 | 0.26 | 0.26 | |
| 3/7/2010 | 0.27 | 0.27 | No Trades |
| 3/6/2010 | 0.27 | 0.27 | No Trades |
| 3/5/2010 | 0.27 | 0.27 | |
| 3/4/2010 | 0.27 | 0.27 | |
| 3/3/2010 | 0.3 | 0.3 | |
| 3/2/2010 | 0.26 | 0.26 | |
| 3/1/2010 | 0.25 | 0.25 | No Trades |
| 2/28/2010 | 0.25 | 0.25 | No Trades |
| 2/27/2010 | 0.25 | 0.25 | |
| **Total Days** 30 **Average** | **0.2763** | **0.2813** | |

| | | | |
|---|---|---|---|
| Financial Obligation | $ | 114,000,000 | |
| | | 2% | |
| | $ | 2,280,000 | |
| | | | |
| Warrants to be issued: | | 8,251,402.38 | 8,104,745.54 |
| | | | |
| Warrants Issued: | | 11,000,000 | 11,000,000 |
| | | | |
| Additional Warrants: | | 2,748,597.62 | 2,895,254.46 |
| | | | |
| Closing Price on Issuance: | $ | 0.21 | $ 0.26 |
| | | | |
| Additional Consideration: | | 577,205.50 | 752,766.16 |

*Attorney Work Product*
*Privileged & Confidential*
*Preliminary Analysis – Subject to Change*

Notes for Agogliati Opinion & Approach:

Opinion:
The Fair Market Value (FMV) of the warrants granted to Shahini were less than the publicly traded price of $0.21 each, and therefore the 'consideration' given to Shahini was less than $2,310,000 ($0.21 x 11,000,000).

Analysis Notes:
   a. The publicly traded price was $0.21 as of March 26, 2010 (the date closest to the date of the Shahini Warrant Agreement).
   b. I assume the Public Warrants had a strike of $7.50 and a term that would last until January 16, 2012, or a remaining term of almost 2 years.[1]
   c. Therefore, the Shahini warrant had similar terms as the public warrants in that they had the same strike price, but the Shahini warrant had a longer term. All things being equal, the longer term would increase the FMV of the Shahini Warrant.
   d. I calculated the Implied Volatility of the Public Warrants as of March 26, 2010 (closest trading day to Shahini Warrant Date) using the following assumptions:
      i. Stock Price as of date closest to warrant date ($5.88, 3/24/2010);
      ii. Exercise Price is $7.50 (Source: Note 7, pF-12 of 2009 Financials);
      iii. Term calculated to 1/16/2012 (Source: Note 7, pF-12 of 2009 Financials);
      iv. Risk Free Rate per Fed Release (1.04%, 2-year Rate);
      v. Dividend yield was assumed to be zero;
      vi. Number of Shares Issued and Outstanding (14,000,000, See F-2 of 2009 Financials);
      vii. Number of Warrants (17,700,000; p129 of the 2009 Financials);
      viii. Solve for Implied Volatility whereby calculated Warrant Value equals trading price of warrant ($0.21). Implied volatility is 63.1%.

   e. I calculated the FMV of the Shahini Warrant using the following assumptions:
      i. Stock Price as of date closest to warrant date ($5.88, 3/24/2010);
      ii. Exercise Price is $7.50;
      iii. Term is 3 years;
      iv. Risk Free Rate per Fed Release (1.64%, 3-year Rate);
      v. Volatility – Four scenarios, (1) Implied Volatility calculated above (63.1%), (2) Historical Volatility pre-March (limited Data, 4.2%), (3) Historical Volatility (all data, 15.1%), and (4) Volatility quoted in Financial Statements, pF-13 under 'Initial Public Offering', 9.45%);
      vi. Dividend yield was assumed to be zero;
      vii. Number of Shares Issued and Outstanding (14,000,000, See F-2 of 2009 Financials)

---

[1] See Note 7, 'Initial Public Offering' (pF-12 of 2009 financials). This note gives details of the IPO, which included both shares and warrants. Further, the financials state that warrants were changed on May 21, 2010 to: (a) reduce the strike from $7.50 to $7 and (b) extend the term two years to January 16, 2014 (p71). This would imply that, prior to May 21, 2010, the warrants had a strike of $7.50 and a term that ended January 16, 2012.

Case 1:15-cr-00643-PKC   Document 386   Filed 03/03/17   Page 73 of 112

   viii. Number of Warrants (17,700,000 [p129 of the 2009 Financials] + 11,000,000 in
        the Shahini Warrant);
    ix. Calculate Warrant Value with dilution.
f.  The resulting unadjusted FMV of the Shahini Warrant ranged from $0 to $0.2526 per
    warrant.
g.  However, the Shahini warrant was a private instrument versus the public warrants that
    were fully marketable; therefore a Discount for Lack of Marketability (DLOM) would be
    appropriate. I also note that, unlike the publicly traded warrants, the Shahini Warrant
    was subject to Regulation S. DLOMs for privately held stock generally range from 20-
    35% (See - restricted stock studies).
h.  Further, and most significant, the Shahini Warrant would be subject to a significant
    'blockage' discount. The Shahini warrant contemplated 11 million shares. The average
    daily trading volume for shares pre-March 29, 2010 was 10,247 shares, with the
    maximum being less than 80,000 shares. The average daily trading volume for *publicly
    listed* warrants pre-March 29, 2010 was 14,191 warrants, with the maximum being
    approximately 95,000 warrants.
i.  Assuming (i) an investor would not trade more than 10% of the daily share trading
    volume, (ii) a daily trading volume equivalent to the maximum of the pre-March 2010
    trading volume (80,000 shares), an investor might assume he could only liquidate a
    maximum of 8,000 shares per day, every day. Note the daily trading volume exceeded
    8,000 shares less than 25% of the trading days prior to March 20, 2010. At 8,000 shares
    being traded per day, it would take at least 5.5 years to liquidate the position.
j.  The Shahini warrant is a private warrant. However, I looked to the publicly traded
    warrant data as an indication of investor interest. Assuming (i) an investor would not
    trade more than 10% of the daily warrant trading volume, (ii) a daily trading volume
    equivalent to the maximum of the pre-March 2010 trading volume (95,000 warrants),
    an investor might assume he could only liquidate a maximum of 9,500 warrants per day,
    every day. At 9,500 warrants being traded per day, it would take at least 4.6 years to
    liquidate the position. I note that this exceeds the term of the warrant. In addition, I
    note that the time value of the warrant would decrease every day based upon the term
    to expiration decreasing every day.
k.  A DLOM for a delay in liquidating a position can be 1% per month (tax court cases,
    empirical study review). This would imply a significant blockage discount.
l.  Consequently, the FMV of the Shahini warrant was less than $0.21 per share.

*Attorney Work Product*
*Privileged & Confidential*
*Preliminary Analysis – Subject to Change*

### Pre-April 1997 Marketability Studies

| Study | Years Covered in Study | Discount Mean | Discount Median |
|---|---|---|---|
| SEC Overall Average[A] | 1966-1969 | 26% | n/a |
| SEC Nonreporting OTC Companies[A] | 1966-1969 | 33% | n/a |
| Gelman[B] | 1968-1970 | 33% | 33% |
| Trout[C] | 1968-1972 | 34% | n/a |
| Moroney[D] | 1968-1972 | 36% | 33% |
| Maher[E] | 1969-1973 | 35% | 33% |
| Standard Research Consultants[F] | 1978-1982 | n/a | 45% |
| Willamette Management Associates[G] | 1981-1984 | n/a | 31% |
| Silber[H] | 1981-1988 | 34% | n/a |
| Hall/Polacek[I] | 1979-1992 | 23% | n/a |
| Management Planning, Inc.[J] | 1980-1995 | 28% | 29% |
| Johnson[K] | 1991-1995 | 20% | n/a |
| Columbia Financial Advisors[L] | 1996-1997 | 21% | 14% |

Reference:

A. *Discounts Involved in Purchases of Common Stock (1966-1969)*, Institutional Investor Study Report of the Securities and Exchange Commission, 1971.

B. Milton Gelman, *An Economist-Financial Analyst's Approach to Valuing Stock of a Closely Held Company*, Journal of Taxation, June, 1972.

C. Robert R. Trout, *Estimation of the Discount Associated with the Transfer of Restricted Securities*, Taxes, June, 1977.

D. Robert E. Moroney, *Most Courts Overvalue Closely Held Stocks*, Taxes, March, 1973.

E. J. Michael Maher, *Discounts for Lack of Marketability for Closely-Held Business Interests*, Taxes, September, 1976.

F. *Revenue Ruling 77-287 Revisited*, SRC Quarterly Reports, Spring, 1983.

G. *Willamette Management Associates study* (unpublished).

H. William L. Silber, *Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices*, Financial Analysts Journal, July-August, 1991.

I. Lance S. Hall and Timothy C. Polacek, *Strategies for Obtaining the Largest Discount*, Estate Planning, January/February, 1994.

J. Robert P. Oliver and Roy H. Meyers, *Discounts Seen in Private Placements of Restricted Stock The Management Planning, Inc., Long-Term Study (1980-1995)*.

K. Bruce Johnson, *Quantitative Support for Discounts for Lack of Marketability*, Business Valuation Review, December, 1999.

L. Kathryn Aschwald, *Restricted Stock Discounts Decline as a Result of 1-Year Holding Period*, Shannon Pratt's Business Valuation Update, May, 2000.

| Date | Symbol | High | Low | Last | Volume |
|------|--------|------|-----|------|--------|
| 2/1/2010 | GFCWS | $0.3500 | $0.3500 | $0.3500 | 100 |
| 2/2/2010 | GFCWS | $0.3900 | $0.3600 | $0.3900 | 2,300 |
| 2/3/2010 | GFCWS | $0.3800 | $0.3600 | $0.3799 | 4,900 |
| 2/4/2010 | GFCWS | $0.3100 | $0.2600 | $0.3000 | 41,000 |
| 2/10/2010 | GFCWS | $0.3500 | $0.3500 | $0.3500 | 5,000 |
| 2/12/2010 | GFCWS | $0.4000 | $0.4000 | $0.4000 | 5,000 |
| 2/17/2010 | GFCWS | $0.3900 | $0.3900 | $0.3900 | 100 |
| 2/19/2010 | GFCWS | $0.3400 | $0.3400 | $0.3400 | 4,100 |
| 2/23/2010 | GFCWS | $0.3200 | $0.3200 | $0.3200 | 5,000 |
| 2/25/2010 | GFCWS | $0.3000 | $0.2500 | $0.3000 | 38,100 |
| 2/26/2010 | GFCWS | $0.3000 | $0.2000 | $0.2500 | 95,100 |
| 3/2/2010 | GFCWS | $0.2600 | $0.2400 | $0.2600 | 36,800 |
| 3/3/2010 | GFCWS | $0.3000 | $0.3000 | $0.3000 | 10,000 |
| 3/4/2010 | GFCWS | $0.2700 | $0.2700 | $0.2700 | 12,000 |
| 3/5/2010 | GFCWS | $0.2700 | $0.2700 | $0.2700 | 6,000 |
| 3/8/2010 | GFCWS | $0.2700 | $0.2600 | $0.2600 | 9,790 |
| 3/9/2010 | GFCWS | $0.2600 | $0.2600 | $0.2600 | 2,000 |
| 3/10/2010 | GFCWS | $0.2900 | $0.1500 | $0.2600 | 24,290 |
| 3/11/2010 | GFCWS | $0.3000 | $0.3000 | $0.3000 | 200 |
| 3/15/2010 | GFCWS | $0.3200 | $0.2800 | $0.3200 | 12,800 |
| 3/19/2010 | GFCWS | $0.3000 | $0.2999 | $0.2999 | 10,000 |
| 3/23/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 300 |
| 3/24/2010 | GFCWS | $0.3000 | $0.2900 | $0.2999 | 3,000 |
| 3/25/2010 | GFCWS | $0.2600 | $0.2600 | $0.2600 | 5,000 |
| 3/26/2010 | GFCWS | $0.2600 | $0.2000 | $0.2100 | 21,900 |
| 3/30/2010 | GFCWS | $0.2400 | $0.2400 | $0.2400 | 23,200 |
| 3/31/2010 | GFCWS | $0.3000 | $0.2000 | $0.3000 | 99,002 |
| 4/1/2010 | GFCWS | $0.3000 | $0.3000 | $0.3000 | 900 |
| 4/5/2010 | GFCWS | $0.2900 | $0.2000 | $0.2500 | 3,600 |
| 4/6/2010 | GFCWS | $0.3000 | $0.2000 | $0.2100 | 201,960 |
| 4/7/2010 | GFCWS | $0.2500 | $0.2100 | $0.2499 | 20,400 |
| 4/9/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 2,500 |
| 4/13/2010 | GFCWS | $0.3500 | $0.2800 | $0.3000 | 89,700 |
| 4/14/2010 | GFCWS | $0.3300 | $0.2900 | $0.3000 | 2,174,700 |
| 4/15/2010 | GFCWS | $0.3000 | $0.2900 | $0.2900 | 307,100 |
| 4/16/2010 | GFCWS | $0.3000 | $0.2500 | $0.2800 | 230,400 |
| 4/20/2010 | GFCWS | $0.2800 | $0.2500 | $0.2700 | 177,700 |
| 4/21/2010 | GFCWS | $0.2700 | $0.2500 | $0.2500 | 100,200 |
| 4/22/2010 | GFCWS | $0.2900 | $0.2500 | $0.2500 | 13,500 |
| 4/23/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 9,980 |
| 4/26/2010 | GFCWS | $0.2500 | $0.2499 | $0.2500 | 237,000 |
| 4/27/2010 | GFCWS | $0.2800 | $0.2500 | $0.2800 | 63,156 |
| 4/28/2010 | GFCWS | $0.3300 | $0.2800 | $0.3000 | 5,100 |
| 4/29/2010 | GFCWS | $0.2900 | $0.2899 | $0.2900 | 179,100 |
| 4/30/2010 | GFCWS | $0.3000 | $0.2900 | $0.3000 | 98,950 |
| 5/3/2010 | GFCWS | $0.4500 | $0.2601 | $0.3500 | 1,348,308 |

