H2GSDERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                                15 CR 643 (PKC)

DEREK GALANIS,

        Defendant.

------------------------------x

                         New York, N.Y.
                         February 16, 2017
                         2:00 p.m.


Before:

              HON. P. KEVIN CASTEL,

                     District Judge


                 APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
AIMEE HECTOR
REBECCA G. MERMELSTEIN
BRIAN R. BLAIS
    Assistant United States Attorneys

LAW OFFICE OF ANTHONY J. BRASS
    Attorney for Defendant
BY:   ANTHONY J. BRASS

ALSO PRESENT:
Shannon Bieniek, FBI Agent

H2GSDERS

| | |
|---|---|
| 1 | (Case called) |
| 2 | MS. HECTOR:  Good afternoon, your Honor.  Aimee |
| 3 | Hector, Rebecca Mermelstein, Brian Blais for the government. |
| 4 | With us is Shannon Bieniek from the FBI. |
| 5 | THE COURT:  Good afternoon to you all. |
| 6 | For the defendant. |
| 7 | MR. BRASS:  Good afternoon, your Honor.  Tony Brass |
| 8 | appearing with Derek Galanis, who appears in custody. |
| 9 | THE COURT:  Good afternoon, Mr. Brass.  Good |
| 10 | afternoon, Mr. Galanis. |
| 11 | Mr. Brass, what I propose to do is go through the |
| 12 | materials that I have, and the question will be whether I have |
| 13 | everything I should have.  I have a presentence report, |
| 14 | recommendation, and addendum that was revised as of January 31, |
| 15 | 2017, I have a sentencing memorandum on behalf of Mr. Galanis |
| 16 | that was filed on February 2, and I have the government's |
| 17 | sentencing memorandum dated February 9, 2017.  I also have a |
| 18 | letter from the government in which they ask to defer on |
| 19 | restitution. |
| 20 | Do I have everything I should have on the subject of |
| 21 | sentencing? |
| 22 | MR. BRASS:  Yes, your Honor. |
| 23 | THE COURT:  Ms. Hector? |
| 24 | MS. HECTOR:  Yes, your Honor. |
| 25 | THE COURT:  Has the defendant read, reviewed, and |

1    discussed with you the presentence report, recommendation, and

2    addendum?

3              MR. BRASS:  Yes.

4              THE COURT:  Does the defendant have any objections to

5    the facts set forth in the presentence report?

6              THE DEFENDANT:  None.

7              THE COURT:  Does the defendant have any objections to

8    the guideline calculation set forth in the presentence report?

9              MR. BRASS:  No, your Honor.

10             THE COURT:  Does the government have any objections to

11   the facts set forth in the presentence report?

12             MS. HECTOR:  No, your Honor.

13             THE COURT:  Does the government have any objections to

14   the guideline calculation?

15             MS. HECTOR:  No, we do not.

16             THE COURT:  I adopt as my findings of fact the facts

17   set forth in the presentence report and further adopt as my

18   guideline calculation the guideline calculation set forth in

19   the presentence report.

20             Defendant is at total offense level 28, criminal

21   history category III, guideline range of 97 to 121 months.

22             I'll now give Mr. Brass an opportunity to speak on

23   behalf of Mr. Galanis.

