UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
UNITED STATES OF AMERICA
:
      - v. -                                      15 Cr. 643 (PKC)
:
JASON GALANIS,
JOHN GALANIS,                             :
  a/k/a "Yanni,"
DEREK GALANIS, and                  :
GARY HIRST,
:
              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM IN RESPONSE TO SUBMISSIONS OF WIMBLEDON FINANCING MASTER FUND, LTD. AND STILLWATER LIQUIDATING LLC REGARDING RESTITUTION

                                                        JOON H. KIM
                                                        Acting United States Attorney
                                                        Southern District of New York
                                                        Attorney for the United States of America

Brian R. Blais
Aimee Hector
Rebecca Mermelstein
Assistant United States Attorneys
   Of Counsel

The Government respectfully submits this memorandum in response to the submissions by Wimbledon Financing Master Fund, Ltd. ("Wimbledon") and Stillwater Liquidating LLC ("Stillwater") in connection with the restitution determination for defendants Jason Galanis, John Galanis, Derek Galanis and Gary Hirst (collectively, the "Gerova Defendants") and their desire to be included in any restitution order as victims in this matter. Jason Galanis was sentenced by this Court on February 15, 2017 and both John and Derek Galanis were sentenced on February 16, 2017. Gary Hirst will be sentenced on June 12, 2017. By statute, restitution issues must be resolved within 90 days of sentencing. *See* 18 U.S.C. § 3664(d)(5). Thus, restitution issues must be resolved by May 16, 2017 for Jason Galanis and by May 17, 2017 for both Derek and John Galanis.[1]

As an initial matter, the Government acknowledges that the situation of Stillwater and Wimbledon is indisputably sympathetic – both contributed substantial assets to Gerova Financial Group Ltd. ("Gerova") and both suffered substantial losses when Gerova collapsed. But sympathetic circumstances are not the touchstone for whether an individual or entity qualifies as a "victim" under the restitution statutes. Instead, the pertinent question is whether the putative victim was "directly and proximately harmed" by the criminal conduct of the defendant or defendants at issue in a particular case. Here, the Government submits that Stillwater and Wimbledon, like every Gerova shareholder, suffered a dilution of the value of their shareholdings

---

[1] Although the restitution statutes provide for a determination of restitution within 90 days, a restitution determination outside that time window is not impermissible. *See Dolan v. United States*, 560 U.S. 605 (2010) ("a sentencing court that misses the 90–day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount."); *United States v. Gushlak*, 728 F.3d 184, 191 (2d Cir. 2013) ("[W]e have declined to reverse a restitution order because of a district court's failure to determine identifiable victims' losses within ninety days ... unless [the defendant] can show actual prejudice from the omission." (internal citation and quotation marks omitted)).

in Gerova when more than 5,000,000 shares were fraudulently issued to a foreign national, Ymer Shahini, for no legitimate purpose. While they can be considered victims in this regard, given the numerosity of Gerova shareholders and the complexity of attributing losses based on stock dilution from the fraudulent scheme, as opposed to other confounding causes, the Government submits that ascertaining the restitution impact of dilution losses is impracticable and would unnecessarily prolong and complicate the sentencing process. 18 U.S.C. § 3663A(c)(3).[2] As to the contention that Stillwater and Wimbledon should be classified as victims for restitution purposes because they each contributed assets which were then used to facilitate the criminal conduct of the Gerova defendants, the Government submits, with due respect to these parties, that this theory of victimhood for restitution purposes has no legal basis. Stillwater and Wimbledon cannot establish that they were victims of the charged criminal scheme because neither the allegations in the Indictment nor the evidence at trial indicated that such contributions were induced by fraud or otherwise were a result of the charged criminal scheme. Accordingly, neither Stillwater nor Wimbledon may be included in any restitution order.

### A. Factual Background

In early 2010, Stillwater and Wimbledon each contributed certain illiquid hedge fund assets to the entity that became Gerova, in exchange for shares of Gerova. The operating vision of Gerova was that such illiquid assets could be used as regulatory capital that could help to grow Gerova's reinsurance business. (Transcript of Hirst Trial ("Tr.") 342-43). There is no dispute that

---

[2] Courts have recognized that issues such as numerosity of victims and complexity of loss amount calculation can obviate the requirement for the imposition of a restitution order. *See, e.g., In re Huff Mgmt Co.*, 409 F.3d 555 (2d Cir. 2005) (in context of Adelphia securities fraud case, recognizing that restitution is not mandatory if the district court determines that the number of victims or the complexity of the issues renders restitution "impracticable").

the shares to which Stillwater and Wimbledon became entitled as a result of their asset contribution were never registered with the SEC, and thus never became freely tradeable.[3] (Tr. 442) (testimony of Michael Hlavsa that the registration statement registering, among other things, the restricted shares of Stillwater and Wimbledon, was never filed).

