UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                                                      15-cr-643 (PKC)

              -against-                                        MEMORANDUM
                                                                               AND ORDER

JASON GALANIS,
JOHN GALANIS, and
DEREK GALANIS


                                            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        This is the Court's finding on the restitution allegations of defendants Jason Galanis, John Galanis, and Derek Galanis arising from a criminal securities fraud scheme for which each has entered a guilty plea. At the core of the scheme, Jason Galanis and others caused Gerova Financial Group, Ltd. ("Gerova") to issue shares to Ymer Shahini, a foreign national, and then arranged for the sale of those shares within the United States. At each defendants' sentencing the Court deferred the determination of restitution. The government urges that the Court order restitution to clients of James Tagliaferri, a corrupt investment advisor and a participant in the scheme, in whose names fraudulently issued shares of Gerova were purchased, and who consequently suffered losses after the company collapsed.

        Jason Galanis has objected to the government's restitution proposal. (Dkt. 401.) Non-parties Stillwater Liquidating LLC, a court appointed fiduciary acting on behalf of designated Stillwater Funds ("Stillwater"), and Wimbledon Financing Master Fund, Ltd. ("Wimbledon"), hedge funds who contributed capital to Gerova at its formation in return for

shares of the company, also object to the government's proposal, asserting that restitution should be made to them. For reasons to be explained, the Court orders restitution to the Tagliafarri clients and rejects the arguments of Jason Galanis, Stillwater, and Wimbledon.

BACKGROUND

I. Procedural History.

Jason, John, and Derek Galanis entered pleas of guilty to Counts 1 and 2 of the Indictment charging securities fraud and conspiracy to commit securities fraud. Jason Galanis also pled guilty to Counts 5 and 8 of the Indictment, charging him with Investment Advisor fraud and a count of conspiracy to commit securities fraud. On September 28, 2016, a jury returned a verdict of guilty against Gary Hirst as to Counts 1-4 of the Superseding Indictment, charging him with securities fraud, conspiracy to commit securities fraud, wire fraud, and conspiracy to commit wire fraud. Gary Hirst has not yet been sentenced.

II. The Facts.

This Court presided over the trial of Gary Hirst, a conspirator, and the Court relies on evidence presented at trial to support the conclusions herein. The Court also relies upon the facts set forth in Jason, John, and Derek's plea allocutions and presentence reports to the extent adopted as the Court's findings of facts at the time of sentencing. Finally, to the extent not inconsistent with the forgoing, the Court considers the content of the Indictment and Superseding Indictment which are presented upon a grand jury's finding by a preponderance of the evidence. See United States v. Skowron, 839 F. Supp. 2d 740, 745 (S.D.N.Y. 2012) (basing findings of fact with respect to restitution on the Information to which defendant pleaded guilty, the parties' sentencing submissions, and defendants' Presentence Report).

The manager and supervisor of the conspiracy was Jason Galanis. Jason Galanis was an investment banker, venture investor, and consultant, who was barred as a result of action by the Securities and Exchange Commission ("SEC") for five years from serving as an officer or director of a publically traded company beginning in April 2007. He owned equity both directly and indirectly in various companies, and at times owned approximately 50% of the free trading shares of Gerova, formerly known as Asia Special Situation Acquisition Corporation ("ASSAC"), which purported to be an international reinsurance company incorporated in the Cayman Islands in March 2007 and later redomiciled in Bermuda. John Galanis is the father of, among others, Jason, Derek, and Jared Galanis. He was a venture investor in various companies, and in connection with decades old events, was permanently banned by the SEC from trading securities through any brokerage account other than in his own name or the names of his wife or children. Derek Galanis assisted his father and brothers in engaging in certain transactions related to Gerova and other companies. Jared was a lawyer who participated in certain transactions at the direction of Jason in connection with companies controlled by Jason. Gary Hirst was president of Gerova and Chairman of its Board of Directors.

