*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 28, 2017

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Daniel Patrick Moynihan Federal Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re:    <u>United States v. Gary Hirst</u>
              15 Cr. 643 (PKC)

Dear Judge Castel:

      The Government writes in brief response to the defendant's July 21, 2017 letter in which he (i) urges the Court to impose no forfeiture arguing that joint and several forfeiture is unavailable in light of the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), and that, in any event, forfeiture is inappropriate because the defendant purportedly received no fraudulent proceeds; and (ii) urging the Court to disregard the indisputably applicable enhancement arising from the defendant's role as an officer or director of a public company. The Court should reject each of the defendant's arguments. The *Honeycutt* decision pertained solely to forfeiture under the drug trafficking statutes and does not implicate securities and wire fraud – the crimes of which Hirst was convicted. Even if Hirst were not liable for the forfeiture of the full fraud proceeds – and he is – he is indisputably liable for forfeiture of the $2.62 million he personally received. Lastly, the defendant's role as an officer or director of a public company – a role he abused when he stole tens of millions of dollars in shares from his own company– should be given significant weight in crafting an appropriate sentence because such an extreme abuse of trust merits a harsher sentence than others who had an otherwise similar role in the fraud.

      I.    *Honeycutt* is Inapplicable to the Offenses of Conviction

      Hirst argues that, as a result of the Supreme Court's *Honeycutt* decision, he cannot be held jointly and severally liable for the criminal proceeds obtained by his co-defendants. (Def. Sub. at 1-5). Hirst is wrong. *Honeycutt* applies only to the forfeiture statute applicable to drug offenses, and not to the forfeiture statute at issue in this case. Additionally, given the different statutory language contained in the forfeiture statute at issue in *Honeycutt* and the forfeiture statute applicable here, the logic of *Honeycutt* does not extend to the forfeiture statute applicable to Hirst. Finally, *Honeycutt* did not purport to overrule the Second Circuit's precedents providing for joint and several forfeiture liability under the forfeiture statute at issue in this case. This Court remains bound by those precedents.

a. The Supreme Court's Honeycutt Decision

In *Honeycutt*, the Supreme Court addressed whether the forfeiture statute for federal drug offenses, 21 U.S.C. § 853, provided for joint and several forfeiture liability. 137 S. Ct. at 1630. The Supreme Court held that it did not. *Id.* Section 853(a) provides for the forfeiture of, among other things, "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" certain drug crimes. *Id.* Focusing on dictionary definitions of the word "obtain," the Court held that the statute contemplated that a defendant forfeit only tainted property that came into that defendant's possession, and not property obtained by other participants in the crime. *Id.* at 1632-33. The Court found that its conclusion that Section 853 does not provide for joint and several forfeiture liability was consistent with other statutory provisions of Section 853, including Section 853(d)'s presumption that property is forfeitable if the Government establishes that it was "acquired" by the defendant during the period of the offense and Section 853(p)'s allowance for the forfeiture of substitute assets when property specifically described in Section 853(a) is not forfeitable. *Id.* at 1634-35.

b. Application

In *Honeycutt*, the Court interpreted the forfeiture statute applicable to federal drug offenses – Section 853 – and concluded that that statute did not contemplate joint and several forfeiture liability. Here, however, the Government is not seeking forfeiture pursuant to Section 853, but instead pursuant to a different forfeiture provision, 18 U.S.C. § 981. *Honeycutt*, by its terms, did not hold that joint and several liability was unavailable under Section 981.

Indeed, the logic of *Honeycutt* does not extend to forfeiture under Section 981. The property forfeitable under Section 981 is different than that forfeitable under Section 853. In particular, while Section 853 defines forfeitable property to include "any property constituting, or derived from, any proceeds the person *obtained*, directly or indirectly, as the result of" the federal drug crime, 21 U.S.C. § 853(a)(1) (emphasis added), Section 981 makes forfeitable "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense," 18 U.S.C. § 981(a)(1)(C).[1] Thus, while forfeitable property under Section 853 is confined to property "obtained" by the defendant in question as a result of the offense, thus rendering joint and several forfeiture liability unavailable, Section 981 contains no similar limitation and does not use the word "obtained." Instead, Section 981 makes forfeitable "*any* property" "which constitutes or is derived from proceeds traceable" to the offense in question. The lack of the word "obtained" in Section 981 shows that Section 981's statutory reach is not limited solely to property acquired or obtained by the defendant in question, but instead reaches all proceeds of the offense. Joint and several forfeiture liability under Section 981, even in the face of *Honeycutt*, remains appropriate.