| 5/4/2010 | GFCWS | $0.3800 | $0.3500 | $0.3800 | 26,200 |
|---|---|---|---|---|---|
| 5/5/2010 | GFCWS | $0.5000 | $0.3500 | $0.4300 | 522,061 |
| 5/6/2010 | GFCWS | $0.4500 | $0.4300 | $0.4300 | 36,500 |
| 5/7/2010 | GFCWS | $0.4600 | $0.4000 | $0.4000 | 39,600 |
| 5/10/2010 | GFCWS | $0.5500 | $0.3500 | $0.3600 | 58,100 |
| 5/11/2010 | GFCWS | $0.4400 | $0.3500 | $0.3800 | 23,200 |
| 5/12/2010 | GFCWS | $0.5500 | $0.4400 | $0.5100 | 76,700 |
| 5/13/2010 | GFCWS | $0.5400 | $0.4800 | $0.5000 | 344,700 |
| 5/14/2010 | GFCWS | $0.5000 | $0.4400 | $0.5000 | 370,000 |
| 5/17/2010 | GFCWS | $0.5500 | $0.4900 | $0.5400 | 72,400 |
| 5/18/2010 | GFCWS | $0.8500 | $0.5800 | $0.8190 | 409,900 |
| 5/19/2010 | GFCWS | $0.8500 | $0.6200 | $0.6800 | 162,962 |
| 5/20/2010 | GFCWS | $0.7500 | $0.6000 | $0.6500 | 67,700 |
| 5/21/2010 | GFCWS | $0.6800 | $0.6000 | $0.6400 | 65,300 |
| 5/24/2010 | GFCWS | $0.6600 | $0.5100 | $0.5500 | 38,300 |
| 5/25/2010 | GFCWS | $0.5500 | $0.4500 | $0.5000 | 22,200 |
| 5/26/2010 | GFCWS | $0.5500 | $0.5000 | $0.5500 | 2,500 |
| 5/27/2010 | GFCWS | $0.6000 | $0.5400 | $0.5800 | 65,600 |
| 5/28/2010 | GFCWS | $0.5500 | $0.5400 | $0.5500 | 24,500 |
| 6/1/2010 | GFCWS | $0.5500 | $0.5400 | $0.5500 | 40,000 |
| 6/2/2010 | GFCWS | $0.5500 | $0.5000 | $0.5500 | 36,500 |
| 6/3/2010 | GFCWS | $1.0100 | $0.5900 | $0.9300 | 1,115,133 |
| 6/4/2010 | GFCWS | $0.8300 | $0.5900 | $0.7400 | 428,700 |
| 6/7/2010 | GFCWS | $0.7700 | $0.7000 | $0.7200 | 50,900 |
| 6/8/2010 | GFCWS | $0.9300 | $0.6980 | $0.8600 | 368,100 |
| 6/9/2010 | GFCWS | $0.6400 | $0.4500 | $0.4900 | 139,400 |
| 6/10/2010 | GFCWS | $0.4900 | $0.4400 | $0.4900 | 22,200 |
| 6/11/2010 | GFCWS | $0.4900 | $0.4600 | $0.4900 | 8,600 |
| 6/14/2010 | GFCWS | $0.6800 | $0.4900 | $0.6600 | 1,362,123 |
| 6/15/2010 | GFCWS | $0.7000 | $0.5400 | $0.7000 | 688,150 |
| 6/16/2010 | GFCWS | $0.8000 | $0.6800 | $0.8000 | 595,312 |
| 6/17/2010 | GFCWS | $0.8200 | $0.7300 | $0.7600 | 294,508 |
| 6/18/2010 | GFCWS | $0.8000 | $0.7200 | $0.7500 | 288,588 |
| 6/21/2010 | GFCWS | $0.7599 | $0.7200 | $0.7400 | 256,488 |
| 6/22/2010 | GFCWS | $0.7000 | $0.6300 | $0.6800 | 245,000 |
| 6/23/2010 | GFCWS | $0.7300 | $0.6300 | $0.7100 | 366,700 |
| 6/24/2010 | GFCWS | $0.6900 | $0.6500 | $0.6500 | 139,300 |
| 6/25/2010 | GFCWS | $0.6600 | $0.4900 | $0.5200 | 272,000 |
| 6/28/2010 | GFCWS | $0.5000 | $0.3000 | $0.3000 | 513,600 |
| 6/29/2010 | GFCWS | $0.3500 | $0.2700 | $0.3400 | 272,400 |
| 6/30/2010 | GFCWS | $0.3500 | $0.3500 | $0.3500 | 100 |
| 7/1/2010 | GFCWS | $0.3390 | $0.3000 | $0.3300 | 44,900 |
| 7/2/2010 | GFCWS | $0.3000 | $0.2500 | $0.2800 | 37,900 |
| 7/6/2010 | GFCWS | $0.3400 | $0.2600 | $0.3100 | 51,650 |
| 7/7/2010 | GFCWS | $0.3100 | $0.2800 | $0.3100 | 38,600 |
| 7/8/2010 | GFCWS | $0.3100 | $0.2900 | $0.3100 | 94,200 |
| 7/12/2010 | GFCWS | $0.3300 | $0.3000 | $0.3300 | 16,500 |

| | | | | | |
|---|---|---|---|---|---|
| 7/14/2010 | GFCWS | $0.2900 | $0.2810 | $0.2810 | 26,200 |
| 7/15/2010 | GFCWS | $0.2900 | $0.2900 | $0.2900 | 800 |
| 7/16/2010 | GFCWS | $0.2810 | $0.2810 | $0.2810 | 400 |
| 7/20/2010 | GFCWS | $0.3000 | $0.2900 | $0.3000 | 5,000 |
| 7/21/2010 | GFCWS | $0.3300 | $0.3300 | $0.3300 | 300 |
| 7/22/2010 | GFCWS | $0.3300 | $0.3290 | $0.3300 | 2,000 |
| 7/23/2010 | GFCWS | $0.4100 | $0.3000 | $0.3700 | 70,400 |
| 7/26/2010 | GFCWS | $0.3600 | $0.3200 | $0.3500 | 58,100 |
| 7/28/2010 | GFCWS | $0.3500 | $0.3500 | $0.3500 | 100 |
| 7/29/2010 | GFCWS | $0.3500 | $0.3300 | $0.3500 | 1,484,408 |
| 7/30/2010 | GFCWS | $0.3900 | $0.3500 | $0.3800 | 6,700 |
| 8/2/2010 | GFCWS | $0.3900 | $0.3700 | $0.3800 | 15,582 |
| 8/3/2010 | GFCWS | $0.3500 | $0.3200 | $0.3500 | 12,884 |
| 8/4/2010 | GFCWS | $0.3500 | $0.3200 | $0.3500 | 13,000 |
| 8/5/2010 | GFCWS | $0.3500 | $0.3500 | $0.3500 | 50,000 |
| 8/6/2010 | GFCWS | $0.3200 | $0.3200 | $0.3200 | 8,000 |
| 8/9/2010 | GFCWS | $0.3300 | $0.3000 | $0.3100 | 51,300 |
| 8/11/2010 | GFCWS | $0.3000 | $0.3000 | $0.3000 | 25,000 |
| 8/13/2010 | GFCWS | $0.2900 | $0.2900 | $0.2900 | 26,000 |
| 8/17/2010 | GFCWS | $0.3300 | $0.2800 | $0.3099 | 11,200 |
| 8/20/2010 | GFCWS | $0.3000 | $0.3000 | $0.3000 | 100 |
| 8/23/2010 | GFCWS | $0.2800 | $0.2800 | $0.2800 | 25,500 |
| 8/24/2010 | GFCWS | $0.2600 | $0.2000 | $0.2000 | 59,700 |
| 8/25/2010 | GFCWS | $0.2600 | $0.2500 | $0.2600 | 17,000 |
| 8/26/2010 | GFCWS | $0.2500 | $0.2300 | $0.2300 | 8,000 |
| 8/27/2010 | GFCWS | $0.2600 | $0.2600 | $0.2600 | 100 |
| 8/31/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 100 |
| 9/1/2010 | GFCWS | $0.2600 | $0.2500 | $0.2600 | 200 |
| 9/2/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 12,000 |
| 9/3/2010 | GFCWS | $0.2200 | $0.2100 | $0.2100 | 9,500 |
| 9/7/2010 | GFCWS | $0.2600 | $0.2300 | $0.2600 | 155,000 |
| 9/8/2010 | GFCWS | $0.2500 | $0.2500 | $0.2500 | 45,000 |
| 9/9/2010 | GFCWS | $0.2700 | $0.2500 | $0.2500 | 85,100 |
| 9/10/2010 | GFCWS | $0.2200 | $0.2200 | $0.2200 | 7,500 |
| 9/13/2010 | GFCWS | $0.2100 | $0.2100 | $0.2100 | 2,500 |
| 9/15/2010 | GFCWS | $0.2200 | $0.2000 | $0.2200 | 59,924 |
| 9/16/2010 | GFCWS | $0.2100 | $0.2000 | $0.2000 | 4,000 |
| 9/20/2010 | GFCWS | $0.1900 | $0.1900 | $0.1900 | 100 |
| 9/22/2010 | GFCWS | $0.1800 | $0.1800 | $0.1800 | 500 |
| 9/23/2010 | GFCWS | $0.2000 | $0.1700 | $0.1700 | 4,600 |
| 9/24/2010 | GFCWS | $0.1800 | $0.1800 | $0.1800 | 5,100 |
| 9/28/2010 | GFCWS | $0.1800 | $0.1600 | $0.1800 | 15,106 |
| 9/29/2010 | GFCWS | $0.1600 | $0.1600 | $0.1600 | 50,100 |
| 9/30/2010 | GFCWS | $0.1500 | $0.1500 | $0.1500 | 7,000 |
| 10/1/2010 | GFCWS | $0.1500 | $0.1500 | $0.1500 | 5,500 |
| 10/4/2010 | GFCWS | $0.1500 | $0.1300 | $0.1500 | 56,000 |
| 10/5/2010 | GFCWS | $0.1700 | $0.1600 | $0.1700 | 30,000 |

| | | | | | |
|---|---|---|---|---|---|
| 10/6/2010 | GFCWS | $0.1500 | $0.1500 | $0.1500 | 333,690 |
| 10/7/2010 | GFCWS | $0.1600 | $0.1500 | $0.1500 | 20,400 |
| 10/11/2010 | GFCWS | $0.2600 | $0.1600 | $0.1600 | 12,900 |
| 10/12/2010 | GFCWS | $0.2200 | $0.1600 | $0.1600 | 61,650 |
| 10/14/2010 | GFCWS | $0.1698 | $0.1600 | $0.1600 | 40,601 |
| 10/15/2010 | GFCWS | $0.1900 | $0.1700 | $0.1900 | 19,401 |
| 10/18/2010 | GFCWS | $0.2100 | $0.2100 | $0.2100 | 3,000 |
| 10/20/2010 | GFCWS | $0.2100 | $0.1900 | $0.2100 | 10,622 |
| 10/21/2010 | GFCWS | $0.2200 | $0.1800 | $0.2200 | 16,000 |
| 10/22/2010 | GFCWS | $0.2000 | $0.1900 | $0.1900 | 30,800 |
| 10/25/2010 | GFCWS | $0.2000 | $0.2000 | $0.2000 | 4,000 |
| 10/26/2010 | GFCWS | $0.2000 | $0.2000 | $0.2000 | 1,000 |
| 10/27/2010 | GFCWS | $0.2000 | $0.2000 | $0.2000 | 14,500 |
| 10/28/2010 | GFCWS | $0.2300 | $0.2100 | $0.2100 | 13,750 |
| 10/29/2010 | GFCWS | $0.2300 | $0.2100 | $0.2300 | 13,500 |
| 11/1/2010 | GFCWS | $0.2500 | $0.2200 | $0.2500 | 133,300 |
| 11/2/2010 | GFCWS | $0.2900 | $0.2200 | $0.2500 | 2,084,600 |
| 11/3/2010 | GFCWS | $0.3000 | $0.2500 | $0.2798 | 141,900 |
| 11/4/2010 | GFCWS | $0.3200 | $0.2700 | $0.3100 | 190,238 |
| 11/5/2010 | GFCWS | $0.3050 | $0.2950 | $0.2950 | 15,800 |
| 11/8/2010 | GFCWS | $0.3500 | $0.2900 | $0.3000 | 174,853 |
| 11/9/2010 | GFCWS | $0.3200 | $0.3000 | $0.3000 | 5,700 |
| 11/10/2010 | GFCWS | $0.2900 | $0.2700 | $0.2900 | 4,800 |
| 11/11/2010 | GFCWS | $0.2700 | $0.2501 | $0.2501 | 4,300 |
| 11/12/2010 | GFCWS | $0.2401 | $0.2401 | $0.2401 | 6,801 |
| 11/16/2010 | GFCWS | $0.2300 | $0.2300 | $0.2300 | 1,000 |
| 11/17/2010 | GFCWS | $0.2200 | $0.1800 | $0.1800 | 44,658 |
| 11/18/2010 | GFCWS | $0.2300 | $0.1900 | $0.2100 | 34,100 |
| 11/22/2010 | GFCWS | $0.2600 | $0.2200 | $0.2500 | 672,278 |
| 11/23/2010 | GFCWS | $1.0500 | $0.9000 | $1.0000 | 42,500 |
| 11/24/2010 | GFCWS | $1.0100 | $0.9000 | $0.9100 | 274,950 |
| 11/26/2010 | GFCWS | $1.0500 | $0.9000 | $0.9500 | 216,070 |
| 11/29/2010 | GFCWS | $1.0000 | $0.8700 | $0.9000 | 15,600 |
| 11/30/2010 | GFCWS | $0.8500 | $0.6000 | $0.6899 | 61,700 |
| 12/1/2010 | GFCWS | $0.6000 | $0.4100 | $0.5200 | 71,215 |
| 12/2/2010 | GFCWS | $0.4800 | $0.3001 | $0.4000 | 871,616 |
| 12/3/2010 | GFCWS | $0.4800 | $0.3900 | $0.3900 | 9,700 |
| 12/6/2010 | GFCWS | $0.4600 | $0.4499 | $0.4500 | 47,580 |
| 12/7/2010 | GFCWS | $0.7000 | $0.5000 | $0.7000 | 632,666 |
| 12/8/2010 | GFCWS | $0.7400 | $0.6500 | $0.6500 | 73,500 |
| 12/9/2010 | GFCWS | $0.6500 | $0.5100 | $0.5500 | 2,600 |
| 12/10/2010 | GFCWS | $0.6000 | $0.5001 | $0.6000 | 31,831 |
| 12/13/2010 | GFCWS | $0.6800 | $0.6300 | $0.6500 | 50,699 |
| 12/14/2010 | GFCWS | $0.6200 | $0.6200 | $0.6200 | 3,000 |
| 12/15/2010 | GFCWS | $0.6200 | $0.6200 | $0.6200 | 1,600 |
| 12/20/2010 | GFCWS | $0.5800 | $0.5001 | $0.5001 | 4,100 |
| 12/21/2010 | GFCWS | $0.5000 | $0.4600 | $0.4600 | 23,390 |

| 12/22/2010 | GFCWS | $0.5000 | $0.5000 | $0.5000 | 2,100 |
| 12/23/2010 | GFCWS | $0.5300 | $0.4500 | $0.4500 | 62,251 |
| 12/27/2010 | GFCWS | $0.4300 | $0.4300 | $0.4300 | 10,000 |
| 12/28/2010 | GFCWS | $0.4300 | $0.3601 | $0.4300 | 21,000 |
| 12/29/2010 | GFCWS | $0.6100 | $0.4200 | $0.6100 | 18,500 |
| 12/30/2010 | GFCWS | $0.5700 | $0.4600 | $0.5700 | 2,600 |
| 12/31/2010 | GFCWS | $0.5900 | $0.5500 | $0.5900 | 400 |