24             MR. BRASS:  Thank you, your Honor.

25             Your Honor, the factual disagreements that we have

H2GSDERS

```
1    with the government in the sentencing memorandum I am not going

2    to address today.  I think we all generally agree with the

3    picture of Mr. Galanis' case.

4            Mr. Galanis was released from federal prison on his

5    prior conviction, went home and to the only place he had, home

6    with his father at that point.  I don't want anything I say to

7    confuse what I mean.  Mr. Galanis is a full-grown man.  He is

8    an adult and responsible for himself.  But the way his life has

9    worked out, he ended up being someone who had very few places

10   to go other than home, where he lived with John Galanis and

11   Jason Galanis.  I will dance circles around the topic of

12   whether I am blaming John Galanis for the evils of Derek

13   Galanis, but I am, and that will come forth in what I am trying

14   to say today.

15           I am not going to repeat what I said in my sentencing

16   memorandum, but I will let the court know, when I met Mr. Derek

17   Galanis -- I'll refer to him as Derek only because everyone has

18   the same last name.

19           THE COURT:  That's fine.

20           MR. BRASS:  Thank you.

21           When I met Derek, the only thing he wanted was to

22   protect his brother Jared.  He wanted nothing for himself.  He

23   didn't ask me to get any deal.  He didn't ask me to put up a

24   defense.  He didn't ask me how much evidence the government had

25   so that he could get away with what he had done.  He
```

1   acknowledged immediately what he had done and said, How do I

2   protect Jared?  That was all he wanted.

3           I have represented many, many people.  I have never

4   had anyone do that, to lay themselves down for someone they

5   cared about.  I think the court recently acknowledged that

6   Jared Galanis is less culpable than the other people involved

7   in this case.  I am not saying he was not culpable and didn't

8   deserve what he got, but the level of culpability was

9   significantly less.  That's the same reason that Derek was

10  always ready to put himself in front of what was coming to

11  Jared.

12          The primary threat against Jared, John and Jason.

13  This case was on a super highway to trial.  Your Honor set the

14  trial date very, very quickly, and then it was moved a little

15  bit, but only just so.  Derek saw that trial coming, saw

16  himself sitting next to Jared at a jury trial in this case, and

17  couldn't bear it.  All we ever discussed was how to stop that

18  from happening to Jared.

19          To that end, at one point Derek met with the

20  government.  We met via teleconference, flew to San Diego, and

21  we had extensive meetings with the government where he

22  debriefed about this case.  I am not making a 5K type

23  cooperation type argument, but what was touching about that was

24  that he went in and he laid himself out as much as his brother

25  Jason and his father John, and that wasn't easy.  That was a

1   brutal experience for him.  He went in also knowing that he

2   would have to say everything he had about his brother Jared.

3   But that was a frontier, even committing to that situation, it

4   was a frontier he wouldn't cross, knowing that he was in a

5   situation where at least at the time, he had no reason to not

6   believe he was going to get credit for that debrief.  When

7   asked questions about Jared, he just couldn't do it.

8           Now, I know how that works.

9           THE COURT:  You have to explain that a little bit

10   better for me.  What do you mean he just couldn't do it?  I

11   don't understand that.

12           MR. BRASS:  He simply couldn't provide information

13   about Jared's involvement.  He couldn't put himself in a

14   situation where he would be a witness against Jared.  Jared has

15   culpability.  He couldn't quantify that, so he could not answer

16   those questions, making the debrief not successful, making it

17   so that he knew he would get no credit for cooperating.  He

18   would basically render himself useless as a witness by not

19   having the willingness to answer those questions.  He knew

20   because I told him repeatedly and he couldn't do it, but the

21   spirit with which he approached that endeavor regarding John

22   and Jason was also not easy.

23           My point being that, for someone like Derek to go into

24   that, the painful exercise of laying out his brother and

25   father, was challenging and trying for him.  It was just a

fool's hope that the government wouldn't have a lot of

questions about Jared.  But the fact is even when he was in a

situation to help himself, he couldn't do it over his brother,

because the family dynamic here is so significant.

That is really the crux of the sentencing memorandum.

This is a guy who goes home to a master con man of a father.

John is a master manipulator and that manipulated Derek.  The

words in the sentencing memorandum I wrote, that Derek joined

this conspiracy by introducing Shahini into the mix without

knowing that it was a criminal enterprise.  When he first

joined, he didn't know it was a criminal enterprise.  That is

from the presentence report.  I didn't make that up and it is

not my opinion.  The presentence report says it as a result of

reviewing the government's evidence.