### B. Procedural Background

On March 22, 2017, the Government filed a restitution submission with respect to Jason Galanis, John Galanis, Derek Galanis and Gary Hirst, which sought restitution in the amount of $19,019,404.36, for the Tagliaferri clients[4] whose money had been used to purchase shares of Gerova.[5] By submission dated April 7, 2017, Jason Galanis opposed the imposition of any restitution, arguing that the conduct underlying his convictions was too far removed from the alleged losses and the Government had not sustained its burden of proving the actual losses.

Thereafter, Wimbledon and Stillwater each sought restitution in the instant matter. More specifically, in its submission dated April 12, 2017, Wimbledon sought restitution for (i) "[t]he misappropriation of $4.3 million from Wimbledon's account in 2010 and 2011;" (ii) "[t]he $5 million 'unwind' payment to Galanis and his co-conspirators in 2011;" (iii) "[t]he loss in value of Wimbledon's stock," calculated at either $38,306,665.50 (using the average stock price) or $43,633,332 (using the price at which Wimbledon acquired the shares); and (iv) Wimbledon's

---

[3] There is some dispute as to whether Stillwater and Wimbledon ever physically received their restricted shares in Gerova. *Compare* DX 1214 (share certificate for Stillwater shares) *with* Tr. 119 (Doueck testimony that Stillwater never received Gerova shares). The status of Stillwater and Wimbledon as "victims" does not ultimately turn on whether they in fact physically received any Gerova shares.
[4] The similarly situated Martin Kelly clients were made whole by SunTrust bank, which has not itself sought restitution.
[5] The Government also sought restitution of $18,012,93.07 from Jason Galanis in connection with his conviction for investment adviser fraud with respect to shares of fund.com.

unspecified "costs and attorney's fees to investigate the fraud." Wimbledon Br. at 19. Thus, Wimbledon seeks total restitution of approximately $50 million. In its April 14, 2017 submission, Stillwater seeks restitution of between $335.6 and $480.7 million. Stillwater Br. at 26. Stillwater also proffered several alternative loss calculation methodologies yielding restitution amounts between approximately $216 million and $640 million. Stillwater Br. at 29-30.[6]

### C. Applicable Law

The basic parameters of the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, which have been set forth in prior submissions, are repeated here in brief for the Court's convenience. Title 18, United States Code, Section 3663A provides that a sentencing court, for defendants convicted of offenses described in 18 U.S.C. § 3663A(c), "*shall* order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense, or if the victim is deceased, to the victim's estate." A "victim," for purposes of the restitution statute, is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Most importantly, for purposes of the Court's evaluation of the claims by Stillwater and Wimbledon, restitution is limited to losses that were the direct and proximate result of the charged conduct.

---

[6] Though the availability of funds is not, of course, a factor in the determination of restitution, the Government notes that based on the information currently available it believes that the total amount of money available to make restitution payments will be in in the millions – not tens or hundreds of millions – of dollars.

### D. Stillwater and Wimbledon Are Not Compensable Victims of the Charged Criminal Conduct for Purposes of a Restitution Order

#### a. Stillwater and Wimbledon, Like All Gerova Shareholders, Suffered Dilution Losses, Which Are Too Complex to Calculate Precisely

The gravamen of the Indictment against the Gerova Defendants – and the corresponding nature of the evidence adduced at Hirst's trial – is that the Gerova Defendants participated in a scheme to cause the fraudulent issuance of over 5 million shares of Gerova to a foreign national, Ymer Shahini, and then monetized those illegally obtained shares for the benefit of the conspirators through various means, including, among others, "matched trading" with corrupt investment advisers. (Indictment ¶¶ 13-67). As background to that charged conspiracy, a single paragraph of the Indictment describes the formation of Gerova through, in part, the contribution of assets by Stillwater and Wimbledon. (Indictment ¶ 18). Notably, the Indictment does not allege – nor did the Government's evidence at the Hirst trial establish – that either Stillwater or Wimbledon were fraudulently induced by the Gerova Defendants to contribute their assets to Gerova or that Gerova was intended to be a vehicle for fraud *ab initio*. The pertinent question, for restitution purposes, is whether Stillwater and Wimbledon were directly and proximately harmed by the proven criminal conduct of the Gerova Defendants, as opposed to other potentially criminal conduct that occurred outside of the charged and proven criminal scheme.