Gerova was formed in January 2010 when ASSAC, its predecessor company, acquired illiquid assets held by Stillwater Funds and all of the assets of Weston Capital's Wimbledon Financing Fund, in exchange for Gerova stock. Because Gerova had not complied with the SEC regulations regarding the issuance of new stock, it could not issue stock to U.S persons that was not restricted stock. Due to exemptions from registration requirements, a foreign national could under certain circumstances be issued shares of Gerova that could be immediately resold. In order to issue shares that could be sold in the short term, the defendants conspired to issue stock to Ymer Shahini, a citizen of Kosovo and Canada living in the Czech

Republic, that would in fact be controlled by Jason Galanis and the other defendants. To make the issuance of shares appear legitimate, the defendants caused Gerova to enter into a fraudulent consulting agreement with Shahini, back-dated to January 22, 2010, falsely claiming that Shahini was owed compensation for introducing Weston Capital to Gerova in connection with Gerova's acquisition of Wimbledon in January 2010.

Pursuant to a warrant agreement, fraudulently back-dated to March 29, 2010, this compensation was paid in the form of 11,000,000 warrants issued to Shahini, enabling him to acquire ordinary shares of Gerova at $7.50 per share. The warrant agreement also contained a cashless exercise provision that permitted Shahini to exercise the warrants without paying any consideration. The defendants fraudulently obtained an attorney opinion letter, authorizing the removal of restrictions on the Gerova shares to be issued to Shahini following his exercise of the warrants, based on the misrepresentation that Shahini intended to dispose of the securities to persons outside the United States, thus complying with applicable SEC regulations. Ultimately, Shahini was issued 5,333,333 unrestricted ordinary shares of Gerova stock, worth approximately $72 million. At the time, neither the consulting agreement nor the warrant agreement was disclosed to Gerova's Board of Directors, Gerova's shareholders, the New York Stock Exchange ("NYSE"), or the investing public.

Jason, John, Jared, and Derek then opened brokerage accounts in the name of Shahini to effectuate the sale of Gerova stock for their own benefit. In coordination with Shahini, they effectively controlled the accounts and directed trading for the accounts. Beginning June 14, 2010, the conspirators began to cause the sale of Gerova shares from these accounts. In the last two weeks of June 2010 the defendants realized a net profit of approximately $6.4 million, before the stock price declined dramatically at the end of June.

In order to continue to profit from the scheme and manipulate the market to artificially prop up the price of Gerova stock, Jason enlisted the assistance of certain corrupt investment advisors who purchased Gerova stock for their clients' accounts in exchange for stock and cash for the advisors' personal benefit.  Two investment advisors engaged in match trading with the Shahini accounts controlled by the defendants between July and September 2010, before their employers discovered the arrangement and terminated their employment, reimbursing the clients and liquidating the firm's Gerova holdings.  Jason and Jared then found a new investment advisor to participate in the scheme, James Tagliaferri, who between September 2010 and February 2011 purchased over 1.5 million shares of Gerova for his clients' accounts for a total of $24 million.  In exchange, Jason transferred approximately 1.6 million shares of Gerova to an account, which were eventually distributed to Tagliaferri's clients at no cost.  In order to distribute the proceeds of the sale of Gerova stock to the individuals involved in the scheme, funds were periodically transferred from the Shahini accounts to the defendants.

Tagliaferri also caused clients to invest in notes issued by entities associated with Jason and Jared, such as fund.com, in exchange for compensation.  When these obligations became due, Tagliaferri used other clients' funds to either purchase notes issued by other entities associated with Jason and Jared, or publically-traded shares held by such entities, and the funds generated were used to pay the original obligations owed to Tagliaferri's other clients.

On February 23, 2011, following the publication of articles which questioned whether Gerova had engaged in wrongdoing, the NYSE halted trading of Gerova's stock.  By November 2, 2011, Gerova stock had lost all value.