Further, *Honeycutt* did not purport to overrule any lower court decisions interpreting forfeiture statutes other than Section 853. As a result, the Second Circuit's precedents interpreting

---

[1] The forfeiture allegation in the Indictment against Hirst specifically cites Section 981(a)(1)(C).

Section 981 – which provide for joint and several forfeiture liability – are still binding upon this Court. *See United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) ("This general rule is somewhat modified by the principle that a court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant. . . . The extension of forfeiture to proceeds received by actors in concert with a defendant may be deemed to be based on the view that the proceeds of a crime jointly committed are within the possessory rights of each concerted actor, i.e. are 'acquired' jointly by them and distributed according to a joint decision."); *United States v. Jiau*, 624 F. App'x 771, 773 (2d Cir. 2015) ("But there is no requirement that an individual defendant take actual control of the illicit proceeds, because 'the property [need only] have, at some point, been under defendant's control *or the control of his co-conspirators* in order to be considered "acquired" by him.'" (emphasis in original) (citing *Contorinis*, 692 F.3d at 147)); *United States v. Capoccia*, 402 F. App'x 639, 640 (2d Cir. 2010) ("Thus, property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture."); *see also Cartica Mgmt. LLC v. Corpbanca S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y. 2014) (Castel, J.) ("District courts and other inferior courts are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law.") (citing *United States v. Moreno*, 94 Cr. 165 (SS), 2000 WL 1843232, at * 5 (S.D.N.Y. Dec. 5, 2000) (Sotomayor, J.)). Because this Court remains bound by the Second Circuit's Section 981 precedents, including *Contorinis*, which require the imposition of joint and several liability under Section 981, joint and several forfeiture liability must be imposed in this case. Hirst should be required to forfeit the entirety of the proceeds of his offense of conviction, which were 19,038,650.53.[2]

II. Hirst Personally Received $2.6 Million That Must be Forfeited

a. Factual Background

The evidence at trial clearly established that Hirst received $2.62 million of the proceeds of the sales of the Shahini shares. As the Court will recall, following Hirst's fraudulent issuance of the Shahini shares (the "Shares"), the Shares were deposited into a series of brokerage accounts including a brokerage account at CK Cooper. Following the Shares' deposit at CK Cooper, nearly $10 million of shares were sold from the CK Cooper Account. (GX 906).[3] On June 22, 2010, approximately $2.62 million of that money was transferred to an account in the name of Taurus Global, which – as even the defendant now concedes – was an account controlled by Hirst. (GX 906).

Hirst transferred the $2.62 million twice more that day. First, Hirst transferred the money to another account he controlled in the name of Global Asset/Pennine Investors Ltd ("Global

---

[2] Hirst's co-defendants – Jason Galanis, Derek Galanis and John Galanis – were each ordered to forfeit, jointly and severally, $19,038,650.53. Thus, to permit Hirst to forfeit anything less than the full fraud proceeds would give him an unfair windfall at the expense of his co-defendants.

[3] "GX" refers to Government exhibits admitted into evidence at Hirst's trial; "Tr." refers to the transcript of that trial.

Asset Account"). (GX 906).[4]  Immediately thereafter, Hirst transferred the money from the Global Asset Account to a Swiss bank account affiliated with Weston. (GX 906). At trial, the Government established the purpose of these transfers: In June 2010, Hirst owed money to Weston because Weston had invested $5 million in Hirst's hedge fund, the Global Asset Fund. Albert Hallac, who ran Weston, had demanded repayment of Weston's investment, but Hirst had only returned a part of the money.  As a result, on June 22, 2010, Hirst still owed Weston $2.62 million. Thus, when Hirst received the proceeds of the Shares, he used the money for his own important purpose – to repay an existing debt.