Value of Gary's 375,000 2008 IPO Shares - Privileged Attorney Client Communication

| Date | Open | High | Low | Close | Volume | Split-Adjusted | |
|------|------|------|-----|-------|--------|----------------|---|
| 1/20/2010 | 8.90 | 9.10 | 8.30 | 8.30 | 16,030 | 8.30 | De-SPAC Closing |
| 1/21/2010 | 8.40 | 8.40 | 8.01 | 8.01 | 10,300 | 8.01 | |
| 1/22/2010 | 8.01 | 8.03 | 7.46 | 7.46 | 9,500 | 7.46 | |
| 1/25/2010 | 7.70 | 7.70 | 6.50 | 6.51 | 39,058 | 6.51 | |
| 1/26/2010 | 7.22 | 7.31 | 6.39 | 6.46 | 65,979 | 6.46 | |
| 1/27/2010 | 6.57 | 7.03 | 6.49 | 6.50 | 4,200 | 6.50 | |
| 1/28/2010 | 6.34 | 6.37 | 6.33 | 6.34 | 4,700 | 6.34 | |
| 1/29/2010 | 6.32 | 6.32 | 5.91 | 5.91 | 3,350 | 5.91 | |
| 2/1/2010 | 5.98 | 5.98 | 5.98 | 5.98 | 2,000 | 5.98 | |
| 2/2/2010 | 5.98 | 5.98 | 5.98 | 5.98 | 1,000 | 5.98 | |
| 2/3/2010 | 6.13 | 6.46 | 6.13 | 6.25 | 6,800 | 6.25 | |
| 2/4/2010 | 6.10 | 6.10 | 5.81 | 5.96 | 19,200 | 5.96 | |
| 2/5/2010 | 5.83 | 5.83 | 5.83 | 5.83 | 1,000 | 5.83 | |
| 2/8/2010 | 6.00 | 6.08 | 5.90 | 5.90 | 1,341 | 5.90 | |
| 2/9/2010 | 5.75 | 5.81 | 5.75 | 5.81 | 1,700 | 5.81 | |
| 2/17/2010 | 5.96 | 5.98 | 5.96 | 5.98 | 200 | 5.98 | |
| 2/18/2010 | 5.96 | 6.10 | 5.96 | 6.10 | 100 | 6.10 | |
| 2/22/2010 | 6.05 | 6.05 | 6.05 | 6.05 | 200 | 6.05 | |
| 2/23/2010 | 6.00 | 6.00 | 6.00 | 6.00 | 300 | 6.00 | |
| 2/24/2010 | 6.00 | 6.00 | 5.95 | 6.00 | 1,920 | 6.00 | |
| 2/26/2010 | 5.80 | 6.00 | 4.43 | 6.00 | 79,530 | 6.00 | |
| 3/1/2010 | 5.90 | 5.90 | 5.90 | 5.90 | 100 | 5.90 | |
| 3/2/2010 | 5.85 | 5.85 | 5.85 | 5.85 | 940 | 5.85 | |
| 3/3/2010 | 5.70 | 5.72 | 5.06 | 5.72 | 6,335 | 5.72 | |
| 3/4/2010 | 5.57 | 5.57 | 5.32 | 5.45 | 1,600 | 5.45 | |
| 3/7/2010 | 5.34 | 5.34 | 5.34 | 5.34 | 300 | 5.34 | |
| 3/8/2010 | 5.32 | 5.32 | 5.00 | 5.00 | 5,700 | 5.00 | |
| 3/9/2010 | 5.21 | 5.35 | 5.19 | 5.35 | 3,100 | 5.35 | |
| 3/10/2010 | 5.50 | 5.50 | 5.35 | 5.35 | 600 | 5.35 | |
| 3/15/2010 | 5.51 | 6.63 | 5.51 | 6.01 | 52,400 | 6.01 | |
| 3/16/2010 | 5.86 | 5.86 | 5.86 | 5.86 | 200 | 5.86 | |
| 3/17/2010 | 5.78 | 5.93 | 5.78 | 5.93 | 2,400 | 5.93 | |
| 3/18/2010 | 5.90 | 6.10 | 5.82 | 5.89 | 5,400 | 5.89 | |
| 3/22/2010 | 5.68 | 5.80 | 5.68 | 5.80 | 1,700 | 5.80 | |
| 3/24/2010 | 5.65 | 6.05 | 5.46 | 5.88 | 19,600 | 5.88 | |
| 3/29/2010 | 5.65 | 5.76 | 5.65 | 5.76 | 100 | 5.76 | |
| 3/30/2010 | 5.73 | 5.73 | 5.28 | 5.28 | 1,300 | 5.28 | |
| 3/31/2010 | 5.42 | 5.42 | 5.42 | 5.42 | 100 | 5.42 | |
| 4/5/2010 | 5.57 | 5.62 | 5.34 | 5.62 | 900 | 5.62 | |
| 4/6/2010 | 5.77 | 6.10 | 5.77 | 6.00 | 5,165 | 6.00 | |
| 4/7/2010 | 5.91 | 5.91 | 5.89 | 5.90 | 300 | 5.90 | |
| 4/8/2010 | 5.91 | 6.03 | 5.91 | 6.03 | 1,850 | 6.03 | |
| 4/9/2010 | 6.05 | 6.05 | 6.00 | 6.05 | 1,700 | 6.05 | |

| | | | | | |
|---|---|---|---|---|---|
| 6/22/2010 | 12.58 | 13.63 | 12.09 | 13.45 | 39,188 | 13.45 |
| 6/23/2010 | 13.95 | 15.92 | 13.24 | 13.44 | 99,534 | 13.44 |
| 6/24/2010 | 13.74 | 14.43 | 13.60 | 13.66 | 86,349 | 13.66 |
| 6/25/2010 | 13.00 | 13.51 | 9.50 | 9.50 | 1,395,687 | 9.50 |
| 6/28/2010 | 8.47 | 9.40 | 6.29 | 6.44 | 780,808 | 6.44 |
| 6/29/2010 | 6.45 | 6.83 | 5.20 | 5.63 | 448,895 | 5.63 |
| 6/30/2010 | 5.89 | 5.95 | 5.22 | 5.41 | 202,730 | 5.41 |
| 7/1/2010 | 5.49 | 5.57 | 4.88 | 5.15 | 138,634 | 5.15 |
| 7/2/2010 | 4.85 | 5.15 | 4.73 | 4.89 | 141,215 | 4.89 |
| 7/6/2010 | 4.97 | 5.18 | 4.85 | 4.90 | 74,442 | 4.90 |
| 7/7/2010 | 4.91 | 5.40 | 4.83 | 5.40 | 112,341 | 5.40 |
| 7/8/2010 | 5.33 | 5.85 | 5.20 | 5.60 | 106,514 | 5.60 |
| 7/9/2010 | 5.65 | 5.65 | 5.10 | 5.59 | 33,483 | 5.59 |
| 7/12/2010 | 5.51 | 5.72 | 5.12 | 5.22 | 32,525 | 5.22 |
| 7/13/2010 | 5.27 | 5.40 | 5.02 | 5.26 | 94,023 | 5.26 |
| 7/14/2010 | 5.21 | 5.24 | 5.02 | 5.08 | 91,873 | 5.08 |
| 7/15/2010 | 5.04 | 5.04 | 4.85 | 5.02 | 28,804 | 5.02 |
| 7/16/2010 | 5.03 | 5.14 | 4.90 | 5.00 | 23,504 | 5.00 |
| 7/19/2010 | 4.99 | 4.99 | 4.88 | 4.97 | 47,666 | 4.97 |
| 7/20/2010 | 4.94 | 5.40 | 4.94 | 5.35 | 62,330 | 5.35 |
| 7/21/2010 | 5.39 | 5.71 | 5.39 | 5.60 | 63,965 | 5.60 |
| 7/22/2010 | 5.64 | 5.85 | 5.60 | 5.85 | 372,392 | 5.85 |
| 7/23/2010 | 5.80 | 6.53 | 5.72 | 6.39 | 80,406 | 6.39 |
| 7/26/2010 | 6.65 | 6.69 | 6.19 | 6.67 | 82,513 | 6.67 |
| 7/27/2010 | 6.05 | 6.69 | 6.03 | 6.35 | 120,787 | 6.35 |
| 7/28/2010 | 6.50 | 6.50 | 6.35 | 6.46 | 196,970 | 6.46 |
| 7/29/2010 | 6.75 | 6.88 | 6.45 | 6.70 | 211,908 | 6.70 |
| 7/30/2010 | 6.80 | 6.95 | 6.65 | 6.94 | 22,641 | 6.94 |
| 8/2/2010 | 6.98 | 7.11 | 6.91 | 7.06 | 37,561 | 7.06 |
| 8/3/2010 | 7.16 | 7.16 | 6.38 | 6.68 | 64,495 | 6.68 |
| 8/4/2010 | 6.70 | 6.83 | 6.24 | 6.50 | 38,099 | 6.50 |
| 8/5/2010 | 6.49 | 6.58 | 6.42 | 6.53 | 8,040 | 6.53 |
| 8/6/2010 | 6.50 | 6.52 | 6.25 | 6.38 | 13,759 | 6.38 |
| 8/9/2010 | 6.38 | 6.52 | 6.30 | 6.41 | 5,570 | 6.41 |
| 8/10/2010 | 6.38 | 6.61 | 6.18 | 6.20 | 74,106 | 6.20 |
| 8/11/2010 | 6.14 | 6.20 | 5.90 | 6.03 | 56,289 | 6.03 |
| 8/12/2010 | 5.58 | 5.96 | 5.32 | 5.78 | 38,958 | 5.78 |
| 8/13/2010 | 5.76 | 5.99 | 5.55 | 5.99 | 36,419 | 5.99 |
| 8/16/2010 | 5.97 | 6.06 | 5.91 | 6.02 | 48,374 | 6.02 |
| 8/17/2010 | 6.06 | 6.06 | 5.91 | 6.00 | 41,191 | 6.00 |
| 8/18/2010 | 5.97 | 6.32 | 5.96 | 6.32 | 21,654 | 6.32 |
| 8/19/2010 | 6.31 | 6.31 | 5.95 | 6.10 | 16,909 | 6.10 |
| 8/20/2010 | 6.09 | 6.10 | 5.75 | 5.91 | 17,195 | 5.91 |
| 8/23/2010 | 5.94 | 5.94 | 5.45 | 5.60 | 33,068 | 5.60 |
| 8/24/2010 | 5.90 | 5.90 | 5.59 | 5.75 | 8,778 | 5.75 |
| 8/25/2010 | 5.77 | 5.97 | 5.66 | 5.74 | 8,851 | 5.74 |
| 8/26/2010 | 5.75 | 5.75 | 5.41 | 5.41 | 15,282 | 5.41 |

| | | | | | |
|---|---|---|---|---|---|
| 11/4/2010 | 6.33 | 6.56 | 6.33 | 6.56 | 75,106 | 6.56 |
| 11/5/2010 | 6.56 | 6.76 | 6.48 | 6.68 | 36,082 | 6.68 |
| 11/8/2010 | 6.67 | 7.40 | 6.67 | 6.80 | 70,563 | 6.80 |
| 11/9/2010 | 6.75 | 6.92 | 6.46 | 6.80 | 117,528 | 6.80 |
| 11/10/2010 | 6.76 | 6.84 | 6.61 | 6.73 | 30,482 | 6.73 |
| 11/11/2010 | 6.73 | 6.80 | 6.42 | 6.75 | 70,939 | 6.75 |
| 11/12/2010 | 6.65 | 6.82 | 6.52 | 6.73 | 68,512 | 6.73 |
| 11/15/2010 | 6.72 | 6.75 | 6.41 | 6.65 | 81,386 | 6.65 |
| 11/16/2010 | 6.60 | 6.65 | 6.38 | 6.53 | 109,519 | 6.53 |
| 11/17/2010 | 6.52 | 6.60 | 6.23 | 6.49 | 38,999 | 6.49 |
| 11/18/2010 | 6.50 | 6.55 | 6.39 | 6.43 | 15,754 | 6.43 |
| 11/19/2010 | 6.45 | 6.60 | 6.03 | 6.49 | 44,205 | 6.49 |
| 11/22/2010 | 6.41 | 6.41 | 6.15 | 6.24 | 30,446 | 6.24 |
| 11/23/2010 | 30.89 | 31.89 | 29.32 | 29.82 | 61,73 | 5.94 |
| 11/24/2010 | 29.78 | 30.00 | 29.20 | 29.50 | 32,573 | 5.90 |
| 11/26/2010 | 29.32 | 29.51 | 26.29 | 26.48 | 49,599 | 5.30 |
| 11/29/2010 | 26.71 | 27.23 | 25.05 | 26.20 | 27,115 | 5.24 |
| 11/30/2010 | 26.05 | 26.32 | 25.25 | 26.25 | 30,138 | 5.25 |
| 12/1/2010 | 26.06 | 26.29 | 25.25 | 25.49 | 11,953 | 5.10 |
| 12/2/2010 | 25.52 | 25.75 | 20.31 | 21.86 | 147,867 | 4.37 |
| 12/3/2010 | 21.84 | 21.84 | 18.60 | 20.26 | 123,123 | 4.05 |
| 12/6/2010 | 20.25 | 21.50 | 18.50 | 21.50 | 132,135 | 4.30 |
| 12/7/2010 | 22.25 | 27.93 | 22.25 | 27.59 | 166,190 | 5.52 |
| 12/8/2010 | 27.48 | 29.32 | 26.10 | 27.46 | 59,268 | 5.49 |
| 12/9/2010 | 27.55 | 27.55 | 25.95 | 27.50 | 92,962 | 5.50 |
| 12/10/2010 | 27.32 | 27.80 | 26.60 | 26.78 | 25,644 | 5.36 |
| 12/13/2010 | 26.84 | 27.02 | 25.53 | 26.93 | 65,555 | 5.39 |
| 12/14/2010 | 26.79 | 27.00 | 25.68 | 26.08 | 31,866 | 5.22 |
| 12/15/2010 | 26.30 | 28.24 | 26.30 | 27.28 | 15,980 | 5.46 |
| 12/16/2010 | 27.28 | 27.60 | 27.05 | 27.18 | 6,028 | 5.44 |
| 12/17/2010 | 26.95 | 27.04 | 25.95 | 26.83 | 18,723 | 5.37 |
| 12/20/2010 | 26.68 | 26.68 | 25.23 | 26.50 | 7,424 | 5.30 |
| 12/21/2010 | 26.38 | 26.80 | 26.18 | 26.37 | 19,754 | 5.27 |
| 12/22/2010 | 26.90 | 27.60 | 26.90 | 27.60 | 9,283 | 5.52 |
| 12/23/2010 | 27.60 | 29.25 | 27.60 | 29.25 | 21,701 | 5.85 |
| 12/27/2010 | 29.25 | 29.25 | 29.04 | 29.23 | 1,800 | 5.85 |
| 12/28/2010 | 29.26 | 29.26 | 28.71 | 28.85 | 19,800 | 5.77 |
| 12/29/2010 | 28.87 | 33.75 | 28.87 | 29.97 | 22,945 | 5.99 |
| 12/30/2010 | 29.89 | 30.45 | 29.63 | 30.16 | 16,100 | 6.03 |
| 12/31/2010 | 29.90 | 30.50 | 29.73 | 30.00 | 11,748 | 6.00 |
| 1/3/2011 | 30.09 | 30.09 | 28.79 | 29.00 | 15,118 | 5.80 |
| 1/4/2011 | 29.08 | 29.08 | 28.01 | 28.11 | 12,963 | 5.62 |
| 1/5/2011 | 28.28 | 28.28 | 27.00 | 28.10 | 14,490 | 5.62 |
| 1/6/2011 | 28.75 | 29.25 | 28.35 | 28.75 | 39,016 | 5.75 |
| 1/7/2011 | 28.51 | 28.51 | 27.70 | 28.04 | 8,711 | 5.61 |
| 1/10/2011 | 28.11 | 28.11 | 26.82 | 26.98 | 5,031 | 5.40 |
| 1/11/2011 | 26.52 | 26.61 | 24.35 | 26.25 | 38,590 | 5.25 |