He might have done anything to be in the family

business.  He was an outcast, and anyone who has father-son

issues is familiar with people who do understand the power of

that.  He joined this business and was taken advantage of

because he had something that John and Jason needed, which was

a foreign national that he could trust.  John and Jason don't

have anyone they can trust, but Derek did.  Derek knew this man

and was in that sort of relationship.

So in order to win his father's favor, he introduced

Shahini to Jason and John, not at that point understanding

exactly what was going on.  He learned soon thereafter, and

1    there is no question he stuck to it.  I am not telling the

2    court that he was wide-eyed and innocent when he participated

3    in this conspiracy.  He knew what was going on soon thereafter,

4    but not at first.  Once he was in, he was in.  He was embraced

5    by his family, part of the family business now, and almost

6    everything he did involved keeping Shahini quiet, keeping

7    Shahini involved, because his father and his brother needed

8    him.

9           For that reason, I see his culpability less.  Maybe

10   I am just moved by the nobility of his willingness to stand in

11   front of his brother as a guard, even putting himself at risk

12   of a lengthy prison sentence, which now is coming.  There will

13   be no 5K argument.  There will be no message from anyone on

14   that, and that's appropriate.  But what I am saying is that

15   Derek's heart is in the right place now.  He did this because

16   he was embraced by his family maybe for the first time and it

17   was only because they needed him.  They needed an asset that he

18   had, and there was no way John and Jason weren't going to make

19   use of that.

20          So how much of a chance did Derek stand before a

21   master manipulating con man and his other parent, who likewise

22   is a master manipulating con man?  Not much.  The last thing

23   Derek said to me before walking in here is, I think everyone

24   looks at me like I'm just a thug and I'm just a family thug.

25   I grant Derek that his appearance has that, but what really

H2GSDERS

happened here, the human story is that he was trying to protect

his little brother entirely through this case and always

willing to accept responsibility from the moment I met him,

which is right after the indictment.

I urge the court to just take those human factors into

account.  I realize under 3553(a), I am not hitting those

factors strongly because I can't.  Derek is culpable and

acknowledges that.

THE COURT:  Tell me a little bit more about the period

from the time of release in August 2008 until the conspiracy

gets in full swing by the spring of 2010.  What was he doing?

Where was he?  What was he doing?

MR. BRASS:  He became a martial arts instructor, and

I actually have letters and things.  I didn't think that they

would be as interesting to the court on this point, but he was

an instructor for children in martial arts, very much enjoyed

doing that work.  He made very, very little money.

THE COURT:  He was living with John and Jason, did you

say, or John and Jared?

MR. BRASS:  He was living with John.

THE COURT:  He was living with John?

MR. BRASS:  Correct.  Jason at the time was living in

the most Liberace-esque ostentatious mansion one could imagine

while Derek was living with his dad driving an early '90s Ford

Mustang.

H2GSDERS

1      THE COURT:  Now, tell me about Derek's take on this

2  overall transaction or series of transactions, this scheme.

3      MR. BRASS:  Derek's take on the scheme, your Honor, is

4  that this master plan was being --

5      THE COURT:  No, no.  I mean following the money.  What

6  did he get out of it?

7      MR. BRASS:  His father's approval for a moment.

8      THE COURT:  Financially, what did he get out of it?

9      MR. BRASS:  There was a period where he received

10  $13,000 a month as a salary, but that period was only for

11  several months.

12      THE COURT:  Salary from whom?

13      MR. BRASS:  From his father.  So he had a successful

14  person --

15      THE COURT:  When was that?

16      MR. BRASS:  I'm sorry, your Honor.  I don't know.

17      THE COURT:  Was it for a year?  Was it two years?

18      MR. BRASS:  Approximately one year.

19      THE COURT:  Right.  Go ahead.

20      MR. BRASS:  I would submit it, your Honor.

21      THE COURT:  Pardon me?

22      MR. BRASS:  With that, I would submit, unless your

23  Honor has any other questions.

24      THE COURT:  No, that's fine.

25      Mr. Galanis, this is your opportunity to speak, to

H2GSDERS

1    address the court directly, to bring to my attention any facts

2    or circumstances that you believe I should take account of.  If

3    there is anything you wish to say, this is the time.