The Government has previously acknowledged, and continues to accept, that Stillwater and Wimbledon, like all shareholders of Gerova, were victims of the proven criminal conduct of the Gerova Defendants – *i.e.*, the Shahini share issuance scheme – because their shareholdings were diluted by the fraudulent issuance of shares to Shahini. Put simply, if before the criminal conduct, Stillwater and Wimbledon owned a specific percentage of the total outstanding shares of Gerova, and thus had a corresponding claim on that percentage of Gerova's net assets, then following the

Shahini share issuance, Stillwater and Wimbledon both owned a smaller percentage of Gerova and had a corresponding claim to a smaller percentage of Gerova's net assets. Thus, both Stillwater and Wimbledon are "victims" of the Gerova Defendants' charged and proven criminal conduct to the extent that their shareholdings were diluted by the Shahini share issuance because that share issuance directly and proximately diluted their claim on Gerova's net assets.

Nonetheless, the Government does not believe that ascertaining a restitution amount based on the dilutive impact of the Shahini share issuance is practicable. First, as noted, every shareholder of Gerova at the time of the Shahini share issuance suffered a dilutive impact from that issuance. As the Court is aware, Gerova was a publicly-traded company and as a result the "number of identifiable victims is so large as to make restitution impracticable." 18 U.S.C. § 366A(c)(3)(A). Additionally, determining the precise dollar value impact of such dilution on the value of any putative victim's Gerova shareholdings and isolating the impact of that dilution from other confounding causes that impacted the value of Gerova's stock – including, for example, Gerova's failure to generate financial statements that could be filed with the SEC, and the negative publicity generated by the Dalrymple research report and the *Forbes* article that detailed Jason Galanis's history with Gerova and the run-ins members of his family had had with both the criminal justice system and the SEC—would necessitate the determination of "complex issues of fact related to the cause or amount of the victim's losses." 18 U.S.C. § 366A(c)(3)(B). Ascertaining the dilution losses attributable to each Gerova shareholder would therefore "prolong the sentencing process to a degree" that the burden on the sentencing process would outweigh the need to provide restitution to these putative victims. 18 U.S.C. § 366A(c)(3)(B).

### b. Outside of Their General Status as Diluted Shareholders, Stillwater and Wimbledon are Not Victims of the Charged Offense

Stillwater and Wimbledon do not limit their request for victim status to generalized allegations that their Gerova shareholdings were diluted by the Shahini share issuance. Instead, they claim that the entirety of their losses, *i.e.*, the full value of their contributed assets, collectively totaling nearly half a billion dollars, were the direct and proximate result of the charged criminal conduct engaged in by the Gerova Defendants. But this position ignores the reality that the criminal conduct alleged in the Indictment, and established, either through the guilty pleas of certain Gerova Defendants or the evidence adduced at the Hirst trial, was limited to the scheme to fraudulently issue shares to Shahini and then to liquidate those shares through fraudulent trading with corrupt investment advisers. The Indictment did not allege, nor did the Government endeavor to prove, that either Stillwater or Wimbledon were fraudulently induced to contribute their assets to Gerova or that Gerova, as an entity, was wholly fraudulent from its initiation.[7] Stillwater and Wimbledon cannot assert that because they contributed assets to an entity in which a fraudulent scheme occurred, they are victims of that scheme simply because the end result of their investment decision was a monetary loss. Rather, they most show that those losses were caused *by the Gerova Defendants' participation in the proven criminal scheme*, as opposed to being caused by some other criminal scheme in which the Gerova Defendants participated or by other factors, including the general deterioration in Gerova's attractiveness as investment vehicle.