LEGAL STANDARD

The Mandatory Victims Restitution Act ("MVRA"), requires a sentencing court, for defendants convicted of offences "against property . . . including any offense committed by fraud or deceit" in which "an identifiable victim or victims has suffered . . . pecuniary loss," to order "that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate." 18 U.S.C. §§ 3663A(a)(1), (c). The statute defines a "victim" as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). However, a court need not order restitution "if the court finds, from facts on the record, that" either "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(B)(3). The Second Circuit has found that where tens of thousands of victims of defendants' securities fraud suffered losses, and that those victims' losses "ha[d] not been established and doing so would indisputably take a great deal of time," no restitution was required. United States v. Rigas (In re W.R. Huff Asset Mgmt. Co.), 409 F.3d 555, 563-64 (2d Cir. 2005) (district court did not abuse its discretion by approving a settlement agreement that petitioners argued compromised their right to restitution under the MVRA).

DISCUSSION

    I.    The Parties' Proposals.

        a.    The Government's Restitution Proposal.

The government proposes that restitution be made to clients of Tagliaferri in whose accounts Gerova stock was purchased. The government asserts that the losses suffered by Tagliaferri clients at the time Gerova trading was halted by the NYSE, net of recoveries from third parties, was $19,019,404.36. (Gov.'s Supp. Sentencing Mem., March 22, 2017, Dkt. 397 ("Gov.'s Mem.") at 3.) The government seeks restitution in this amount, jointly and severally, against Jason, John, and Derek. Additionally, the government seeks restitution against Jason for losses caused by a Ponzi scheme connected with the sale of fund.com shares to Tagliaferri clients, which resulted in losses, net of recoveries, of $18,012,933.07. (Id. at 3-4.) The government seeks restitution against Jason for a sum total of $37,032,337.43.

The comparative worthiness of various victims' claims for restitution is not a factor in the Court's restitution analysis. Simply by way of background, it notes that Tagliaferri's clients placed in him their trust and their financial security. Tagliaferri accepted defendants' bribes, and fraudulently invested his clients' money in Gerova shares and worthless companies owned by Jason Galanis. Tagliaferri has been convicted of various crimes in connection with this scheme. (U.S. v. Tagliaferri, 13-cr-115, Dkt. 137.) Many of these victims, whose assets had likely been built though years or decades of hard work, have been deprived of a secure financial future.

        b.    Restitution Proposal of Stillwater and Wimbledon.

Stillwater contends that it is entitled to restitution in this case. Stillwater argues that: i) all holders of Gerova stock, including Stillwater, were victims of defendants' scheme to

fraudulently issue Gerova shares to Shahini, which diluted the value of all Gerova shareholders' holdings, and, ii) even if restitution for all Gerova shareholders is not appropriate, restitution to Stillwater is nonetheless required because its assets were necessary for the fraud and because it was uniquely harmed by the lock-up provision preventing it from selling its Gerova shares on the market.

First, Stillwater contends that all holders of Gerova stock were victims within the meaning of the MVRA.  (Stillwater Mem., April 17, 2017, Dkt. 405-1 at 21.)  Stillwater challenges the government's contention that restitution would be impractical, citing cases with greater overall losses and greater numbers of victims.  (Stillwater Reply, May 3, 2017 Dkt. 408-1 at 7-8.)  Stillwater contends that when the number of victims makes restitution to all victims impractical, "the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings."  (Id. at 9 (citing Rigas, 409 F.3d at 561) (emphasis omitted).)

Alternatively, Stillwater argues that even if restitution is not required for all Gerova shareholders under the MVRA, Stillwater is nonetheless entitled to restitution.  Stillwater contends that "[o]btaining Stillwater's assets was the primary and essential mechanism through which the defendants executed their scheme to defraud." (Stillwater Mem. at 7.)  According to Stillwater, this transfer of assets was in furtherance of the conspiracy.  (Id.)  Stillwater claims that its holdings in Gerova, which were subject to a lock-up provision restricting their sale while the fraud was being committed, distinguishes Stillwater's losses from those of Gerova shareholders generally.  (Id.)  Stillwater argues that this lock-up provision indicates that Gerova's acquisition of Stillwater's assets was part of the fraudulent scheme from the beginning.