Hirst attempts to elide this fact by describing the $2.62 million transaction as a transaction in which "the funds were transferred by Jason Galanis to a Swiss bank account owned by Weston Capital . . . and [] the money only fleetingly passed through an account over which Mr. Hirst had signatory authority." (Def. Sub. at 4).  But this characterization grossly understates Hirst's connection to, and responsibility for both Taurus Global and Global Asset and their bank accounts.  In an email admitted into evidence at trial, Hirst described both Taurus Global and Global Asset as being *his* Cayman Island hedge funds.  (GX 540) (emphasis added). Albert Hallac testified that Weston made its $5 million investment into Global Asset after Jason Galanis asked Hallac to "invest in Mr. Hirst's fund called the Global Asset Fund" and told Hallac that Hirst was the chief investment officer of the fund. (Tr. 1168; 1172). In addition, documentary evidence introduced at trial established that Hirst was both the joint owner and *sole* signatory of both the Taurus Global and Global Asset Accounts, (GX 423; 418), and served as both the investment manager and the President of Global Asset. (GX 419; 1210).  Email correspondence and other documentary evidence made clear that it was Hirst with whom Weston corresponded about Weston's investment in Hirst's fund, including Weston's redemption request, and Hirst who guaranteed that the investment was protected against loss. (GX 540, 542; Tr. 1174-1177).  Finally, it was Hirst himself who directed that the money be wired to Weston's Swiss bank account. (GX 543; Tr. 1187).  It is simply inaccurate to describe the transfer to the Weston account as being done by "Jason Galanis," when the funds were first placed in an account Hirst controlled, transferred to a different account Hirst controlled and then finally transferred, at Hirst's initiation, to Weston's Swiss bank account.

    b.  Argument

In the course of a successful criminal securities fraud prosecution, a district court can order the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation." *United States v. Controrinis*, 692 F.3d at 145  (citing 18 U.S.C. § 981(a)(1)(C)).[5] Criminal forfeiture focuses on the disgorgement by a defendant of his

---

[4] Pennine Investors Ltd subsequently changed its name to Global Asset.  We refer to the entity through this letter as "Global Asset."

[5] Section 981(a)(1)(C) allows a court to order forfeiture for "any offense constituting 'specified unlawful activity' [ ]as defined in [18 U.S.C. § ] 1956(c)(7)." Section 1956(c)(7)(A) incorporates "any act or activity constituting an offense listed in [18 U.S.C. § ] 1961(1)." And § 1961(1)(D) lists "any offense involving ... fraud in the sale of securities." While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c).

"ill-gotten gains." *United States v. Kalish,* 626 F.3d 165, 170 (2d Cir. 2010) (citing *United States v. Emerson,* 128 F.3d 557, 566 (7th Cir. 1997); *United States v. Various Computers & Computer Equip.,* 82 F.3d 582, 588 (3d Cir. 1996)). Thus – leaving aside issues of joint and several liability - the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain. *United States v. Controrinis*, 692 F.3d 136, 146-47 (citations omitted). "Because criminal forfeiture is viewed as part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence." *United States v. Gaskin,* 364 F.3d 438, 461 (2d Cir. 2004) (internal citations omitted).

The defendant appears to argue that the Government cannot forfeit the $2.62 million of Shahini proceeds he received because (i) he had only temporary possession of them; (ii) there is "no evidence" that the defendant understood the funds to be ill-gotten gains; and (iii) there is no evidence that the defendant "dissipated the funds knowingly." These arguments each fail.

The defendant cites no cases – and the Government is aware of none – holding that a defendant must *retain* possession of his illicit profits in order to be responsible for forfeiting those funds. To the contrary, the law is clear that a defendant's choice to share or transfer his illicit profits is of no moment. *United States v. Ohle*, 441 F.App'x 798, 803 (2d Cir. 2011) (the defendant's "challenge to the order that he forfeit $255,000 appears to rest on the mistaken premise that he can only be required to forfeit fraud proceeds that he personally kept. To the contrary, 18 U.S.C. § 981(a)(1)(C) authorizes forfeiture of illicit proceeds "whether kept by the defendant or shared with others") (citing *United States v. Uddin,* 551 F.3d 176, 181 (2d Cir.2009)). Thus, the fact that the defendant waited only hours, rather than days, weeks, or years, before using his illicit profits to repay a debt is simply irrelevant.