| | | | | | |
|---|---|---|---|---|---|
| 6/23/2011 | 0.44 | 0.44 | 0.44 | 0.44 | 20,000 | 0.09 |
| 6/24/2011 | 0.44 | 0.44 | 0.40 | 0.40 | 13,307 | 0.08 |
| 6/27/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 4,000 | 0.08 |
| 6/28/2011 | 0.45 | 0.45 | 0.39 | 0.40 | 2,873 | 0.08 |
| 6/29/2011 | 0.33 | 0.45 | 0.33 | 0.45 | 1,408 | 0.09 |
| 6/30/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 200 | 0.08 |
| 7/1/2011 | 0.42 | 0.42 | 0.10 | 0.10 | 3,517 | 0.02 |

| | |
|---|---|
| $ | 2,448,750 |
| $ | 2,475,000 |
| $ | 2,235,000 |
| $ | 2,302,500 |
| $ | 2,381,250 |
| $ | 2,336,250 |
| $ | 2,343,750 |
| $ | 2,418,750 |
| $ | 2,362,500 |
| $ | 2,362,500 |
| $ | 2,520,000 |
| $ | 2,516,250 |
| $ | 2,782,500 |
| $ | 2,917,500 |
| $ | 3,045,000 |
| $ | 3,187,500 |
| $ | 2,793,750 |
| $ | 2,797,500 |
| $ | 3,116,250 |
| $ | 3,461,250 |
| $ | 3,633,750 |
| $ | 3,813,750 |
| $ | 4,312,500 |
| $ | 5,985,000 |
| $ | 5,741,250 |
| $ | 5,730,000 |
| $ | 5,478,750 |
| $ | 4,623,750 |
| $ | 4,987,500 |
| $ | 5,358,750 |
| $ | 5,085,000 |
| $ | 4,807,500 |
| $ | 4,650,000 |
| $ | 4,916,250 |
| $ | 5,006,250 |
| $ | 5,250,000 |
| $ | 5,891,250 |
| $ | 5,816,250 |
| $ | 5,805,000 |
| $ | 5,231,250 |
| $ | 5,205,000 |
| $ | 6,468,750 |
| $ | 5,411,250 |
| $ | 5,175,000 |
| $ | 5,175,000 |
| $ | 5,081,250 |
| $ | 4,608,750 |

| | |
|---|---|
| $ | 2,028,750 |
| $ | 2,002,500 |
| $ | 2,025,000 |
| $ | 2,160,000 |
| $ | 2,171,250 |
| $ | 2,186,250 |
| $ | 2,250,000 |
| $ | 1,950,000 |
| $ | 1,965,000 |
| $ | 1,968,750 |
| $ | 1,983,750 |
| $ | 2,130,000 |
| $ | 2,111,250 |
| $ | 2,107,500 |
| $ | 2,066,250 |
| $ | 2,032,500 |
| $ | 2,010,000 |
| $ | 1,897,500 |
| $ | 1,912,500 |
| $ | 1,890,000 |
| $ | 1,897,500 |
| $ | 1,983,750 |
| $ | 2,025,000 |
| $ | 1,998,750 |
| $ | 1,912,500 |
| $ | 1,897,500 |
| $ | 1,867,500 |
| $ | 1,912,500 |
| $ | 1,912,500 |
| $ | 1,893,750 |
| $ | 1,886,250 |
| $ | 1,890,000 |
| $ | 1,927,500 |
| $ | 1,931,250 |
| $ | 1,905,000 |
| $ | 1,946,250 |
| $ | 1,938,750 |
| $ | 1,935,000 |
| $ | 1,987,500 |
| $ | 2,036,250 |
| $ | 2,066,250 |
| $ | 2,028,750 |
| $ | 2,126,250 |
| $ | 2,137,500 |
| $ | 2,171,250 |
| $ | 2,283,750 |
| $ | 2,385,000 |

| | |
|---|---:|
| $ | 2,035,500 |
| $ | 2,079,750 |
| $ | 2,047,500 |
| $ | 1,824,000 |
| $ | 1,744,500 |
| $ | 1,650,000 |
| $ | 1,572,000 |
| $ | 1,556,250 |
| $ | 1,632,000 |
| $ | 1,592,250 |
| $ | 1,585,500 |
| $ | 1,607,250 |
| $ | 1,575,000 |
| $ | 1,568,250 |
| $ | 1,526,250 |
| $ | 1,488,750 |
| $ | 1,455,750 |
| $ | 1,275,750 |
| $ | 1,266,000 |
| $ | 1,207,500 |
| $ | 1,177,500 |
| $ | 1,135,500 |
| $ | 900,000 |
| $ | 697,500 |
| $ | 479,250 |
| $ | 522,750 |
| $ | 492,750 |
| $ | 425,250 |
| $ | 396,000 |
| $ | 71,250 |
| $ | 56,250 |
| $ | 48,750 |
| $ | 41,250 |
| $ | 37,500 |
| $ | 26,250 |
| $ | 26,250 |
| $ | 28,500 |
| $ | 30,000 |
| $ | 30,000 |
| $ | 30,000 |
| $ | 28,500 |
| $ | 26,250 |
| $ | 26,250 |
| $ | 29,250 |
| $ | 30,000 |
| $ | 30,000 |
| $ | 33,750 |