4              THE DEFENDANT:  Your Honor, the only thing I want to

5    say is I take full responsibility for my actions and that's it.

6              THE COURT:  Thank you very much.

7              Ms. Hector.

8              MS. HECTOR:  Yes, your Honor.

9              First let me begin by just addressing this point of

10   what Mr. Galanis, Mr. Derek Galanis' understanding was at the

11   time he introduced Shahini into this conspiracy.  The argument

12   we make in the papers is very much tied to the e-mail

13   correspondence that this individual had with Mr. Shahini at the

14   outset of bringing him into the scheme, I think it is five days

15   after the e-mail saying, We need a foreign nominee.  That is

16   where you come in, my friend.

17             There is a subsequent e-mail where Mr. Shahini

18   indicates his awareness that he's become magically rich

19   basically because he's been granted these shares that he

20   understands he is not a true beneficiary of, but is purely

21   serving as a straw man, in essence.  Mr. Galanis writes back

22   something along the lines of, If this works out, we all may be.

23   If not, well, I don't want to think about that.

24             I think that e-mail in and of itself demonstrates

25   Mr. Galanis' knowledge that what they were engaging in at this

H2GSDERS

1    point was a criminal endeavor and that they were fearsome that

2    if law enforcement were to uncover this scheme, well, the

3    consequences could be dire.  If not, they could be rich men.

4         So I think that stands in stark contrast to the

5    argument that is being presented in the papers and here, that

6    he was somehow unaware of the PSR notes that Shahini had been

7    introduced to Jacob by Derek Galanis at an earlier point.  But

8    Derek Galanis knew Shahini for years, and I believe he did

9    introduce Shahini to Jason Galanis at some earlier point as

10   well.  But with respect to his introduction to this scheme, it

11   was for the purpose of serving a criminal purpose, and that was

12   the purpose of serving as the foreign nominee.  I think that is

13   clear from the record.

14        With respect to Mr. Galanis' attempted cooperation --

15   this wasn't brought up in the papers, obviously it was brought

16   up here today -- Mr. Galanis did seek to proffer with the

17   government and he did meet with the government via video

18   teleconference on several occasions.  The government credited

19   some of the things he said, but we did not credit many of the

20   other things he said, particularly around the issue of Jared

21   Galanis.  It was Mr. Derek Galanis that cut off those proffers,

22   not the government.  He decided to cease that process and stop

23   meeting with the government and stop endeavoring to potentially

24   cooperate in this case.

25        So for both the fact that we didn't fully credit his

H2GSDERS

1    statements and for the fact that he cut off that process and

2    never actually became a cooperator and never provided

3    information that the government was able to use in any capacity

4    in the investigation or the trial, he deserves no credit for

5    doing that.

6              THE COURT:  Your account of what transpired is not

7    materially different than Mr. Brass' account of what

8    transpired.

9              MS. HECTOR:  I am just confirming for your Honor what

10   happened.

11             THE COURT:  Thank you.

12             MS. HECTOR:  I think one of the most important things

13   for your Honor to consider when considering Derek Galanis and

14   the sentence that he should receive is the fact that he chose

15   to become involved in this scheme knowing full well what he was

16   entering.  He had a history of a prior conviction, so he was

17   not someone who was un-equated with the consequences of

18   engaging in criminal activity.  He was well aware of his

19   father's history and his brother's history at that point.  He

20   had grown up in affluent circumstances, and yes, of course, the

21   fact that his father had been in prison for much of his

22   childhood certainly had an impact on him.  But one could also

23   argue that it should have impacted him in a way to make

24   decisions that wouldn't bring him down that same path.