Indeed, the broad sweep of the claims advanced by Stillwater and Wimbledon is evident on the face of Wimbledon's restitution filing. Wimbledon claims to have been victimized by a wide

---

[7] The Government does not seek here to comment on or critique these allegations. Rather, the Government notes only that these allegations are far broader than the criminal conduct that was charged in this matter and either admitted to by plea or proven at trial.

swath of conduct, including the sale of one of Wimbledon's assets, HM Ruby, from which proceeds were allegedly improperly diverted, and an "unwind" transaction in which the Wimbledon assets were transferred from Gerova to a purportedly sham company. (Wimbledon Br. at 12-14). Significant portions of the conduct by which Wimbledon claims to have been victimized, including the HM Ruby transaction and the "unwind" transaction, are nowhere alleged in the Indictment and were not proven by the Government at the Hirst trial or included in the agreed-upon factual recitation in any of the Gerova Defendants' Presentence Reports.[8] The evidentiary record before the Court at this time, in light of the allegations in the Indictment and the evidence established at the Hirst trial, is simply inadequate to establish that these purported actions by which Wimbledon was purportedly defrauded in fact took place as described by Wimbledon in their restitution submission. More importantly, the factual record is also inadequate to establish that any losses suffered by Wimbledon attributable to such purported conduct were directly and proximately caused by the criminal conduct of the Gerova Defendants that was actually charged and proven, which centered on the fraudulent issuance of shares to Shahini.[9]

---

[8] To be sure, Albert Hallac pled guilty to an Information that covers certain of the alleged fraudulent conduct now advanced by Wimbledon. In addition, an Indictment against David Bergstein and others pending before Your Honor alleges fraudulent conduct related to, among other things, the Gerova "unwind" transaction. *See United States v. David Bergstein et al.*, 16 Cr. 746 (PKC). But the question before this Court is not whether Wimbledon was victimized by people other than the Gerova Defendants, but instead whether, on the factual record currently before the Court, given the allegations in the Indictment and the facts established at the Hirst trial, Wimbledon was victimized by the Gerova Defendants in this case.

[9] The Government, of course, is making no suggestion as to whether Wimbledon's claims that the Gerova Defendants and others engaged in various types of fraudulent conduct beyond the Shahini share issuance could be established in an alternative proceeding, such as a civil action, or whether Wimbledon might qualify as a "victim" entitled to restitution in connection with the criminal proceedings against Hallac, Bergstein and others. Such determinations must await a future resolution.

Stillwater and Wimbledon nonetheless claim that they are victims of the Gerova Defendants' criminal conduct because the assets contributed by Stillwater and Wimbledon were a necessary part of the proven criminal conduct. *See* Stillwater Br. at 9, 12 ("Without Stillwater's assets, Gerova would not have existed and the defendants would not have been able to take the steps they did to carry out their fraud;" "Without Stillwater's assets, the defendants would not have been able to divert Gerova's shares and maintain share value, much less continue to operate the company."); Wimbledon Br. at 2 ("the scheme[] could not have succeeded without this transaction [the acquisition of Wimbledon assets] . . . which allowed Galanis and Hirst to avoid the dissolution of Gerova and to give a veneer of legitimacy to what in fact was another Ponzi-like scheme."). This is, of course, true. Without assets in one form or another, Gerova would have been nothing more than a shell entity; a scheme to fraudulently issue to a foreign national, and then subsequently monetize, shares of Gerova could not have succeeded because the market would have attributed little value to a company wholly devoid of assets. Stillwater and Wimbledon have thus established that "but for" their contribution of assets the fraudulent Shahini scheme could not have succeeded. This, however, is different from establishing that they were victims of this scheme.

Stillwater and Wimbledon cannot establish that their losses were proximately caused by the Gerova Defendants' criminal conduct, beyond the impact of dilution, which has already been discussed. The evidence the Government adduced at trial did not establish that the Shahini share issuance singularly caused the ultimate downfall of Gerova, and thus the ultimate diminution in the value of Stillwater's and Wimbledon's investments in Gerova. Instead, the evidence established that Gerova failed for a number of reasons unrelated to the Shahini share issuance, including (1) the publication of the Dalrymple Report and the *Forbes* article that revealed Jason Galanis's involvement with Gerova, and the relationship between the principals of Gerova and other

10

fraudulent schemes[10]; and (2) Gerova's inability to obtain a valuation for its illiquid hedge fund assets and its corresponding inability to generate financial statements that could be filed with the SEC to, for example, register the Stillwater and Wimbledon shares.  The evidentiary record before the Court does not support a finding that Stillwater and Wimbledon were proximately harmed by the Gerova Defendants' criminal conduct, in light of the presence of substantial confounding causes, to which the ultimate failure of Gerova (and the corresponding diminution in the value of Stillwater's and Wimbledon's stakes in Gerova) can readily be attributed.