(Id.)  Stillwater maintains that while the defendants were selling Gerova shares on the open market, they promoted the company using the value of Stillwater's assets.  (Id. at 8.)

Wimbledon's submission largely raises the same arguments articulated by Stillwater.  Additionally, Wimbledon claims that the defendants misappropriated $4.3 million from Wimbledon's account, dividing the funds between one of the investment advisors participating in the scheme and an account controlled by Hirst.  (Wimbledon Mem., April 13, 2017, Dkt. 402-1 at 16.)  Further, Wimbledon claims that the defendants caused Wimbledon to enter into an unwind of the Wimbledon-Gerova transaction in which the defendants stole an additional $5 million.  (Id.)

## II. Jason Galanis' Objections Lack Merit.

Jason Galanis argues that the government has failed to establish the direct and proximate cause element necessary to order restitution, and questions whether the victims' losses alleged by the government actually occurred.  (Jason Galanis Supp. Sentencing Mem., Dkt. 401 at 2.)  He also takes issue with the government's restitution figure, though does not specify his objection.  (Id. at 3.)  These objections lack merit.  The evidence presented at the Hirst trial and the admissions that Jason Galanis made in connection with his guilty plea demonstrate that Jason Galanis was both a but-for and proximate cause of Tagliaferri's clients' losses.  The governments' loss calculation is well within the acceptable range of what need not be a "mathematically precise" determination, but only a "reasonable approximation of losses supported by a sound methodology."  United States v. Gushlak, 728 F.3d 184, 195-96 (2d Cir. 2013).  The Court finds that the government has proven causation and a reasonable approximation of losses by a preponderance of the evidence.

> III.   Stillwater and Wimbledon are not entitled to Restitution as Gerova Shareholders.

Members of this conspiracy caused Gerova to fraudulently issue over 5 million shares to Shahini, which diluted shareholders' holdings. The dilution in their Gerova holdings resulted in a loss of value of those holdings. No party has presented evidence as to the number of Gerova shareholders at the time of the issuance of the Shahini shares or at the time Gerova was delisted from the NYSE. Gerova was a publically-traded company with millions of shares outstanding.

As the Second Circuit has stated, "Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof . . . ." United States v. Reifler, 446 F.3d 65, 136 (2d Cir. 2006). The exceptions to mandatory restitution under the MVRA provided for in 18 U.S.C. 3663A(c)(B)(3) "reflect[] Congress's intention that the process of determining an appropriate order of restitution be 'streamlined,'" id. at 137 (quoting Senate Report at 20, 21, reprinted in 1996 U.S.C.C.A.N. at 933, 934), and "that the restitution 'determination be made quickly,'" id. (quoting Senate Report at 20, reprinted in 1996 U.S.C.C.A.N. at 933). A district court is called upon to exercise its discretion in making determinations relating to restitution. See e.g., Gushlak, 728 F.3d at 192 ("the statute explicitly contemplates that the district court weigh against the burden of ordering restitution the victims' interests in receiving restitution," and "commits the balancing to the district court's discretion"); United States v. McMillan, 600 F.3d 434, 459-60 (5th Cir. 2010) ("Because we conclude that the district court did not err in determining that the amount of the loss attributable to the defendants' fraud could not reasonably be determined, the district court did not abuse its discretion by finding restitution inapplicable.")

The Court finds that Gerova shareholders who were harmed by the dilution of their holdings resulting from the fraudulent issuance of shares to Shahini are excepted from

mandatory restitution under the MVRA.  Determining complex issues of fact related to the amount of these victims' losses would significantly complicate and prolong sentencing.  The need to provide restitution to these victims is outweighed by the burdens such restitution would impose on the sentencing process.