The defendant also makes much of his claim that the Government has allegedly failed to prove that the defendant understood the $2.62 million to be ill-gotten gains. Again, the defendant cites not a single case in support of his argument that the Government need prove his specific knowledge of the source of the illicit proceeds. To the contrary, in order to render forfeiture appropriate, the Government must show only that the property subject to forfeiture constitutes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the defendant's offense of conviction. Here, there can be little legitimate dispute that the $2.62 million was property which constituted proceeds traceable to the offense of conviction. As detailed in the Indictment, proven at trial, and not now seriously contested by the defendant, the defendant participated in a large-scale securities fraud in which the defendant fraudulently issued shares of Gerova stock to his coconspirators for no legitimate purpose. The defendant also does not and could not dispute that the $2.62 million he received was, in fact, proceeds of that fraudulent scheme. This then, is sufficient for the Court to find that forfeiture of the $2.62 million is appropriate.

Even if the Government needed to prove that Hirst knew that the $2.62 million were proceeds of the Gerova fraud – and it need not – it could amply satisfy its burden to do so by a

---

This roundabout statutory mechanism allows a court to order forfeiture in criminal securities fraud proceedings.

preponderance of the evidence.  As referenced above, the Government established beyond a reasonable doubt that Hirst abdicated his obligations to Gerova by fraudulently issuing more than $72 million of Gerova shares for the benefit of the members of conspiracy and then engaged in efforts to cover up the fraud, including by backdating fraudulent documents.  It is similarly undisputed that the $2.62 million did in fact constitutes proceeds of the fraudulently issued Shahini shares.  On this basis alone, the Court can infer that Hirst understood the $2.62 million to be his share of the fraudulent proceeds.  To find otherwise, the Court would have to believe that Hirst abdicated his responsibility to Gerova shareholders, stole millions of Gerova shares, took steps to paper over his crime and did so without any expectation of sharing in the criminal proceeds. The Court would further need to believe that after gifting Jason Galanis with millions of dollars in Gerova shares, Jason Galanis completely unrelatedly gifted Hirst with $2.62 million.  Such inferences strain credulity.  The far more obvious inference and the one which the Court should find here is that Hirst undertook an enormous risk in return for the promise of a significant financial benefit and that he understood the $2.62 million to be his share of the fraudulent proceeds.[6]

       The defendant's third argument – that the Government cannot show that he knowingly dissipated the funds for the purpose of hiding the assets from the Government, implicates the substitute assets provision of the forfeiture laws.  Title 21, United States Code, Section 853(p) provides that, if "as a result of any act or omission of the defendant" any property:

> (A) cannot be located upon the exercise of due diligence;
> (B) has been transferred or sold to, or deposited with, a third party;
> (C) has been placed beyond the jurisdiction of the court;
> (D) has been substantially diminished in value; or
> (E) has been commingled with other property which cannot be divided without difficulty

---

[6] For the same reason, the Court should reject out of hand the defendant's claim that he could be considered a "bona fide purchaser of value . . . who at the time of the purchase was reasonably without cause to know that the funds were subject to forfeiture." (Def. Sub at 4). Title 21, United States Code, Section 853(c) provides that "right, title, and interest" in forfeitable property, "vests in the United States upon the commission of the act giving rise to forfeiture under this section" and may be forfeited even if it has been transferred to a third party, unless the third party can establish that "he is a bona fide purchaser for value of such property who at the time of the purchase was reasonably without cause to believe that the property was subject to forfeiture." The defendant seems to argue that Galanis was the owner of the assets subject to forfeiture and that when Galanis transferred the $2.62 million to Hirst, Hirst received it as a bona fide purchaser.  As a preliminary matter, as Hirst is not a "purchaser for value" of the $2.62 million.  But even if he was, Hirst cannot establish that was reasonably without cause to believe that the property was subject to forfeiture because he was aware both that he was a participant in a large scale fraud with Galanis and that Galanis had transferred the money to him.

the "court shall order the forfeiture of any other property of the defendant, up to the value of any property" so transferred or moved by the defendant.