| Date | Open | High | Low | Close | Volume | Split-Adjusted | Return | |
|------|------|------|-----|-------|--------|----------------|--------|--|
| 1/20/2010 | 8.90 | 9.10 | 8.30 | 8.30 | 16,030 | 8.30 | | |
| 1/21/2010 | 8.40 | 8.40 | 8.01 | 8.01 | 10,300 | 8.01 | -0.035564754 | 1 |
| 1/22/2010 | 8.01 | 8.03 | 7.46 | 7.46 | 9,500 | 7.46 | -0.071135347 | 1 |
| 1/25/2010 | 7.70 | 7.70 | 6.50 | 6.51 | 39,058 | 6.51 | -0.136215958 | 1 |
| 1/26/2010 | 7.22 | 7.31 | 6.39 | 6.46 | 65,979 | 6.46 | -0.007710138 | 1 |
| 1/27/2010 | 6.57 | 7.03 | 6.49 | 6.50 | 4,200 | 6.50 | 0.006173859 | 1 |
| 1/28/2010 | 6.34 | 6.37 | 6.33 | 6.34 | 4,700 | 6.34 | -0.024923408 | 0 |
| 1/29/2010 | 6.32 | 6.32 | 5.91 | 5.91 | 3,350 | 5.91 | -0.070232937 | 0 |
| 2/1/2010 | 5.96 | 5.98 | 5.98 | 5.98 | 2,000 | 5.98 | 0.011774737 | 0 |
| 2/2/2010 | 5.98 | 5.98 | 5.98 | 5.98 | 1,000 | 5.98 | 0 | 0 |
| 2/3/2010 | 6.13 | 6.46 | 6.13 | 6.25 | 6,800 | 6.25 | 0.04116896 | 0 |
| 2/4/2010 | 6.10 | 6.10 | 5.81 | 5.96 | 19,200 | 5.96 | -0.047510983 | 0 |
| 2/5/2010 | 5.83 | 5.83 | 5.83 | 5.83 | 1,000 | 5.83 | -0.022053481 | 1 |
| 2/8/2010 | 6.00 | 6.08 | 5.90 | 5.90 | 1,341 | 5.90 | 0.011935351 | 0 |
| 2/9/2010 | 5.75 | 5.81 | 5.75 | 5.81 | 1,700 | 5.81 | -0.01537178 | 0 |
| 2/17/2010 | 5.96 | 5.98 | 5.96 | 5.98 | 200 | 5.98 | 0.028839997 | 0 |
| 2/18/2010 | 5.96 | 6.10 | 5.96 | 6.10 | 100 | 6.10 | 0.019868203 | 0 |
| 2/22/2010 | 6.05 | 6.05 | 6.05 | 6.05 | 200 | 6.05 | -0.008230499 | 0 |
| 2/23/2010 | 6.00 | 6.00 | 6.00 | 6.00 | 300 | 6.00 | -0.008298803 | 0 |
| 2/24/2010 | 6.00 | 6.00 | 5.95 | 6.00 | 1,920 | 6.00 | 0 | 0 |
| 2/26/2010 | 5.80 | 6.00 | 4.43 | 6.00 | 79,530 | 6.00 | 0 | 0 |
| 3/1/2010 | 5.90 | 5.90 | 5.90 | 5.90 | 100 | 5.90 | -0.016807118 | 1 |
| 3/2/2010 | 5.85 | 5.85 | 5.85 | 5.85 | 940 | 5.85 | -0.00851069 | 0 |
| 3/3/2010 | 5.70 | 5.72 | 5.06 | 5.72 | 6,335 | 5.72 | -0.022472856 | 0 |
| 3/4/2010 | 5.57 | 5.57 | 5.32 | 5.45 | 1,600 | 5.45 | -0.048353197 | 0 |
| 3/7/2010 | 5.34 | 5.34 | 5.34 | 5.34 | 300 | 5.34 | -0.020389956 | 0 |
| 3/8/2010 | 5.32 | 5.37 | 5.00 | 5.00 | 5,700 | 5.00 | -0.065787741 | 0 |
| 3/9/2010 | 5.21 | 5.35 | 5.19 | 5.35 | 2,100 | 5.35 | 0.067658648 | 0 |
| 3/10/2010 | 5.50 | 5.50 | 5.35 | 5.35 | 600 | 5.35 | 0 | 0 |
| 3/15/2010 | 5.51 | 6.63 | 5.51 | 6.01 | 52,400 | 6.01 | 0.116328188 | 0 |
| 3/16/2010 | 5.86 | 5.86 | 5.86 | 5.86 | 200 | 5.86 | -0.025275145 | 0 |
| 3/17/2010 | 5.78 | 5.93 | 5.78 | 5.93 | 2,400 | 5.93 | 0.011874609 | 0 |
| 3/18/2010 | 5.90 | 6.10 | 5.82 | 5.89 | 5,400 | 5.89 | -0.006768215 | 0 |
| 3/22/2010 | 5.68 | 5.80 | 5.68 | 5.80 | 1,700 | 5.80 | -0.01539808 | 0 |
| 3/24/2010 | 5.65 | 6.05 | 5.46 | 5.88 | 19,600 | 5.88 | 0.013698844 | 0 |
| 3/29/2010 | 5.65 | 5.76 | 5.65 | 5.76 | 100 | 5.76 | -0.020619287 | 1 |
| 3/30/2010 | 5.73 | 5.73 | 5.28 | 5.28 | 1,300 | 5.28 | -0.087011377 | 0 |
| 3/31/2010 | 5.42 | 5.42 | 5.42 | 5.42 | 100 | 5.42 | 0.026169718 | 0 |
| 4/5/2010 | 5.57 | 5.62 | 5.34 | 5.62 | 900 | 5.62 | 0.036235848 | 0 |
| 4/6/2010 | 5.77 | 6.10 | 5.77 | 6.00 | 5,165 | 6.00 | 0.065427805 | 0 |
| 4/7/2010 | 5.91 | 5.91 | 5.89 | 5.90 | 300 | 5.90 | -0.016807118 | 0 |
| 4/8/2010 | 5.91 | 6.03 | 5.91 | 6.03 | 1,850 | 6.03 | 0.02179466 | 0 |
| 4/9/2010 | 6.05 | 6.05 | 6.00 | 6.05 | 1,700 | 6.05 | 0.003311261 | 0 |
| 4/13/2010 | 6.05 | 6.67 | 6.02 | 6.53 | 22,054 | 6.53 | 0.076348671 | 0 |
| 4/14/2010 | 6.68 | 6.85 | 6.25 | 6.60 | 7,191 | 6.60 | 0.010662706 | 1 |
| 4/16/2010 | 6.51 | 6.51 | 5.96 | 5.96 | 3,550 | 5.96 | -0.101999168 | 0 |
| 4/19/2010 | 6.00 | 6.14 | 6.00 | 6.14 | 200 | 6.14 | 0.029754261 | 0 |
| 4/20/2010 | 6.02 | 6.35 | 6.02 | 6.35 | 263 | 6.35 | 0.033630071 | 0 |
| 4/21/2010 | 6.02 | 6.23 | 6.02 | 6.23 | 100 | 6.23 | -0.01907848 | 0 |
| 4/23/2010 | 6.16 | 6.25 | 6.14 | 6.25 | 1,650 | 6.25 | 0.003205131 | 0 |
| 4/26/2010 | 6.30 | 6.45 | 6.24 | 6.45 | 3,600 | 6.45 | 0.031498667 | 0 |
| 4/27/2010 | 6.31 | 6.31 | 6.30 | 6.30 | 200 | 6.30 | -0.023530497 | 0 |
| 4/28/2010 | 6.33 | 6.34 | 6.23 | 6.30 | 4,900 | 6.30 | 0 | 0 |
| 4/29/2010 | 6.39 | 6.73 | 6.30 | 6.72 | 11,300 | 6.72 | 0.064538521 | 0 |
| 4/30/2010 | 6.74 | 7.00 | 6.61 | 6.71 | 2,918 | 6.71 | -0.001489304 | 1 |
| 5/3/2010 | 6.70 | 12.45 | 6.70 | 7.42 | 86,300 | 7.42 | 0.100580106 | 0 |
| 5/4/2010 | 7.46 | 7.90 | 7.46 | 7.78 | 31,800 | 7.78 | 0.047377281 | 1 |
| 5/5/2010 | 7.88 | 8.65 | 7.85 | 8.12 | 11,919 | 8.12 | 0.042773816 | 1 |
| 5/6/2010 | 8.29 | 8.79 | 8.29 | 8.50 | 17,218 | 8.50 | 0.045736009 | 1 |
| 5/7/2010 | 8.31 | 8.31 | 7.40 | 7.45 | 15,500 | 7.45 | -1.131852131 | 1 |
| 5/10/2010 | 7.60 | 7.60 | 7.40 | 7.46 | 7,200 | 7.46 | 0.001341382 | 1 |
| 5/11/2010 | 7.50 | 8.31 | 7.45 | 8.31 | 14,322 | 8.31 | 0.107904195 | 0 |
| 5/12/2010 | 8.35 | 9.32 | 8.35 | 9.23 | 28,111 | 9.23 | 0.10499944 | 1 |
| 5/13/2010 | 9.05 | 9.77 | 8.84 | 9.69 | 69,200 | 9.69 | 0.048635237 | 1 |
| 5/14/2010 | 9.60 | 10.24 | 9.21 | 10.17 | 19,636 | 10.17 | 0.048347284 | 1 |
| 5/17/2010 | 9.99 | 11.50 | 9.97 | 11.50 | 26,000 | 11.50 | 0.122904825 | 1 |
| 5/18/2010 | 11.96 | 15.96 | 11.51 | 15.96 | 27,820 | 15.96 | 0.327738557 | 1 |
| 5/19/2010 | 15.22 | 15.67 | 13.61 | 15.31 | 19,622 | 15.31 | -0.041579382 | 1 |
| 5/20/2010 | 14.80 | 16.04 | 14.30 | 15.28 | 7,147 | 15.28 | -0.001961426 | 1 |
| 5/21/2010 | 15.67 | 17.20 | 13.77 | 14.61 | 23,482 | 14.61 | -0.044038558 | 0 |
| 5/24/2010 | 13.80 | 14.05 | 11.52 | 12.33 | 24,783 | 12.33 | -0.169670909 | 1 |
| 5/25/2010 | 12.77 | 13.42 | 11.62 | 13.30 | 4,725 | 13.30 | 0.075728718 | 1 |
| 5/26/2010 | 14.00 | 14.49 | 13.33 | 14.29 | 5,455 | 14.29 | 0.071795957 | 0 |
| 5/27/2010 | 15.70 | 16.01 | 13.49 | 13.56 | 18,252 | 13.56 | -0.052435709 | 0 |
| 5/28/2010 | 13.16 | 13.44 | 12.81 | 12.82 | 67,047 | 12.82 | -0.056117831 | 1 |
| 6/1/2010 | 12.15 | 12.66 | 11.31 | 12.40 | 17,100 | 12.40 | -0.033309979 | 1 |
| 6/2/2010 | 12.21 | 13.12 | 12.21 | 13.11 | 4,400 | 13.11 | 0.055678825 | 1 |
| 6/3/2010 | 12.47 | 13.45 | 11.70 | 13.35 | 27,809 | 13.35 | 0.018141087 | 0 |
| 6/4/2010 | 13.60 | 14.37 | 13.25 | 14.00 | 4,400 | 14.00 | 0.047540945 | 1 |
| 6/7/2010 | 13.37 | 16.00 | 13.37 | 15.71 | 77,796 | 15.71 | 0.115240123 | 0 |
| 6/8/2010 | 15.24 | 15.70 | 14.00 | 15.51 | 14,135 | 15.51 | -0.012812475 | 1 |
| 6/9/2010 | 15.24 | 15.48 | 15.24 | 15.48 | 100 | 15.48 | -0.001936109 | 1 |
| 6/10/2010 | 15.50 | 15.89 | 13.95 | 13.95 | 6,906 | 13.95 | -0.10406936 | 0 |
| 6/11/2010 | 13.75 | 13.88 | 13.50 | 13.88 | 4,033 | 13.88 | -0.005030553 | 0 |
| 6/14/2010 | 15.75 | 18.50 | 14.85 | 17.25 | 134,309 | 17.25 | 0.217363188 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6/15/2010 | 16.50 | 16.50 | 13.76 | 14.43 | 151,793 | 14.43 | -0.178502771 | 1 |
| 6/16/2010 | 13.68 | 14.53 | 13.30 | 13.80 | 49,314 | 13.80 | -0.044640781 | 1 |
| 6/17/2010 | 13.81 | 14.00 | 13.15 | 13.80 | 14,028 | 13.80 | 0 | 1 |
| 6/18/2010 | 14.30 | 15.00 | 12.84 | 13.55 | 48,563 | 13.55 | -0.018282045 | 1 |
| 6/21/2010 | 14.05 | 14.55 | 12.05 | 12.29 | 69,003 | 12.29 | -0.097600624 | 1 |
| 6/22/2010 | 12.58 | 13.63 | 12.09 | 13.45 | 39,188 | 13.45 | 0.090193182 | 1 |
| 6/23/2010 | 13.95 | 15.92 | 13.24 | 13.44 | 99,534 | 13.44 | -0.000743771 | 1 |
| 6/24/2010 | 13.74 | 14.43 | 13.60 | 13.66 | 86,349 | 13.66 | 0.016236519 | 1 |
| 6/25/2010 | 13.00 | 13.51 | 9.50 | 9.50 | 1,395,687 | 9.50 | -0.363180056 | 1 |
| 6/28/2010 | 8.47 | 9.40 | 6.29 | 6.44 | 780,808 | 6.44 | -0.388763258 | 1 |
| 6/29/2010 | 6.45 | 6.83 | 5.20 | 5.63 | 448,895 | 5.63 | -0.134419098 | 1 |
| 6/30/2010 | 5.89 | 5.95 | 5.22 | 5.41 | 202,730 | 5.41 | -0.039860349 | 1 |
| 7/1/2010 | 5.49 | 5.57 | 4.88 | 5.15 | 138,634 | 5.15 | -0.049252378 | 1 |
| 7/2/2010 | 4.85 | 5.15 | 4.73 | 4.89 | 141,215 | 4.89 | -0.051804411 | 1 |
| 7/6/2010 | 4.97 | 5.18 | 4.85 | 4.90 | 74,442 | 4.90 | 0.002042902 | 1 |
| 7/7/2010 | 4.91 | 5.40 | 4.83 | 5.40 | 112,341 | 5.40 | 0.097163748 | 1 |
| 7/8/2010 | 5.33 | 5.85 | 5.20 | 5.60 | 106,514 | 5.60 | 0.036367644 | 1 |
| 7/9/2010 | 5.65 | 5.65 | 5.10 | 5.59 | 33,483 | 5.59 | -0.001787311 | 1 |
| 7/12/2010 | 5.53 | 5.72 | 5.12 | 5.22 | 32,525 | 5.22 | -0.068481885 | 1 |
| 7/13/2010 | 5.27 | 5.40 | 5.02 | 5.26 | 94,023 | 5.26 | 0.007633625 | 1 |
| 7/14/2010 | 5.21 | 5.24 | 5.02 | 5.08 | 91,873 | 5.08 | -0.034819765 | 1 |
| 7/15/2010 | 5.04 | 5.04 | 4.85 | 5.02 | 28,804 | 5.02 | -0.011881328 | 1 |
| 7/16/2010 | 5.03 | 5.14 | 4.90 | 5.00 | 23,504 | 5.00 | -0.003992021 | 1 |
| 7/19/2010 | 4.99 | 4.99 | 4.88 | 4.97 | 47,666 | 4.97 | -0.006018072 | 1 |
| 7/20/2010 | 4.94 | 5.40 | 4.94 | 5.35 | 62,330 | 5.35 | 0.073676721 | 1 |
| 7/21/2010 | 5.39 | 5.71 | 5.39 | 5.60 | 63,965 | 5.60 | 0.045670097 | 1 |
| 7/22/2010 | 5.64 | 5.85 | 5.60 | 5.85 | 372,392 | 5.85 | 0.043675064 | 1 |
| 7/23/2010 | 5.80 | 6.53 | 5.72 | 6.39 | 80,406 | 6.39 | 0.088292607 | 1 |
| 7/26/2010 | 6.65 | 6.69 | 6.19 | 6.67 | 82,513 | 6.67 | 0.042885592 | 1 |
| 7/27/2010 | 6.05 | 6.69 | 6.03 | 6.35 | 120,787 | 6.35 | -0.049165047 | 1 |
| 7/28/2010 | 6.50 | 6.50 | 6.35 | 6.46 | 196,970 | 6.46 | 0.017174505 | 1 |
| 7/29/2010 | 6.75 | 6.88 | 6.45 | 6.70 | 211,908 | 6.70 | 0.036478209 | 1 |
| 7/30/2010 | 6.80 | 6.95 | 6.65 | 6.94 | 22,641 | 6.94 | 0.035194248 | 1 |
| 8/2/2010 | 6.98 | 7.11 | 6.91 | 7.06 | 37,561 | 7.06 | 0.017143277 | 1 |
| 8/3/2010 | 7.16 | 7.16 | 6.38 | 6.68 | 64,495 | 6.68 | -0.055327064 | 1 |
| 8/4/2010 | 6.70 | 6.83 | 6.24 | 6.50 | 38,099 | 6.50 | -0.027315811 | 1 |
| 8/5/2010 | 6.49 | 6.58 | 6.42 | 6.53 | 8,040 | 6.53 | 0.004604766 | 1 |
| 8/6/2010 | 6.52 | 6.25 | 6.38 | 13,759 | 6.38 | -0.023238846 | 1 |
| 8/9/2010 | 6.38 | 6.52 | 6.30 | 6.41 | 5,570 | 6.41 | 0.004691174 | 1 |
| 8/10/2010 | 6.38 | 6.61 | 6.18 | 6.20 | 74,106 | 6.20 | -0.033309979 | 0 |
| 8/11/2010 | 6.14 | 6.20 | 5.90 | 6.03 | 56,289 | 6.03 | -0.027802281 | 1 |
| 8/12/2010 | 5.58 | 5.96 | 5.32 | 5.78 | 38,958 | 5.78 | -0.042343328 | 1 |
| 8/13/2010 | 5.76 | 5.99 | 5.55 | 5.99 | 36,419 | 5.99 | 0.035687729 | 1 |
| 8/16/2010 | 5.97 | 6.06 | 5.91 | 6.02 | 49,374 | 6.02 | 0.004995847 | 1 |
| 8/17/2010 | 6.06 | 6.06 | 5.91 | 6.00 | 41,191 | 6.00 | -0.00332779 | 1 |
| 8/18/2010 | 5.97 | 6.32 | 5.96 | 6.32 | 21,654 | 6.32 | 0.051959739 | 1 |
| 8/19/2010 | 6.31 | 6.31 | 5.95 | 6.10 | 16,909 | 6.10 | -0.035430437 | 1 |
| 8/20/2010 | 6.09 | 6.10 | 5.75 | 5.91 | 17,195 | 5.91 | -0.03164294 | 1 |
| 8/23/2010 | 5.94 | 5.94 | 5.45 | 5.60 | 33,068 | 5.60 | -0.053879234 | 1 |
| 8/24/2010 | 5.90 | 5.90 | 5.59 | 5.75 | 8,778 | 5.75 | 0.026433257 | 1 |
| 8/25/2010 | 5.77 | 5.97 | 5.66 | 5.74 | 8,851 | 5.74 | -0.001740644 | 1 |
| 8/26/2010 | 5.75 | 5.75 | 5.41 | 5.41 | 15,282 | 5.41 | -0.059210117 | 1 |
| 8/27/2010 | 5.45 | 5.50 | 5.34 | 5.41 | 25,777 | 5.41 | 0 | 1 |
| 8/30/2010 | 5.40 | 5.40 | 5.34 | 5.34 | 33,975 | 5.34 | -0.01302344 | 1 |
| 8/31/2010 | 5.32 | 5.50 | 5.16 | 5.40 | 36,093 | 5.40 | 0.011173301 | 1 |
| 9/1/2010 | 5.51 | 5.76 | 5.45 | 5.76 | 19,348 | 5.76 | 0.064538521 | 1 |
| 9/2/2010 | 5.78 | 5.80 | 5.49 | 5.79 | 20,013 | 5.79 | 0.005194817 | 1 |
| 9/3/2010 | 5.82 | 5.85 | 5.74 | 5.83 | 10,543 | 5.83 | 0.006884709 | 1 |
| 9/7/2010 | 5.58 | 7.59 | 5.80 | 6.00 | 56,835 | 6.00 | 0.028742499 | 1 |
| 9/9/2010 | 5.97 | 5.97 | 5.15 | 5.20 | 127,710 | 5.20 | -0.143100844 | 1 |
| 9/10/2010 | 5.10 | 5.29 | 5.10 | 5.24 | 41,959 | 5.24 | 0.007662873 | 1 |
| 9/13/2010 | 5.28 | 5.31 | 5.21 | 5.25 | 19,843 | 5.25 | 0.001906578 | 1 |
| 9/14/2010 | 5.22 | 5.33 | 5.22 | 5.29 | 7,780 | 5.29 | 0.007590169 | 1 |
| 9/15/2010 | 5.29 | 5.73 | 5.29 | 5.68 | 25,535 | 5.68 | 0.071132587 | 0 |
| 9/16/2010 | 5.70 | 5.75 | 5.62 | 5.63 | 5,822 | 5.63 | -0.008841791 | 1 |
| 9/17/2010 | 5.62 | 5.67 | 5.50 | 5.62 | 26,699 | 5.62 | -0.001777778 | 0 |
| 9/20/2010 | 5.61 | 5.61 | 5.45 | 5.51 | 15,136 | 5.51 | -0.019767041 | 1 |
| 9/21/2010 | 5.50 | 5.53 | 5.41 | 5.42 | 9,067 | 5.42 | -0.016458808 | 1 |
| 9/22/2010 | 5.40 | 5.40 | 5.33 | 5.36 | 8,347 | 5.36 | -0.01113384 | 1 |
| 9/23/2010 | 5.33 | 3.38 | 5.04 | 5.06 | 24,397 | 5.06 | -0.055797492 | 1 |
| 9/24/2010 | 5.10 | 5.15 | 5.04 | 5.10 | 74,251 | 5.10 | 0.007874056 | 1 |
| 9/27/2010 | 5.12 | 5.12 | 4.91 | 5.04 | 7,268 | 5.04 | -0.011834458 | 1 |
| 9/28/2010 | 5.06 | 5.07 | 4.83 | 5.06 | 86,674 | 5.06 | 0.003960401 | 0 |
| 9/29/2010 | 5.06 | 5.29 | 5.02 | 5.29 | 12,557 | 5.29 | 0.044451763 | 1 |
| 9/30/2010 | 5.24 | 5.40 | 5.01 | 5.40 | 20,023 | 5.40 | 0.020580708 | 1 |
| 10/1/2010 | 5.40 | 5.45 | 5.25 | 5.33 | 8,367 | 5.33 | -0.013047715 | 1 |
| 10/4/2010 | 5.31 | 5.31 | 5.00 | 5.10 | 8,354 | 5.10 | -0.044110698 | 1 |
| 10/5/2010 | 5.09 | 5.20 | 4.94 | 5.06 | 41,665 | 5.06 | -0.007874056 | 1 |
| 10/6/2010 | 5.00 | 5.07 | 4.92 | 4.98 | 46,374 | 4.98 | -0.015938592 | 1 |
| 10/7/2010 | 5.01 | 5.12 | 4.90 | 5.10 | 47,066 | 5.10 | 0.023810649 | 1 |
| 10/8/2010 | 5.10 | 5.10 | 4.95 | 5.10 | 26,303 | 5.10 | 0 | 1 |
| 10/11/2010 | 5.08 | 5.08 | 4.85 | 5.05 | 39,068 | 5.05 | -0.009852296 | 1 |
| 10/12/2010 | 5.03 | 5.04 | 4.90 | 5.03 | 64,391 | 5.03 | -0.003968259 | 1 |
| 10/13/2010 | 5.02 | 5.12 | 5.00 | 5.04 | 62,184 | 5.04 | 0.001986098 | 1 |
| 10/14/2010 | 5.05 | 5.15 | 5.05 | 5.14 | 42,359 | 5.14 | 0.019646997 | 1 |
| 10/15/2010 | 5.19 | 5.34 | 5.15 | 5.15 | 51,191 | 5.15 | 0.001943635 | 1 |
| 10/18/2010 | 5.11 | 5.17 | 5.06 | 5.08 | 55,023 | 5.08 | -0.013685453 | 1 |
| 10/19/2010 | 5.05 | 5.50 | 4.85 | 5.19 | 58,460 | 5.19 | 0.021422496 | 1 |