25             He was an adult.  He had education.  He had the

H2GSDERS

         ability to do something different with his life.  Nonetheless,
he chose to become involved in a scheme with his criminal
family.  That was his choice and he made that choice with other
options.

         So he stands before your Honor today having been
someone who has a criminal past, who the prior sentence that he
served of seven years did not serve to adequately deter him
from continuing to engage in criminal conduct, and who is
deserving of a significant sentence not only to specifically
deter him from engaging in criminal conduct in the future, but
also for a general deterrence impact.

         This crime impacted many people.  Your Honor is well
aware of the financial hardships suffered by the people who
lost money in this scheme.  Yes, Mr. Derek Galanis did not
receive the kind of proceeds that some of the other people
involved in the scheme received, but he did receive a monthly
stipend from the family during this period of time in partial
compensation for his willingness to perform a role.

         He had communications with Mr. Shahini and with Jason
Galanis about Mr. Shahini's interest in continuing to serve
such a role in the future.  His communication --

         THE COURT:  Say that one again.

         MS. HECTOR:  He had communications with Jason Galanis
indicating that Mr. Shahini was happy to be serving the role he
did and hoped to be included in the future.  So there was

H2GSDERS

 1     contemplation of future criminal endeavors as well.

 2             We submit, your Honor, that this defendant is

 3     deserving of a significant sentence and one within the

 4     guidelines would be appropriate in this case.

 5             THE COURT:  Thank you.

 6             This is the court's statement of reasons for the

 7     sentence to be imposed on Derek Galanis.  I have considered all

 8     the materials I referenced at the outset.  I have considered

 9     the very thoughtful comments of Mr. Brass and Ms. Hector and

10     the brief statement by Derek Galanis, considering all the

11     factors under Section 3553(a).

12             The record will reflect that I presided at the trial

13     of Gary Hirst and I have presided at the sentencings of Jason

14     Galanis and Jared Galanis and have, in connection with this

15     sentencing today, also reviewed the sentencing materials

16     related to John Galanis.

17             The defendant was a knowing participant in a scheme to

18     defraud.  He played an important role in being the person to

19     whom Ymer Shahini was introduced and brought on board and

20     managed during the conspiracy.  It is not clear to me from this

21     record that Derek Galanis, I don't think he was excluded from

22     information necessary to make the conspiracy operate, but he

23     was nothing like a co-architect or participant in the brain

24     trust that brought this scheme about.  It seems to me that he

25     was somewhat on a need-to-know basis and a willing participant,

H2GSDERS

1    enthusiastic participant.

2          In presiding over criminal cases, there are a lot of

3    reasons why people participate in criminal conspiracies.  Money

4    is one of them, but it is not always the only one.  It is

5    perhaps somewhat unusual that a significant motivation may be

6    family approval, but it is not unheard of, and indeed that's a

7    common reason in organized crime cases why people commit

8    crimes, to curry favor, to have an enhanced stature; not

9    because they are going to get anything out of it, but it gives

10   them credibility with people who they want credibility with.

11         I accept that as a reason, and when I say accept it as

12   a reason, I don't excuse it as a reason.  Listen, we could

13   bring in teams of sociologists and psychiatrists in every

14   criminal case to get to the root cause of what causes someone

15   to engage in criminal activity.  The fact of the matter is, as

16   an adult, it was a knowing decision by Derek Galanis.