This conclusion is not impacted by the Government's introduction, at the Hirst trial, of evidence regarding the formation of Gerova.  Background information regarding the formation of a conspiracy and the relationship between co-conspirators is routinely admitted at trial.  Here, the evidence of Stillwater and Wimbledon's connection to Gerova was background information to explain how Gerova was formed, the nature of its business and shareholder base, and the post-formation governance structure of Gerova.  The mere fact that such background testimony included information about Stillwater's and Wimbledon's asset contribution does not mean that such contribution was the result of the criminal scheme proven at trial, which again, focused on the subsequent Shahini share issuance, not any purportedly fraudulent inducement that caused Stillwater and Wimbledon to contribute their assets.[11]

---

[10] The evidence at trial established that Stillwater, at least, was aware of Jason Galanis's involvement at Gerova.  *See, e.g.*, Tr. 82-83 (Doueck testimony regarding his interactions with Galanis).  In contrast, Albert Hallac, the proprietor of Weston Capital Management, which managed the Wimbledon assets prior to their contribution to Gerova, pled guilty to investment adviser fraud, based in part on his concealment of Jason Galanis's Gerova role from Wimbledon's investors.

[11] In advancing their claims for restitution, Stillwater and Wimbledon rely heavily on the Government's extemporaneous evidentiary arguments concerning the admissibility of certain background testimony by Jack Doueck of Stillwater.  In responding to a hearsay objection to such statements, the Government argued that the statements were (i) "admissible not for their truth but

The cases cited by Stillwater and Wimbledon do not dictate a different result. Though the holdings in each of the cited cases is tethered closely to the specific circumstances of the putative victims, at their base the cases make clear that restitution is limited to cases in which the harm to the victim was an integral or significant part of the offense of conviction. For example, Stillwater first cites a number of cases in which courts have found that – unsurprisingly – individuals harmed by a defendant's efforts to profit from his criminal scheme were entitled to restitution regardless of whether the effort to profit was itself an element of the charged offense. Thus, for example, in *United States v. Paul*, a defendant engaged in a pump and dump scheme and extracted profits from the scheme by obtaining bank loans collateralized by the artificially inflated shares. The Second Circuit upheld the award of restitution to the victim banks, explaining that the fraudulently collateralized loans were a "significant part of the greater fraud, [such that] the necessary 'causal nexus' unquestionably exists between [the defendant's] conduct, the margin loans, and the losses to the banks." 634 F.3d 668, 677 (2d Cir. 2011).

Similarly, in *United States v. Archer*, the Second Circuit upheld the award of restitution to immigration clients who had paid legal fees under the false belief that their attorney would file

---

simply to show how it is that [Doueck] ended up in business with Gerova," (ii) as background of the conspiracy; and (iii) as statements in furtherance of the conspiracy. Tr. 85-91. The mere fact that the Court admitted certain of Doueck's statements on the ground that they were made in furtherance of the conspiracy cannot bear the weight Stillwater and Wimbledon ascribe to it – such a finding simply does not justify the conclusion that the charged and proven criminal scheme was a direct and proximate cause of their losses.

This analysis is also in no way altered by the fact that the Government elicited from Doueck testimony concerning the significance or materiality of the Shahini shares issuance. As described above, Stillwater – like all Gerova shareholders – was a victim of share dilution as a result of the Shahini share issuance. Questions concerning the materiality of the Shahini shares issuance simply reflect Doueck's status as a Gerova shareholder; that status, for the reasons set forth above, is insufficient to justify an award of restitution.

legitimate immigration applications, but who had in fact filed fraudulent applications. 671 F.3d 149 (2d Cir. 2011). Although not an element of immigration fraud, the Second Circuit found that restitution was appropriate because the client payments were the mechanism through which the defendant profited from the conspiracy and were thus an integral part of the devised scheme.

Finally, in *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011), the Circuit considered restitution in the case of defendants convicted of conspiring to illegally import lobsters to the United States, knowing such lobsters had been harvested in violation of South African law. In that case, the Circuit rejected the defendants' contention that South Africa was ineligible for restitution because the defendants' offense of conviction did not itself involve the illegal harvesting of lobsters in South Africa. Rather, recognizing that illegal harvesting was inextricably bound to the offense of conviction of illegal importation, the Court upheld restitution to South Africa because "[b]y smuggling the lobsters out of South Africa knowing that they had been harvested unlawfully, the defendants deprived the South African government of its right to seize and sell the poached lobsters." *Id.* at 41. The harm to the South African government was directly and proximately caused by the defendants' convicted conduct.