        The issuance of shares to Shahini did not directly cause a decrease in the share price of Gerova Stock.  On May 27, 2010, the day that Shahini received the shares, trading ended with Gerova's share price at $67.80.  GVFG US Equity, Performance Details, Bloomberg Law, https://www.bloomberglaw.com/company/performance/ticker/GVFG%20US%20Equity ("Bloomberg Performance Details").  The share price decreased over the next several days to $62.00 on June 1, 2010.  Id.  However, from that point in time the share price consistently rose until it reached $78.53 on June 7.  Id.  The price then fluctuated between $86.25 and $61.45 until June 24.  Id.  Starting June 25 the price declined precipitously, bottoming out at $24.45 on July 2.  Id.  Between June 14, 2010, and June 29, 2010, defendants sold over $6.8 million worth of the Gerova stock that had been issued to Shahini.  (Presentence Investigation Report of Jason Galanis, January 30, 2017, Dkt. 366 at 14.)

        The board of directors was not asked to ratify the issuance of shares to Shahini until October 6, 2010.  (Id. at 13.)  At the close of business on October 6 the shares were trading at $24.90.  Bloomberg Performance Details.  After October 6 the share price of Gerova gradually increased for the next month, reaching $34 on November 8 and 9.  Id.  Between November 10, 2010, and January 14, 2011, the price ranged from $33.75 to $20.26.  Id.  After January 14, 2011, Gerova's share price declined until trading was halted on February 23.  (Presentence Investigation Report of Jason Galanis at 16.)  The stock price of Gerova did not reach a zero value until November 2, 2011.  (Id.)

A determination of damages for the holders of millions of shares of Gerova stock would be complex and prolong the sentencing process.  It is undisputed that defendants' fraudulent scheme diluted the holdings of all of Gerova's shareholders.  However, the calculation of a loss of value to a disparate array of shareholders poses practical problems.  A variety of factors impacted the value of Gerova stock in addition to the dilution caused by the fraudulent issuance of shares to Shahini: negative news coverage regarding Jason Galanis' connection to Gerova and his past history with securities fraud, as well as Gerova's failure to file financial statements with the SEC.  Additional factors that may have impacted the value of Gerova's share price are normal volatility in the market, broad trends affecting the financial services and reinsurance industry, and other factors beyond the scope of the Court's expertise.  To separate these confounding variables from the effect that dilution from the Shahini issuance had on Gerova's share price, an expert witness would need to be paid tens of thousands of dollars (or likely much more) to engage in a regression analysis.  None of the proposals submitted by Stillwater adequately account for potential alternate causes in the decline of Gerova's share price.

The difficulties in constructing a proper and admissible regression analysis were laid out by Judge Oetken of this Court in the case of Reed Constr. Data Inc. v. McGraw-Hill Cos.:

> First, to be admissible, a regression analysis must examine an appropriate selection of data.  When constructing a benchmark statistic, the regression analyst may not cherry-pick the time-frame or data points so as to make her ultimate conclusion stronger. . . . Second, to be admissible, a regression analysis must be the product of a consistently followed methodology. . . .  [A] regression analyst [would need] to create a benchmark model of defendants' stock prices against which to measure the volatility of the prices on the event days. . . .  Finally, to be admissible, a regression analysis must control for the major factors that might influence the

>dependent variable. . . . [A] regression that excludes major variables is inadmissible while a regression that excludes other potentially important ones may not be.

49 F. Supp. 3d 385, 400-01 (S.D.N.Y. 2014) (internal citations and quotation marks excluded).

The construction of a proper and admissible regression analysis is not the only obstacle. The Second Circuit's opinion in Reifler, also a securities fraud prosecution, is instructive. The Second Circuit noted the difficulties in calculating restitution to victims of a securities fraud who suffered losses from decreases in share price, and encouraged the district court to consider whether such victims were excepted from mandatory restitution under 18 U.S.C. 3663A(c)(B)(3) due to those difficulties. See Reifler, 446 F.3d at 138-39.