Here too, the defendant creates legal requirements out of whole cloth. The defendant argues that the government may not obtain a forfeiture judgment against Hirst for $2.62 million because "it cannot be said that Mr. Hirst 'bears responsibility' for the dissipation of the funds, as the transfer was unwitting, and not done to prevent recovery by the government." (Def. Sub. At 4).[7] But this is not the standard for the seizure of substitute assets. It is sufficient for the Government to show that as the result of an act or omission of the defendant, the asset subject to forfeiture has been either transferred to a third party or placed beyond the jurisdiction of the court. Here, both are true. The defendant directed the wire transfer that transferred the $2.62 million from a bank account he controlled to a bank account in Switzerland. It was thus the defendant's own act that caused the transfer of the asset, while simultaneously placing it beyond the jurisdiction of this Court. To put it another way, it is clearly the defendant who bears responsibility for the dissipation of the asset and his description of his participation in the transfer as "unwitting" is baffling. With respect to the defendant's claim that the transfer's purpose was not done to prevent recovery by the Government, that claim is likely true. As described above, the purpose of the transfer was to repay a debt. But there is simply no statutory or other requirement that the transfer of an asset be done with the purpose to prevent recovery by the Government. Whatever its purpose, a defendant cannot escape forfeiture simply by transferring an asset to another.

### III. Hirst's Role as an Officer or Director of Gerova Mandates a More Significant Sentence

The defendant concedes that he is subject to an additional four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(19) because Hirst was an officer or director of a public company. He nonetheless argues that the Court should not increase his sentence on that basis because (i) the enhancement was not the product of the Sentencing Commission's empirical study and analysis; (ii) the enhancement should be discounted because it was "all but inherent to

---

[7] The defendant also seems to place great weight on language in *Honeycutt*, stating that the "substitute asset provision authorizes the confiscation of 'assets only from the defendant who initially acquired the property and who bears responsibility for its dissipation.'" (Def. Sub at 4) (citing, *Honeycutt*, 137 S.Ct. at 1634.) The defendant appears to argue that because Jason Galanis arguably received the fraudulent proceeds and only then transferred them to Hirst that Hirst was not the one who "initially" received the proceeds. This is plainly not the meaning of *Honeycutt*. To the contrary, the Honeycutt decision makes frequent use of a hypothetical farmer who masterminds "a scheme to grow, harvest and distribute marijuana" and who "recruits a college student to deliver packages and pays the student $300 each month from the distribution proceeds for his services." *Honeycutt*, 137 S. Ct. at 1631-32. The Court makes clear that while the college student may not be ordered to forfeit the total proceeds of the farmer's scheme, the college student must indisputably forfeit his $300 per month. If *Honeycutt* applies here – and it does not – it makes clear that to the extent mastermind Jason Galanis paid "college student" Hirst his $300 (or $2.62 million) cut, that money was plainly "initially received" by Hirst and may be forfeited.

the crime of conviction;" (iii) because its use constitutes a "piling on" of enhancements; and (iv) because the "shadow Guidelines" would yield a Guidelines range of only 33 to 41 months.[8]

In the present case, however, a sentencing increase resulting from Hirst's role as the President and Chairman of Gerova's Board of Directors is amply supported. No empirical study is necessary to determine that an officer or director, let alone the President and Chairman of the Board has special duties of loyalty and trust to the shareholders of his company. The violation of that trust and the pillaging of the very company to whom Hirst owed that loyalty is an especially egregious crime and one that is deserving of additional punishment. In this vein, Hirst's allegation that his role was "all but inherent to the crime of conviction" is simply without factual support. A vast array of securities frauds can be perpetrated without the participation of a company officer or director and many, if not most, perpetrators of securities fraud do not occupy such a role. Indeed, of the six defendants convicted in this very scheme, Hirst was the only one to whom such an enhancement is applicable. Nor is the addition of an enhancement based on Hirst's unique role a piling on of enhancements. The unique relationship of an officer or director to his company makes a violation of that loyalty all the more egregious and justifies a separate increase in sentence.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: /s/_____
Brian R. Blais
Rebecca Mermelstein
Assistant United States Attorneys
(212) 637-2521/2360

cc: Michael Tremonte, Esq. (By Email/ECF)
Justine Harris, Esq.
Noam Biale, Esq.

---

[8] With respect to the "shadow guidelines" – which have no force or effect here – the Government notes that the defendant's self-interested calculation relies on a claim that his culpability was "low," and that the "victim impact" was moderate – both characterizations the Government would dispute.