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/20/2010 | 5.21 | 5.38 | 5.15 | 5.17 | 60,416 | 5.17 | -0.003861009 | 1 |
| 10/21/2010 | 5.19 | 5.28 | 5.07 | 5.16 | 53,690 | 5.16 | -0.001936109 | 1 |
| 10/22/2010 | 5.16 | 5.30 | 5.16 | 5.30 | 57,940 | 5.30 | 0.026770241 | 1 |
| 10/25/2010 | 5.34 | 5.68 | 5.34 | 5.43 | 69,637 | 5.43 | 0.024232313 | 1 |
| 10/26/2010 | 5.40 | 5.51 | 5.37 | 5.51 | 75,726 | 5.51 | 0.014625489 | 1 |
| 10/27/2010 | 5.50 | 5.57 | 5.30 | 5.41 | 53,305 | 5.41 | -0.01831553 | 1 |
| 10/28/2010 | 5.45 | 5.68 | 5.42 | 5.67 | 67,938 | 5.67 | 0.046940025 | 1 |
| 10/29/2010 | 5.69 | 5.71 | 5.37 | 5.70 | 60,187 | 5.70 | 0.005277057 | 1 |
| 11/1/2010 | 5.70 | 5.87 | 5.70 | 5.79 | 47,248 | 5.79 | 0.015666117 | 1 |
| 11/2/2010 | 5.84 | 6.09 | 5.68 | 6.09 | 73,471 | 6.09 | 0.05051579 | 1 |
| 11/3/2010 | 6.10 | 6.38 | 6.05 | 6.36 | 72,982 | 6.36 | 0.043380296 | 1 |
| 11/4/2010 | 6.33 | 6.56 | 6.33 | 6.56 | 75,106 | 6.56 | 0.030962226 | 1 |
| 11/5/2010 | 6.56 | 6.76 | 6.48 | 6.68 | 36,082 | 6.68 | 0.018127385 | 1 |
| 11/8/2010 | 6.67 | 7.40 | 6.67 | 6.80 | 70,563 | 6.80 | 0.017804625 | 1 |
| 11/9/2010 | 6.75 | 6.92 | 6.46 | 6.80 | 117,528 | 6.80 | 0 | 1 |
| 11/10/2010 | 6.76 | 6.84 | 6.61 | 6.73 | 30,482 | 6.73 | -0.010347469 | 1 |
| 11/11/2010 | 6.73 | 6.80 | 6.42 | 6.75 | 70,939 | 6.75 | 0.002967361 | 1 |
| 11/12/2010 | 6.65 | 6.82 | 6.52 | 6.73 | 68,512 | 6.73 | -0.002967361 | 1 |
| 11/15/2010 | 6.72 | 6.75 | 6.41 | 6.65 | 81,386 | 6.65 | -0.011958289 | 1 |
| 11/16/2010 | 6.60 | 6.65 | 6.38 | 6.53 | 109,519 | 6.53 | -0.018209911 | 1 |
| 11/17/2010 | 6.52 | 6.60 | 6.23 | 6.49 | 38,959 | 6.49 | -0.006144413 | 1 |
| 11/18/2010 | 6.50 | 6.55 | 6.39 | 6.43 | 15,754 | 6.43 | -0.009287992 | 1 |
| 11/19/2010 | 6.45 | 6.60 | 6.03 | 6.49 | 44,205 | 6.49 | 0.009287992 | 1 |
| 11/22/2010 | 6.41 | 6.41 | 6.15 | 6.24 | 30,446 | 6.24 | -0.039282348 | 1 |
| 11/23/2010 | 30.89 | 31.39 | 29.58 | 29.69 | 61,776 | 5.94 | -0.049607806 | 1 |
| 11/24/2010 | 29.78 | 30.00 | 29.20 | 29.50 | 32,573 | 5.90 | -0.006420025 | 1 |
| 11/26/2010 | 29.32 | 29.51 | 26.29 | 26.48 | 49,599 | 5.30 | -0.108000532 | 1 |
| 11/29/2010 | 26.71 | 27.23 | 25.05 | 26.20 | 27,115 | 5.24 | -0.01063032 | 1 |
| 11/30/2010 | 26.05 | 26.32 | 25.25 | 26.25 | 30,138 | 5.25 | 0.001906578 | 1 |
| 12/1/2010 | 26.06 | 26.29 | 25.25 | 25.49 | 11,953 | 5.10 | -0.029379771 | 1 |
| 12/2/2010 | 25.52 | 25.75 | 20.31 | 21.86 | 147,867 | 4.37 | -0.153627736 | 1 |
| 12/3/2010 | 21.84 | 21.84 | 18.60 | 20.26 | 123,123 | 4.05 | -0.076099984 | 1 |
| 12/6/2010 | 20.25 | 21.50 | 18.50 | 21.50 | 132,135 | 4.30 | 0.059404436 | 1 |
| 12/7/2010 | 22.25 | 27.93 | 22.25 | 27.59 | 166,190 | 5.52 | 0.249400453 | 1 |
| 12/8/2010 | 27.48 | 29.32 | 26.10 | 27.46 | 59,268 | 5.49 | -0.004722988 | 1 |
| 12/9/2010 | 27.55 | 27.55 | 25.95 | 27.50 | 92,962 | 5.50 | 0.001455604 | 1 |
| 12/10/2010 | 27.32 | 27.80 | 26.60 | 26.78 | 25,644 | 5.36 | -0.026530664 | 1 |
| 12/13/2010 | 26.84 | 27.02 | 25.53 | 26.93 | 65,555 | 5.39 | 0.005585567 | 1 |
| 12/14/2010 | 26.79 | 27.00 | 25.68 | 26.08 | 31,866 | 5.22 | -0.03207217 | 1 |
| 12/15/2010 | 26.30 | 28.24 | 26.30 | 27.28 | 15,980 | 5.46 | 0.044985096 | 1 |
| 12/16/2010 | 27.28 | 27.60 | 27.05 | 27.18 | 6,028 | 5.44 | -0.003672424 | 1 |
| 12/17/2010 | 26.95 | 27.04 | 25.95 | 26.83 | 18,723 | 5.37 | -0.012960744 | 0 |
| 12/20/2010 | 26.68 | 26.68 | 25.23 | 26.50 | 7,424 | 5.30 | -0.012375931 | 1 |
| 12/21/2010 | 26.38 | 26.80 | 26.18 | 26.37 | 19,754 | 5.27 | -0.004917733 | 0 |
| 12/22/2010 | 26.90 | 27.60 | 26.90 | 27.60 | 9,283 | 5.52 | 0.045568772 | 1 |
| 12/23/2010 | 27.60 | 29.25 | 27.60 | 29.25 | 21,701 | 5.85 | 0.058063801 | 1 |
| 12/27/2010 | 29.25 | 29.25 | 29.04 | 29.23 | 1,800 | 5.85 | 0.000683995 | 1 |
| 12/28/2010 | 29.26 | 29.76 | 28.71 | 28.85 | 19,800 | 5.77 | -0.013085586 | 0 |
| 12/29/2010 | 28.87 | 33.75 | 28.87 | 29.97 | 22,945 | 5.99 | 0.038086888 | 1 |
| 12/30/2010 | 29.89 | 30.45 | 29.63 | 30.16 | 16,100 | 6.03 | 0.006319662 | 1 |
| 12/31/2010 | 29.90 | 30.50 | 29.73 | 30.00 | 11,748 | 6.00 | -0.005319161 | 1 |
| 1/3/2011 | 30.09 | 30.09 | 28.79 | 29.00 | 15,118 | 5.80 | -0.033901552 | 1 |
| 1/4/2011 | 29.08 | 29.08 | 28.01 | 28.11 | 12,963 | 5.62 | -0.031170445 | 1 |
| 1/5/2011 | 28.28 | 28.28 | 27.00 | 28.10 | 14,490 | 5.62 | -0.000355809 | 1 |
| 1/6/2011 | 28.75 | 29.25 | 28.35 | 28.75 | 39,016 | 5.75 | 0.022868191 | 1 |
| 1/7/2011 | 28.51 | 28.51 | 27.70 | 28.04 | 8,711 | 5.61 | -0.025005705 | 1 |
| 1/10/2011 | 28.11 | 28.11 | 26.82 | 26.98 | 5,031 | 5.40 | -0.038536211 | 1 |
| 1/11/2011 | 26.52 | 26.61 | 24.35 | 26.25 | 38,580 | 5.25 | -0.027429862 | 0 |
| 1/12/2011 | 26.06 | 27.94 | 25.76 | 27.14 | 9,002 | 5.43 | 0.033342605 | 1 |
| 1/13/2011 | 27.75 | 28.09 | 27.49 | 27.73 | 163,799 | 5.55 | 0.021506205 | 1 |
| 1/14/2011 | 27.89 | 27.89 | 27.14 | 27.30 | 25,489 | 5.46 | -0.015628157 | 1 |
| 1/18/2011 | 28.30 | 28.30 | 24.00 | 24.32 | 42,233 | 4.86 | -0.115587645 | 1 |
| 1/19/2011 | 24.46 | 24.46 | 23.06 | 23.26 | 23,691 | 4.65 | -0.04456391 | 1 |
| 1/20/2011 | 23.03 | 23.15 | 21.87 | 22.00 | 49,403 | 4.40 | -0.055692694 | 1 |
| 1/21/2011 | 21.65 | 22.32 | 20.65 | 20.96 | 145,104 | 4.19 | -0.048426594 | 1 |
| 1/24/2011 | 20.71 | 20.98 | 20.43 | 20.75 | 5,534 | 4.15 | -0.010069513 | 1 |
| 1/25/2011 | 20.54 | 22.00 | 20.54 | 21.76 | 8,635 | 4.35 | 0.047527175 | 0 |
| 1/26/2011 | 21.55 | 21.65 | 20.80 | 21.23 | 15,849 | 4.25 | -0.024658146 | 1 |
| 1/27/2011 | 20.92 | 21.37 | 20.92 | 21.14 | 30,651 | 4.23 | 0.004248295 | 1 |
| 1/28/2011 | 21.03 | 21.90 | 20.08 | 21.43 | 9,068 | 4.29 | 0.013624829 | 1 |
| 1/31/2011 | 21.01 | 21.77 | 20.00 | 21.00 | 25,846 | 4.20 | -0.020269372 | 1 |
| 2/1/2011 | 21.00 | 21.88 | 20.48 | 20.91 | 15,416 | 4.18 | -0.004294924 | 1 |
| 2/2/2011 | 21.26 | 21.97 | 20.12 | 20.35 | 6,341 | 4.07 | -0.027146602 | 1 |
| 2/3/2011 | 20.07 | 20.47 | 19.85 | 19.85 | 6,347 | 3.97 | -0.024876905 | 0 |
| 2/4/2011 | 19.94 | 20.12 | 19.27 | 19.41 | 4,304 | 3.88 | -0.02241561 | 0 |
| 2/7/2011 | 19.23 | 19.23 | 16.83 | 17.01 | 104,542 | 3.40 | -0.131986991 | 0 |
| 2/8/2011 | 17.11 | 17.45 | 16.50 | 16.88 | 38,162 | 3.38 | -0.007671917 | 1 |
| 2/9/2011 | 16.74 | 16.75 | 15.90 | 16.10 | 13,053 | 3.22 | -0.047310217 | 1 |
| 2/10/2011 | 16.33 | 16.33 | 15.70 | 15.70 | 5,896 | 3.14 | -0.02515856 | 1 |
| 2/11/2011 | 15.61 | 15.76 | 14.93 | 15.14 | 34,220 | 3.03 | -0.036520464 | 0 |
| 2/14/2011 | 14.91 | 14.91 | 11.99 | 12.00 | 47,128 | 2.40 | -0.232433598 | 1 |
| 2/15/2011 | 12.98 | 12.98 | 9.23 | 9.30 | 157,747 | 1.86 | -0.25489225 | 1 |
| 2/16/2011 | 9.40 | 9.65 | 6.21 | 6.39 | 1,182,457 | 1.28 | -0.375280132 | 1 |
| 2/17/2011 | 6.95 | 7.90 | 6.50 | 6.97 | 659,686 | 1.39 | 0.086880936 | 1 |
| 2/18/2011 | 7.00 | 7.27 | 6.41 | 6.57 | 181,781 | 1.31 | -0.059101392 | 1 |
| 2/22/2011 | 6.52 | 6.56 | 5.65 | 5.67 | 277,704 | 1.13 | -0.147324715 | 1 |
| 2/23/2011 | 5.63 | 5.73 | 4.90 | 5.28 | 205,279 | 1.06 | -0.07126302 | 1 |
| 5/23/2011 | 1.01 | 1.07 | 0.85 | 0.95 | 105,880 | 0.19 | -1.715219392 | 1 |

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5/24/2011 | 0.92 | 0.92 | 0.70 | 0.75 | 146,621 | 0.15 | -0.236388778 | 1 |
| 5/25/2011 | 0.75 | 0.77 | 0.60 | 0.65 | 38,864 | 0.13 | -0.143100844 | 1 |
| 5/26/2011 | 0.60 | 0.62 | 0.50 | 0.55 | 137,419 | 0.11 | -0.167054085 | 1 |
| 5/27/2011 | 0.50 | 0.55 | 0.50 | 0.50 | 66,827 | 0.10 | -0.09531018 | 1 |
| 6/1/2011 | 0.40 | 0.42 | 0.35 | 0.35 | 1,522 | 0.07 | -0.356674944 | 1 |
| 6/2/2011 | 0.33 | 0.58 | 0.33 | 0.35 | 148,507 | 0.07 | 0 | 0 |
| 6/6/2011 | 0.35 | 0.36 | 0.35 | 0.38 | 11,068 | 0.08 | 0.082238098 | 1 |
| 6/7/2011 | 0.42 | 0.45 | 0.40 | 0.40 | 51,428 | 0.08 | 0.051293294 | 1 |
| 6/8/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 11,923 | 0.08 | 0 | 1 |
| 6/9/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 924 | 0.08 | 0 | 1 |
| 6/10/2011 | 0.40 | 0.40 | 0.25 | 0 38 | 22,416 | 0.08 | -0.051293294 | 0 |
| 6/13/2011 | 0.35 | 0.35 | 0.32 | 0.35 | 13,735 | 0.07 | -0.082238098 | 1 |
| 6/14/2011 | 0.36 | 0.36 | 0.35 | 0.35 | 4,800 | 0.07 | 0 | 1 |
| 6/15/2011 | 0.40 | 0.40 | 0.39 | 0.39 | 8,300 | 0.08 | 0.108213585 | 0 |
| 6/17/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 10,000 | 0.08 | 0.025317808 | 1 |
| 6/20/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 1,200 | 0.08 | 0 | 1 |
| 6/22/2011 | 0.45 | 0.45 | 0.40 | 0.45 | 13,565 | 0.09 | 0.117783036 | 0 |
| 6/23/2011 | 0.44 | 0.44 | 0.44 | 0.44 | 20,000 | 0.09 | -0.022472856 | 1 |
| 6/24/2011 | 0.44 | 0.44 | 0.40 | 0.40 | 13,307 | 0.08 | -0.09531018 | 1 |
| 6/27/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 4,000 | 0.08 | 0 | 1 |
| 6/28/2011 | 0.45 | 0.45 | 0.39 | 0.40 | 2,873 | 0.08 | 0 | 0 |
| 6/29/2011 | 0.33 | 0.45 | 0.33 | 0.45 | 1,408 | 0.09 | 0.117783036 | 0 |
| 6/30/2011 | 0.40 | 0.40 | 0.40 | 0.40 | 200 | 0.08 | -0.117783036 | 0 |
| 7/1/2011 | 0.42 | 0.42 | 0.10 | 0.10 | 3,517 | 0.02 | -1.386294361 | 0 |

| | |
|---|---|
| Vol (all) | 15.1% |
| Vol (Pre-March) | 4.2% |

**All Data**

| | |
|---|---|
| Average Volume | 55,226 |
| Median Volume | 22,945 |
| Minimum | 100 |
| Maximum | 1,395,687 |

At Median - All Warrants Exercised

| | | |
|---|---|---|
| 10% | Max Trades per Day | 2,295 |
| | Warrants | 11,000,000 |
| | Days to Liquidate | 4,794.07 |
| | Years | 22 |