17         It's a crime in which there are at least 60 victims.

18   There is a stipulated loss from the offense of between 25 and

19   $65 million.  One of the elephants in the room and the reason

20   why the guidelines are what they are is Derek Galanis was

21   convicted of conspiracy to distribute and possess with intent

22   to distribute ecstasy and received an 108-month prison term

23   going back to October -- well, I guess he was sentenced

24   December of 2003, about 13 years ago, and was arrested in

25   October of 2001.

H2GSDERS

1          There he was involved in an actual manufacturing

2     operation at a warehouse with a partner, and it was a rather

3     serious operation.  Agents discovered a clandestine laboratory

4     accessible through a bookcase which was opened with a hidden

5     latch, and agents recovered 20,000 ectasy tablets and enough

6     chemicals to produce 159 kilograms of ectasy.  So this was a

7     very serious crime of which he was convicted.  Then finally, he

8     got his freedom, and it was not long before he returned to

9     criminal activity.  I can't imagine what it's like to have

10    grown up in the family that Derek Galanis grew up in, with a

11    father who was a serious criminal, who gave the family a

12    privileged lifestyle, which was supported in part by criminal

13    activity.

14         Now, Mr. Galanis has self-diagnosed himself as having

15    bipolar disorder.  At least I guess his primary care physician

16    has gone along with the diagnosis, Dr. Gary Ross, but he's

17    never received a prescription for bipolar disorder.  It is not

18    clear to me to what extent Dr. Ross is qualified to make that

19    diagnosis.  He does receive Xanax, and it doesn't surprise me

20    at all to read that he has anxiety and depression.

21         Part of what troubles me in the case of Derek Galanis

22    is that he had a pretty good academic background.  He has a

23    bachelor of arts in history from Cal State at San Marcos.  He

24    attended the University of Reading in London to study finance.

25    He also attended for a period of time something called the

H2GSDERS

New York School of Finance in Lower Manhattan.  I can't give

Mr. Galanis the credit for simply not understanding the ways of

finance and not understanding the nature and consequences of

his acts or the extent to which they were wrong.

He had formed a business in Kosovo with Dennis Alba

selling prepaid cards to access pornography on the Internet.  I

say this not because of the nature of the business, but to show

that there was some sophistication.  He also was involved in a

business that functioned as a third-party limited liability

insurance company or broker for AIG and sought to establish a

market at the end of the Kosovo war in June of 1999.  Derek

Galanis was certainly smart enough to know better.

I think in a way, even as the government put it, the

monies that were paid by John Galanis to Derek Galanis would,

in the common parlance, make him a non-equity partner in this

enterprise, a salaried employee in this enterprise, albeit a

well paid one.  But as even the government put it, the money

was in part, maybe in large part, to compensate him for his

cooperation in the criminal enterprise, but there may have been

other familial reasons, including the fact that John Galanis is

all of a sudden flesh again and can pay out the money.

I must say, in so many cases, I find it very difficult

to fashion the right sentence and often walk away hoping that

I've done my best, but knowing that this is a very imperfect

exercise.  But based on my consideration of the sentencing

H2GSDERS

```
1    guidelines, policy statements, official commentary of the

2    United States Sentencing Commission, recognizing that I am not

3    obligated to sentence within the guidelines, that I have

4    various discretion, I conclude that a sentence of 72 months'

5    imprisonment, three years' supervised release, waiver of the

6    fine based on both limited assets, and a serious restitution

7    and forfeiture obligation, and an imposition of a $200 special

8    assessment is sufficient but not greater than necessary to

9    achieve the purposes of Section 3553(a).

10            Does the defendant or his counsel have any objection

11   to the court's proposed sentence or to the statement of reasons

12   for that sentence?

13            MR. BRASS:  None, your Honor.  Thank you.

14            THE COURT:  Same question for the government.

15            MS. HECTOR:  No, your Honor.

16            THE COURT:  If the defendant will please stand and

17   I'll impose sentence.

18            Derek Galanis, it is the judgment of this court that

19   you're hereby remanded to the custody of the United States

20   Bureau of Prisons for 72 months.  Following release from

21   imprisonment you shall be placed on supervised release for a

22   period of three years.  I should note that the sentence of

23   72 months is on Count Two, with a sentence of 60 months on

24   Count One to run concurrently.

25            On supervised release the following terms and
```

H2GSDERS

1    conditions apply:  You shall not commit another federal, state

2    or local crime, nor illegally possess a controlled substance,

3    nor possess a firearm or destructive device.  The mandatory

4    drug-testing condition is suspended due to imposition of a

5    special condition requiring drug treatment and testing.  You

6    shall cooperate in the collection of DNA as directed.