All three of these cases thus support restitution payments, not to Stillwater or Wimbledon, but to the victims of the matched trading, as the Government has urged. Though not a necessary element of the scheme to fraudulently issue the Shahini shares, the disposition of these shares – and the ability to profit from the scheme – was an indisputable and essential part of larger scheme. The same simply cannot be said of the formation of Gerova. Though the existence of a company from which shares could be fraudulently issued was of course a prerequisite for the scheme, the specifics of Gerova's formation were not so integrally enmeshed with the offense of conviction to give rise to restitution. This fundamental principle – that restitution is permissible only where the

criminal conduct harming victims is integral to the charged conduct, is similarly expressed in the remaining cases cited by Stillwater.

Thus, for example, in *United States v. Skowron*, 839 F.Supp. 2d 740 (S.D.N.Y. 2012) (DLC), Judge Cote considered the propriety of ordering restitution to Morgan Stanley in connection with the conviction of a Morgan Stanley managing director for insider trading and obstruction of an SEC investigation into the insider trading. Judge Cote concluded that Morgan Stanley was a victim of the charged offense because the defendant's "offenses of conviction" directly and proximately harmed Morgan Stanley" because [a Morgan Stanley entity] was the vehicle or 'mechanism' through which [the defendant] committed his crimes," because the defendant "diverted valuable corporate time and energy in the defense of [the defendant] and [the Morgan Stanley entity], and injured Morgan Stanley's reputation." *Id.* at 745. Significantly, Judge Cote noted that the defendant's deceit of his employer was "an integral part [of his] scheme" and that such deceit was part and parcel of the defendant's efforts to obstruct the SEC investigation.

Finally, *United States v. Desnoyers* addressed restitution imposed on a defendant whose work as an asbestos air sampler required him to take air samples pre-abatement, during abatement, and after final clearance of the asbestos. 708 F.3d 378, 389 (2d Cir. 2013). The defendant was convicted, among other charges, for failing to take proper samplings following final clearance. The Second Circuit upheld restitution awards to the defendant's victim clients not only for the costs of the improper final clearance samplings but also for the costs of the appearingly proper samplings before and during the abatement. Here too the Circuit relied on the fact that "before" and "during" samplings – and the payments for that work – were an "integral part of the overall scheme" to provide improper final clearance samplings, such that restitution for the all payments was proper. *Id.*

Again, the losses to the victims in *Skowron* and *Desnoyers* were inextricably tied to the criminal offenses of conviction. The insider trading by *Skowron* took place during his employment at Morgan Stanley and using Morgan Stanley's funds. His efforts to cover up his fraud involved lies directly to Morgan Stanley as well as to the SEC. The harm to Morgan Stanley was thus temporally and factually intertwined with the criminal conduct. Similarly, the payments by the asbestos abatement clients for the seemingly proper pre-and during abatement testing was inexorably tied to the ultimate fraudulent post-abatement tests. There would be no purpose to conducting only the pre and during testing – the entire purpose of the early phase testing was to provide a point of comparison for the post-abatement tests. In contrast here, Gerova's transactions with Stillwater and Wimbledon took place months before the fraudulent issuance of shares to Shahini. The Stillwater and Wimbledon transactions had a business purpose separate and apart from any subsequent effort to divert shares to Shahini. Thus, any losses to Wimbledon and Stillwater were simply not a part of, let alone integral to, the Shahini fraud.

Stillwater and Wimbledon have indisputably suffered enormous losses and their plight engenders significant sympathy. The law, however, constrains the payment of restitution to those victims directly and proximately harmed by the defendants' offenses of conviction. This Stillwater and Wimbledon cannot show. At its base, the transactions which gave rise to the formation of Gerova are simply too far afield from the core of the criminal offense here – the misappropriation of the Shahini shares and the disposition of those shares through matched trading. A restitution award to Stillwater and Wimbledon would thus be unfair to both the other more directly harmed victims – whose recovery would be diluted – and to the defendants themselves. Accordingly, Stillwater and Wimbledon's restitution claims must be denied.

Dated: New York, New York
       April 24, 2017

                                       Respectfully submitted,

                                       JOON H. KIM
                                       Acting United States Attorney
                                       Southern District of New York

By:   */s/*
        Brian R. Blais
        Aimee Hector
        Rebecca Mermelstein
        Special Assistant United States Attorneys
        (212) 637-2521/2203/2360

cc: Counsel of record (by email)