First, the Court noted, no evidence was presented as to which individuals harmed by the securities fraud were buyers or sellers, rather than holders, of the relevant shares. Id. at 135-36. An individual holding a security, who neither bought nor sold it during the time period during which the fraud was ongoing, would not be entitled to recovery against defendants in a civil action brought under § 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5. See id. at 136 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749 (1975)). In Reifler, the Court reasoned that the language and legislative history of the MVRA suggested that restitution was not "mandatory in a criminal proceeding for a person who would have no right to recover in a civil action." Id. at 137. Second, even if the Court assumed that nonselling shareholders were victims under the MVRA, "the MVRA provision governing the calculation of loss is not easily applied in this case," because of ambiguity in the statute as to which date is to be used to determine the share price which is itself used in the calculation of the value of the loss. Id.

"[A] sentencing court's discretion, when fashioning a restitution award . . . is necessarily circumscribed by an important caveat: the MVRA does not permit awards 'in excess of the amount of the [victim's] loss.'" United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006) (quoting United States v. Nucci, 364 F.3d 419, 423 (2d Cir. 2004)) (alteration in original). Courts violate this rule where the ordered restitution would provide the victim with a windfall that puts the victim in a better position than they would have been but for the defendant's crime. See id. (district court abused its discretion by using a nominal sale price for recouped property to measure offset value). This principle is embodied in the requirement that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in" a federal proceeding or a state proceeding to the extent provided by the law of that state. 18 U.S.C. § 3664(j)(2).

Any recovery to Gerova shareholders would necessarily be offset against recovery to the same person in the numerous civil actions against Gerova and several of the defendants. The Judicial Panel on Multidistrict Litigation entered a transfer order on October 6, 2011, transferring various actions against Gerova and others to Judge Shira A. Scheindlin of this Court. (In re: Gerova Financial Group, Ltd. Securities Litigation, 11-md-2275, Dkt. 1.) This litigation resulted in a stipulation of agreement and settlement of claims against Gerova, Hirst, and certain Stillwater entities, by a class of all persons who purchased or otherwise acquired Gerova securities from January 8, 2010 through February 23, 2011, excepting officers and directors of Gerova and affiliated persons. (11-md-2275, Dkt. 73 at 16, 19.) The settlement was approved by the Court on June 10, 2014. (11-md-2275, Dkt. 103.) The need to calculate offsets weighs in favor of finding that complex issues of fact related to the amount of the victims' losses would impose burdens on the sentencing process and prolong it. "Congress did not want sentencing to

become a forum for determination of issues better suited to civil proceedings." United States v. Akande, 200 F.3d 136, 141 (3d Cir. 1999) (citing Senate Report at 18, reprinted in 1996 U.S.C.C.A.N. 924, 931).

It is now approaching a year since the guilty pleas of most of the defendants, and several months since their sentencings. Determining the amount of the loss suffered by all Gerova shareholders from the dilution of their holdings resulting from the fraudulent Shahini issuance, and the accompanying setoff recoveries from settled civil actions, would impose a heavy burden on the sentencing process and prolong the process for an indefinite period of time. The Court finds that restitution to each Gerova shareholder for losses stemming from the dilution of their holdings falls under the exceptions to mandatory restitution in the MVRA found in 18 U.S.C. § 3663A(c)(B)(3).

> IV. Stillwater and Wimbledon are not entitled to Restitution for the Assets they contributed to the Formation of Gerova.

The MVRA defines victims as not only including a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," but also, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

Thus restitution may be ordered where a victim's losses were caused by the mechanism by which a defendant profited from his fraudulent scheme, even though that mechanism was separate from the charged conduct. See United States v. Archer, 671 F.3d 149, 171-72 (2d Cir. 2011) (restitution available to victim clients who paid legal fees to attorney convicted of filing false visa applications). Restitution may also be ordered where the conduct underlying the defendant's offense facilitated the victims' loss. See United States v. Bengis, 631

F.3d 33, 40-41 (2d Cir. 2011) (defendant who conspired to import lobsters harvested in violation of South African law required to pay restitution to South Africa for harm caused by the illegal harvesting, where defendant's conduct of "off-loading the overharvested lobster at night, under-reporting catch amounts to South African authorities, bribing officials, and submitting false export documents" facilitated such harm).