At Average - All Warrants Exercised

| | | |
|---|---|---|
| 10% | Max Trades per Day | 5,523 |
| | Warrants | 11,000,000 |
| | Days to Liquidate | 1,991.81 |
| | Years | 9 |

**Pre-March 2010**

| | |
|---|---|
| Average Volume | 10,247 |
| Median Volume | 2,200 |
| Minimum | 100 |
| Maximum | 79,530 |

At Median - All Warrants Exercised

| | | |
|---|---|---|
| 10% | Max Trades per Day | 220 |
| | Warrants | 11,000,000 |
| | Days to Liquidate | 50,000.00 |
| | Years | 227 |

At Average - All Warrants Exercised

| | | |
|---|---|---|
| 10% | Max Trades per Day | 1,025 |
| | Warrants | 11,000,000 |
| | Days to Liquidate | 10,735.11 |
| | Years | 49 |

At Max - All Warrants Exercised

| | | |
|---|---|---|
| 10% | Max Trades per Day | 7,953 |
| | Warrants | 11,000,000 |
| | Days to Liquidate | 1,383.13 |
| | Years | 6.3 |

# FEDERAL RESERVE statistical release



**H.15 (519) SELECTED INTEREST RATES**
Yields in percent per annum

For use at 2:30 p.m. Eastern Time
March 29, 2010

| Instruments | 2010 Mar 22 | 2010 Mar 23 | 2010 Mar 24 | 2010 Mar 25 | 2010 Mar 26 | Week Ending Mar 26 | Week Ending Mar 19 | 2010 Feb |
|---|---|---|---|---|---|---|---|---|
| Federal funds (effective)[1][2][3] | 0.18 | 0.17 | 0.17 | 0.17 | 0.17 | 0.18 | 0.18 | 0.13 |
| Commercial Paper[3][4][5][6] | | | | | | | | |
| Nonfinancial | | | | | | | | |
| 1-month | 0.16 | 0.17 | 0.17 | 0.18 | 0.15 | 0.17 | 0.17 | 0.13 |
| 2-month | 0.19 | 0.18 | 0.25 | n.a. | 0.24 | 0.22 | 0.17 | 0.13 |
| 3-month | 0.22 | n.a. | 0.20 | n.a. | 0.26 | 0.23 | 0.21 | 0.15 |
| Financial | | | | | | | | |
| 1-month | 0.19 | 0.19 | 0.18 | 0.18 | 0.18 | 0.18 | 0.20 | 0.15 |
| 2-month | 0.25 | 0.26 | 0.20 | 0.21 | 0.19 | 0.22 | 0.20 | 0.18 |
| 3-month | 0.27 | 0.34 | 0.34 | 0.24 | 0.24 | 0.29 | 0.23 | 0.20 |
| CDs (secondary market)[3][7] | | | | | | | | |
| 1-month | 0.21 | 0.21 | 0.22 | 0.21 | 0.22 | 0.21 | 0.19 | 0.16 |
| 3-month | 0.25 | 0.25 | 0.25 | 0.25 | 0.27 | 0.25 | 0.23 | 0.19 |
| 6-month | 0.36 | 0.36 | 0.38 | 0.38 | 0.39 | 0.37 | 0.34 | 0.30 |
| Eurodollar deposits (London)[3][8] | | | | | | | | |
| 1-month | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 | 0.28 |
| 3-month | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 |
| 6-month | 0.45 | 0.45 | 0.45 | 0.45 | 0.45 | 0.45 | 0.46 | 0.45 |
| Bank prime loan[2][3][9] | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 | 3.25 |
| Discount window primary credit[2][10] | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 | 0.59 |
| U.S. government securities | | | | | | | | |
| Treasury bills (secondary market)[3][4] | | | | | | | | |
| 4-week | 0.13 | 0.11 | 0.12 | 0.12 | 0.11 | 0.12 | 0.13 | 0.06 |
| 3-month | 0.15 | 0.14 | 0.14 | 0.14 | 0.14 | 0.14 | 0.16 | 0.11 |
| 6-month | 0.24 | 0.23 | 0.23 | 0.24 | 0.24 | 0.24 | 0.24 | 0.18 |
| 1-year | 0.39 | 0.38 | 0.41 | 0.41 | 0.40 | 0.40 | 0.39 | 0.33 |
| Treasury constant maturities | | | | | | | | |
| Nominal[11] | | | | | | | | |
| 1-month | 0.13 | 0.11 | 0.12 | 0.12 | 0.11 | 0.12 | 0.13 | 0.06 |
| 3-month | 0.15 | 0.14 | 0.14 | 0.14 | 0.14 | 0.14 | 0.16 | 0.11 |
| 6-month | 0.24 | 0.23 | 0.23 | 0.25 | 0.25 | 0.24 | 0.24 | 0.18 |
| 1-year | 0.41 | 0.40 | 0.44 | 0.44 | 0.43 | 0.42 | 0.41 | 0.35 |
| 2-year | 1.01 | 1.02 | 1.08 | 1.10 | 1.04 | 1.05 | 0.97 | 0.86 |
| 3-year | 1.54 | 1.55 | 1.67 | 1.69 | 1.64 | 1.62 | 1.50 | 1.40 |
| 5-year | 2.43 | 2.44 | 2.62 | 2.65 | 2.59 | 2.55 | 2.42 | 2.36 |
| 7-year | 3.12 | 3.13 | 3.28 | 3.37 | 3.31 | 3.24 | 3.13 | 3.12 |
| 10-year | 3.67 | 3.69 | 3.84 | 3.91 | 3.86 | 3.79 | 3.68 | 3.69 |
| 20-year | 4.41 | 4.43 | 4.56 | 4.63 | 4.60 | 4.53 | 4.43 | 4.48 |
| 30-year | 4.57 | 4.60 | 4.72 | 4.77 | 4.75 | 4.68 | 4.59 | 4.62 |
| Inflation indexed[12] | | | | | | | | |
| 5-year | 0.61 | 0.64 | 0.73 | 0.78 | 0.73 | 0.70 | 0.50 | 0.42 |
| 7-year | 1.10 | 1.12 | 1.21 | 1.28 | 1.24 | 1.19 | 1.02 | 0.90 |
| 10-year | 1.48 | 1.49 | 1.60 | 1.65 | 1.62 | 1.57 | 1.45 | 1.42 |
| 20-year | 1.91 | 1.93 | 2.03 | 2.06 | 2.03 | 1.99 | 1.92 | 2.03 |
| 30-year | 2.09 | 2.11 | 2.21 | 2.23 | 2.20 | 2.17 | 2.10 | 2.16 |
| Inflation-indexed long-term average[13] | 2.04 | 2.05 | 2.15 | 2.17 | 2.14 | 2.11 | 2.04 | 2.03 |
| Interest rate swaps[14] | | | | | | | | |
| 1-year | 0.56 | 0.54 | 0.57 | 0.58 | 0.57 | 0.56 | 0.53 | 0.51 |
| 2-year | 1.17 | 1.13 | 1.17 | 1.21 | 1.20 | 1.18 | 1.14 | 1.12 |
| 3-year | 1.76 | 1.72 | 1.77 | 1.81 | 1.79 | 1.77 | 1.73 | 1.74 |
| 4-year | 2.25 | 2.21 | 2.26 | 2.30 | 2.30 | 2.26 | 2.23 | 2.26 |
| 5-year | 2.65 | 2.60 | 2.65 | 2.71 | 2.71 | 2.67 | 2.64 | 2.68 |
| 7-year | 3.22 | 3.17 | 3.23 | 3.29 | 3.30 | 3.24 | 3.22 | 3.27 |
| 10-year | 3.71 | 3.66 | 3.71 | 3.78 | 3.79 | 3.73 | 3.72 | 3.78 |
| 30-year | 4.44 | 4.41 | 4.44 | 4.48 | 4.50 | 4.45 | 4.46 | 4.48 |
| Corporate bonds | | | | | | | | |
| Moody's seasoned | | | | | | | | |
| Aaa[15] | 5.19 | 5.22 | 5.34 | 5.40 | 5.35 | 5.30 | 5.21 | 5.35 |
| Baa | 6.17 | 6.20 | 6.32 | 6.38 | 6.35 | 6.28 | 6.21 | 6.34 |
| State & local bonds[16] | | | | 4.44 | | 4.44 | 4.32 | 4.36 |
| Conventional mortgages[17] | | | | 4.99 | | 4.99 | 4.96 | 4.99 |

See overleaf for footnotes.
n.a.   Not available.

# Exhibit D

# [**REDACTED**]

Original Filed Under Seal

# Exhibit E

# [**REDACTED**]

Original Filed Under Seal

# Exhibit F

# [REDACTED]

Original Filed Under Seal

# Exhibit G

███████████
Heathrow, Florida ████

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re:  United States v. Gary Hirst, 15 Cr. 643 (PKC)

Dear Judge Castel:

My name is Nancy Hirst, and I am the former wife of Gary Hirst. I've known Gary for 37 years. We were married for 18 years and have a daughter, Tracey, and a son, Robert. I am a registered nurse (RN) with over 30 years of experience in emergency departments. I don't know about the events that led to Gary being in the position of coming before you for sentencing, but I can speak about the Gary that I know.

We met in an evening class that required some physical aptitude. Not his strong suit, so I was comfortable around him. If I had known how smart a person he was, I would have avoided him out of intimidation. Because he is so quiet, gentle, and unpretentious-it was months before I had an inkling of the depth of his intelligence and talents.

Before we were married we discussed the possibility of having children. The key question was, if we had children, what could we do to raise children who were of good character and were productive, positive people? Our experiences with family and friends showed that being good people did not guarantee your children would be good people. Yet children with difficult childhoods often became incredible adults.  We decided that allowing the children to make as many decisions as was safely possible, and understanding the consequences of their actions, was a good start. Gary understands the importance of education and the importance of having a love of learning, which he has passed on to our children.

I was difficult to live with, and eventually we divorced. During that process, Gary never complained or said anything bad or negative about me, although there were many things he could have said. We now have a good relationship, and a large part of that can be attributed to the fact that we did our best to figure out what was in the best interest for our children in the short and long run, and work as best we could towards that end.

Gary is quiet and unassuming by nature.  He is not motivated by people knowing and praising his work.

1

It's hard to list all of Gary's charitable contributions or what he's done to help others, because if he sees someone having a problem, he just always does whatever needs doing to fix the issue if he has the power to do so, with no fuss or attempts to let others know what he's accomplished.  Gary is motivated by kindness and will never ignore people in difficult situations.

A typical example is when Gary found out from his aunt that his cousin (with a wife and two young children) was about to be foreclosed on.  Gary called and spoke with his cousin to get the details of the situation.  The options were limited, so Gary not only paid the back house payments due, but he paid off the entire mortgage, as the downturn in his cousin's family finances would cause the problem to keep recurring.  Gary didn't want them to be in the awkward situation of having to ask for help over and over. He never asked for any repayment, nor was any offered.  It was more important to Gary to keep the family in good stead without strife or conflict.

Gary was always ready to help employees with any problems that they had, whether financial (such as car payments), medical, or legal.

When Hurricane Katrina hit the US, my church (we were divorced already -- Gary never attended) was sending medical and construction people as well as supplies to help care for and rebuild a small town in Mississippi.  Gary spent thousands of dollars purchasing supplies for the effort, but left them as an anonymous gift.

His father died suddenly when Gary was in college in his early 20's.  Just a week prior to his death, he had asked Gary to always take care of his mother, and Gary had promised to do so.  Although this caused many challenges, Gary kept his word until his mother passed, almost 40 years later.

Our daughter, Tracey, was born 

Gary is also very forgiving and non-judgmental.  Years ago, when we were still married, I had asked Gary how his day had gone-he responded "fine."  We met with some of his co-workers later that evening. One of them asked me if Gary had told me about how a coworker helping build an electronic engineering project that Gary had been working of for 4 months had made an error causing the equipment /project to be destroyed.   He never complained or spoke badly about the co-worker.

Gary loves his family deeply and is loyal to everyone he knows or works with.  He has a strong work ethic, but is not quite a workaholic.  The children and I have learned from his example.

2

The current events have been devastating to the children.  Robert internalizes his feelings, but stays in constant contact with us.  Tracey used to be very cheerful and optimistic, always finding the good in situations and people, even when she was bullied for her visible disability.   Now she's often depressed and withdrawn, with frequent episodes of crying.  I now spend time with her daily as much as possible. Gary is extremely concerned and upset about the impact of his situation on his children.

I ask that you consider my letter when deciding Gary's future.

Thank you for your time and consideration.

Respectfully,

*Nancy Hirst*

Nancy Hirst

**Tracey Hirst**

████████████

**Longwood, FL** ████

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: United States v. Gary Hirst, 15 Cr. 643 (PKC)

Dear Judge Castel:

I am Gary Hirst's daughter. We interacted briefly during my testimony and I remember your kindness in reassuring me when I was nervous about speaking in front of so many people. I am grateful that you're allowing me the opportunity to speak to you about my dad in this way, where I can be more like myself.

I have never known Dad to do a selfish thing in his life. It may sound ridiculous, but this is down to and including deciding on what restaurant to eat at; he'll defer to everyone else's wishes, and if it's just us, I tend to have to make a decision just so we don't starve to death. I need a whole year just to figure out what to get him for his birthday or Christmas because his wants are so few. For pajamas he wears scrubs that are older than I am, and during the day if he has a choice he always wears a polo shirt (the same brand in a variety of colors) and jeans, so even that old standby gift of clothes doesn't work. I've never known him to be happier than going to a theme park with his family when the weather is perfect, or geeking out over meeting the cast of the Avengers at a comic book convention for just few seconds. All I've ever known him to want is what's best for his family and for us to be happy.

Anger was never an emotion that my brother and I saw when we were kids and got in trouble, but the disappointment that Dad showed in somehow both us and himself simultaneously was far worse to experience and something we strove not to cause because we couldn't stand making him feel so sad.

When I entered college, I became an economics major because I thought that would make him happy, but as soon as he saw the radical difference between my feelings towards the courses of my major in contrast to the Gen Ed theatre courses I was taking at the same time, he was the one who encouraged me to switch majors if it would make ME happy. Unlike most of my other Theatre Major friends whose families disapproved of, derided, or were skeptical of their choice of major, Dad recognized that people in the Theatre Department worked just as hard if not harder than any other major, and he told me that he knew I'd be successful whatever path I chose, so the important thing was that I was enjoyed what I was doing.

Dad sees the world through eyes of wonder; he's never lost his inner child. He is curious and delights in sharing the wonders of the world with his children. Everywhere we would go with him, he would always find something interesting to talk about. We'd be riding in a slow elevator and he would explain the ancient discovery of hydraulics and the difference between traction and hydraulic elevators. Or we'd be sitting outside eating and he'd be inspired by the circling seagulls to talk about the wonder of flight. His passion and awe never made these discussions lectures, but instead each felt like a gift he was sharing with us. Even as an adult, if I'm ever feeling the press of cynisicm or struggling to hold on to the optimism that is such a core part of who I am, I can always rely on Dad to realign my perspective, resurrect my optimism, and help me rediscover the wonder and beauty in the world.

This is part of why Dad is an such an ardent science fiction fan. A long as I can remember, he has shared with us that his love for the genre stems from its ability to use speculative scenarios to explore human nature, provide thought-provoking allegories, or even just tell inspiring what-if stories of a hopeful future. This love that he passed on to my brother, myself, and even our mother has not just provided delightful entertainment but more importantly helped widen our perspective, opening our minds to accept new concepts and points of view, which is a true and immeasurable gift.