7            The standard conditions of supervision 1 through 13

8    are imposed with the following special conditions:  You shall

9    participate in outpatient treatment programs for drug addiction

10   and also outpatient mental health treatment programs as

11   directed by the probation office, which programs may include

12   testing to determine whether you've reverted to using drugs or

13   alcohol.  You shall contribute to the cost of services rendered

14   based on your ability to pay and the availability of

15   third-party payments.  The court authorizes the release of

16   evaluations and reports, including the presentence

17   investigation report, to the healthcare provider.  As part of

18   the mental health treatment program, you shall take any

19   prescribed medications, unless otherwise instructed by the

20   healthcare provider.  You shall submit your person, residence,

21   place of business, any property, computer, electronic

22   communications, data storage devices, and other media under

23   your control to a search on the basis that the probation

24   officer has reasonable suspicion that contraband or evidence of

25   a violation of the conditions of release may be found.  The

H2GSDERS

1    search must be conducted at a reasonable time and in a

2    reasonable manner.  Failure to submit to a search may be

3    grounds for revocation.  You shall inform any other residents

4    that the premises may be subject to search pursuant to this

5    condition.  You shall refrain from engaging in any legal or

6    financial transactions, be it directly or in an advisory

7    capacity, involving his family members, including his parents

8    and siblings, and his siblings' spouses and their children.

9    You shall report to the nearest probation office within

10   72 hours of release of custody.  It is ordered that you shall

11   pay the United States a special assessment of $200, which shall

12   be due immediately.  An order of restitution will be entered

13   within 90 days, with the government's submission due 30 days

14   hence.  I believe that is the date I said yesterday, is that

15   correct?

16              MS. HECTOR:  Yes, your Honor.

17              THE COURT:  Is there a specific date?

18              MS. HECTOR:  There are.  The government's brief is due

19   March 15, the defense the 31st, and the reply April 7.

20              THE COURT:  That's the schedule that applies here.

21              The defendant shall forfeit all right, title, and

22   interest to the proceeds of the crime, including a sum of money

23   equal to $19,038,650.53, representing property, real and

24   personal, that constitutes or is derived from the proceeds

25   traceable to the commission of the offenses alleged in Counts

H2GSDERS

One and Two.  The fine is waived because of the substantial

restitution and forfeiture obligations.

Mr. Galanis, you have the right to appeal the sentence

I've imposed.  If you cannot afford the cost of an appeal, you

may apply for leave to appeal as a poor person.  The time

limits for filing a notice of appeal are brief and they are

strictly enforced.  If you request, the Clerk of Court will

prepare and file a notice of appeal immediately.

Do you understand all that?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Please be seated.

Anything further from the government?

MS. HECTOR:  Only that we would ask that any open

counts be dismissed at this time.

THE COURT:  Without objection, that is granted.

Mr. Brass, any application?

MR. BRASS:  No, your Honor.

THE COURT:  How about place of incarceration?

MR. BRASS:  Western region, your Honor.

THE COURT:  I will recommend that he be housed as

close to Los Angeles as is feasible to facilitate family

visitation.

Mr. Galanis, you have a job to do.  You have to get

things straight in your own mind.  If you have bipolar

disorder, you should be evaluated for that.  In fact, I am

H2GSDERS

1    going to recommend that he be evaluated by the Bureau of

2    Prisons for appropriate mental health treatment.  You have to

3    figure out what you're going to do with the rest of your life

4    and how you're going to live a law-abiding life.  I wish you

5    the best in that endeavor.

6              MR. BRASS:  Thank you, your Honor.

7              THE COURT:  We are adjourned.

8                            o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25