However, "courts have held that a defendant may not be ordered to pay restitution for losses unrelated to the acts for which he was convicted. The conduct underlying the offense of conviction thus stakes out the boundaries of the restitutionary authority." Akande, 200 F.3d at 141 (internal citation omitted). The Second Circuit has found that "the requirement that the harm have been proximately caused [is] a reflection of Congress's interest in maintaining efficiency in the sentencing process, as the term proximate cause is sometimes used to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient." Reifler, 446 F.3d at 135 (internal quotation marks and emphasis omitted). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

Stillwater argues that restitution is appropriate in the amount of the total value of the assets that were transferred to Gerova at that company's formation. It asserts that defendants intended at the time for such transfer to further their scheme to profit from the fraudulent issuance of shares to Shahini.

Stillwater points to statements the government made outside the presence of the jury at the Hirst trial, in the context of an evidentiary objection, to support its position. (Hirst Trial Transcript, September 13, 2016 at 86-92.) However, the indictment to which Jason, John,

and Derek pled guilty does not charge that the acquisition of the Stillwater or Wimbledon assets was part of the conspiracy to fraudulently issue shares to Shahini. Nor does it charge that the assets were fraudulently obtained. Stillwater fails to explain how stray comments made at trial outside the presence of the jury could possibly cause the jury's verdict in the Hirst case to encompass an alleged conspiracy that was neither charged nor presented to the jury, nor how this would affect the guilty pleas.

Stillwater and Wimbledon's losses resulting from the transfer of assets to Gerova at Gerova's formation were not directly and proximately caused by the issuance of shares to Shahini two years later. The core scheme had not been hatched at the time of the transfer. This initial acquisition of assets was not part of the scheme or conspiracy to which any defendant has pled guilty. The transfer of assets was not a mechanism by which the defendants used to profit from the fraudulent issuance of shares to Shahini. Its relationship to the scheme was incidental. The defendants profited by selling the Shahini shares on the market, and then in match trading with corrupt investment advisors.

Stillwater and Wimbledon are in the same position as all Gerova shareholders, who suffered losses from the dilution of their holdings. For the reasons discussed above, individuals or entities who are victims simply as a result of their ownership of Gerova stock at the time of the fraudulent issuance of shares to Shahini are not entitled to restitution. It is undisputed that without Gerova's acquisition of assets, the fraudulent scheme could never have come to fruition. But just because the acquisition of assets was a but-for cause of Gerova's loss, and necessary for the scheme to work, does not mean that it was part of the scheme or conspiracy. The acquisition occurred two years before any shares were issued to Shahini. Neither the fraudulent issuance of shares, nor the sale of those shares for the profit of the

defendants, was inextricably entwined with Gerova's original acquisition of assets from Stillwater and Wimbledon.

Based on the evidence before the Court, the Court cannot conclude that Gerova's acquisition of assets from Stillwater and Wimbledon at its formation was part of the scheme or conspiracy for which defendants were convicted. Neither are Wimbledon's claims that as part of the conspiracy Jason Galanis and Gary Hirst "siphoned funds for their own purposes," and appropriated further assets through a fraudulent unwind transaction, borne out by the record. (Wimbledon Mem. at 16.) No such actions are alleged in the Indictment and no proof of these actions was put forth at Gary Hirst's trial.

The losses suffered by Stillwater and Wimbledon do not set them apart from shareholders of Gerova generally. While Stillwater and Wimbledon held shares that they were unable to trade, ultimately they suffered the same losses as the rest of the Gerova shareholders due to the dilution of their holdings caused by the fraudulent issuance of shares to Shahini. As described above, restitution is not appropriate for these victims, and thus restitution is not appropriate for Stillwater or Wimbledon.

CONCLUSION

The Court will enter the Orders of Restitution proposed by the government. For the reasons stated, Stillwater and Wimbledon's requests for restitution are DENIED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
May 16, 2017