My dad is incredibly empathetic. There was a time I was travelling with him and broke a temporary crown, causing me pain and requiring an emergency visit to a dentist. A year later the subject came up and he started relating the story – *as though from his own perspective.* When I pointed this out to him, he was genuinely disbelieving because he had felt my pain so much at the time, his remembered it as his own experience.

Any time my brother Robert or I have been hurt or were hurting in any way, his empathy made it so much worse for him, because he'd always blame himself for not being able to prevent it or being able to do anything to make it better, even though he was never in any way to blame.

Robert suffered an accident at school several years ago that had him bedridden and physically recovering for several months. My dad was devoted to making sure his recovery was as speedy as possible and that he had everything he needed during that time. He made sure that he never fell behind in his schoolwork and worked with him on his physical therapy. He made sure my brother ate and otherwise received the best nutrients to heal. My brother was always very active so Dad did everything he could to make sure that  being inactive didn't make him too stircrazy by keeping him entertained and being a constant emotional support.  The safety, health and happiness of his children has always been Dad's first priority ever since we were born. I in particular have witnessed this for my entire life.





My whole life he's helped me conquer whatever everyday challenge I faced, and when it was something he could do himself, he has *always* been there to help me and is still there to this day.



My closest friends consider Dad a second father because he has loved and suppported them over the years as though he were. He has often taken the time to attend events or shows that they were involved in. When I was a child and in theatre classes, he would videotape the shows, then make sure any of the other kids who wanted a copy got one.

Any time a family member, no matter how distant, needs help in any way, my Dad will always be there for them without a second thought. He always treated his employees like family and was there for them in any way they needed too. He helped them with their car payments, legal fees for divorce, and tuition fee's for their children's school, just to name a few instances.

I believe his biggest fault is that he is too trusting; he wants to believe the best in people and is (I think) too quick to forgive when he is wronged; I have witnessed this time and again.

His compassion is something he feels towards animals as well as humans. I've lost count of how many times he has gone out of his way to stop his car and carry a turtle out of the danger of the road and to safety. When I was a child, a peahen laid eggs under our laundry room window but was scared away by a neighbor's cat, so he bought an incubator and we hatched and raised the chicks ourselves. Every dog he's ever had was a rescue and he loved them each as a member of the family. He loves observing wildlife too; we have a family of Sandhill Cranes that crosses our yard every day and he delights in watching them, stopping whatever he's doing. He even named the chick that hatched last year and took great pride in watching it grow up, celebrating milestones like its first flight.

We have kept recent events private and to ourselves but the few people who know, or have found out, immediately offered their genuine support for our whole family, but especially Dad.

I know many people say that their Dad is the best, so I'll just say this: I could not imagine or ask for a better father. And I can objectively say that I was extraordinarily lucky to have been born his daughter.

Thank you.

Respectfully yours,

Tracey Hirst

# Robert T. Hirst

███████████████████████████████ ███ SAN DIEGO, CA ███████

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: United States v. Gary Hirst, 15 Cr. 643 (PKC)

Dear Judge Castel:

My name is Robert Hirst, and I am Gary Hirst's son.

Every child thinks the world of their parents, and I am no exception. However, I want to write to you not just to tell you about the loving, caring father that I know, but also the thoughtful and kind man whom I have known my whole life.

One thing that he has always taught me is that even though all humans are imperfect, we must always strive to improve ourselves. There is no better example of this than when I suffered a serious accident at my school that left me bedridden for eight weeks, unable to walk. During that time he helped me, cared for me, and pushed me to keep up with my schoolwork and physical therapy. He provided the emotional and physical support when I needed it, and I know he would do so again without hesitation. He has also taken wonderful care of my sister, who herself has fought through many hardships in life, with our dad standing next to her guiding and supporting her. ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████ He is the emotional and physical rock that provides a strong and unbreakable foundation for our family.

Our whole lives, Dad has always been there to help me and my sister whenever we needed him, not just for the big struggles, but the little moments as well. Whether it be cheering me on at my soccer games, attending my sister's plays with flowers at the ready, or helping with homework or school projects, he was always there, and it didn't matter how often or for how long. He spent so many hours helping me figure out how to build a model mag-lev train for science fair back in middle school, or helping my sister design and construct a theatrical prop that could be made to light up surreptitiously.

He also contributed much of who I am as a person. One of the things he passed on to me was his love of music. He learned to play the piano when he was very young from his mother, and he used to play music every day. Even if it was only a two minute musical interlude as his tea cooked in the microwave, he always found the time, and I know

that I always smiled when I heard the music ringing out through the house. I've rarely seen him be able to walk past a piano without wanting to sit down and just play something, and when he does, he does so with great joy and skill. Even if he's playing something using sheet music, he'll often add fun flourishes, making it uniquely his own.

Some of my fondest memories are of him teaching me to play the piano, or the two of us struggling to figure out how to play a song we just heard in a movie or on the radio. Whether we'd hit a chord that was too sharp, or a note that was a little flat, we'd laugh our way through the song until we had it figured out.  We both have the ability to hear a song and find a way to play it on the piano, and that ability is something that we have bonded over many times as we offer suggestions, or try our own rendition.

Over the years, I've also learned to play the guitar, and now, it's a tradition that whenever we are together, we play duets.  We'll go through the books of music we have and select something we both know or if we're feeling adventurous, branch out and try something new. Just as the songs vary from time to time, sometimes so does the quality of the renditions. But in the end, we just enjoy our time together, sharing something that we both truly love.

But we don't limit it only to duets. When we can, we include others in the fun.  Our entire family often plays different instruments, and when we are all together, we try to play them together.  And the time that we are all sure we can play together is on Christmas Eve.  So my cousins bring their violin and viola, my mother her concertina, my sister her voice, a keyboard for my father, and a guitar for myself as we gather around a single music stand at my grandmother's house, and play Christmas songs for hours on end. It's become a habit, but we'd miss it so much if we didn't do it.

Something Dad is somewhat less skilled at is singing – I think maybe the term "joyful noise" was invented with him in mind – but that doesn't stop him when it's a song he loves. I sometimes suspect he does so just to make us smile. He always says laughter is the best medicine.

Another thing Dad passed on to me is a strong work ethic. I haven't yet learned to balance my personal life with my work life, which usually requires upwards of 11 hours a day and quite a few weekends as well.  However, Dad is always encouraging me to seek more out of life than just work.  Dating all the way back to when I was in college, Dad would constantly find excuses to visit and make sure I took a little time for myself. He would drag me to that movie I'd been really wanting to see but had held off seeing, or make sure I got some fresh air by taking me to an outdoor restaurant for dinner or to just stroll through the local park.

But beyond instilling my work ethic, he has encouraged me to explore my passions.  I have a love of photography and film, something Dad and I share, and as a birthday present many years ago, he got me a camera so that I could further explore my passion. Ever since then, I have been finding time to pursue my passion, and take my camera with me wherever I go.

But he is more than just a good father or family member, he is a good man.  My parents divorced when I was younger, however, none of my friends knew.  The way that both of my parents interacted with each other, the amount of time I got to spend with them together, made it impossible for my friends to guess that they had separated.  He was never bitter, never antagonistic, and always supportive of my mother and her family even after they split.

Once, one of my friends was camping out overnight with a few of her friends for an event she had been looking forward to for quite some time.  However, in her excitement, she had forgotten to bring any food.  I was traveling at the time, and my dad, who had heard of my friend's plight, decided to bring her food.  No one had asked him, he had no obligation to go out of his way and help her, but he did. He brought everyone food, blankets, and even a deck of cards to keep them occupied.  He went above and beyond, and he didn't even tell me he had done it, so I didn't find out until my friend told me, full of gratitude. She still brings it up, years later. That is the type of person he is. He doesn't ask for recognition, he just does what needs to be done without hesitation, and he helps those who need it, whether human or otherwise.

He has a sincere love for animals of all kinds.  I don't know if there has ever been a dog that he's seen that he hasn't petted (excluding service dogs of course!), and that affection has always been returned.  He loves to visit the San Diego Zoo when he visits me. No matter where he is headed, if he sees a turtle stuck in the middle of the road, then he always pulls over to save it, even if it involves risking his own life in the traffic. I've known him to casually suggest bicycle rides if a lost dog poster would go up. He cares for animals almost as much as he cares for his family. He can't even stand hurting spiders. If one is found in the house, he always takes the time and care to put it safely outside, night or day, rain or shine.

My father is a good man.  He always does what he can to help others, without being asked, without looking for recognition; he simply does it because that's who he is. Therefore, I ask you take all that I have said into consideration when you see him next.

Thank you.

Sincerely,

Robert Hirst



The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: United States v. Gary Hirst, 15 Cr. 643 (PKC)

Dear Judge Castel:

My name is Gerald D. Anderton, and I am writing to you and the court today on behalf of Dr. Gary Hirst. I have decided to reach out to you in the hope that I might offer a little insight into the personal history and character of Dr. Hirst and that my input might be useful in some positive way as the Court moves forward to determine his immediate future.

I thank you for your time and this opportunity to express my sentiments about a man that I have known personally for many years and come to love and respect. I thought it might be helpful and instructive to share some incidents that demonstrate Dr. Hirst's pattern of giving and selfless contributions to others throughout his daily life as well as his kind and gentle approach to helping his family and fellow citizens who he encounters struggling their way through life.

I have been a business entrepreneur during the past forty years of my life and have held various positions at companies that I helped to build, from the Janitor to Chairman of the Board.

I am currently the Chairman of a Music Label residing in Nashville, Tennessee.  I have come to know Dr. Hirst, Professionally, on a business level and also on a personal basis while working in the music industry.

Several years ago I was representing an Artist who was also a noted singer and songwriter. Although he had accumulated a valuable catalogue of his songs representing his life's work up to that point, because of an unfortunate series of mishaps, his catalogue ended up securing a loan that was on the brink of foreclosure at the bank.

This man's life's work would have been liquidated and forever lost, if not for the kind and generous infusion of energy and funding that Dr. Hirst personally arranged and timely funded to solve the problem with the bank. He stepped in and made all the necessary arrangements and financial contributions and ultimately a great difference in the life of this Artist and his family. This was a selfless act that Dr. Hirst initiated because he saw a need and wanted to help.

When Dr. Hirst found out that a Music Group represented by G-Force wanted to have their own reality show, he remembered that the father of a college friend of his daughter was a Cinematographer who worked with a well-known, Emmy Award-winning Reality Show Producer. He reached out and made contact with the Producer and met with him in person to pitch him on the idea. When the Producer showed interest, Dr. Hirst flew him to Nashville to meet with the group and label representatives, with the end result that the show was produced, aired, and has now made it to Netflix. And he went to all this effort without any personal benefit at all, just out of generosity and the goodness of his heart.

I have many times seen this kind behavior over the years by Dr. Hirst, as he has always been a great example of caring and giving to his associates who he treats as though they were his own family.

Dr. Hirst is also a great father to his children who rely on him for their physical and spiritual sustenance. He is always willing to be a great mentor and a willing contributor to any worthy cause that he encounters. If his time, personal labors, or his financial support are required, he is always there first to cheerfully pitch in and accomplish the necessary task at hand.

As a community leader and role model, his actions have always been exemplary and encouraging of rising above the ordinary. Dr. Hirst has also always been a great role model for all those around him to strive for one's betterment and toward excellence. His friends, associates and children have all been served well by his faithful actions and the good example to them that he has set. I must say, we all are a little better off by the personal association with this Good and Gentle Human Being. Also, Dr. Hirst is always, first and foremost a Gentleman, and it has been my pleasure to be able to count myself as both a business acquaintance and a friend.

Whatever the disposition of the Court proves to be in this matter while pursuing its duty to determine and apply the law, justice, and equity, I wish the Court to know that for me personally, I only wish to present to the court my own insight and knowledge about this wonderful man in the hopes that it might assist the Court in some positive and merciful manner as the Court deliberates and ultimately resolves this matter.

I would like to thank Your Honor for the opportunity to express myself and for the time and consideration of the Court.

Have a Great Day.

Sincerely,


Gerald D Anderton
Chairman, G-Force Music Group



NEW YORK, NY ▮▮▮

The Honorable P. Kevin Castel                                    January 3, 2016
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: United States v. Gary Hirst, 15 Cr. 643 (PKC)

Dear Judge Castel:

I have known Gary Hirst for 20 years, initially in a business relationship, and then as a friend.
Our children have spent time together, and are friends as well.

It is easy to claim, when asking for some measure of mercy, that someone is kind, or honest, or
decent. Gary, however, has provided long and frequent evidence of these qualities in both small
ways and large. Some of the more memorable examples I would now wish to call to your
attention, that you may consider them when rendering judgment.

1. Gary's firm had hired a new manager to supervise a new business venture. The finance
   industry then plunged into one of its periodic upheavals, and the venture's prospects plunged
   with it. Gary, however, kept the executive on at full salary and benefits for several months
   until he could secure another position, which was (and still is) unheard of in such situations,
   where standard policy calls for a swift unwind and immediate termination of staff. Gary was
   aware that getting a new job in these circumstances would be difficult enough even while he
   was still employed, and almost impossible if he were let go. When I questioned the wisdom
   of "paying someone to do nothing," he shrugged. "He has two kids in college," he said.
   There was no more discussion.

2. Gary and I were returning from Europe after a long and demanding business trip involving
   several lengthy meetings a day for about ten days. About an hour into our eight-hour flight
   back to the US, the flight crew requested assistance from any doctor on board. Gary, who is
   an MD but never went into medical practice, said "Let's see if anyone else answers." When
   no one did, he notified the flight crew. They advised him that a young woman was very ill
   and appeared to be having a heart attack of some sort. This turned out to be the case, and for
   two hours Gary worked feverishly to stabilize the woman using only rudimentary equipment
   (the plane had no cardiac kit or other related device) until the plane could make an emergency
   landing and the woman could be removed to a hospital. That was expected of him; what
   happened next was not. After we took off again, a flight attendant came back to our seats and
   offered to upgrade a clearly exhausted Gary to first class. "Can my friend come too?" he
   asked. The attendant said that unfortunately the invitation was extended only to "herr
   Doktor." "Then I'll stay here," he said.

3. Early in our business relationship, my firm conducted an extensive "due diligence"
   examination of Gary's firm, and in the process found that his head of information technology
   had made an error in judgment many years earlier. Since investment firms generally are very
   reluctant to hire anyone with even a small blemish for so sensitive a position, I asked Gary if
   he was aware of this situation, and he affirmed that he did. "We gave him a job and he did it

well, so we promoted him, and now he runs the department. He's been a very good employee here, really knows his business, and we know we can rely on him." I pushed a little further. "Well," Gary said, "he told us about it when he applied, so he was honest with us. People do make mistakes, and his life had been difficult as a result. We thought he was worth taking a small chance, and I think we were right."

These are but a few of many such examples I have witnessed of Gary's fundamental nature. There is nothing heroic here – no epic sacrifices, no grand gestures, no earth-shaking remedies for the ills of mankind. What there is, and has been, is a consistent and fair charity of spirit that he applies to all his relationships, and for which he has long been known for by his associates, colleagues, family and friends.

I am sorry that you should have the necessity of passing sentence on him for what the court has found, but I cannot and do not seek to alter that requirement. I can commend him to you as a worthy candidate for your mercy, based on what I know and have known of him, what I have seen him do, and how he has influenced our lives for so many years now.

Respectfully,

Burt Kozloff